APPEAL,PROSE,TERMED

# U.S. District Court
## District of Wyoming (Casper)
## CIVIL DOCKET FOR CASE #: 1:23–cv–00003–SWS
### *Internal Use Only*

DeWilde v. United States Attorney General et al
Assigned to: Honorable Scott W Skavdahl
Referred to: Honorable Kelly H Rankin
 Case in other court:  USCA, 23–08054
Cause: 28:1331 Fed. Question

Date Filed: 01/06/2023
Date Terminated: 07/17/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Jake Stanley DeWilde**

represented by **Jake Stanley DeWilde**
PO Box 267
Wapiti, WY 82450
Email: jakedewilde@gmail.com
PRO SE

V.

**Defendant**

**United States Attorney General**
*in his official capacity*
*also known as*
Merrick Garland

represented by **Jeremy A Gross**
UNITED STATES ATTORNEY'S
OFFICE
PO Box 668
2120 Capitol Avenue, 4th Floor
Cheyenne, WY 82003–0668
307/772–2124
Fax: 307/772–2123
Email: jeremy.gross@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. B. Newman**
DEPARTMENT OF JUSTICE
1100 L Street NW
Washington, DC 20005
202–532–3114
Email: jeremy.s.newman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bureau of Alcohol Tobacco Firearms
and Explosives Director**
*in his official capacity*
*also known as*
Steven Dettelbach

represented by **Jeremy A Gross**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. B. Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2023 | 1 | COMPLAINT (1 summons issued) ( Filing fee $402 receipt #CSP 1–81.), filed by Jake Stanley DeWilde. (Attachments: # 1 Appendix A, # 2 Envelope) (Court Staff, stbd) (Entered: 01/06/2023) |
| 01/06/2023 | 2 | Summons Issued. (Court Staff, stbd) (Entered: 01/06/2023) |
| 01/06/2023 | 3 | Pro Se Electronic Notification Registration Form by Jake Stanley DeWilde. (Court Staff, stbd) (Entered: 01/06/2023) |
| 01/30/2023 | 4 | SUMMONS Returned Executed by Jake Stanley DeWilde. United States Attorney General served on 1/19/2023, answer due on 3/20/2023. Served through the United States Attorney General. (Attachments: # 1 envelope) (Court Staff, skb) (Main Document 4 replaced due to upside down page on 2/2/2023) (Court Staff, skb). (Entered: 01/30/2023) |
| 02/13/2023 | 5 | SUMMONS Returned Executed by Jake Stanley DeWilde. Bureau of Alcohol Tobacco Firearms and Explosives Director served on 1/30/2023, answer due on 3/31/2023. (Attachments: # 1 Envelope) (Court Staff, stbd) Modified text to reflect correct answer date of 60 days/NEF regenerated on 2/13/2023 (Court Staff, stbd). (Additional attachment(s) added on 2/14/2023: # 2 Certified Mail Receipt) (Court Staff, stbd). (Entered: 02/13/2023) |
| 03/08/2023 | 6 | NOTICE of Attorney Appearance by Jeremy A Gross on behalf of Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General (Gross, Jeremy) (Entered: 03/08/2023) |
| 03/08/2023 | 7 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Jeremy S. B. Newman to appear pro hac vice; Check not tendered; filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Attachments: # 1 Supplement Declaration of Jeremy S.B. Newman in Support of Motion for Admission Pro Hac Vice, # 2 Proposed Order Granting Motion for Admittance Pro Hac Vice)(Gross, Jeremy) Modified text on 3/10/2023 (Court Staff, skb). (Entered: 03/08/2023) |
| 03/08/2023 | 8 | ORDER by the Honorable Kelly H Rankin granting 7 MOTION for Jeremy S. B. Newman to appear pro hac vice filed by Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Court Staff, stbd) (Entered: 03/08/2023) |
| 03/13/2023 | 9 | MOTION to Dismiss *Complaint,* filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) Modified text on 3/20/2023 (Court Staff, skb). (Entered: 03/13/2023) |
| 03/13/2023 | 10 | MEMORANDUM in Support of 9 Motion to Dismiss, filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) (Entered: 03/13/2023) |
| 03/15/2023 | 11 | |

| | | |
|---|---|---|
| | | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Amend/Correct 1 Complaint filed by Plaintiff Jake Stanley DeWilde. (Attachments: # 1 Amended Complaint for Declaratory and Injunctive Relief, # 2 Envelope)(Court Staff, stbd) (Entered: 03/15/2023) |
| 03/16/2023 | 12 | RESPONSE to 11 Motion to Amend/Correct filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) (Entered: 03/16/2023) |
| 03/17/2023 | 13 | ORDER by the Honorable Kelly H Rankin granting 11 MOTION to Amend/Correct 1 Complaint. Plaintiff may file an Amended Complaint on or before March 24, 2023.(Court Staff, sjgc) (Entered: 03/17/2023) |
| 03/17/2023 | 14 | ORDER by the Honorable Scott W Skavdahl denying as moot 9 Motion to Dismiss. It is hereby ORDERED that Defendants' Motion to Dismiss (ECF No. 9 ) is DENIED AS MOOT without prejudice to refiling. (Court Staff, skb) (Entered: 03/17/2023) |
| 03/20/2023 | 15 | AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF against Defendant Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General, filed by Jake Stanley DeWilde. (Attachments: # 1 Envelope) (Court Staff, stbd) (Entered: 03/20/2023) |
| 04/03/2023 | 16 | MOTION to Dismiss *First Amended Complaint* filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) (Entered: 04/03/2023) |
| 04/03/2023 | 17 | MEMORANDUM in Support of 16 Motion to Dismiss filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) (Entered: 04/03/2023) |
| 04/07/2023 | 18 | MOTION for Leave to File Excess Pages regarding Response to Motion to Defendants' Dismiss Amended Complaint filed by Plaintiff Jake Stanley DeWilde. (Attachments: # 1 Proposed Order, # 2 envelope) (Court Staff, skb) (Entered: 04/07/2023) |
| 04/07/2023 | 19 | ORDER by the Honorable Scott W Skavdahl granting 18 Motion to File Excess Pages. It is hereby ORDERED that Plaintiff's Motion for Leave to File Brief in Excess of Page Limit (ECF No. 18 ) is GRANTED, to the extent Plaintiff may file a brief no more than thirty (30) pages, not including any Table of Contents or Table of Authorities, and Defendants may file a reply brief no more than fifteen (15) pages. (Court Staff, skb) (Entered: 04/07/2023) |
| 04/11/2023 | 20 | MOTION for Summary Judgment, filed by Plaintiff Jake Stanley DeWilde. (Attachments: # 1 Envelope)(Court Staff, stbd) (Entered: 04/11/2023) |
| 04/11/2023 | 21 | BRIEF IN OPPOSITION to 16 Motion to Dismiss Amended Complaint & Brief in Support of 20 Motion for Summary Judgment filed by Plaintiff Jake Stanley DeWilde. (Attachments: # 1 Exhibits A–H) (Court Staff, stbd) (Attachment 1 replaced to correct page orientation on 4/18/2023) (Court Staff, stbd). (Entered: 04/11/2023) |
| 04/13/2023 | 22 | MOTION for Leave to Submit Combined Briefing on Defendants' Motion to Dismiss and Plaintiff's Motion for Summary Judgment filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) Modified event and text on 4/13/2023 (Court Staff, skb). (Additional attachment(s) added on 4/13/2023: # 1 Proposed Order) (Court Staff, skb). (Entered: 04/13/2023) |

| 04/13/2023 | 23 | ORDER by the Honorable Scott W Skavdahl granting 22 Motion for Leave to Submit Combined Briefing on Defendants' Motion to Dismiss and Plaintiff's Motion for Summary Judgment. It is hereby ORDERED that Defendants' Motion for Leave to Submit Combined Briefing on Defendants' Motion to Dismiss and Plaintiff's Motion for Summary Judgment (ECF No. 22 ) is GRANTED. It is further ORDERED that Defendants' combined brief must be filed on or before April 25, 2023, and must separately address their legal arguments as to each pending motion respectively. (Court Staff, skb) (Entered: 04/13/2023) |
|---|---|---|
| 04/25/2023 | 24 | REPLY BRIEF in Support of 16 Motion to Dismiss, and in Opposition to 20 Motion for Summary Judgment filed by Defendants Bureau of Alcohol Tobacco Firearms and Explosives Director, United States Attorney General. (Newman, Jeremy) Modified text on 4/26/2023 (Court Staff, skb). (Entered: 04/25/2023) |
| 04/28/2023 | 25 | REPLY BRIEF In Support of 20 Motion for Summary Judgment filed by Plaintiff Jake Stanley DeWilde. (Attachments: # 1 Exhibit 1, # 2 Envelope) (Court Staff, stbd) Modified text to link correct Motion Reply Brief is supporting on 4/28/2023 /NEF regenerated. (Court Staff, stbd). (Entered: 04/28/2023) |
| 07/17/2023 | 26 | ORDER by the Honorable Scott W Skavdahl granting 16 Motion to Dismiss Amended Complaint; denying as moot 20 Motion for Summary Judgment. It is hereby ORDERED Plaintiff's Amended Complaint (ECF No. 15 ) is DISMISSED for lack of jurisdiction, Defendants' Motion to Dismiss the Amended Complaint (ECF No. 16 ) is HEREBY GRANTED. It is further ORDERED that Plaintiff's Motion for Summary Judgment (ECF No. 20 ) is DENIED AS MOOT. (Copy of Order sent to Plaintiff via U.S. Mail) (Court Staff, skb) (Entered: 07/17/2023) |
| 07/17/2023 | 27 | JUDGMENT in favor of Defendants against Plaintiff by the Honorable Scott W Skavdahl. (Copy of Judgment sent to Plaintiff via U.S. Mail) (Court Staff, skb)The AO133 Bill of Cost form is available at https://www.wyd.uscourts.gov/forms/bill−costs. (Copy of Judgment sent to Plaintiff via U.S. Mail) (Entered: 07/17/2023) |
| 07/28/2023 | 28 | NOTICE OF APPEAL as to 26 Order on Motion to Dismiss, Order on Motion for Summary Judgment & 27 Judgment, by Plaintiff Jake Stanley DeWilde. Filing fee $ 505 paid, receipt number CAS 1−252. (Attachments: # 1 Envelope) (Court Staff, stbd) (Entered: 07/31/2023) |
| 07/28/2023 | 29 | TRANSCRIPT REQUEST (No Transcripts Necessary) by Plaintiff Jake Stanley DeWilde re 28 Notice of Appeal. (Court Staff, stbd) (Entered: 07/31/2023) |
| 08/01/2023 | 30 | Preliminary Record of appeal sent to USCA and counsel re 28 Notice of Appeal (Court), **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, stbd) (Entered: 08/01/2023) |
| 08/01/2023 | 31 | Appeal Number **23−8054** received from USCA for 28 Notice of Appeal (Court), filed by Jake Stanley DeWilde. Notice of appearance due on 08/31/2023 for Jake Stanley DeWilde, and Notice of appearance due on 08/15/2023 for Director of Bureau of Alcohol, Tobacco, Firearms and Explosives and United States Attorney General. (Court Staff, stbd) (Entered: 08/01/2023) |

# United States District Court

for the

District of Wyoming

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2023 JAN -6  AM 11: 03

MARGARET BOTKINS, CLERK
CASPER

| | | |
|---|---|---|
| Jake Stanley DeWilde, Individually and as Trustee of the DEWILDE ARMS TRUST, | ) ) ) ) | Case No. 23 CV 03.5 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Attorney General Of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Jake Stanley DeWilde, Individually and as Trustee of the

DeWilde Arms Trust, and for his Complaint for Declaratory and Injunctive Relief states as

follows:

## INTRODUCTION

1.    This is an action seeking declaratory and injunctive relief from 18 U.S.C. § 922(o) and the implementing regulation 27 C.F.R. § 479.105(a). These statutory and regulatory provisions generally act as an unlawful *de facto* ban on the transfer or possession of a machinegun manufactured after May 19, 1986. By imposing such a ban on an entire class of weapons, the statutes and regulations exceed the power of the United States under Article I of the United States Constitution; and violate the Second Amendment rights of the Plaintiff.

2.    Plaintiff seeks declaratory and injunctive relief against the unconstitutional provisions contained in 18 U.S.C. § 922(o) and 27 C.F.R. § 479.105(a); declaring the ban on machineguns unconstitutional under the Second Amendment and in violation of Article I of the United States Constitution.

## PARTIES

3.    Plaintiff Jake Stanley DeWilde is an adult male citizen of the State of Wyoming and is the Trustee of the DeWilde Arms Trust.

4.    Defendant Merrick Garland is sued in his official capacity as the Attorney General of the United States of America. As Attorney General, Defendant Garland is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

5.    Defendant Steven Dettelbach is sued in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"). As Director of BATFE, Defendant Dettelbach is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

## BASIS FOR JURISDICTION

6.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1346, because this action arises under the Constitution and laws of the United States, and has jurisdiction to render declaratory relief under 28 U.S.C §§ 2201, 2202.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1402, because the Plaintiff resides in Wyoming, and the Defendants are agencies of the United States or officers thereof acting in their official capacity.

## FACTUAL ALLEGATIONS

8.      The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

9.      The Second Amendment confers "an individual right to keep and bear arms" *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, at 595.

10.     In *U.S. v. Miller*, 307 U.S. 174 (1939), Jack Miller was charged with violating the National Firearms Act by transporting in interstate commerce a shotgun having a barrel less than 18 inches in length that was not registered and that they did not possess a stamp-affixed written order for. The *Miller* opinion "assumes from the prologue that the Amendment was designed to preserve the militia, 307 U. S., at 178" *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008).

11.     In *Heller*, the court analyzed the *Miller* opinion, and determined that it was not a comprehensive analysis of the full scope of the Second Amendment. "The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard

from no one but the Government (reason enough, one would think, not to make that case the beginning and the end of this Court's consideration of the Second Amendment)." *Id.,* at 673. *Heller* emphasized the limited extent of analysis of the Second Amendment conducted in *Miller,* acknowledging that there was a lack of evidence to determine whether or not the weapon in question was "any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.,* at 622, and continued that "Beyond that, the opinion provided no explanation of the content of the right." *Id.*

12.     In *Heller*, the court directed that *Miller*'s phrase "ordinary military equipment" be read "in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U. S., at 179." *Id*., at 624. ""In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973))." *Id.,* at 624, 625.

13.     The M16 rifle, and its variants, are the standard small-arms weapons in common use by the United States military[1]. The M16 is the quintessential rifle for use in the modern militia, just as the musket was the quintessential rifle for use in the militia of the colonial and revolutionary war era.

---

[1] *M16 Rifle*, Defense Advanced Research Projects Agency (n.d.) https://www.darpa.mil/about-us/timeline/agile-and-m16 (last accessed January 4, 2023).

14.    18 U.S.C. § 922(o) generally bans the possession or transfer of machineguns manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
> > (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> >
> > (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

15.    In *New York State Rifle & Pistol Assn., Inc. v. Bruen,* 597 U.S. ___ (2022), the court reaffirmed the standard established in *Heller* for Second Amendment challenges while rejecting the two-part framework that had been developed by Courts of Appeals:

> "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.,* at 10.

16.    "The test that the Court set forth in Heller and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.,* at 17.

17.    *Bruen* additionally clarified that a class of arms categorized as "dangerous and unusual" cannot be banned if they are in "common use":

> "Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Id., at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.,* at 39.

18.    With the clarification of *Bruen,* the M16 rifle, being in common use today as the standard small-arms weapon used by the United States military, as well as it and hundreds of thousands of machineguns being lawfully registered and not in the possession or under control of the U.S. Government[2], cannot be banned on the basis of being "dangerous and unusual".

---

[2] *Firearms Commerce in the United States - Annual Statistical Update 2021*, Bureau of Alcohol, Tobacco, Firearms, and Explosives (2021) https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 4, 2023).

19.     On December 8, 2022, Plaintiff submitted an ATF Form 5320.1, Application to

Make and Register a firearm, to the BATFE, requesting permission to make an M16

machinegun.

20.     On December 20, 2022, the BATFE disapproved Plaintiff's application, citing 18

U.S.C. § 922(o) (see Appendix A).

### COUNT I

### VIOLATION OF THE SECOND AMENDMENT RIGHT

### TO KEEP AND BEAR ARMS

21.     Plaintiff incorporates each and every paragraph as if copied in full hereafter.

22.     The machinegun ban in 18 U.S.C. § 922(o) and the associated regulations violate

Plaintiff's Second Amendment rights.

23.     Plaintiff desires to own an M16 machinegun for all lawful purposes, including

defense of hearth and home and militia functions.

24.     Plaintiff is entitled to declaratory and injunctive relief that 18 U.S.C. § 922(o) is

unconstitutional.

### PRAYER FOR RELIEF

25.     Plaintiff respectfully asks this Court to:

A.      Issue a judgment declaring that 18 U.S.C. § 922(o) is unconstitutional.

B.      Issue an order requiring the Defendants to approve Plaintiff's Form 1

application.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:                               1/4/2023

Signature of Plaintiff

Printed Name of Plaintiff               JAKE S. DeWILDE

DATED this January 4, 2023.

Respectfully Submitted,

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

**Appendix "A"**

**Disapproved Form 1 – Application to Make and Register a Firearm**

**(8 pages)**

U.S. Department of Justice — Case: 23-8054   Document: 010110898895   Date Filed: 08/04/2023   Page: 15

Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 1140-0011 (06/30/2019)

# Application to Make and Register a Firearm

| ATF Control Number   2023133773 |
|---|

**To:** National Firearms Act Division, Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 530298, Atlanta, GA 30353-0298 *(Submit in duplicate. See instructions attached.)*

As required by Sections 5821 (b), 5822, and 5841 of the National Firearms Act, Title 26 U.S.C., Chapter 53, the undersigned hereby submits application to make and register the firearm described below.

**1. Type of Application** *(check one)*

**2. Application is made by:**
[ ] INDIVIDUAL   [X] TRUST or LEGAL ENTITY   [ ] GOVERNMENT ENTITY

**3a. Trade name** *(If any)*

[X] a. Tax Paid. Submit your tax payment of $200 with the application. The tax may be paid by credit or debit card, check, or money order. Please complete item 17. Upon approval of the application, we will affix and cancel the required National Firearms Act Stamp. *(See instruction 2c and 3)*

**3b. Applicant's name and mailing address** *(Type or print below and between the dots) (see instruction 2d)*

DEWILDE ARMS TRUST
301 STAGECOACH TRL
CODY, WY 82414, UNITED STATES

[ ] b. Tax Exempt because firearm is being made on behalf of the United States, or any department, independent establishment, or agency thereof.

[ ] c. Tax Exempt because firearm is being made by or on behalf of any State or possession of the United States, or any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations.

**3c. If P.O. Box is shown above, street address must be given here**

| 3d. County | 3e. Telephone (area code and number) | 3f. e-mail address (optional) |
|---|---|---|
| PARK | (580) 461-0202 | JAKEDEWILDE@GMAIL.COM |

**4. Description of Firearm** *(complete items a through k) (See instruction 2j)*

| a. Name and Address of Original Manufacturer and/or Importer of Firearm *(if any)* | b. Type of Firearm to be made *(See definition 1c)* If a destructive device, complete item 4j | c. Caliber or Gauge *(Specify one)* | d. Model M16 | | |
|---|---|---|---|---|---|
| SPIKE'S TACTICAL LLC, UNITED STATES | MACHINEGUN | 5.56 | Length (Inches) | e. Of Barrel: 16 | f. Overall: 38 |
| | | | g. Serial Number 105674 | | |

**h.** Additional Description *(Include all numbers and other identifying data to include maker's name, city and state which will appear on the firearm) (use additional sheet if necessary)*

**i.** State Why You Intend To Make Firearm *(Use additional sheet if necessary)*
ALL LAWFUL PURPOSES

**j.** Type of destructive device (check one box): [ ] Firearm   [ ] Explosives *(if the Explosives box is checked, complete item 5 and see instruction 2l)*

If an explosive type destructive device, identify the type of explosive(s): _____

**k.** Is this firearm being reactivated?   [ ] Yes   [X] No *(See definition 1k)*

**5.** Applicant's Federal Firearms License *(If any)* or Explosives License or Permit Number

**6.** Special *(Occupational)* Tax Status *(if applicable) (See definitions)*

*(Give complete 15-digit Number)*

| a. Employer Identification Number | b. Class |
|---|---|

**Under Penalties of Perjury, I Declare** that I have examined this application, including accompanying documents, and to the best of my knowledge and belief it is true, accurate and complete and the making and possession of the firearm described above would not constitute a violation of Title 18, U.S.C., Chapter 44, Title 26, U.S.C., Chapter 53; or any provisions of State or local law.

| 7. Signature of Applicant | 8. Name and Title of Authorized Official | 9. Date |
|---|---|---|
| DIGITALLY SIGNED | JAKE DEWILDE, TRUSTEE | 12/08/2022 |

**The space below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By authority of the Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, this application has been examined and the applicant's making and registration of the firearm described above is:

[ ] Approved *(With the following conditions, if any)*

[X] Disapproved *(For the following reasons)*

**SEE THE ATTACHED PAGE FOR THE REASON FOR THE DISAPPROVAL**

| Authorized ATF Official | Date |
|---|---|
| | 12/20/2022 |

Previous Editions Are Obsolete

ATF Copy

ATF Form 1 (5320.1)
Revised August 2017

**MAKER'S CERTIFICATION** *(not completed by a GOVERNMENT ENTITY)*

10.   **Law Enforcement Notification** *(See instruction 2g)*

Each applicant is to provide notification of the proposed making and possession of the firearm described on this Form 1 by providing a copy of the completed form to the chief law enforcement officer in the agency identified below:

| Agency or Department Name | Name and Title of Official |
|---|---|
| PARK COUNTY SHERIFF | SCOTT STEWARD, SHERIFF |

Address (Street address or P.O. Box, City, State and Zip Code) to which sent (mailed or delivered))

1402 RIVER VIEW DRIVE, CODY, WY, 82414, UNITED STATES

**Information for the Chief Law Enforcement Officer**

This form provides notification of the applicant's intent to make and register a National Firearms Act (NFA) firearm.  No action on your part is required.  However, should you have information that may disqualify this person from making or possessing a firearm, please contact the NFA Division at (304) 616-4500 or NFA @atf.gov.  A "Yes" answer to items 11.a. through 11.h or 13.a or 13.b. could disqualify a person from acquiring or possessing a firearm.  Also, ATF will not approve an application if the making or possession of the firearm is in violation of State or local law.

**Maker's Questions** *(complete only when the maker is an individual)*

A maker who is an individual must complete this Section.

11.  Answer questions 11.a. through 11.j.  Answer questions 13 through 14 if applicable.  For any "Yes" answer the applicant shall provide details on a separate sheet. *(See instruction 7c and definitions)*

|   |   | Yes | No | 12.  Photograph |
|---|---|---|---|---|
| a. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See definition 1n)* |   |   | Affix |
| b. | Have you ever been convicted in any court for a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See definition 1n)* |   |   | Recent Photograph Here |
| c. | Are you a fugitive from justice? *(See definition 1t)* |   |   | *(Approximately 2" x 2")* |
| d. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.** |   |   | *(See instruction 2e)* |
| e. | Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution? *(See definition 1o and 1p)* |   |   |   |
| f. | Have you been discharged from the Armed Forces under **dishonorable** conditions? |   |   |   |
| g. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See definition 1q)* |   |   |   |
| h. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See definition 1r)* |   |   |   |

13a.  Country of Citizenship:  *(Check/List more than one, if applicable.  Nationals of the United States may check U.S.A.) (See definition 1s)*

☐ United States of America     ☐ Other Country/Countries *(specify):* _____

|   |   | Yes | No |
|---|---|---|---|
| b. | Have you ever renounced your United States citizenship? |   |   |
| c. | Are you an alien illegally or unlawfully in the United States? |   |   |
| d.1. | Are you an alien who has been admitted to the United States under a nonimmigrant visa? |   |   |
| d.2. | If "yes", do you fall within any of the exceptions stated in the instructions? Attach the documentation to the application ☐ N/A |   |   |

14.  If you are an alien, record your U.S.-Issued Alien or Admission number (AR#, USCIS#, or 194#): _____

**CERTIFICATION: Under penalties imposed by 18 U.S.C. § 924 and 26 U.S.C. § 5861, I certify that, upon submission of this form to ATF, a completed copy of this form will be directed to the chief law enforcement officer (CLEO) shown in item 10, that the statements, as applicable, contained in this certification, and any attached documents in support thereof, are true and correct to the best of my knowledge and belief.  NOTE: See instructions 2.d(2) and 2.d(3) for the items to be completed depending on the type of applicant.**
DIGITALLY SIGNED
JAKE DEWILDE, TRUSTEE

12/08/2022

Signature of Maker                                              Date

ATF Form 1 (5320.1)
Revised August 2017

15. Number of Responsible Persons *(see definitions)* associated with the applicant trust or legal entity _____

16. Provide the full name (printed or typed) below for each Responsible Person associated with the applicant trust or legal entity *(if there are more Responsible Persons than can be listed on the form, attach a separate sheet listing the additional Responsible Person(s))*. Please note that a completed Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, must be submitted with the Form 1 application for each Responsible Person.

| Full Name | Full Name |
|---|---|
| JAKE DEWILDE | |
| | |
| | |
| | |

17. **Method of Payment** *(Check one) (See instruction 2h) (if paying by credit/debit card, complete the sections below)*

☐ Check *(Enclosed)*   ☐ Cashier's Check or Money Order *(Enclosed)*   ☐ Visa   ☐ Mastercard   ☐ American Express   ☐ Discover   ☐ Diners Club

| Credit/Debit Card Number *(No dashes)* | | Name as Printed on the Credit/Debit Card | Expiration Date *(Month & year)* |
|---|---|---|---|
| Credit/Debit Card Billing Address: | Address: | | |
| | City: | State: | Zip Code: |
| | | | Tax Amount: $ |

I Authorize ATF to Charge my Credit/Debit Card the Above Amount.

_____                    _____
Signature of Cardholder                                              Date

Your credit/debit card will be charged the above stated amount upon receipt of your application. The charge will be reflected on your credit/debit card statement. In the event your application is NOT approved, the above amount will be credited to the credit/debit card noted above.

**Important Information for Currently Registered Firearms**

If you are the current registrant of the firearm described on this form, please note the following information.

**Estate Procedures:** For procedures regarding the transfer of firearms in an estate resulting from the death of the registrant identified in item 3b, the executor should contact the NFA Division, Bureau of ATF, 244 Needy Road, Martinsburg, WV 25405.

**Interstate Movement:** If the firearm identified in item 4 is a **machinegun, short-barreled rifle, short-barreled shotgun,** or **destructive device,** the registrant may be required by 18 U.S.C. § 922(a)(4) to obtain permission from ATF prior to any transportation in interstate or foreign commerce. ATF Form 5320.20 can be used to request this permission.

**Change of Description or Address:** The registrant shall notify the NFA Division, Bureau of Alcohol, Tobacco, Firearms and Explosives, 244 Needy Road, Martinsburg, WV 25405, in writing, of any change to the description of the firearm in item 4, or any change to the address of the registrant.

**Restrictions on Possession:** Any restriction *(see approval block on face of form)* on the possession of the firearm identified in item 4 continues with the further transfer of the firearm.

**Persons Prohibited from Possessing Firearms:** If the registrant becomes prohibited from possessing a firearm, please contact the NFA Division for procedures on how to dispose of the firearm.

**Proof of Registration:** A person possessing a firearm registered as required by the NFA shall retain proof of registration which shall be made available to any ATF officer upon request.

**Paperwork Reduction Act Notice**

This form is in accordance with the Paperwork Reduction Act of 1995. The information you provide is used to establish that the applicant's making and possession of the firearm would be in conformance with Federal, State, and local law. The data is used as proof of lawful registration of a firearm to the manufacturer. The furnishing of this information is mandatory *(26 U.S.C. § 5822)*.

The estimated average burden associated with this collection of information is 4.0 hours per respondent or recordkeeper, depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestion for reducing this burden should be addressed to Reports Management Officer, Information Technology Coordination Staff, Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, DC 20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

1. **Authority.** Solicitation of this information is made pursuant to the National Firearms Act *(26 U.S.C. § § 5821 and 5822)*. Disclosure of this information by the applicant is mandatory for any person (other than a manufacturer qualified under the National Firearms Act) making a firearm as defined in the National Firearms Act.

2. **Purpose.** To verify payment of the tax imposed by 26 U.S.C. § 5821; to determine that the making would not be in violation of law; and to effect registration of the firearm.

3. **Routine Uses.** The information will be used by ATF to make the determinations set forth in paragraph 2. In addition, to effect registration of the firearm, information as to the identification of the firearm, date of registration, and the identification and address of person entitled to possess the firearm will be entered into the National Firearms Registration and Transfer Record. No information obtained from an application, registration, or records required to be submitted by an individual in order to comply with any provision of the National Firearms Act or regulation issued thereunder, shall, except in connection with prosecution or other action for furnishing false information, be used, directly or indirectly, as evidence against that person in any criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application. The information from this application may only be disclosed to Federal authorities for purposes of prosecution for violation of the National Firearms Act.

4. **Effects of not Supplying Information Requested.** Failure to supply complete information will delay processing and may cause denial of the application.

### Definitions/Instructions

1. Definitions.

   a. **National Firearms Act (NFA).** Title 26, United States Code, Chapter 53. The implementing regulations are found in Title 27, Code of Federal Regulations, Part 479.

   b. **Gun Control Act (GCA).** Title 18, United States Code, Chapter 44. The implementing regulations are found in Title 27, Code of Federal Regulations, Part 478.

   c. **Firearm.** The term "firearm" means: (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in 26 U.S.C. § 5845(e); (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition; and (8) a destructive device, as defined in 26 U.S.C. § 5845 (f).

   d. **Person.** A partnership, company, association, trust, corporation, including each responsible person associated with such an entity; an estate; or an individual.

   e. **Responsible Person.** In the case of an unlicensed entity, including any trust, partnership, association, company *(including any Limited Liability Company (LLC))*, or corporation, any individual who possesses, directly or indirectly, the power or authority to direct the management and policies of the trust or entity to receive, possess, ship, transport, deliver, transfer or otherwise dispose of a firearm for, or on behalf of, the trust or legal entity. In the case of a trust, those persons with the power or authority to direct the management and policies of the trust includes any person who has the capability to exercise such power and possesses, directly or indirectly, the power or authority under any trust instrument, or under State law, to receive, possess, ship, transport, deliver, transfer, or otherwise dispose of a firearm for, or on behalf of the trust. Examples of who may be considered a responsible person include settlors/grantors, trustees, partners, members, officers, directors, board members, or owners. An example of who may be excluded from this definition of responsible person is the beneficiary of a trust, if the beneficiary does not have the capability to exercise the enumerated powers or authorities.

   f. **Employer Identification Number (EIN).** Required of taxpayer filing special (occupational) tax returns under 27 CFR § 479.35.

   g. **Special (Occupational) Tax.** Required by the NFA to be paid by a Federal firearms licensee engaged in the business of manufacturing *(Class 2)*, importing *(Class 1)*, or dealing *(Class 3)* in NFA firearms.

   h. **Federal Firearms License.** A license issued under the provisions of the GCA to manufacture, import or deal in firearms.

   i. **ATF Officer.** An officer or employee of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) authorized to perform any function relating to the administration of the NFA.

   j. **Make.** The term "make", and the various derivatives of such word, shall include manufacturing *(other than by one qualified to engage in such business under the NFA)*, putting together, altering, any combination of these, or otherwise producing a firearm.

   k. **Reactivation.** The restoration of a registered unserviceable NFA firearm to a functional condition. This action incurs the making tax liability.

   l. **Unserviceable Firearm.** One which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to firing condition. An acceptable method of rendering most firearms unserviceable is to fusion weld the chamber closed and fusion weld the barrel solidly to the frame.

   m. **Maker.** A person applying to make an NFA firearm.

   n. **Prohibited Person.** Generally, 18 U.S.C. § 922 (g) prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who: has been convicted of a misdemeanor or crime of domestic violence; has been convicted of a felony, or any other crime, punishable by imprisonment for a term exceeding one year *(this does not include State misdemeanors punishable by imprisonment of two years or less)*; is a fugitive from justice, is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated as a mental defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions, has renounced his or her U.S. citizenship; is an alien illegally in the United States or an alien admitted to the United States under a nonimmigrant visa; or is subject to certain restraining orders. Furthermore, Section 922 (n) prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony in any Federal, State or local court, or any other crime, punishable by imprisonment for a term exceeding one year. An information is a formal accusation of a crime verified by a prosecutor.

   EXCEPTION: A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who has been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if: (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights (the right to vote, sit on a jury, and hold public office) taken away and later restored AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms. Persons subject to this exception should mark "no" in the applicable box.

   o. **Adjudicated As a Mental Defective.** A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) is a danger to himself or to others; or (2) lacks the mental capacity to contract or manage his own affairs. This term shall include; (1) a finding of insanity by a court in a criminal case; and (2) those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility.

Instruction *(continued)*

p. **Committed to a Mental Institution**. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution

EXCEPTION NICS Improvement Amendments Act of 2007: A person who has been adjudicated as a mental defective or committed to a mental institu tion in a state proceeding is not prohibited by the adjudication or commitment if the person has been granted relief by the adjudicating/committing state pursuant to a qualifying mental health relief from disabilities program. Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of the Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/ committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication/commitment; or (d) the adjudication or commitment, respectively is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code; or (e) the person was granted relief by the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities program. Persons who fall within one of the above exceptions should mark "no" in the applicable box. This exception to an adjudication or commitment by a Federal department or agency does not apply to any person who was adjudicated to be not guilty by reason of insanity, or based on a lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

q. **Restraining Order**. Under 18 U.S.C. § 922, firearms may not be sold to or received by persons subject to a court order that; (A) was issued after a hearing which the person received actual notice of and had an opportunity to participate in; (B) restrains such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. An "intimate partner' of a person is; the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or has cohabitated with the person.

r. **Misdemeanor Crime of Domestic Violence**. A Federal, State, local, tribal offense that is a misdemeanor under Federal, State, or tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person cohabitating with, or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim. The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon (e.g., assault and battery), if the offense is committed by one of the defined parties. *(See Exception in the definition of "Prohibited Person").* A person who has been convicted of a misdemeanor crime of domestic violence also is not prohibited unless; (1) the person was represented by a lawyer or gave up the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a jury, or gave up the right to a jury trial. Persons subject to this exception should mark "no" in the applicable box.

s. **Alien Admitted to the United States Under a Nonimmigrant Visa**. An alien admitted to the United States under a nonimmigrant visa includes, among others, persons visiting the United States temporarily for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain temporary foreign workers. These aliens must answer "yes" to question 13.d.1 and provide the additional documentation required under question 13.d.2. Permanent resident aliens and aliens legally admitted to the United States pursuant to either the Visa Waiver Program or to regulations otherwise exempting them from visa requirements may answer "no" to this question and are not required to submit the additional

documentation under 13.d.2. An alien admitted to the United States under a nonimmigrant visa is not prohibited from purchasing, receiving, or possessing a firearm if the alien; (1) is in possession of a hunting license or permit lawfully issued by the Federal Government, a State, or local government, or an Indian tribe federally recognized by the Bureau of Indian Affairs, which is valid and unexpired; (2) was admitted to the United States for lawful hunting or sporting purposes; (3) is an official representative of a foreign government who is accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; (4) is an official representative of a foreign government who is en route to or from another country to which that alien is accredited; (5) is an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; (6) is a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business; (7) has received a waiver from the prohibition from the Attorney General of the United States.

t. **Fugitives from Justice**. Any person who has fled from any State to avoid prosecution for a felony or a misdemeanor, or any person who leaves the State to avoid giving testimony in any criminal proceeding. The term also includes any person who knows that misdemeanor or felony charges are pending against such person and who leaves the State of prosecution.

## 2    Preparation of Application and Payment of Tax.

a. **Authority.** As provided by 26 U.S.C. § 5822, any person *(other than a qualified manufacturer of firearms (see paragraph b))* seeking to make a firearm must submit, in duplicate, a separate application on this form for each firearm. The applicant maker must furnish all the information called for, except as noted by instructions within, on this application form. Please note that the form now contains a 3rd (CLEO) copy of the form for use in compliance with instruction 2g and item 10 of the form.

b. **Registration by Qualified Manufacturer.** A person who has a Federal firearms license to manufacture firearms *(Type 07 or 10)* and who has paid special *(occupational)* tax to manufacture NFA firearms is exempt from the making tax and filing of the ATF Form 1 application. Such qualified manufacturer must report and register each NFA firearm manufactured by filing ATF Form 2, Notice of Firearms Manufactured or Imported, as required by 27 CFR § 479.103.

c. **Payment of/Exemption from Payment of Tax.** As provided in 26 U.S.C. § 5821, there is a $200.00 tax on each firearm made, **except** as provided in 26 U.S.C. §§ 5852 and 5853, when an NFA firearm may be made without payment of the tax when made by, or on behalf of the United States or any State or political subdivision thereof. Documentation that the firearm is being made for a government entity, such as a United States government contract or a State or local government agency purchase order, must accompany the application. The reactivation of a registered un-serviceable firearm is subject to the making tax.

d. **Completion of Form (Note: If the applicant is a Federal firearms licensee except for a Type 03 license, items 10, 11, 12, 13, 14, 15 and 16 are not required to be completed.).**

   (1)  The applicant shall provide the applicant's complete name and mailing address in item 3b. If a post office box address is used, the physical address must be entered in item 3c. If the applicant is a trust or legal entity, show only the complete name of the trust or legal entity and do not include any individual names (such as names of trustees or corporate officials). The address shall be the location within the particular state where the firearm will be maintained for a trust or legal entity. In the case of two or more locations for a legal entity, the address shown shall be the principal place of business within the particular state (or principal office, in the case of a corporation).

   (2)  If the applicant is an individual, the entire Form 1 shall be completed except for items 15 and 16. In addition, the applicant must include his or her fingerprints on FBI Form FD-258 and his or her photographs (see instruction 2g).

   (3)  If the applicant is other than an individual, e.g., a trust or legal entity ATF Form 1 (5320.1) such as a corporation, the applicant shall not complete items 11, 12, Revised May 201613, and 14. All other items must be completed including the signing of the Certification statement.

   (4)  Documentation of entity existence:
   (a)  If the applicant is other than an individual, the applicant must attach documentation evidencing the existence and validity of the entity, which includes complete and unredacted copies of partnership agreements, articles of incorporation, corporate registration, declarations of trust with any trust schedules, attachments, exhibits, and enclosures.

transferee within the preceding 24 months of the date of filing this application, and there has been no change to the documentation evidencing the existence and validity of the entity previously provided, the entity may provide a certification that the information has not been changed since the prior approval and shall identify the application for which the documentation had been submitted by form number, serial number, and date approved.

(5) If the applicant is other than an individual, each responsible person (see definition 1e) for the trust or legal entity must include a completed ATF Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, with the submitted Form 1.

(6) Item 17 (Method of Payment) is obscured on the ATF copy 2 (Registrant) and the CLEO copy. In addition, item 4g (serial number) is obscured on the CLEO copy. These fields do not require completion on these copies.

e. **Photograph and Fingerprints.** An individual maker (including any Federally licensed collector who is an individual but not any other type of Federal firearms licensee) must (1) attach to each copy in item 12 of the ATF Form 1, a 2 inch x 2 inch photograph of his/her frontal view taken within one year prior to the date of the application and (2) submit two properly completed FBI Forms FD-258 (Fingerprint Card with blue lines) with application. The fingerprints must be clear for accurate classification and taken by someone properly equipped to take them.

f. **Signatures.** All signatures required on ATF Form 1 must be original in ink on both copies.

(1) if the applicant is an individual, the applicant shall sign the form;
(2) if the applicant is a trust or legal entity, a responsible person of the trust or legal entity shall sign the form;
(3) if the applicant is a Federal firearms licensee, a responsible person of the Federal firearms licensee shall sign the form; or
(4) if the applicant is a government entity, a person who has a authority to sign for the entity shall sign the form.

g. **Law Enforcement Notification.** The applicant must provide a copy of the Form 1 to the chief law enforcement officer (CLEO) who has jurisdiction over the area of the applicant's address shown in item 3b of the Form 1. In addition, if the applicant is other than an individual, a copy of the Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire, for each responsible person must be provided to their respective chief law enforcement officer. The chief law enforcement officer is considered to be the Chief of Police; the Sheriff; the Head of the State Police; or a State or local district attorney or prosecutor.

h. **Remittance.** If the application is subject to the $200 making tax, please complete item 17 of the ATF Form 1. Please note that you may pay the tax by credit/debit card, check, or money order. The check or money order is to be made payable to ATF. Do not send cash.

i. **Photocopies or Computer Generated Versions.** After downloading or copying and printing this form from the ATF website, ensure that the front and back are on the same sheet of paper. The NFA Division will not approve the application if the front and back are on separate sheets of paper.

j. **Description of Firearm and Markings.** (1) Item 4a. If you are modifying an existing firearm, enter the name and location of the original manufacturer. (2) Item 4b. The types of NFA firearms are listed in the definitions; (3) Item 4c. Specify one caliber or gauge. If there is another designation, indicate the designation in item 4h. (4) Item 4d. Show the model designation (if known). (5) Item 4e and 4f. Specify one barrel length and overall length in items 4e and 4f as applicable. Note: if the firearm has a folding or collapsible stock, the overall measurement is to be made with the stock extended. (6) Item 4g. Do not alter or modify the serial number of an existing firearm . Enter the existing serial number or, if a new firearm, one you create. (7) Markings: The maker is required to mark the firearm with his or her name, city and state. All markings are to be in compliance with 27 CFR 478.92 and 479.102.

k. **State or Local Permit.** If a state or local permit or license is required before the making of the firearm, a copy of the permit or license must be submitted with the

application if the applicant is a trust or legal entity, where the State of residence or any responsible person requires a State or local permit or license, a copy of the permit or license must be submitted with Form 5320.23, National Firearms Act (NFA) Responsible Person Questionnaire.

l. **Compliance with explosives laws (18 U.S.C. Chapter 40) and regulations (27 CFR Part 555).** If the application is for a destructive device utilizing explosive materials, check the Explosives box in item 4.j and provide the type(s) of explosives to be used. If the applicant is other than a government agency, item 5 must be completed with an explosives license or permit number issued to the applicant. If the applicant is other than an individual, such as a legal entity, and does not have an explosives license or permit, then a responsible person for the applicant must have a license or permit and enter the information in item 5. To comply with the explosives laws and regulations, any member of a legal entity must also be identified as a responsible person or employee possessor on the explosives licenser or permit. A trust cannot be issued an explosives license or permit.

m. **Submission.** The maker shall submit 2 complete forms (ATF copy and registrant copy) with original signatures to the NFA Division at the address on the face of the form. The applicant shall direct a 3rd complete copy of the form to the chief local law enforcement officer (CLEO) as provided in instruction 2g and item 10.

3. **Approval of Application.** Upon approval of an application, the NFA Division will affix the NFA tax stamp (if any) to the application, cancel it, and return the approved copy to the maker. The approval of the application effectuates registration of the firearm to the maker; however, the firearm must not be made until the applicant has been approved.

4. **Withdrawal of Application.** The application may be withdrawn prior to approval by submission of a written request to the Chief, NFA Division, 244 Needy Road, Martinsburg, WV 25405 from the maker. The NFA Division will arrange for a refund of any tax paid.

5. **Cancellation of Approved Application.** An approved application may be can celled only if the firearm had not been made or modified. The maker must return the approved application with original tax stamp affixed with a written request for cancel lation, citing the need and that the making of the firearm did not take place. The NFA Division will arrange for a refund of any tax paid.

6. **Disapproval of Application.** If the application is disapproved, the NFA Division will note the reason for disapproval on the application and return one copy to the maker. The NFA Division will arrange for a refund of any tax paid.

7. **Reason for Disapproval.** 26 U.S.C. § 5822 provides that applications shall be denied if the making or possession of the firearm would place the maker in violation of law.

a. **Violation of Law.** Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

b. **Machineguns.** 18 U.S.C. § 922 (o) provides that a machinegun may be made only for government use or export. An application will be denied unless the making meets these criteria.

c. **Persons Prohibited from Making a Firearm.** The application will be disapproved if the maker is a person prohibited from possessing a firearm. For information regarding persons prohibited from possessing a firearm, refer to definitions 1n through 1t.

8. **Inquiries.** Information relating to the NFA and other firearms laws is available at the ATF Internet website at www.atf.gov. Any inquiry relating to the status of an application to transfer an NFA firearm or about procedures in general should be directed to the NFA Division at (304) 616-4500. Please be aware that any dissemina tion by ATF of information relating to the application to register an NFA firearm must conform with the restrictions in 26 U.S.C. § 6103.

9. **Penalties.** Any person who violates or fails to comply with any of the requirements of the NFA shall, upon conviction, be fined not more than $10,000 or be imprisoned for not more than 10 years, or both. Any firearm involved in a violation of the NFA shall be subject to seizure and forfeiture. It is unlawful for any person to make or cause the making of a false entry on any application or record required by the NFA knowing such entry to be false.

10. **Compliance with the Gun Control Act.** Person must also comply with all relevant portions of the GCA.

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

Control Number:   2023133773

## RESTRICTIONS

| 1 | RESTRICTED REGISTRATION-Possession limited to continued compliance with provisions of Public Law 99-308. |

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

Control
Number:   2023133773

### Reasons For Disapproval

PROHIBITED FROM POSSESSION OF A FIREARM UNDER 18 U.S.C. 922(O). IT IS AGAINST THE LAW TO MAKE OR MANUFACTURE A MACHINEGUN AFTER MAY 19, 1986 UNLESS THE MAKER OR MANUFACTURER HAS A TYPE 7 OR 10 FFL WITH 62/72 SOT OR FOR OR BY A GOVERNMENT AGENCY. REFUND REQUESTED.

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| Jake Stanley De Wilde, Individually and as Trustee of the DEWILDE ARMS TRUST, )<br><br>        Plaintiff, )<br><br>   v. )<br><br>Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, )<br><br>        Defendants. ) | Case No. 1:23-cv-00003-SWS |

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants Merrick Garland, in his official capacity as the Attorney General of the United

States of America, and Steven Dettelbach, in his official capacity of the Bureau of Alcohol,

Tobacco, Firearms, and Explosives, through undersigned counsel, hereby move to dismiss the Complaint for Declaratory and Injunctive Relief (Doc. 1), for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The accompanying Memorandum in Support of Defendants' Motion to Dismiss the Complaint further states the grounds for this Motion.

Dated this 13th day of March, 2023.

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney

By: /s/ Jeremy A. Gross
JEREMY A. GROSS
Assistant United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| Jake Stanley De Wilde, Individually and as<br>Trustee of the DEWILDE ARMS TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:23-cv-00003-SWS |
| v. | ) | |
| | ) | |
| Attorney General of the United States; | ) | |
| Director of the Bureau of Alcohol, | ) | |
| Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION.............................................................................................................1

BACKGROUND..............................................................................................................1

    I.     Statutory and Regulatory Background.................................................1

    II.    Plaintiff's Complaint.........................................................................4

LEGAL STANDARD .....................................................................................................6

ARGUMENT ..................................................................................................................6

    I.     Under Supreme Court Precedent, Machineguns Are Not Protected by the Second Amendment..................................................................................................6

    II.    Courts Have Uniformly Upheld 18 U.S.C. § 922(o).........................................10

         A.    Six Courts of Appeals Have Upheld § 922(o) Since *Heller*....................10

         B.    Multiple District Courts Have Upheld § 922(o) Since *Bruen* .................13

    III.    Section 922(o) Comports with the Second Amendment Under *Bruen*'s Standard14

         A.    The Second Amendment's Plain Text Does Not Cover Possession of a Machinegun...................................................................................15

         B.    Section 922(o) Is Consistent with Historical Tradition...........................20

    IV.    The Complaint Does Not State an Article I Claim ............................................22

    V.    DeWilde Lacks Authority to Represent the Trust *Pro Se* .................................22

CONCLUSION...............................................................................................................23

# TABLE OF AUTHORITIES

## **Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................6

*Bonidy v. U.S. Postal Serv.,*
    790 F.3d 1121 (10th Cir. 2015).............................................................................10

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)..........................................................................................*passim*

*English v. State,*
    35 Tex. 473 (1871)..................................................................................................21

*Farmer v. Higgins,*
    907 F.2d 1041 (11th Cir. 1990)...............................................................................4

*Hamblen v. United States,*
    591 F.3d 471 (6th Cir. 2009)..................................................................................11

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016).............................................................................*passim*

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)..................................................................................................8

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022).......................................................................................*passim*

*O'Neill v. State,*
    16 Ala. 65 (1849)....................................................................................................21

*Sherman v. Trinity Teen Sols., Inc.,*
    No. 20-cv-215-SWS, 2021 WL 7286422 (D. Wyo. Nov. 30, 2021)........................6

*State v. Langford,*
    10 N.C. 381 (1824).................................................................................................21

*State v. Lanier,*
    71 N.C. 288 (1874).................................................................................................21

WYD 27

*United States v. Carrero*,
   No. 2:22-cr-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022)............................. 13

*United States v. Fincher*,
   538 F.3d 868 (8th Cir. 2008) ....................................................... 11, 12

*United States v. Haney*,
   264 F.3d 1161 (10th Cir. 2001)........................................................ 22

*United States v. Henry*,
   688 F.3d 637 (9th Cir. 2012) ................................................... *passim*

*United States v. Hoover*,
   --- F. Supp. 3d ---, 2022 WL 10524008 (M.D. Fla. Oct. 18, 2022)...................... 13

*United States v. Jennings*,
   195 F.3d 795 (5th Cir. 1999) ..................................................... 12, 17

*United States v. Lain*,
   773 F. App'x 476 (10th Cir. 2019)..................................................... 23

*United States v. Lain*,
   No. 17-cv-113-J, 2018 WL 8244912 (D. Wyo. Dec. 28, 2018)............................ 23

*United States v. Miller*,
   307 U.S. 174 (1939)..........................................................6, 7, 15, 16

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*,
   822 F.3d 136 (3d Cir. 2016) ....................................................... 10, 11

*United States v. Rozier*,
   598 F.3d 768 (11th Cir. 2010)......................................................... 10

*United States v. Serawop*,
   505 F.3d 1112 (10th Cir. 2007)........................................................ 10

*United States v. Simien*,
   2023 WL 1980487 (W.D. Tex. Feb. 10, 2023) ........................... 13, 14, 16, 18, 20

*United States v. Teerlink*,
   2022 WL 17093425 (D. Utah Nov. 21, 2022).............................................. 13

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992)..................................................................... 3

*United States v. Wilks*,
    58 F.3d 1518 (10th Cir. 1995).................................................................17

*United States v. Zaleski*,
    489 F. App'x 474 (2d Cir. 2012).....................................................10, 11

**Constitutional Provisions**

U.S. Const. amend. II...............................................................................15

U.S. Const. art. I, § 8, cl. 3........................................................................22

**Statutes**

18 U.S.C. § 921...........................................................................................2

18 U.S.C. § 922...............................................................................*passim*

26 U.S.C. § 5811.........................................................................................4

26 U.S.C. § 5812.........................................................................................4

26 U.S.C. § 5822.........................................................................................4

26 U.S.C. § 5841.........................................................................................4

26 U.S.C. § 5845.........................................................................................2

720 Ill. Comp. Stat. 5/24-1......................................................................18

Alaska Stat. § 11.61.200...........................................................................18

Ariz. Rev. Stat. § 13-3101........................................................................18

Ariz. Rev. Stat. § 13-3102........................................................................18

Cal. Penal Code § 32625...........................................................................18

Colo. Rev. Stat. § 18-12-102....................................................................18

D.C. Code § 22-4514................................................................................18

Del. Code tit. 11, § 1444..........................................................................18

Fla. Stat. § 790.221..................................................................................18

Ga. Code Ann. § 16-11-122......................................................................18

Haw. Rev. Stat. § 134-8 ................................................................................................18

Ind. Code § 35-47-5-8 ..................................................................................................18

Iowa Code § 724.1 ........................................................................................................18

Iowa Code § 724.3 ........................................................................................................18

Kan. Stat. § 21-6301 .....................................................................................................18

La. Stat. § 40:1752 ........................................................................................................18

Mass. Gen. Laws ch. 140 .............................................................................................18

Me. Rev. Stat. Ann. tit. 17-A ........................................................................................18

Mich. Comp. Laws § 750.224 ......................................................................................18

Minn. Stat. § 609.67 .....................................................................................................18

Mo. Ann. Stat. § 571.020 .............................................................................................18

N.C. Gen. Stat. § 14-409 ..............................................................................................18

N.D. Cent. Code § 62.1-05-01 .....................................................................................18

N.J. Stat. § 2C:39-5 ......................................................................................................18

N.Y. Penal Law § 265.02 .............................................................................................18

Neb. Rev. Stat. § 28-1203 ............................................................................................18

Nev. Rev. Stat. § 202.350 ............................................................................................18

Ohio Rev. Code Ann. § 2923.11 ..................................................................................18

Ohio Rev. Code Ann. § 2923.17 ..................................................................................18

Or. Rev. Stat. § 166.272 ...............................................................................................18

Pub. L. No. 73-474, 48 Stat. 1236 (June 26, 1934) ......................................................2

Pub. L. No. 90-618, 82 Stat. 1213 (Oct. 22, 1968) ......................................................3

Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986) ...........................................3, 4, 17

R.I. Gen. Laws § 11-47-8...................................................................................18

S.C. Code Ann. § 16-23-230..............................................................................18

S.D. Codified Laws § 22-1-2..............................................................................18

S.D. Codified Laws § 22-14-6............................................................................18

Tenn. Code Ann. § 39-17-1302..........................................................................18

Tex. Penal Code Ann. § 46.05............................................................................18

W. Va. Code § 61-7-9.........................................................................................18

Wash. Rev. Code § 9.41.190..............................................................................18

Wis. Stat. § 941.26.............................................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................6

**Regulation**s

27 C.F.R. § 479.105.........................................................................................4, 5

**Other Authorities**

1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors (1831)................................21

3 B. Wilson, Works of the Honourable James Wilson (1804)..................................................21

78 Cong. Rec. 11,400 (June 13, 1934).....................................................................3

ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021* (2021),
    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download...........20

C. Humphreys, A Compendium of the Common Law in Force in Kentucky (1822).................21

E. Lewis, An Abridgment of the Criminal Law of the United States (1847)...........................21

F. Wharton, A Treatise on the Criminal Law of the United States (1852)...............................21

H.R. Rep. No. 73-1780, at 1 (1934).................................................................3, 17

H.R. Rep. No. 99-495 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327.......................................17

H. Stephen, Summary of the Criminal Law 48 (1840).................................................... 21

J. Dunlap, The New–York Justice 8 (1815)................................................................. 21

William Blackstone, 4 Commentaries on the Laws of England (1769)................8, 14, 15-16, 21

William Rosenau, *The Origins of the First Modern Weapon,* TECH. REV. (1987), (reviewing John Ellis, *The Social History of the Machine Gun* (1986))................................................. 16

## INTRODUCTION

Plaintiff Jake Stanley DeWilde claims in this lawsuit that he — and, by extension, every law-abiding citizen — has a constitutional right to possess the same advanced weaponry that the United States military uses to equip armed forces on the battlefield, the M-16 machinegun.  The Second Amendment does not countenance that result.  The Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and reaffirmed in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that although the Second Amendment protects the rights of law-abiding citizens to possess arms that are in common use for lawful purposes such as self-defense, it does not guarantee a right to possess dangerous and unusual weapons.  *See Heller*, 554 U.S. at 624, 627; *Bruen*, 142 S. Ct. at 2128.  The Supreme Court has cited machineguns such as the M-16 rifle as a prime example of the type of dangerous and unusual weapon that "may be banned," dismissing as "startling" the notion that machineguns are protected by the Second Amendment. *Heller*, 554 U.S. at 624, 627.  Since *Heller*, courts have uniformly upheld restrictions on machineguns, including a small but growing body of case law since *Bruen*.  In prohibiting possession of machineguns with limited exceptions not applicable here, 18 U.S.C. § 922(o) does not transgress the Second Amendment.  Machineguns are among the most dangerous firearms in existence, and they are not commonly used for lawful purposes such as self-defense.  Machineguns are beyond the scope of the Second Amendment's text, and 18 U.S.C. § 922(o) is consistent with this nation's historical tradition of restricting dangerous and unusual weapons.  The Court should dismiss Plaintiff's lawsuit for failure to state a claim.

## BACKGROUND

### I.      Statutory and Regulatory Background

Congress has defined machinegun to include an automatic weapon that can fire more than one shot with a single function of the trigger, the frame or receiver of such a weapon, and certain

parts that can be used to convert a weapon into a machinegun.  *See* 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24).[1]  Federal regulation of machineguns evolved throughout the twentieth century, leading to the 1986 enactment of 18 U.S.C. § 922(o), which prohibits most possession of machineguns.

Congress first regulated machineguns with the passage of the National Firearms Act of 1934 ("NFA"), which was enacted not long after machineguns were "first widely used during World War I[.]"  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012).  The NFA regulated "firearms," a statutory term of art originally defined to include machineguns, short-barreled rifles, short-barreled shotguns, and silencers.  Pub. L. No. 73-474, 48 Stat. 1236, § 1(a) (June 26, 1934) (*codified as amended at* 26 U.S.C. § 5845(a)).  Among other things, the NFA imposed a transfer tax on NFA firearms such as machineguns, required registration of such firearms and completion of an application with the federal government to make and transfer such firearms, and criminalized possession or receipt of such firearms without compliance with the Act's requirements.  48 Stat. at 1237-38, §§ 3-6.

Legislative history shows that the NFA was intended to curb the spread of the type of weapons used by gangsters for criminal activity, with machineguns identified as the most

---

[1] Congress has refined the definition of machinegun over time and has variously used the spellings "machinegun" and "machine gun."  This memorandum uses "machinegun," the spelling currently used in federal firearms statutes, except when quoting a source that uses "machine gun."  Currently, federal law defines machinegun as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

dangerous weapons for gangsters.  The House Report for the NFA states: "The growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons needs no comment.  The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."  *See* H.R. Rep. No. 73-1780, at 1 (May 28, 1934).  On the House floor, Rep. Doughton, the chairman of the committee that advanced the NFA, explained that "[f]or some time this country has been at the mercy of the gangsters, racketeers, and professional criminals," and "the primary purpose of the bill is to stop gangsters from getting hold of machine guns."  78 Cong. Rec. 11,400 (June 13, 1934).  "It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes[.]"  *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion).

    In 1968, Congress amended and updated various provisions of the NFA in the National Firearms Act Amendments of 1968, which was part of a legislative package that also included the Gun Control Act of 1968 ("GCA").  Pub. L. No. 90-618, 82 Stat. 1213 (Oct. 22, 1968).  Among other things, the GCA imposed recordkeeping and licensing requirements on manufacturers and dealers of firearms and prohibited certain categories of individuals (including felons, fugitives, and drug addicts) from receiving or shipping firearms.  *Id.* at 1216-21 (*codified as amended at* 18 U.S.C. § 922).

    In 1986, Congress enacted § 922(o), which prohibits possession of most privately held machineguns, as part of the Firearms Owners Protection Act ("FOPA"), a broad set of reforms to the GCA.  Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986).  Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun" except for transfers or possession of machineguns "under the authority of" a federal or state government agency, or "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection

takes effect [May 19, 1986]." 18 U.S.C. § 922(o). Through § 922(o), "Congress intended to prohibit the private possession of machine guns not lawfully possessed prior to May 19, 1986." *Farmer v. Higgins*, 907 F.2d 1041, 1044 (11th Cir. 1990). When enacting FOPA, Congress found that the Act was necessary "to reaffirm the intent of the Congress" from the GCA not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 100 Stat. 449, § 1(b)(2).

The NFA's registration, taxation, and approval requirements for machineguns still apply to lawful machineguns that fit within one of the exceptions to § 922(o). *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5822, 5841. The NFA provides that an application to make or transfer a firearm "shall be denied" if the making, transfer, receipt or possession of such firearm would put the maker or transferee "in violation of law." 26 U.S.C. §§ 5812(a), 5822. Similarly, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has enacted a regulation providing that "an application to make or transfer a firearm shall be denied if the making, transfer, receipt, or possession of the firearm would place the maker or transferee in violation of law," including 18 U.S.C. § 922(o). 27 C.F.R. § 479.105(a). The regulation accordingly provides that "no application to make, transfer, or import a machine gun will be approved" unless the machinegun fits within one of the regulatory exceptions, which generally track the statutory exceptions in § 922(o) for machineguns lawfully possessed prior to May 19, 1986, or possessed or transferred under the authority of a government agency. *See* 27 C.F.R. § 479.105.

## II.   Plaintiff's Complaint

Plaintiff Jake Stanley DeWilde ("Plaintiff" or "DeWilde") brings this lawsuit individually

4

and as trustee of the DeWilde Arms Trust (the "Trust"). Compl. for Declaratory and Inj. Relief ¶ 3, ECF No. 1 ("Compl."). He sues Defendants Merrick Garland and Steven Dettelbach, in their official capacities as Attorney General and Director of ATF, respectively. *Id.* ¶¶ 4-5. The Trust submitted a form to the ATF, "requesting permission to make an M[-]16 machinegun." *Id.* ¶ 19; Compl. App'x A, at 2, ECF No. 1-1. Plaintiff alleges that the M-16 is "the standard small-arms weapon used by the United States military[.]" Compl. ¶ 18; *see also Hollis v. Lynch*, 827 F.3d 436, 440 n.2 (5th Cir. 2016) ("The M-16 is a rifle in service with the United States military. It is capable of automatic fire, that is to say, firing more than one round per trigger-action."). Plaintiff alleges that he "desires to own an M[-]16 machinegun for all lawful purposes, including defense of hearth and home and militia functions." Compl. ¶ 23. The ATF denied Plaintiff's application, citing 18 U.S.C. § 922(o). *See id.* ¶ 20; Compl. App'x A, at 9 ("Reasons For Disapproval: PROHIBITED FROM POSSESSION OF A FIREARM UNDER 18 U.S.C. 922(O)."). Plaintiff does not dispute that the M-16 rifle he wishes to make is a machinegun, or that 18 U.S.C. § 922(o), if constitutional, would prohibit his possession of such a weapon. *See* Compl. ¶¶ 1, 14, 19-20. Nor does he raise any objection to 27 C.F.R. § 479.105(a), other than that it implements 18 U.S.C. § 922(o), which he contends is unconstitutional. Compl. ¶¶ 1, 22.

Plaintiff brings one claim, titled, "Violation of the Second Amendment Right to Keep and Bear Arms." *Id.* at 7, Count I, Heading (capitalization and emphasis omitted). Plaintiff claims that "[t]he machine gun ban in 18 U.S.C. § 922(o) and the associated regulations[2] violate Plaintiff's Second Amendment rights." *Id.* ¶ 22. Plaintiff seeks "declaratory and injunctive relief that 18 U.S.C. § 922(o) is unconstitutional." *Id.* ¶ 24. He asks the Court to "[i]ssue a judgment declaring

---

[2] This paragraph does not specify the associated regulations, but the Complaint elsewhere cites 27 C.F.R. § 479.105(a) as an implementing regulation of 18 U.S.C. § 922(o). *See* Compl. ¶¶ 1-2.

that 18 U.S.C. § 922(o) is unconstitutional" and "[i]ssue an order requiring the Defendants to approve" Plaintiff's application to make a machinegun. *Id.* ¶¶ 25(A)-(B). [3]

## LEGAL STANDARD

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must 'raise a right to relief above the speculative level' and must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Sherman v. Trinity Teen Sols., Inc.*, No. 20-cv-215-SWS, 2021 WL 7286422, at *1 (D. Wyo. Nov. 30, 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard "requires the plaintiff to plead facts that allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true." *Id.*

## ARGUMENT

I.  **Under Supreme Court Precedent, Machineguns Are Not Protected by the Second Amendment**

Under Supreme Court precedent, machineguns are in the category of weapons that can be restricted, or even banned, because they are dangerous and unusual weapons beyond the scope of the Second Amendment. In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court limited the types of weapons protected by the Second Amendment. *Miller* held that the NFA's registration requirements for short-barreled shotguns did not violate the Second Amendment,

---

[3] The Complaint's introductory paragraphs assert that § 922(o) "exceed[s] the power of the United States under Article I of the United States Constitution" and is "in violation of Article I of the United States Constitution," Compl. ¶¶ 1-2, but the Complaint contains no other allegations concerning any Article I claim.

reasoning: "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Miller*, 307 U.S. at 178. The Court further explained that in the founding era, men engaged in militia service "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179.

The Court next addressed the Second Amendment in detail in *District of Columbia v. Heller*, 554 U.S. 570 (2008), explaining that the Second Amendment protected the right to keep and bear weapons in common use, but not dangerous and unusual weapons. *Heller* held that "the Second Amendment conferred an individual right to keep and bear arms," but acknowledged that "the right was not unlimited[.]" *Heller*, 554 U.S. at 595. In articulating the limits of the Second Amendment right, the Court explained the significance of its holding in *Miller*. *Heller* rejected a reading of *Miller* that the Second Amendment protected weapons "useful in warfare," noting that this reading would lead to the "startling" result that "the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624. The Court thus found it so clear that the NFA's regulations on machineguns were constitutional that it curtly dismissed the contrary notion as "startling." *Heller* explained that "*Miller* stands . . . for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623. Specifically, the Second Amendment protects "arms 'in common use at the time' for lawful purposes like self-defense," 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179), a "limitation . . . fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" 554 U.S. at 627

(quoting William Blackstone, 4 Commentaries on the Laws of England 148-49 (1769)).

The *Heller* Court considered the potential "object[ion]" to its reasoning "that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" concerning the necessity of a well-regulated militia. *Id.* But the Court rebuffed this objection, explaining that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." 554 U.S. at 627. The Court thus found it implicit and obvious that under its reading of the Second Amendment, "M-16 rifles and the like . . . may be banned." *Id.* As the Fifth Circuit explained, "*Heller* took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment." *Hollis*, 827 F.3d at 446.

In *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), the Supreme Court held that under the Fourteenth Amendment, the Second Amendment right to bear arms applied not only against the federal government but also against the states. A plurality also "repeat[ed]" the "assurances" from *Heller* about the limitations on the Second Amendment right, including that "the right to keep and bear arms is not a right to keep and carry any weapon whatsoever." 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626) (plurality opinion).

Finally, last year in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Court reaffirmed its analysis of the Second Amendment in *Heller*, including *Heller*'s conclusions about the limits of the types of weapons protected by the Second Amendment. *Bruen* held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. In so holding, *Bruen* articulated the standard for Second Amendment challenges:

we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126.

The *Bruen* Court stated that it was clarifying, rather than abrogating, *Heller*'s analysis, explaining that its articulation of the governing standard was "[i]n keeping with *Heller.*" *Id. Bruen* noted that *Heller* "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right." *Id.* at 2128. Specifically, the Court found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* (quoting *Heller*, 554 U.S. at 627).[4] The Court later explained that handguns are protected by the Second Amendment because they "are weapons 'in common use' today for self-defense." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 627).

In sum, the Supreme Court has held that the Second Amendment protects weapons "in common use . . . for lawful purposes like self-defense," but does not protect "dangerous and unusual weapons." *Heller*, 554 U.S. at 624, 627. The Supreme Court has further listed machineguns, and specifically the M-16 rifle, as paradigmatic examples of the type of unprotected dangerous and unusual weapons, finding it implicit that "M-16 rifles and the like[] may be banned." *Id.* at 627. And the Supreme Court's recent clarification of the Second Amendment's

---

[4] Justice Kavanaugh's concurrence, joined by Chief Justice Roberts (whose votes were necessary to form the majority in *Bruen*), explicitly quoted and reaffirmed *Heller*'s conclusion that an "important limitation on the right to keep and carry arms" was "that the sorts of weapons protected were those in common use at the time," rather than "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 627).

scope stated that it was "[i]n keeping with *Heller*" and approvingly cited *Heller*'s discussion of the limitation of the Second Amendment to weapons in common use that are not dangerous and unusual. *Bruen*, 142 S. Ct. at 2126, 2128.

This Supreme Court precedent forecloses Plaintiff's claim that the Second Amendment protects his right to possess a machinegun. To be sure, courts have questioned whether *Heller*'s discussion of the limitations of the Second Amendment is holding or dicta. *Compare United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) (concluding that *Heller*'s limitation of Second Amendment protections to law-abiding individuals "is not dicta"), *with Hollis*, 827 F.3d at 448 (suggesting that it "may well be right" that "some of the statements" in *Heller* about machineguns "are dicta"). But that question does not matter here, because as the Tenth Circuit previously noted in following *Heller*'s discussion of the Second Amendment's limitations, "we are 'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (quoting *United States v. Serawop,* 505 F.3d 1112, 1122 (10th Cir. 2007)). *Heller*'s implicit endorsement of machinegun bans is binding because it is recent and is supported, rather than enfeebled, by the Supreme Court's later statements in *Bruen*. *See Hollis*, 827 F.3d at 448 (concluding that the court was "generally bound" by *Heller*'s endorsement of machinegun bans, even if it were "dicta").

## II.   Courts Have Uniformly Upheld 18 U.S.C. § 922(o)

### A.   Six Courts of Appeals Have Upheld § 922(o) Since *Heller*

Since *Heller*, courts have uniformly upheld 18 U.S.C. § 922(o) and other restrictions on machineguns against Second Amendment challenges. Six courts of appeals have rejected Second Amendment challenges to § 922(o) since *Heller*. *See United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012); *United States v. One (1) Palmetto State Armory PA-15 Machinegun*

*Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 141 (3d Cir. 2016);

*Hollis*, 827 F.3d at 451; *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *Henry*, 688 F.3d at 640.

Examining the reasoning of these decisions shows that they are consistent with *Bruen*. *Bruen* explained that after *Heller*, "the Courts of Appeals ha[d] coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125.  The Court concluded that "[s]tep one of the predominant framework," at which courts would consider whether "the challenged law regulates activity falling outside the scope of the right as originally understood," "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."  *Id.* at 2126-27.  But the Court rejected step two of that framework, in which courts applied "means-end scrutiny" to assess the constitutionality of laws that implicated the Second Amendment right.  *Id.* at 2127.

Consistent with *Bruen*, the appellate decisions upheld § 922(o) by concluding that machineguns were outside the scope of the Second Amendment based on the Second Amendment's text and history, including *Heller*'s analysis of text and history.  *See Zaleski*, 489 F. App'x at 475 ("the Second Amendment does not protect Zaleski's personal possession of machine guns"); *Palmetto State Armory*, 822 F.3d at 141 ("*Heller* and subsequent decisions in our Court make clear that the de facto ban on machine guns found in § 922(o) does not impose a burden on conduct falling within the scope of the Second Amendment."); *Hollis*, 827 F.3d at 451 ("Machineguns are dangerous and unusual and therefore not in common use.  They do not receive Second Amendment protection, so we uphold Section 922(o)."); *Hamblen*, 591 F.3d at 474 (relying on *Heller* to conclude that "the individual right to keep and bear arms . . . does not authorize an unlicensed individual to possess unregistered machine guns for personal use");

*Fincher*, 538 F.3d at 874 ("under *Heller,* Fincher's possession of the [machine]guns is not protected by the Second Amendment"); *Henry*, 688 F.3d at 640 ("we hold that the Second Amendment does not apply to machine guns").   None of these decisions applied means-end scrutiny, and to the extent they referenced the two-step framework, they resolved the case at step one. *See Hollis*, 827 F.3d at 451 (upholding § 922(o) "at step one of our framework"); *Henry*, 688 F.3d at 640 ("because we conclude that machine gun possession is not entitled to Second Amendment protection, it is unnecessary to consider Henry's argument that the district court applied the incorrect level of constitutional scrutiny in evaluating his claims").

The Fifth Circuit's analysis in *Hollis* is particularly instructive. *Hollis* "glean[ed]" from *Heller* that "protected weapons are 'those in common use at the time,'" but that "[i]f a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment," further noting that "*Heller* took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment." *Hollis*, 827 F.3d at 446 (quoting *Heller*, 554 U.S. at 627).   The court noted that it was "generally bound" by *Heller*'s statements concerning the constitutionality of machinegun bans, but it also "undert[ook] an independent inquiry" to confirm that machineguns were not protected. 827 F.3d at 448.   The court first held that machineguns were "dangerous," reasoning that like "pipebombs," machineguns are "primarily weapons of war and have no appropriate sporting use or use for personal protection." *Id.* at 448 (quoting *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999)).   The court next held that machineguns were "unusual," noting the low number of machineguns in circulation (with just "175,977 pre–1986 civilian-owned machineguns in existence") and that 34 states prohibited most or all machineguns. *Id.* at 449-50.   The court concluded: "[m]achineguns are dangerous and unusual and therefore not in common use.   They do not receive Second Amendment protection[.]" *Id.* at 451.

12

These court of appeals decisions upholding § 922(o) remain strong persuasive authority that support rejecting Plaintiff's claims. As district courts within this circuit have recognized, *Bruen* does not undermine the force of pre-*Bruen* Second Amendment precedent that is consistent with its reasoning. *See United States v. Carrero*, No. 2:22-cr-00030, 2022 WL 9348792, at *4 (D. Utah Oct. 14, 2022) (finding that Tenth Circuit precedent upholding 18 U.S.C. 922(g)(1), which prohibits firearms possession by felons, "remains good law" and "[t]his court must continue to follow [it]"); *United States v. Teerlink*, No. 2:22-cr-0024-TS, 2022 WL 17093425, at *1 (D. Utah Nov. 21, 2022) (holding "that *Bruen* does not disrupt Tenth Circuit precedent upholding Section 922(g)(1) as a constitutional restriction on firearm possession under *Heller*").

**B.      Multiple District Courts Have Upheld § 922(o) Since *Bruen***

Since *Bruen*, every court to address § 922(o) or other restrictions on machineguns has upheld them. Two district courts have rejected Second Amendment challenges to § 922(o). *See United States v. Simien*, No. SA-22-cr-00379-JKP, 2023 WL 1980487, at *9 (W.D. Tex. Feb. 10, 2023) (holding that § 922(o) is "constitutional under the Second Amendment" because "machineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection"); Order, *United States v. Adamiak*, Case 2:22-cr-00047-AWA-LRL, ECF No. 46, at 9-10 (E.D. Va. Sept. 22, 2022) ("strongly disagree[ing]" with argument against constitutionality of § 922(o) and holding that "machineguns . . . are not weapons 'in common use' and thus fall outside the Second Amendment's protection"). Another district court rejected a Second Amendment challenge to the NFA's restrictions on machineguns, reaffirming prior case law holding "that there is no Second Amendment right to possess a machine gun." *United States v. Hoover*, --- F. Supp. 3d ---, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022).

*Simien*'s analysis of the constitutionality of § 922(o) is particularly instructive here. The court reasoned that, as *Heller* concluded, "dangerous and unusual weapons are not afforded Second

Amendment protection," based on a "longstanding tradition" that "grew from English common law," reflected in authorities such as Blackstone's Commentaries. *Simien*, 2023 WL 1980487, at *8 (citing 4 W. Blackstone, Commentaries on the Laws of England 148-49 (1769)). After noting that past decisions, including the Fifth Circuit's *Hollis* decision, held that machineguns were unprotected dangerous and unusual weapons, the court concluded: "Today, machineguns remain dangerous and unusual." *Id.* at *9. The court first reasoned that "[m]achineguns, which have been likened to pipe bombs and hand-grenades, are within the category of weapons of 'quasi-suspect character' that are inherently dangerous." *Id.* (quoting *Hollis*, 827 F.3d at 448). The court then concluded that machineguns "are unusual," noting that the number of registered machineguns was "less than .2% of total firearms in the United States[,]" which was "too insignificant for machineguns to be considered in common use." *Id.*

In sum, this Court need not break new ground to uphold § 922(o). Since the Supreme Court listed M-16 machineguns as the type of weapon that "may be banned" under its interpretation of the Second Amendment, *Heller*, 554 U.S. at 627, courts have uniformly rejected challenges to § 922(o) and held that machineguns are not protected by the Second Amendment. Although some of these decisions were outside the Tenth Circuit, they are highly persuasive authority on which this Court may draw in assessing the constitutionality of § 922(o).

**III.    Section 922(o) Comports with the Second Amendment Under *Bruen*'s Standard**

Although *Heller*'s analysis and the uniform precedent upholding § 922(o) are sufficient to reject Plaintiff's Second Amendment claim, the same result would follow from independently applying *Bruen*'s standard for assessing Second Amendment claims. Under *Bruen*, a court must first determine whether "the Second Amendment's plain text covers an individual's conduct[.]" 142 S. Ct. at 2126. If it does, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Both prongs of *Bruen*'s

14

test point in the same direction. First, the Second Amendment's plain text does not cover possession or manufacture of a machinegun, because the Second Amendment protects the right to keep and bear arms in common use for lawful purposes like self-defense, not dangerous and unusual weapons such as machineguns. Second, even if the Court were to determine (or assume without deciding) that § 922(o) burdens conduct covered by the Second Amendment's text, § 922(o) would still be constitutional because it is consistent with this nation's historical tradition of prohibiting the carrying of dangerous and unusual weapons.[5]

## A. The Second Amendment's Plain Text Does Not Cover Possession of a Machinegun

The Second Amendment's text does not cover possession of a machinegun because the Second Amendment's protection extends only to weapons in common use for lawful purposes, not dangerous and unusual weapons. The Second Amendment's text reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The phrase "right of the people to keep and bear arms" in the Second Amendment's text refers to "a *pre-existing* right" that the Second Amendment "codified," but it was well understood at the founding that "the right was not a right to keep and carry any weapon whatsoever[.]" *Heller*, 554 U.S. at 592, 626. Rather, "the sorts of weapons protected were those 'in common use at the time,'" *id.* at 627 (quoting *Miller*, 307 U.S. at 179), not "dangerous and unusual weapons." 554 U.S. at 627 (quoting 4 W. Blackstone, Commentaries

---

[5] *Bruen* treated the inquiry of whether a particular type of weapon can be restricted as implicating both prongs of *Bruen*'s test. Under the first prong, in addressing whether New York's requirement for proper cause for a license to carry a handgun was covered by the Second Amendment's plain text, the Court reasoned that the parties did not dispute that "handguns are weapons 'in common use' today for self-defense." 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). At the second prong, the Court considered and rejected New York's argument that its proper cause requirement was supported by the historical tradition of prohibiting carrying of dangerous and unusual weapons. *Id.* at 2143.

on the Laws of England 148-49 (1769)).  That reading of the Second Amendment's text is supported by the prefatory clause's reference to "[a] well regulated militia," because at the founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179).

Machineguns are not encompassed within the scope of the right guaranteed by the Second Amendment's text because they are dangerous and unusual weapons, which are not in common use for lawful purposes like self-defense.  *See generally supra*, Part II (describing cases holding that machineguns are not protected by the Second Amendment).  It can hardly be disputed that machineguns are dangerous.  Machineguns, and M-16 rifles in particular, are weapons of war.  *See Heller*, 554 U.S. at 627 (M-16 rifles are among the "most useful in military service"); *Henry*, 688 F.3d at 640 (the machine gun was "widely used during World War I, where it 'demonstrated its murderously effective firepower over and over again'") (quoting William Rosenau, *The Origins of the First Modern Weapon*, TECH. REV. (1987), at 74  (reviewing John Ellis, *The Social History of the Machine Gun* (1986))); Compl. ¶ 13 (M-16 rifles are the U.S. military's "standard small-arms weapons").  "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds.  Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns." *Henry*, 688 F.3d at 640 (internal citation omitted); *see also Simien*, 2023 WL 1980487, at *9 ("Machineguns, which have been likened to pipe bombs and hand-grenades, are within the category of weapons of 'quasi-suspect character' that are inherently dangerous.") (quoting *Hollis*, 827 F.3d at 448).

Machineguns are also unusual and not in common use for lawful purposes like self-defense.

16

Congress heavily regulated machineguns soon after they became widely available precisely because their primary use outside of military and law enforcement was in violent crime, and they were not suitable for lawful purposes such as self-defense. As the House Report for the NFA states: "The growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons needs no comment. The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun." *See* H.R. Rep. No. 73-1780, at 1 (1934). The report also differentiated machineguns from those weapons useful for self-defense, explaining: "But while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun." *Id.* When Congress banned most machineguns in 1986, the legislative history discussed how machineguns were "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime." *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995) (quoting H.R. Rep. No. 99-495, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1330). Congress also found that FOPA "reaffirm[ed]" that it was "not the purpose" of the GCA (as amended by FOPA) to restrict the rights of "law-abiding citizens" to possess or use "firearms appropriate to the purpose of . . . personal protection, or any other lawful activity," and that FOPA was "not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Pub. L. No. 99-308 § 1(b)(2), 100 Stat. 449 (1986). Congress thus did not believe that banning privately-held machineguns (except for grandfathered weapons) would burden the "use of firearms by law-abiding citizens for lawful purposes," including "personal protection." *Id.*; *see also Hollis*, 827 F.3d at 448 (machineguns are "primarily weapons of war and have no appropriate sporting use or use for personal protection" (quoting *Jennings*, 195 F.3d at 799 n.4)).

17

Since 1986, machineguns have been banned apart from those possessed under the authority of government or grandfathered existing weapons. 18 U.S.C. § 922(o). In addition to the federal government banning most machineguns, at least 35 states and the District of Columbia generally ban machineguns,[6] which supports the conclusion that machineguns are unusual and not in common use.[7] The rarity of machineguns in private hands further shows that machineguns are not protected by the Second Amendment. *See Hollis*, 827 F.3d at 449-50; *Simien*, 2023 WL 1980487, at *9.

The arguments in Plaintiff's Complaint for the unconstitutionality of § 922(o) are incorrect. First, Plaintiff argues that *Bruen* "clarified that a class of arms categorized as 'dangerous and

---

[6] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. §§ 13-3101, 13-3102; Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code tit. 11, § 1444; D.C. Code § 22-4514; Fla. Stat. § 790.221; Ga. Code Ann. § 16-11-122; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1; Ind. Code § 35-47-5-8; Iowa Code §§ 724.1, 724.3; Kan. Stat. § 21-6301; La. Stat. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1051; Mass. Gen. Laws ch. 140, § 131; Mich. Comp. Laws § 750.224; Minn. Stat. § 609.67; Mo. Ann. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350; N.J. Stat. § 2C:39-5; N.Y. Penal Law § 265.02; N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11, 2923.17; Or. Rev. Stat. § 166.272; 18 Pa. Stat. and Cons. Stat. § 908; 47 R.I. Gen. Laws § 11-47-8; S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§ 22-1-2, 22-14-6; Tenn. Code Ann. § 39-17-1302; Tex. Penal Code Ann. § 46.05; Wash. Rev. Code § 9.41.190; W. Va. Code § 61-7-9; Wis. Stat. § 941.26. Many of these state laws have exceptions, such as for machinegun possession for military or law enforcement purposes. *See, e.g.*, D.C. Code § 22-4514(a). Some, but not all, of these state laws have exceptions or affirmative defenses for machineguns possessed in compliance with federal law or limit the prohibition to machineguns possessed in violation of federal law. *See, e.g.*, Me. Rev. Stat. Ann. 17-A, § 1052 ("Machine guns . . . possessed in accordance with the National Firearms Act, as amended, shall be exempt from this chapter."); Mo. Ann. Stat. § 571.020(6) (prohibiting machinegun possession "in violation of federal law"); Or. Rev. Stat. § 166.272(4) ("It is an affirmative defense to a charge of violating subsection (1) of this section that the machine gun . . . was registered as required under federal law.").

[7] In 2016, the Fifth Circuit concluded that the fact that 34 states and the District of Columbia prohibited possession of most machineguns (either directly or by incorporating federal prohibitions) supported the constitutionality of § 922(o). *See Hollis*, 827 F.3d at 450. *Hollis* apparently omitted Hawaii from its list of states that ban machineguns, *see id.* at 450 n.8, perhaps because Hawaii's machinegun ban uses the phrase "automatic firearms" rather than "machineguns." Haw. Rev. Stat. § 134-8(a).

unusual' cannot be banned if they are in 'common use.'" Compl. ¶ 17. Not so. *Bruen* treated "common use" and "dangerous and unusual" as two sides of the same coin, explaining that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to those* that 'are highly unusual in society at large.'" 142 S. Ct. at 2143 (emphasis added) (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (the limitation that the Second Amendment protects weapons "in common use at the time . . . is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons") (quotations and citations omitted). Therefore, "[i]f a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment." *Hollis*, 827 F.3d at 446. Plaintiff cites language from *Bruen* stating that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." Compl. ¶ 17 (quoting *Bruen*, 142 S. Ct. at 2143). This language is best read to suggest that the status of handguns may have changed since the colonial era, not that weapons can be protected as "in common use" even if they are "dangerous and unusual."

Second, Plaintiff contends that the M-16 rifle is "in common use" because it is the "standard small-arms weapon used by the United States military." *See id*. ¶ 18. But use by the military is the wrong metric. *Heller* squarely rejected the argument that "weapons useful in warfare are protected[,]" finding such a reading "startling" because it would suggest the unconstitutionality of "restrictions on machineguns[.]" 554 U.S. at 624. And both *Heller* and *Bruen* clarified that the relevant inquiry for "common use" is whether weapons are "'in common use at the time' for lawful purposes like self-defense." *Id.*; *Bruen*, 142 S. Ct. at 2134 (handguns are protected because they are "weapons 'in common use' today for self-defense"). The Second

19

Amendment does not confer upon individuals a right to possess and carry advanced military weaponry.  What matters in determining whether a weapon qualifies for Second Amendment protection is whether it is commonly used by private individuals for lawful purposes like self-defense.  Machineguns are not.

Third, Plaintiff cites an ATF report, which states that there were 741,146 registered machineguns as of May 2021, as support for the conclusion that machineguns are in common use.  *See* ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021*, at 15-16 (2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (cited in Compl. ¶ 18 n.2).  But as one district court explained in rejecting an argument based on that ATF report, the number of registered machineguns "is less than .2% of total firearms in the United States," which "remains too insignificant for machineguns to be considered in common use."  *Simien*, 2023 WL 1980487, at *9.  Further, the two statutory exceptions that allow a machinegun to be possessed (and therefore registered) are machineguns possessed or transferred under the authority of a government agency, 18 U.S.C. § 922(o)(2)(A), or those lawfully possessed before May 19, 1986, *id.* § 922(o)(2)(B).  Plaintiff makes no factual allegations that reasonably support the inference that these registered machineguns are used by private individuals for lawful purposes like self-defense, as opposed to being possessed by governments or as antique collector's items.

## B.    Section 922(o) Is Consistent with Historical Tradition

That possession of machineguns is not protected by the Second Amendment's plain text suffices to demonstrate § 922(o)'s constitutionality.  But if the Court advances to *Bruen*'s second prong, then § 922(o) "is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126.

*Heller* largely settled the question of historical tradition, holding that a "historical tradition"

exists "of prohibiting the carrying of dangerous and unusual weapons," which "fairly support[s]"

limiting the Second Amendment's protection to "the sorts of weapons . . . in common use at the

time." 554 U.S. at 627 (quotations omitted).  In support of its conclusion about historical tradition,

*Heller* cited the following authorities:

> *See* 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79
> (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the
> Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and
> Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48
> (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F.
> Wharton, A Treatise on the Criminal Law of the United States 726 (1852).  *See also State
> v. Langford,* 10 N.C. 381, 383–384 (1824); *O'Neill v. State,* 16 Ala. 65, 67 (1849); *English
> v. State,* 35 Tex. 473, 476 (1871); *State v. Lanier,* 71 N.C. 288, 289 (1874).

*Heller*, 554 U.S. at 627.

The sources cited by *Heller* show that carrying dangerous and unusual weapons was widely

considered a crime in England and in the early American republic.  For example, Blackstone

explained that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a

crime against the public peace, by terrifying the good people of the land; and is particularly

prohibited by the statute of Northampton, 2 Edw. III. c. 3."  4 W. Blackstone, Commentaries on

the Laws of England 148-49; *see also*, *e.g.*, J. Dunlap, The New–York Justice 8 (stating that "for

a man to arm himself with dangerous and unusual weapons" was a criminal "affray, at common

law"); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 ("Riding or

going armed with dangerous and unusual weapons, is a crime against the public peace . . . .").

Of course, the modern machinegun did not exist at the time of ratification of the Second

Amendment in 1791 or the Fourteenth Amendment in 1868, so there are no laws from those time

periods specifically addressing machineguns.  But *Bruen* requires a "historical *analogue*, not a

historical *twin*" 142 S. Ct. at 2133, to sustain modern firearms regulations.  Modern regulations

restricting dangerous and unusual weapons of today are "relevantly similar" to historical

prohibitions on the carriage of dangerous and unusual weapons of earlier eras. *Id.* at 2132. The key question is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are "dangerous and unusual weapons." For the reasons explained above, *see supra*, pp. 16-20, machineguns are dangerous and unusual weapons that may be banned consistent with historical tradition.

## IV.   The Complaint Does Not State an Article I Claim

It is unclear whether Plaintiff intended to plead a claim that § 922(o) exceeds the scope of Congress's powers under Article I. The Complaint's introductory paragraphs contain two brief assertions that § 922(o) "exceed[s] the power of the United States under Article I of the United States Constitution," and "violat[es] . . . Article I." Compl. ¶¶ 1-2. However, the Complaint contains no further references to Article I, and the Complaint's sole claim is labeled as a claim for violation of the Second Amendment, not Article I.

If the Court generously construes the Complaint to contain a claim that § 922(o) transgresses Article I, such a claim would be foreclosed by binding precedent. In *United States v. Haney*, 264 F.3d 1161, 1166-71 (10th Cir. 2001), the Tenth Circuit held that § 922(o) was a valid exercise of Congress's Article I power to regulate interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3.[8] No subsequent Tenth Circuit or Supreme Court decision undermines *Haney*'s authority. Accordingly, any Article I claim would fail as a matter of law.

## V.   DeWilde Lacks Authority to Represent the Trust *Pro Se*

DeWilde, who does not claim to be a licensed attorney, filed the Complaint *pro se*, purportedly "[i]ndividually and as Trustee of the DeWilde Arms Trust." Compl. at p. 1. But the law is well-established that a non-attorney cannot represent a trust *pro se*, even if he is the trustee.

---

[8] So have at least eight other circuits. *See Henry*, 688 F.3d at 641-42 & n.4 (holding that § 922(o) was constitutional under the Commerce Clause and collecting other cases so holding).

*See United States v. Lain*, 773 F. App'x 476, 477 (10th Cir. 2019) (non-attorney "cannot represent the trust's interests because he lacks the authority to practice law"); *see also United States v. Lain*, No. 17-cv-113-J, 2018 WL 8244912, at *2 (D. Wyo. Dec. 28, 2018) ("With respect to the right of a pro se trustee to appear on behalf of a trust, courts have uniformly held that a non-attorney trustee may not represent a trust in federal court."), *aff'd* 773 F. App'x 476.  Therefore, unless a licensed attorney appears on behalf of the Trust, the Court should dismiss Plaintiff's claims insofar as they are brought on behalf of the Trust for the additional, independent reason that DeWilde lacks authority to represent the Trust.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint for failure to state a claim.

23

Dated this 13th day of March 2023

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney


By:   */s/ Jeremy A. Gross*
JEREMY A. GROSS
Assistant United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

# United States District Court

for the

District of Wyoming

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2023 MAR 15  AM 9:40

MARGARET BOTKINS, CLERK
CASPER

| | | |
|---|---|---|
| Jake  Stanley  DeWilde, Individually and as Trustee of the DEWILDE ARMS TRUST, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 1:23-cv-00003-SWS |
| Attorney General Of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MOTION FOR LEAVE TO AMEND COMPLAINT

The Plaintiff respectfully moves this Court for entry of an order pursuant to Fed. R. Civ.

P. 15(a) granting Plaintiff leave to file an amended complaint, and states the following:

1. Plaintiffs proposed amended complaint is attached to this motion.

2. Local rule 15.1 states that "pro se litigants are excluded from the redlined version and conferral requirements."

3. Plaintiff identifies two changes in the attached proposed amended complaint from the original, ECF No. 1:

    a. Plaintiff withdraws his representation of the DeWilde Arms Trust as Trustee.

    b. Plaintiff withdraws his Article I Claim.

DATED this 14th day of March, 2023.

Respectfully Submitted,

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

# United States District Court

for the

District of Wyoming

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | Case No. 1:23-cv-00003-SWS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Attorney General Of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Jake Stanley DeWilde, and for his Amended Complaint for

Declaratory and Injunctive Relief states as follows:

## INTRODUCTION

1.     This is an action seeking declaratory and injunctive relief from 18 U.S.C. § 922(o) and the implementing regulation 27 C.F.R. § 479.105(a). These statutory and regulatory provisions generally act as an unlawful *de facto* ban on the transfer or possession of a machinegun manufactured after May 19, 1986. By imposing such a ban on an entire class of weapons, the statutes and regulations violate the Second Amendment rights of the Plaintiff.

2.     Plaintiff seeks declaratory and injunctive relief against the unconstitutional provisions contained in 18 U.S.C. § 922(o) and 27 C.F.R. § 479.105(a); declaring the ban on machineguns unconstitutional under the Second Amendment.

### PARTIES

3.     Plaintiff Jake Stanley DeWilde is an adult male citizen of the State of Wyoming.

4.     Defendant Merrick Garland is sued in his official capacity as the Attorney General of the United States of America. As Attorney General, Defendant Garland is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

5.     Defendant Steven Dettelbach is sued in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"). As Director of BATFE, Defendant Dettelbach is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

### BASIS FOR JURISDICTION

6.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343,

1346, because this action arises under the Constitution and laws of the United States, and has

jurisdiction to render declaratory relief under 28 U.S.C §§ 2201, 2202.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1402, because the

Plaintiff resides in Wyoming, and the Defendants are agencies of the United States or officers

thereof acting in their official capacity.

### FACTUAL ALLEGATIONS

8.      The Second Amendment states, "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend. II.

9.      The Second Amendment confers "an individual right to keep and bear arms"

*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and it "extends, prima facie, to all

instruments that constitute bearable arms, even those that were not in existence at the time of the

founding." *Id.,* at 595.

10.     In *U.S. v. Miller*, 307 U.S. 174 (1939), Jack Miller was charged with violating the

National Firearms Act by transporting in interstate commerce a shotgun having a barrel less than

18 inches in length that was not registered and that they did not possess a stamp-affixed written

order for. The *Miller* opinion "assumes from the prologue that the Amendment was designed to

preserve the militia, 307 U. S., at 178" *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008).

11.     In *Heller*, the court analyzed the *Miller* opinion, and determined that it was not a

comprehensive analysis of the full scope of the Second Amendment. "The defendants made no

appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard

from no one but the Government (reason enough, one would think, not to make that case the beginning and the end of this Court's consideration of the Second Amendment)." *Id.,* at 673. *Heller* emphasized the limited extent of analysis of the Second Amendment conducted in *Miller,* acknowledging that there was a lack of evidence to determine whether or not the weapon in question was "any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.,* at 622, and continued that "Beyond that, the opinion provided no explanation of the content of the right." *Id.*

12.    In *Heller*, the court directed that *Miller*'s phrase "ordinary military equipment" be read "in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U. S., at 179." *Id.*, at 624. ""In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973))." *Id.,* at 624, 625.

13.    The M16 rifle, and its variants, are the standard small-arms weapons in common use by the United States military[1]. The M16 is the quintessential rifle for use in the modern militia, just as the musket was the quintessential rifle for use in the militia of the colonial and revolutionary war era.

---

[1] *M16 Rifle*, Defense Advanced Research Projects Agency (n.d.) https://www.darpa.mil/about-us/timeline/agile-and-m16 (last accessed January 4, 2023).

14.     18 U.S.C. § 922(o) generally bans the possession or transfer of machineguns manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
> > (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> >
> > (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

15.     In *New York State Rifle & Pistol Assn., Inc. v. Bruen,* 597 U.S. ___ (2022), the court reaffirmed the standard established in *Heller* for Second Amendment challenges while rejecting the two-part framework that had been developed by Courts of Appeals:

> "Step one of the predominant framework is broadly consistent with *Heller,* which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.,* at 10.

16.     "The test that the Court set forth in Heller and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.,* at 17.

17.     *Bruen* additionally clarified that a class of arms categorized as "dangerous and unusual" cannot be banned if they are in "common use":

> "Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Id., at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.,* at 39.

18.     With the clarification of *Bruen,* the M16 rifle, being in common use today as the standard small-arms weapon used by the United States military, as well as it and hundreds of thousands of machineguns being lawfully registered and not in the possession or under control of the U.S. Government[2], cannot be banned on the basis of being "dangerous and unusual".

---

[2] *Firearms Commerce in the United States - Annual Statistical Update 2021*, Bureau of Alcohol, Tobacco, Firearms, and Explosives (2021) https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 4, 2023).

19.     On December 8, 2022, Plaintiff submitted an ATF Form 5320.1, Application to Make and Register a firearm, to the BATFE, requesting permission to make an M16 machinegun.

20.     On December 20, 2022, the BATFE disapproved Plaintiff's application, citing 18 U.S.C. § 922(o) (see Appendix A).

**COUNT I**

**VIOLATION OF THE SECOND AMENDMENT RIGHT**

**TO KEEP AND BEAR ARMS**

21.     Plaintiff incorporates each and every paragraph as if copied in full hereafter.

22.     The machinegun ban in 18 U.S.C. § 922(o) and the associated regulations violate Plaintiff's Second Amendment rights.

23.     Plaintiff desires to own an M16 machinegun for all lawful purposes, including defense of hearth and home and militia functions.

24.     Plaintiff is entitled to declaratory and injunctive relief that 18 U.S.C. § 922(o) is unconstitutional.

**PRAYER FOR RELIEF**

25.     Plaintiff respectfully asks this Court to:

    A.     Issue a judgment declaring that 18 U.S.C. § 922(o) is unconstitutional.

    B.     Issue an order requiring the Defendants to approve Plaintiff's Form 1 application.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  3/14/2023

Signature of Plaintiff

Printed Name of Plaintiff   JAKE DeWILDE

DATED this 14th day of March, 2023.

Respectfully Submitted,

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN (*PRO HAC VICE*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Jake Stanley De Wilde, Individually and as | ) | |
| Trustee of the DEWILDE ARMS TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:23-cv-00003-SWS |
| v. | ) | |
| | ) | |
| Attorney General of the United States; | ) | |
| Director of the Bureau of Alcohol, | ) | |
| Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## MOTION FOR LEAVE TO AMEND COMPLAINT

Defendants Merrick Garland, in his official capacity as the Attorney General of the United States of America, and Steven Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, through undersigned counsel, hereby respond to Plaintiff's Motion for Leave to Amend Complaint (Doc. 11). Defendants are not opposed to this Motion. However, Defendants reserve all rights with respect to the proposed Amended Complaint, including the right to move to dismiss pursuant to Federal Rule of Civil Procedure 12.

Dated this 16th day of March, 2023.

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney


By:  /s/ Jeremy A. Gross
JEREMY A. GROSS
Assistant United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ Jeremy S.B. Newman
JEREMY S.B. NEWMAN (*Pro Hac Vice*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

**FILED**

9:52 am, 3/17/23

**U.S. Magistrate Judge**

# United States District Court

## For The District of Wyoming

| | |
|---|---|
| Jake Stanley DeWilde, Individually and as Trustee of the DEWILDE ARMS TRUST, | |
| Plaintiff, | |
| vs. | Civil No. 23-CV-03-S |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | |
| Defendants. | |

## ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT [11]

This matter is before the Court on Plaintiff's Motion for Leave to Amend Complaint [Doc. 11]. The Court, having carefully considered the Motion, Response, and being otherwise fully advised, FINDS: Plaintiff's unopposed request to file an amended complaint is not unduly delayed, was not made in bad faith or with ulterior motive, and will not cause undue prejudice.

Plaintiff seeks to amend his Complaint to withdraw his representation of the DeWilde Arms Trust as Trustee and withdraw his Article I claim. Defendants do not oppose Plaintiff's request to amend but reserve all rights with respect to the proposed amended complaint.

Therefore, Plaintiff's request to file an amended complaint is granted. Plaintiff may file the amended complaint within five working days of this Order.

NOW, THEREFORE, IT IS ORDERED Plaintiff's Motion to Amend Complaint [Doc. 10] is GRANTED.

IT IS FURTHER ORDERED Plaintiff may file an Amended Complaint on or before March 24, 2023.

Dated this 17th day of March, 2023.

_____
Kelly H. Rankin
U.S. Magistrate Judge

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

Jake Stanley DeWilde, Individually and as
Trustee of the DEWILDE ARMS TRUST,

          Plaintiff,

     vs.

Attorney General of the United States;
Director of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives,

          Defendants.

Case No.  1:23-CV-00003-SWS

---

## ORDER DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS (ECF No. 9)

This matter comes before the Court on Defendants' *Motion to Dismiss the Complaint* (ECF No. 9). Defendants moved to dismiss on March 13, 2023. (ECF No. 9.) Plaintiff moved to amend the Complaint on March 15, 2023. (ECF No. 11.) Plaintiff's motion to amend has been granted. (ECF No. 13).

Plaintiff's Amended Complaint supersedes his original complaint and therefore, is the operative pleading. *See Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) (noting "an amended complaint supercedes an original complaint and renders the original complaint without legal effect" (internal quotation marks and citation omitted)). Therefore, **IT IS HEREBY ORDERED** that Defendants' *Motion to Dismiss* (ECF No. 9) is **DENIED AS MOOT** without prejudice to refiling.

Dated this ___17___ day of March, 2023.

BY THE COURT:

_____
Scott W. Skavdahl
Chief United States District Judge

# United States District Court

for the

District of Wyoming



| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Attorney General Of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Jake Stanley DeWilde, and for his Amended Complaint for

Declaratory and Injunctive Relief states as follows:

## INTRODUCTION

1

1.      This is an action seeking declaratory and injunctive relief from 18 U.S.C. § 922(o) and the implementing regulation 27 C.F.R. § 479.105(a). These statutory and regulatory provisions generally act as an unlawful *de facto* ban on the transfer or possession of a machinegun manufactured after May 19, 1986. By imposing such a ban on an entire class of weapons, the statutes and regulations violate the Second Amendment rights of the Plaintiff.

2.      Plaintiff seeks declaratory and injunctive relief against the unconstitutional provisions contained in 18 U.S.C. § 922(o) and 27 C.F.R. § 479.105(a); declaring the ban on machineguns unconstitutional under the Second Amendment.

## PARTIES

3.      Plaintiff Jake Stanley DeWilde is an adult male citizen of the State of Wyoming.

4.      Defendant Merrick Garland is sued in his official capacity as the Attorney General of the United States of America. As Attorney General, Defendant Garland is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

5.      Defendant Steven Dettelbach is sued in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"). As Director of BATFE, Defendant Dettelbach is responsible for administering and executing the laws of the United States, and is currently enforcing the laws complained of in this action.

## BASIS FOR JURISDICTION

6.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1346, because this action arises under the Constitution and laws of the United States, and has jurisdiction to render declaratory relief under 28 U.S.C §§ 2201, 2202.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1402, because the Plaintiff resides in Wyoming, and the Defendants are agencies of the United States or officers thereof acting in their official capacity.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

8.      The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

9.      The Second Amendment confers "an individual right to keep and bear arms" *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.,* at 595.

10.     In *U.S. v. Miller*, 307 U.S. 174 (1939), Jack Miller was charged with violating the National Firearms Act by transporting in interstate commerce a shotgun having a barrel less than 18 inches in length that was not registered and that they did not possess a stamp-affixed written order for. The *Miller* opinion "assumes from the prologue that the Amendment was designed to preserve the militia, 307 U. S., at 178" *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008).

11.     In *Heller*, the court analyzed the *Miller* opinion, and determined that it was not a comprehensive analysis of the full scope of the Second Amendment. "The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument; the Court heard

3

from no one but the Government (reason enough, one would think, not to make that case the beginning and the end of this Court's consideration of the Second Amendment)." *Id.,* at 673. *Heller* emphasized the limited extent of analysis of the Second Amendment conducted in *Miller,* acknowledging that there was a lack of evidence to determine whether or not the weapon in question was "any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.,* at 622, and continued that "Beyond that, the opinion provided no explanation of the content of the right." *Id.*

12.     In *Heller*, the court directed that *Miller*'s phrase "ordinary military equipment" be read "in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U. S., at 179." *Id.*, at 624. ""In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6–15, 252–254 (1973))." *Id.,* at 624, 625.

13.     The M16 rifle, and its variants, are the standard small-arms weapons in common use by the United States military[1]. The M16 is the quintessential rifle for use in the modern militia, just as the musket was the quintessential rifle for use in the militia of the colonial and revolutionary war era.

---

[1] *M16 Rifle*, Defense Advanced Research Projects Agency (n.d.) https://www.darpa.mil/about-us/timeline/agile-and-m16 (last accessed January 4, 2023).

WYD 76

14.     18 U.S.C. § 922(o) generally bans the possession or transfer of machineguns manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
>> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>>
>> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

15.     In *New York State Rifle & Pistol Assn., Inc. v. Bruen,* 597 U.S. ___ (2022), the court reaffirmed the standard established in *Heller* for Second Amendment challenges while rejecting the two-part framework that had been developed by Courts of Appeals:

> "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.,* at 10.

WYD 77

16.     "The test that the Court set forth in Heller and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.,* at 17.

17.     *Bruen* additionally clarified that a class of arms categorized as "dangerous and unusual" cannot be banned if they are in "common use":

> "Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Id., at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.,* at 39.

18.     With the clarification of *Bruen,* the M16 rifle, being in common use today as the standard small-arms weapon used by the United States military, as well as it and hundreds of thousands of machineguns being lawfully registered and not in the possession or under control of the U.S. Government[2], cannot be banned on the basis of being "dangerous and unusual".

---

[2] *Firearms Commerce in the United States - Annual Statistical Update 2021*, Bureau of Alcohol, Tobacco, Firearms, and Explosives (2021) https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 4, 2023).

WYD 78

19.     On December 8, 2022, Plaintiff submitted an ATF Form 5320.1, Application to Make and Register a firearm, to the BATFE, requesting permission to make an M16 machinegun.

20.     On December 20, 2022, the BATFE disapproved Plaintiff's application, citing 18 U.S.C. § 922(o) (see Appendix A).

## COUNT I

## VIOLATION OF THE SECOND AMENDMENT RIGHT

## TO KEEP AND BEAR ARMS

21.     Plaintiff incorporates each and every paragraph as if copied in full hereafter.

22.     The machinegun ban in 18 U.S.C. § 922(o) and the associated regulations violate Plaintiff's Second Amendment rights.

23.     Plaintiff desires to own an M16 machinegun for all lawful purposes, including defense of hearth and home and militia functions.

24.     Plaintiff is entitled to declaratory and injunctive relief that 18 U.S.C. § 922(o) is unconstitutional.

## PRAYER FOR RELIEF

25.     Plaintiff respectfully asks this Court to:

    A.     Issue a judgment declaring that 18 U.S.C. § 922(o) is unconstitutional.

    B.     Issue an order requiring the Defendants to approve Plaintiff's Form 1 application.

WYD 79

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3/17/2023

Signature of Plaintiff

Printed Name of Plaintiff JAKE DEWILDE

8

DATED this 17th day of March, 2023.     Respectfully Submitted,

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN (*PRO HAC VICE*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| Jake Stanley De Wilde, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; | ) | |
| Director of the Bureau of Alcohol, | ) | |
| Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendants Merrick Garland, in his official capacity as the Attorney General of the United

States of America, and Steven Dettelbach, in his official capacity as Director of the Bureau of

Alcohol, Tobacco, Firearms, and Explosives, through undersigned counsel, hereby move to dismiss the Amended Complaint for Declaratory and Injunctive Relief (Doc. 15), for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).   The accompanying Memorandum in Support of Defendants' Motion to Dismiss the Amended Complaint further states the grounds for this Motion.

Dated this 3rd day of April, 2023.

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney

By:  /s/ Jeremy A. Gross
     JEREMY A. GROSS
     Assistant United States Attorney

     BRIAN M. BOYNTON
     Principal Deputy Assistant Attorney General

     LESLEY FARBY
     Assistant Branch Director

     /s/ Jeremy S.B. Newman
     JEREMY S.B. NEWMAN (*Pro Hac Vice*)
     Trial Attorney
     Civil Division, Federal Programs Branch
     U.S. Department of Justice
     1100 L St. NW
     Washington, DC 20005
     Phone: (202) 532-3114
     Email: jeremy.s.newman@usdoj.gov

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN (*PRO HAC VICE*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| Jake Stanley De Wilde, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; | ) | |
| Director of the Bureau of Alcohol, | ) | |
| Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 1

    I.     Statutory and Regulatory Background ............................................... 1

    II.    Plaintiff's Amended Complaint .......................................................... 5

LEGAL STANDARD ................................................................................................. 6

ARGUMENT ............................................................................................................... 6

    I.     Under Supreme Court Precedent, Machineguns Are Not Protected by the
          Second Amendment .......................................................................... 6

    II.    Courts Have Uniformly Upheld 18 U.S.C. § 922(o) ....................... 11

          A.    Six Courts of Appeals Have Upheld § 922(o) Since *Heller* .................... 11

          B.    Multiple District Courts Have Upheld § 922(o) Since *Bruen* ................ 13

    III.   Section 922(o) Comports with the Second Amendment
          Under *Bruen*'s Standard .................................................................. 15

          A.    The Second Amendment's Plain Text Does Not Cover Possession
              of a Machinegun .......................................................................... 16

          B.    Section 922(o) Is Consistent with Historical Tradition ........................... 21

CONCLUSION ......................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................6

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015)......................................................................10

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...................................................................................*passim*

*English v. State*,
  35 Tex. 473 (1871).........................................................................................21

*Farmer v. Higgins*,
  907 F.2d 1041 (11th Cir. 1990)........................................................................4

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015)............................................................................8

*Hamblen v. United States*,
  591 F.3d 471 (6th Cir. 2009)....................................................................11, 12

*Hollis v. Lynch*,
  827 F.3d 436 (5th Cir. 2016)....................................................................*passim*

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)......................................................................................8, 9

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...............................................................................*passim*

*O'Neill v. State*,
  16 Ala. 65 (1849)...........................................................................................21

*Sherman v. Trinity Teen Sols., Inc.*,
  No. 20-cv-215-SWS, 2021 WL 7286422 (D. Wyo. Nov. 30, 2021)...................6

*State v. Langford*,
  10 N.C. 381 (1824)........................................................................................21

WYD 86

*State v. Lanier,*
   71 N.C. 288 (1874) ................................................................21

*United States v. Carrero,*
   No. 2:22-cr-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022) ............................ 13

*United States v. Dixon,*
   No. 22-cr-140, 2023 WL 2664076 (N.D. Ill. Mar. 28, 2023) .................................3, 8, 10, 13

*United States v. Fincher,*
   538 F.3d 868 (8th Cir. 2008) ............................................... 11, 12

*United States v. Henry,*
   688 F.3d 637 (9th Cir. 2012) .........................................2, 11, 12, 17

*United States v. Hoover,*
   --- F. Supp. 3d ---, 2022 WL 10524008 (M.D. Fla. Oct. 18, 2022) ....................... 14

*United States v. Jennings,*
   195 F.3d 795 (5th Cir. 1999) ............................................... 13, 18

*United States v. Miller,*
   307 U.S. 174 (1939) .........................................................7, 8, 16

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame,*
   *Unknown Caliber Serial No. LW001804,*
   822 F.3d 136 (3d Cir. 2016) ............................................... 11, 12

*United States v. Rozier,*
   598 F.3d 768 (11th Cir. 2010) ................................................. 10

*United States v. Serawop,*
   505 F.3d 1112 (10th Cir. 2007) ............................................10-11

*United States v. Simien,*
   No. SA-22-cr-00379-JKP, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023) ...........14, 17, 19, 21

*United States v. Teerlink,*
   No. 2:22-cr-0034-TS, 2022 WL 17093425 (D. Utah Nov. 21, 2022) .................................. 13

*United States v. Thompson/Ctr. Arms Co.,*
   504 U.S. 505 (1992) ...........................................................3

*United States v. Wilks,*
   58 F.3d 1518 (10th Cir. 1995) ................................................. 18

WYD 87

*United States v. Zaleski*,
   489 F. App'x 474 (2d Cir. 2012)...............................................................11, 12

**Constitutional Provisions**

U.S. Const. amend. II.............................................................................................16

**Statutes**

18 U.S.C. § 921.........................................................................................................2

18 U.S.C. § 922.................................................................................................*passim*

26 U.S.C. § 5811.......................................................................................................4

26 U.S.C. § 5812.......................................................................................................4

26 U.S.C. § 5822.......................................................................................................4

26 U.S.C. § 5841.......................................................................................................4

26 U.S.C. § 5845.......................................................................................................2

18 Pa. Stat. and Cons. Stat. § 908 ........................................................................18

720 Ill. Comp. Stat. 5/24-1 ...................................................................................18

Alaska Stat. § 11.61.200 ........................................................................................18

Ariz. Rev. Stat. § 13-3101......................................................................................18

Ariz. Rev. Stat. § 13-3102......................................................................................18

Cal. Penal Code § 32625.........................................................................................18

Colo. Rev. Stat. § 18-12-102..................................................................................18

D.C. Code § 22-4514 ........................................................................................18, 19

Del. Code tit. 11, § 1444 ........................................................................................18

Fla. Stat. § 790.221.................................................................................................18

Ga. Code Ann. § 16-11-122 ...................................................................................18

Haw. Rev. Stat. § 134-8 ...................................................................................18, 19

Ind. Code § 35-47-5-8.................................................................................18

Iowa Code § 724.1....................................................................................18

Iowa Code § 724.3....................................................................................18

Kan. Stat. § 21-6301.................................................................................18

La. Stat. § 40:1752....................................................................................18

Mass. Gen. Laws ch. 140...........................................................................18

Me. Rev. Stat. Ann. tit. 17-A................................................................18, 19

Mich. Comp. Laws § 750.224.....................................................................18

Minn. Stat. § 609.67..................................................................................18

Mo. Ann. Stat. § 571.020.....................................................................18, 19

N.C. Gen. Stat. § 14-409............................................................................18

N.D. Cent. Code § 62.1-05-01....................................................................18

N.J. Stat. § 2C:39-5...................................................................................18

N.Y. Penal Law § 265.02...........................................................................18

Neb. Rev. Stat. § 28-1203..........................................................................18

Nev. Rev. Stat. § 202.350...........................................................................18

Ohio Rev. Code Ann. § 2923.11.................................................................18

Ohio Rev. Code Ann. § 2923.17.................................................................18

Or. Rev. Stat. § 166.272.......................................................................18, 19

Pub. L. No. 73-474, 48 Stat. 1236 (June 26, 1934).........................................2

Pub. L. No. 90-618, 82 Stat. 1213 (Oct. 22, 1968).........................................3

Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986)..............................3, 4, 18

R.I. Gen. Laws § 11-47-8...........................................................................18

S.C. Code Ann. § 16-23-230.......................................................................18

S.D. Codified Laws § 22-1-2.................................................................18

S.D. Codified Laws § 22-14-6..............................................................18

Tenn. Code Ann. § 39-17-1302............................................................18

Tex. Penal Code Ann. § 46.05..............................................................18

W. Va. Code § 61-7-9...........................................................................18

Wash. Rev. Code § 9.41.190.................................................................18

Wis. Stat. § 941.26 ...............................................................................18

**Rules**

Fed. R. Civ. P. 12(b)(6).........................................................................6

**Regulations**

27 C.F.R. § 479.105...........................................................................4, 5, 6

**Other Authorities**

1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors (1831)................................21

3 B. Wilson, Works of the Honourable James Wilson (1804)..................................................21

78 Cong. Rec. 11,400 (June 13, 1934)..................................................................................3

ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021* (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download...........20

C. Humphreys, A Compendium of the Common Law in Force in Kentucky (1822)............21, 22

E. Lewis, An Abridgment of the Criminal Law of the United States (1847)............................21

F. Wharton, A Treatise on the Criminal Law of the United States (1852)................................21

H.R. Rep. No. 73-1780, at 1 (1934) .................................................................................3, 17

H.R. Rep. No. 99-495 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327......................................18

H. Stephen, Summary of the Criminal Law 48 (1840).............................................................21

J. Dunlap, The New–York Justice 8 (1815).......................................................................21, 22

WYD 90

William Blackstone, 4 Commentaries on the Laws of England (1769)................ 8, 14, 16, 21, 22

William Rosenau, *The Origins of the First Modern Weapon,* TECH. REV. (1987), (reviewing
    John Ellis, *The Social History of the Machine Gun* (1986))................................................ 17

## INTRODUCTION

Plaintiff Jake Stanley DeWilde claims in this lawsuit that he — and, by extension, every law-abiding citizen — has a constitutional right to possess the same advanced weaponry that the United States military uses to equip armed forces on the battlefield, the M-16 machinegun.  The Second Amendment does not countenance that result.  The Supreme Court recognized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and reaffirmed in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that although the Second Amendment protects the rights of law-abiding citizens to possess arms that are in common use for lawful purposes such as self-defense, it does not guarantee a right to possess dangerous and unusual weapons.  *See Heller*, 554 U.S. at 624, 627; *Bruen*, 142 S. Ct. at 2128.  The Supreme Court has cited machineguns such as the M-16 rifle as a prime example of the type of dangerous and unusual weapon that "may be banned," dismissing as "startling" the notion that machineguns are protected by the Second Amendment.  *Heller*, 554 U.S. at 624, 627.  Since *Heller*, courts have uniformly upheld restrictions on machineguns, including a small but growing body of case law since *Bruen*.  In prohibiting possession of machineguns with limited exceptions not applicable here, 18 U.S.C. § 922(o) does not transgress the Second Amendment.  Machineguns are among the most dangerous firearms in existence, and they are not commonly used for lawful purposes such as self-defense.  Machineguns are beyond the scope of the Second Amendment's text, and 18 U.S.C. § 922(o) is consistent with this nation's historical tradition of restricting dangerous and unusual weapons.  The Court should dismiss Plaintiff's lawsuit for failure to state a claim.

## BACKGROUND

### I.     Statutory and Regulatory Background

Congress has defined machinegun to include an automatic weapon that can fire more than one shot with a single function of the trigger, the frame or receiver of such a weapon, and certain

parts that can be used to convert a weapon into a machinegun. *See* 26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24).[1]  Federal regulation of machineguns evolved throughout the twentieth century, leading to the 1986 enactment of 18 U.S.C. § 922(o), which prohibits most possession of machineguns.

Congress first regulated machineguns with the passage of the National Firearms Act of 1934 ("NFA"), which was enacted not long after machineguns were "first widely used during World War I[.]"  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012).  The NFA regulated "firearms," a statutory term of art originally defined to include machineguns, short-barreled rifles, short-barreled shotguns, and silencers.  Pub. L. No. 73-474, 48 Stat. 1236, § 1(a) (June 26, 1934) (*codified as amended at* 26 U.S.C. § 5845(a)).  Among other things, the NFA imposed a transfer tax on NFA firearms such as machineguns, required registration of such firearms and completion of an application with the federal government to make and transfer such firearms, and criminalized possession or receipt of such firearms without compliance with the Act's requirements.  48 Stat. at 1237-38, §§ 3-6.

Legislative history shows that the NFA was intended to curb the spread of the type of weapons used by gangsters for criminal activity, with machineguns identified as the most

---

[1] Congress has refined the definition of machinegun over time and has variously used the spellings "machinegun" and "machine gun."  This memorandum uses "machinegun," the spelling currently used in federal firearms statutes, except when quoting a source that uses "machine gun."  Currently, federal law defines machinegun as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

2

dangerous weapons for gangsters.  The House Report for the NFA states: "The growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons needs no comment.  The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."  *See* H.R. Rep. No. 73-1780, at 1 (May 28, 1934).   On the House floor, Rep. Doughton, the chairman of the committee that advanced the NFA, explained that "[f]or some time this country has been at the mercy of the gangsters, racketeers, and professional criminals," and "the primary purpose of the bill is to stop gangsters from getting hold of machine guns."  78 Cong. Rec. 11,400 (June 13, 1934).  "It is of course clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes[.]"  *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see also United States v. Dixon*, No. 22-cr-140, 2023 WL 2664076, at *2 (N.D. Ill. Mar. 28, 2023) (NFA "regulated sawed-off shotguns and machine guns, the favorite weapons of organized crime").

In 1968, Congress amended and updated various provisions of the NFA in the National Firearms Act Amendments of 1968, which was part of a legislative package that also included the Gun Control Act of 1968 ("GCA").  Pub. L. No. 90-618, 82 Stat. 1213 (Oct. 22, 1968).  Among other things, the GCA imposed recordkeeping and licensing requirements on manufacturers and dealers of firearms and prohibited certain categories of individuals (including felons, fugitives, and drug addicts) from receiving or shipping firearms.  *Id.* at 1216-21 (*codified as amended at* 18 U.S.C. § 922).

In 1986, Congress enacted § 922(o), which prohibits possession of most privately held machineguns, as part of the Firearms Owners Protection Act ("FOPA"), a broad set of reforms to the GCA.  Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986). Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun" except for transfers or possession of

3

machineguns "under the authority of" a federal or state government agency, or "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect [May 19, 1986]."  18 U.S.C. § 922(o).  Through § 922(o), "Congress intended to prohibit the private possession of machine guns not lawfully possessed prior to May 19, 1986." *Farmer v. Higgins*, 907 F.2d 1041, 1044 (11th Cir. 1990).  When enacting FOPA, Congress found that the Act was necessary "to reaffirm the intent of the Congress" from the GCA not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."  100 Stat. 449, § 1(b)(2).

The NFA's registration, taxation, and approval requirements for machineguns still apply to lawful machineguns that fit within one of the exceptions to § 922(o).  *See*, *e.g.*, 26 U.S.C. §§ 5811, 5812, 5822, 5841.  The NFA provides that an application to make or transfer a firearm "shall be denied" if the making, transfer, receipt or possession of such firearm would put the maker or transferee "in violation of law."  26 U.S.C. §§ 5812(a), 5822.  Similarly, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has enacted a regulation providing that "an application to make or transfer a firearm shall be denied if the making, transfer, receipt, or possession of the firearm would place the maker or transferee in violation of law," including 18 U.S.C. § 922(o).  27 C.F.R. § 479.105(a).  The regulation accordingly provides that "no application to make, transfer, or import a machine gun will be approved" unless the machinegun fits within one of the regulatory exceptions, which generally track the statutory exceptions in § 922(o) for machineguns lawfully possessed prior to May 19, 1986, or possessed or transferred under the

4

authority of a government agency.  *See* 27 C.F.R. § 479.105.

## II.    Plaintiff's Amended Complaint

In his Amended Complaint, Plaintiff Jake Stanley DeWilde ("Plaintiff") brings suit against Defendants Merrick Garland and Steven Dettelbach, in their official capacities as Attorney General and Director of ATF, respectively.   Am. Compl. for Declaratory and Inj. Relief ¶¶ 3-5, ECF No. 15 ("Am. Compl.").[2]  The DeWilde Arms Trust, of which Plaintiff serves as trustee, submitted a form to the ATF, "requesting permission to make an M[-]16 machinegun." *Id.* ¶ 19; Compl. App'x A, at 2, ECF No. 1-1.  Plaintiff alleges that the M-16 is "the standard small-arms weapon used by the United States military[.]"  Am. Compl. ¶ 18; *see also Hollis v. Lynch*, 827 F.3d 436, 440 n.2 (5th Cir. 2016) ("The M-16 is a rifle in service with the United States military.  It is capable of automatic fire, that is to say, firing more than one round per trigger-action.").  Plaintiff alleges that he "desires to own an M[-]16 machinegun for all lawful purposes, including defense of hearth and home and militia functions."  Am. Compl. ¶ 23.  The ATF denied the application, citing 18 U.S.C. § 922(o).  *See id.* ¶ 20; Compl. App'x A, at 9 ("Reasons For Disapproval: PROHIBITED FROM POSSESSION OF A FIREARM UNDER 18 U.S.C. 922(O).").  Plaintiff does not dispute that the M-16 rifle he wishes to possess is a machinegun, or that 18 U.S.C. § 922(o), if constitutional, would prohibit his possession of such a weapon.  *See* Am. Compl. ¶¶ 1, 14, 19-20.  Nor does he raise any objection to 27 C.F.R. § 479.105(a), other than that it implements 18 U.S.C. § 922(o), which he contends is unconstitutional.  *Id.* ¶¶ 1, 22.

Plaintiff brings one claim for alleged violation of the Second Amendment.  *Id.* ¶¶ 21-24.

---

[2] After Defendants moved to dismiss Plaintiff's original Complaint, ECF No. 9, Plaintiff moved for leave to file an Amended Complaint to make two changes: withdrawing his representation of the DeWilde Arms Trust as trustee, and removing references to a claim that § 922(o) exceeded Congress's power under Article I of the U.S. Constitution, ECF No. 11, at 2.  Defendants did not oppose Plaintiff's motion for leave, *see* ECF No. 12, which the Court granted, ECF No. 13.

Plaintiff claims that "[t]he machine gun ban in 18 U.S.C. § 922(o) and the associated regulations[3] violate Plaintiff's Second Amendment rights." *Id.* ¶ 22.  Plaintiff seeks "declaratory and injunctive relief that 18 U.S.C. § 922(o) is unconstitutional."  *Id.* ¶ 24.  He asks the Court to "[i]ssue a judgment declaring that 18 U.S.C. § 922(o) is unconstitutional" and "[i]ssue an order requiring the Defendants to approve" the DeWilde Arms Trust's application to make a machinegun.  *Id.* ¶¶ 25(A)-(B).

**LEGAL STANDARD**

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must 'raise a right to relief above the speculative level' and must contain 'enough facts to state a claim to relief that is plausible on its face.'"  *Sherman v. Trinity Teen Sols., Inc.*, No. 20-cv-215-SWS, 2021 WL 7286422, at *1 (D. Wyo. Nov. 30, 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This standard "requires the plaintiff to plead facts that allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The Court accepts the nonmoving party's well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true."  *Id.*

**ARGUMENT**

I.     **Under Supreme Court Precedent, Machineguns Are Not Protected by the Second Amendment**

Under Supreme Court precedent, machineguns are in the category of weapons that can be restricted, or even banned, because they are dangerous and unusual weapons beyond the scope of

---

[3] This paragraph does not specify the associated regulations, but the Amended Complaint elsewhere cites 27 C.F.R. § 479.105(a) as an implementing regulation of 18 U.S.C. § 922(o).  *See* Am. Compl. ¶¶ 1-2.

6

the Second Amendment.  In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court limited the types of weapons protected by the Second Amendment.  *Miller* held that the NFA's registration requirements for short-barreled shotguns did not violate the Second Amendment, reasoning: "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."  *Miller*, 307 U.S. at 178. The Court further explained that in the founding era, men engaged in militia service "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179.

The Court next addressed the Second Amendment in detail in *District of Columbia v. Heller*, 554 U.S. 570 (2008), explaining that the Second Amendment protected the right to keep and bear weapons in common use, but not dangerous and unusual weapons.  *Heller* held that "the Second Amendment conferred an individual right to keep and bear arms," but acknowledged that "the right was not unlimited[.]" *Heller*, 554 U.S. at 595.  In articulating the limits of the Second Amendment right, the Court explained the significance of its holding in *Miller*.  *Heller* rejected a reading of *Miller* that the Second Amendment protected weapons "useful in warfare," noting that this reading would lead to the "startling" result that "the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624.  The Court thus found it so clear that the NFA's regulations on machineguns were constitutional that it curtly dismissed the contrary notion as "startling." *Heller* explained that "*Miller* stands . . . for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623.  Specifically, the Second

Amendment protects "arms 'in common use at the time' for lawful purposes like self-defense," *id.* at 624 (quoting *Miller*, 307 U.S. at 179), a "limitation . . . fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627 (quoting William Blackstone, 4 Commentaries on the Laws of England 148-49 (1769)).

The *Heller* Court considered the potential "object[ion]" to its reasoning "that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" concerning the necessity of a well-regulated militia. *Id.* But the Court rebuffed this objection, explaining that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* The Court thus found it implicit and obvious that under its reading of the Second Amendment, "M-16 rifles and the like . . . may be banned[.]" *Id.* As the Fifth Circuit explained, "*Heller* took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment." *Hollis*, 827 F.3d at 446; *see also Dixon*, 2023 WL 2664076, at *3 (in *Heller*, "[t]he Court took from *Miller* the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service") (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015)).

In *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), the Supreme Court held that under the Fourteenth Amendment, the Second Amendment right to bear arms applied not only against the federal government but also against the states. A plurality also "repeat[ed]" the "assurances" from *Heller* about the limitations on the Second Amendment right, including that "the right to keep and bear arms is not a right to keep and carry any weapon whatsoever." 561

U.S. at 786 (quoting *Heller*, 554 U.S. at 626) (plurality opinion).

Finally, last year in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Court reaffirmed its analysis of the Second Amendment in *Heller*, including *Heller*'s conclusions about the limits of the types of weapons protected by the Second Amendment. *Bruen* held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. In so holding, *Bruen* articulated the standard for Second Amendment challenges:

> we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126.

The *Bruen* Court stated that it was clarifying, rather than abrogating, *Heller*'s analysis, explaining that its articulation of the governing standard was "[i]n keeping with *Heller*." *Id.* *Bruen* noted that *Heller* "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right." *Id.* at 2128. Specifically, the Court found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id.* (quoting *Heller*, 554 U.S. at 627).[4] The Court later explained that handguns are protected by the Second Amendment because they "are weapons 'in common use'

---

[4] Justice Kavanaugh's concurrence, joined by Chief Justice Roberts (whose votes were necessary to form the majority in *Bruen*), explicitly quoted and reaffirmed *Heller*'s conclusion that an "important limitation on the right to keep and carry arms" was "that the sorts of weapons protected were those in common use at the time," rather than "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 627).

today for self-defense." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 627).

In sum, "*Heller* and *Bruen* both reaffirmed *Miller*'s holding" that "the Second Amendment does not protect the right to own a 'dangerous and unusual' weapon, such as a machine gun." *Dixon*, 2023 WL 2664076, at *2. The Second Amendment protects weapons "in common use . . . for lawful purposes like self-defense," but does not protect "dangerous and unusual weapons." *Heller*, 554 U.S. at 624, 627. The Supreme Court has further listed machineguns, and specifically the M-16 rifle, as paradigmatic examples of the type of unprotected dangerous and unusual weapons, finding it implicit that "M-16 rifles and the like[] may be banned." *Id.* at 627. And the Supreme Court's recent clarification of the Second Amendment's scope stated that it was "[i]n keeping with *Heller*" and approvingly cited *Heller*'s discussion of the limitation of the Second Amendment to weapons in common use that are not dangerous and unusual. *Bruen*, 142 S. Ct. at 2126, 2128.

"Thus, *Miller, Heller*, and *Bruen* foreclose any challenge to the federal machinegun ban." *Dixon*, 2023 WL 2664076, at *3. To be sure, courts have questioned whether *Heller*'s discussion of the limitations of the Second Amendment is holding or dicta. *Compare United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) (concluding that *Heller*'s limitation of Second Amendment protections to law-abiding individuals "is not dicta"), *with Hollis*, 827 F.3d at 448 (suggesting that it "may well be right" that "some of the statements" in *Heller* about machineguns "are dicta"). But that question does not matter here, because as the Tenth Circuit previously noted in following *Heller*'s discussion of the Second Amendment's limitations, "we are 'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (quoting *United States v. Serawop,* 505 F.3d 1112, 1122 (10th Cir.

2007)).  *Heller*'s implicit endorsement of machinegun bans is binding because it is recent and is supported, rather than enfeebled, by the Supreme Court's later statements in *Bruen*.  *See Hollis*, 827 F.3d at 448 (concluding that the court was "generally bound" by *Heller*'s endorsement of machinegun bans, even if it were "dicta").

## II.    Courts Have Uniformly Upheld 18 U.S.C. § 922(o)

### A.    Six Courts of Appeals Have Upheld § 922(o) Since *Heller*

Since *Heller*, courts have uniformly upheld 18 U.S.C. § 922(o) and other restrictions on machineguns against Second Amendment challenges.  Six courts of appeals have rejected Second Amendment challenges to § 922(o) since *Heller*.  *See United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 141 (3d Cir. 2016); *Hollis*, 827 F.3d at 451; *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008); *Henry*, 688 F.3d at 640.

Examining the reasoning of these decisions shows that they are consistent with *Bruen*.  *Bruen* explained that after *Heller*, "the Courts of Appeals ha[d] coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Bruen*, 142 S. Ct. at 2125.  The Court concluded that "[s]tep one of the predominant framework[,]" at which courts would consider whether "the challenged law regulates activity falling outside the scope of the right as originally understood[,]" "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."  *Id.* at 2126-27.  But the Court rejected step two of that framework, in which courts applied "means-end scrutiny" to assess the constitutionality of laws that implicated the Second Amendment right.  *Id.* at 2127.

Consistent with *Bruen*, the appellate decisions upheld § 922(o) by concluding that

11

machineguns were outside the scope of the Second Amendment based on the Second Amendment's text and history, including *Heller*'s analysis of text and history. *See Zaleski*, 489 F. App'x at 475 ("the Second Amendment does not protect Zaleski's personal possession of machine guns"); *Palmetto State Armory*, 822 F.3d at 141 ("*Heller* and subsequent decisions in our Court make clear that the de facto ban on machine guns found in § 922(o) does not impose a burden on conduct falling within the scope of the Second Amendment."); *Hollis*, 827 F.3d at 451 ("Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection, so we uphold Section 922(o)."); *Hamblen*, 591 F.3d at 474 (relying on *Heller* to conclude that "the individual right to keep and bear arms . . . does not authorize an unlicensed individual to possess unregistered machine guns for personal use"); *Fincher*, 538 F.3d at 874 ("under *Heller,* Fincher's possession of the [machine]guns is not protected by the Second Amendment"); *Henry*, 688 F.3d at 640 ("we hold that the Second Amendment does not apply to machine guns"). None of these decisions applied means-end scrutiny, and to the extent they referenced the two-step framework, they resolved the case at step one. *See Hollis*, 827 F.3d at 451 (upholding § 922(o) "at step one of our framework"); *Henry*, 688 F.3d at 640 ("because we conclude that machine gun possession is not entitled to Second Amendment protection, it is unnecessary to consider Henry's argument that the district court applied the incorrect level of constitutional scrutiny in evaluating his claims").

The Fifth Circuit's analysis in *Hollis* is particularly instructive. *Hollis* "glean[ed]" from *Heller* that "protected weapons are 'those in common use at the time,'" but that "[i]f a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment[,]" further noting that "*Heller* took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment." *Hollis*, 827 F.3d at 445-46 (quoting *Heller*, 554 U.S.

12

at 627).  The court noted that it was "generally bound" by *Heller*'s statements concerning the constitutionality of machinegun bans, but it also "undert[ook] an independent inquiry" to confirm that machineguns were not protected.  827 F.3d at 448.  The court first held that machineguns were "dangerous," reasoning that like "pipebombs," machineguns are "primarily weapons of war and have no appropriate sporting use or use for personal protection."  *Id.* at 448 (quoting *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999)).  The court next held that machineguns were "unusual," noting the low number of machineguns in circulation (with just "175,977 pre–1986 civilian-owned machineguns in existence") and that 34 states prohibited most or all machineguns. *Id.* at 449-50.  The court concluded: "[m]achineguns are dangerous and unusual and therefore not in common use.  They do not receive Second Amendment protection[.]"  *Id.* at 451.

These court of appeals decisions upholding § 922(o) remain strong persuasive authority that support rejecting Plaintiff's claims.  As district courts within this circuit have recognized, *Bruen* does not undermine the force of pre-*Bruen* Second Amendment precedent that is consistent with its reasoning.  *See United States v. Carrero*, No. 2:22-cr-00030, 2022 WL 9348792, at *4 (D. Utah Oct. 14, 2022) (finding that Tenth Circuit precedent upholding 18 U.S.C. § 922(g)(1), which prohibits firearms possession by felons, "remains good law" and "[t]his court must continue to follow [it]"); *United States v. Teerlink*, No. 2:22-cr-0024-TS, 2022 WL 17093425, at *1 (D. Utah Nov. 21, 2022) (holding "that *Bruen* does not disrupt Tenth Circuit precedent upholding Section 922(g)(1) as a constitutional restriction on firearm possession under *Heller*").

### B.    Multiple District Courts Have Upheld § 922(o) Since *Bruen*

Since *Bruen*, every court to address § 922(o) or other restrictions on machineguns has upheld them.  Three district courts have rejected Second Amendment challenges to § 922(o).  *See Dixon*, 2023 WL 2664076, at *3 (denying motion to dismiss indictment under § 922(o) and holding that "[t]he Second Amendment simply does not extend to 'dangerous and unusual weapons,'" such

13

as machineguns); *United States v. Simien*, No. SA-22-cr-00379-JKP, 2023 WL 1980487, at *9 (W.D. Tex. Feb. 10, 2023) (holding that § 922(o) is "constitutional under the Second Amendment" because "machineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection"); Order, *United States v. Adamiak*, Case 2:22-cr-00047-AWA-LRL, ECF No. 46, at 9-10 (E.D. Va. Sept. 22, 2022) ("strongly disagree[ing]" with argument against constitutionality of § 922(o) and holding that "machineguns . . . are not weapons 'in common use' and thus fall outside the Second Amendment's protection"). Another district court rejected a Second Amendment challenge to the NFA's restrictions on machineguns, reaffirming prior case law holding "that there is no Second Amendment right to possess a machine gun." *United States v. Hoover*, --- F. Supp. 3d ---, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022).

Simien's analysis of the constitutionality of § 922(o) is particularly instructive here. The court reasoned that, as *Heller* concluded, "dangerous and unusual weapons are not afforded Second Amendment protection," based on a "longstanding tradition" that "grew from English common law," reflected in authorities such as Blackstone's Commentaries. *Simien*, 2023 WL 1980487, at *8 (citing 4 W. Blackstone, Commentaries on the Laws of England 148-49 (1769)). After noting that past decisions, including the Fifth Circuit's *Hollis* decision, held that machineguns were unprotected dangerous and unusual weapons, the court concluded: "Today, machineguns remain dangerous and unusual." *Id.* at *9. The court first reasoned that "[m]achineguns, which have been likened to pipe bombs and hand-grenades, are within the category of weapons of 'quasi-suspect character' that are inherently dangerous." *Id.* (quoting *Hollis*, 827 F.3d at 448). The court then concluded that machineguns "are unusual," noting that the number of registered machineguns was "less than .2% of total firearms in the United States[,]" which was "too insignificant for

14

machineguns to be considered in common use." *Id.*

In sum, this Court need not break new ground to uphold § 922(o). Since the Supreme Court listed M-16 machineguns as the type of weapon that "may be banned" under its interpretation of the Second Amendment, *Heller*, 554 U.S. at 627, courts have uniformly rejected challenges to § 922(o) and held that machineguns are not protected by the Second Amendment. Although some of these decisions were outside the Tenth Circuit, they are highly persuasive authority on which this Court may draw in assessing the constitutionality of § 922(o).

**III.    Section 922(o) Comports with the Second Amendment Under *Bruen*'s Standard**

Although *Heller*'s analysis and the uniform precedent upholding § 922(o) are sufficient to reject Plaintiff's Second Amendment claim, the same result would follow from independently applying *Bruen*'s standard for assessing Second Amendment claims. Under *Bruen*, a court must first determine whether "the Second Amendment's plain text covers an individual's conduct[.]" 142 S. Ct. at 2126. If it does, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Both prongs of *Bruen*'s test point in the same direction. First, the Second Amendment's plain text does not cover possession or manufacture of a machinegun, because the Second Amendment protects the right to keep and bear arms in common use for lawful purposes like self-defense, not dangerous and unusual weapons such as machineguns. Second, even if the Court were to determine (or assume without deciding) that § 922(o) burdens conduct covered by the Second Amendment's text, § 922(o) would still be constitutional because it is consistent with this nation's historical tradition of prohibiting the carrying of dangerous and unusual weapons.[5]

---

[5] *Bruen* treated the inquiry of whether a particular type of weapon can be restricted as implicating both prongs of *Bruen*'s test. Under the first prong, in addressing whether New York's requirement for proper cause for a license to carry a handgun was covered by the Second Amendment's plain text, the Court reasoned that the parties did not dispute that "handguns are weapons 'in common

A.      **The Second Amendment's Plain Text Does Not Cover Possession of a Machinegun**

The Second Amendment's text does not cover possession of a machinegun because the Second Amendment's protection extends only to weapons in common use for lawful purposes, not dangerous and unusual weapons.  The Second Amendment's text reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The phrase "right of the people to keep and bear arms" in the Second Amendment's text refers to "a *pre-existing* right" that the Second Amendment "codified," but it was well understood at the founding that "the right was not a right to keep and carry any weapon whatsoever[.]" *Heller*, 554 U.S. at 592, 626.  Rather, "the sorts of weapons protected were those 'in common use at the time,'" *id.* at 627 (quoting *Miller*, 307 U.S. at 179), not "dangerous and unusual weapons." *Id. (*quoting 4 W. Blackstone, Commentaries on the Laws of England 148-49 (1769)).  That reading of the Second Amendment's text is supported by the prefatory clause's reference to "[a] well regulated militia," because at the founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179).

Machineguns are not encompassed within the scope of the right guaranteed by the Second Amendment's text because they are dangerous and unusual weapons, which are not in common use for lawful purposes like self-defense.  *See generally supra*, Part II (describing cases holding that machineguns are not protected by the Second Amendment).  It can hardly be disputed that machineguns are dangerous. Machineguns, and M-16 rifles in particular, are weapons of war. *See*

---

use' today for self-defense." 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627).  At the second prong, the Court considered and rejected New York's argument that its proper cause requirement was supported by the historical tradition of prohibiting carrying of dangerous and unusual weapons. *Id.* at 2143.

*Heller*, 554 U.S. at 627 (M-16 rifles are among the "most useful in military service"); *Henry*, 688 F.3d at 640 (the machine gun was "widely used during World War I, where it 'demonstrated its murderously effective firepower over and over again'") (quoting William Rosenau, *The Origins of the First Modern Weapon,* TECH. REV. (1987), at 74  (reviewing John Ellis, *The Social History of the Machine Gun* (1986))); Am. Compl. ¶ 13 (M-16 rifles are the U.S. military's "standard small-arms weapons").  "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds.  Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns."  *Henry*, 688 F.3d at 640 (internal citation omitted); *see also Simien*, 2023 WL 1980487, at *9 ("Machineguns, which have been likened to pipe bombs and hand-grenades, are within the category of weapons of 'quasi-suspect character' that are inherently dangerous.") (quoting *Hollis*, 827 F.3d at 448).

Machineguns are also unusual and not in common use for lawful purposes like self-defense.  Congress heavily regulated machineguns soon after they became widely available precisely because their primary use outside of military and law enforcement was in violent crime, and they were not suitable for lawful purposes such as self-defense.  As the House Report for the NFA states: "The growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons needs no comment.  The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."  *See* H.R. Rep. No. 73-1780, at 1 (1934).  The report also differentiated machineguns from those weapons useful for self-defense, explaining: "But while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun."  *Id.*  When Congress banned most machineguns in 1986,

the legislative history discussed how machineguns were "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime." *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995) (quoting H.R. Rep. No. 99-495, at 4 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1330).   Congress also found that FOPA "reaffirm[ed]" that it was "not the purpose" of the GCA (as amended by FOPA) to restrict the rights of "law-abiding citizens" to possess or use "firearms appropriate to the purpose of . . . personal protection, or any other lawful activity," and that FOPA was "not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."   Firearms Owners' Protection Act, Pub. L. No. 99-308 § 1(b)(2), 100 Stat. 449 (1986).   Congress thus did not believe that banning privately-held machineguns (except for grandfathered weapons) would burden the "use of firearms by law-abiding citizens for lawful purposes," including "personal protection."   *Id.*; *see also Hollis*, 827 F.3d at 448 (machineguns are "primarily weapons of war and have no appropriate sporting use or use for personal protection" (quoting *Jennings*, 195 F.3d at 799 n.4)).

Since 1986, machineguns have been banned apart from those possessed under the authority of government or grandfathered existing weapons.   18 U.S.C. § 922(o).   In addition to the federal government banning most machineguns, at least 35 states and the District of Columbia generally ban machineguns,[6] which supports the conclusion that machineguns are unusual and not in

---

[6] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. §§ 13-3101, 13-3102; Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code tit. 11, § 1444; D.C. Code § 22-4514; Fla. Stat. § 790.221; Ga. Code Ann. § 16-11-122; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1; Ind. Code § 35-47-5-8; Iowa Code §§ 724.1, 724.3; Kan. Stat. § 21-6301; La. Stat. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1051; Mass. Gen. Laws ch. 140, § 131; Mich. Comp. Laws § 750.224; Minn. Stat. § 609.67; Mo. Ann. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350; N.J. Stat. § 2C:39-5; N.Y. Penal Law § 265.02; N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11, 2923.17; Or. Rev. Stat. § 166.272; 18 Pa. Stat. and Cons. Stat. § 908; 47 R.I. Gen. Laws § 11-47-8; S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§ 22-1-2, 22-14-6; Tenn. Code Ann. § 39-17-1302; Tex. Penal Code Ann. § 46.05; Wash. Rev. Code § 9.41.190; W. Va. Code § 61-7-9; Wis. Stat. § 941.26.   Many of these state laws have exceptions,

common use.[7]  The rarity of machineguns in private hands further shows that machineguns are not protected by the Second Amendment.  *See Hollis*, 827 F.3d at 449-50; *Simien*, 2023 WL 1980487, at *9.

The arguments in Plaintiff's Amended Complaint for the unconstitutionality of § 922(o) are incorrect.  First, Plaintiff argues that *Bruen* "clarified that a class of arms categorized as 'dangerous and unusual' cannot be banned if they are in 'common use.'"  Am. Compl. ¶ 17.  Not so.  *Bruen* treated "common use" and "dangerous and unusual" as two sides of the same coin, explaining that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to those* that 'are highly unusual in society at large.'"  142 S. Ct. at 2143 (emphasis added) (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 627 (the limitation that the Second Amendment protects weapons "in common use at the time . . . is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons") (quotations and citations omitted).  Therefore, "[i]f a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment."  *Hollis*, 827 F.3d at 446.  Plaintiff cites language from *Bruen* stating that "even if these colonial laws prohibited the carrying

---

such as for machinegun possession for military or law enforcement purposes.  *See, e.g.*, D.C. Code § 22-4514(a).  Some, but not all, of these state laws have exceptions or affirmative defenses for machineguns possessed in compliance with federal law or limit the prohibition to machineguns possessed in violation of federal law.  *See, e.g.*, Me. Rev. Stat. Ann. 17-A, § 1052 ("Machine guns . . . possessed in accordance with the National Firearms Act, as amended, shall be exempt from this chapter."); Mo. Ann. Stat. § 571.020(6) (prohibiting machinegun possession "in violation of federal law"); Or. Rev. Stat. § 166.272(4) ("It is an affirmative defense to a charge of violating subsection (1) of this section that the machine gun . . . was registered as required under federal law.").

[7] In 2016, the Fifth Circuit concluded that the fact that 34 states and the District of Columbia prohibited possession of most machineguns (either directly or by incorporating federal prohibitions) supported the constitutionality of § 922(o).  *See Hollis*, 827 F.3d at 450.  *Hollis* apparently omitted Hawaii from its list of states that ban machineguns, *see id.* at 450 n.8, perhaps because Hawaii's machinegun ban uses the phrase "automatic firearms" rather than "machineguns."  Haw. Rev. Stat. § 134-8(a).

19

of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." Am. Compl. ¶ 17 (quoting *Bruen*, 142 S. Ct. at 2143). This language is best read to suggest that the status of handguns may have changed since the 17th century, not that weapons can be protected as "in common use" even if they are "dangerous and unusual."

Second, Plaintiff contends that the M-16 rifle is "in common use" because it is the "standard small-arms weapon used by the United States military[.]" *See id*. ¶ 18. But use by the military is the wrong metric. *Heller* squarely rejected the argument that "weapons useful in warfare are protected[,]" finding such a reading "startling" because it would suggest the unconstitutionality of "restrictions on machineguns[.]" 554 U.S. at 624. And both *Heller* and *Bruen* clarified that the relevant inquiry for "common use" is whether weapons are "'in common use at the time' for lawful purposes like self-defense." *Id.*; *Bruen*, 142 S. Ct. at 2134 (handguns are protected because they are "weapons 'in common use' today for self-defense"). The Second Amendment does not confer upon individuals a right to possess and carry advanced military weaponry. What matters in determining whether a weapon qualifies for Second Amendment protection is whether it is commonly used by private individuals for lawful purposes like self-defense. Machineguns are not.

Third, Plaintiff cites an ATF report, which states that there were 741,146 registered machineguns as of May 2021, as support for the conclusion that machineguns are in common use. *See* ATF, *Firearms Commerce in the United States – Annual Statistical Update 2021*, at 15-16 (2021), *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (cited in Am. Compl. ¶ 18 n.2). But as one district court explained in rejecting an argument based on that ATF report, the number of registered machineguns "is less than .2% of

total firearms in the United States[,]" which "remains too insignificant for machineguns to be considered in common use." *Simien*, 2023 WL 1980487, at *9. Further, the two statutory exceptions that allow a machinegun to be possessed (and therefore registered) are machineguns possessed or transferred under the authority of a government agency, 18 U.S.C. § 922(o)(2)(A), or those lawfully possessed before May 19, 1986, *id.* § 922(o)(2)(B). Plaintiff makes no factual allegations that reasonably support the inference that these registered machineguns are used by private individuals for lawful purposes like self-defense, as opposed to being possessed by governments or as antique collector's items.

**B.      Section 922(o) Is Consistent with Historical Tradition**

That possession of machineguns is not protected by the Second Amendment's plain text suffices to demonstrate § 922(o)'s constitutionality. But if the Court advances to *Bruen*'s second prong, then § 922(o) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

*Heller* largely settled the question of historical tradition, holding that a "historical tradition" exists "of prohibiting the carrying of dangerous and unusual weapons," which "fairly support[s]" limiting the Second Amendment's protection to "the sorts of weapons . . . in common use at the time." 554 U.S. at 627 (quotations omitted). In support of its conclusion about historical tradition, *Heller* cited the following authorities:

> *See* 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). *See also State v. Langford*, 10 N.C. 381, 383–384 (1824); *O'Neill v. State*, 16 Ala. 65, 67 (1849); *English v. State*, 35 Tex. 473, 476 (1871); *State v. Lanier*, 71 N.C. 288, 289 (1874).

*Heller*, 554 U.S. at 627.

The sources cited by *Heller* show that carrying dangerous and unusual weapons was widely considered a crime in England and in the early American republic.  For example, Blackstone explained that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c. 3."  4 W. Blackstone, Commentaries on the Laws of England 148-49; *see also*, *e.g.*, J. Dunlap, The New–York Justice 8 (stating that "for a man to arm himself with dangerous and unusual weapons" was a criminal "affray, at common law"); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 ("Riding or going armed with dangerous and unusual weapons, is a crime against the public peace . . . .").

Of course, the modern machinegun did not exist at the time of ratification of the Second Amendment in 1791 or the Fourteenth Amendment in 1868, so there are no laws from those time periods specifically addressing machineguns.  But *Bruen* requires a "historical *analogue*, not a historical *twin*" 142 S. Ct. at 2133, to sustain modern firearms regulations.  Modern regulations restricting dangerous and unusual weapons of today are "relevantly similar" to historical prohibitions on the carriage of dangerous and unusual weapons of earlier eras.  *Id.* at 2132.  The key question is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are "dangerous and unusual weapons."  For the reasons explained above, *see supra*, pp. 16-21, machineguns are dangerous and unusual weapons that may be banned consistent with historical tradition.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Amended Complaint for failure to state a claim.

22

Dated this 3rd day of April, 2023

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney


By:  */s/ Jeremy A. Gross*
      JEREMY A. GROSS
      Assistant United States Attorney

      BRIAN M. BOYNTON
      Principal Deputy Assistant Attorney General

      LESLEY FARBY
      Assistant Branch Director

      */s/ Jeremy S.B. Newman*
      JEREMY S.B. NEWMAN (*Pro Hac Vice*)
      Trial Attorney
      Civil Division, Federal Programs Branch
      U.S. Department of Justice
      1100 L St. NW
      Washington, DC 20005
      Phone: (202) 532-3114
      Email: jeremy.s.newman@usdoj.gov

23

# United States District Court

for the

District of Wyoming

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In accordance with Federal Rule of Civil Procedure 56, Plaintiff hereby moves this Court for summary judgment. In accordance with Local Rule 7.1(b)(2)(d), this motion is accompanied by a brief that sets forth the contentions of law, arguments, and authorities on which Plaintiff relies in support of this motion. [1]

---

[1] Plaintiff files contemporaneously herewith his response to Defendants' Motion to Dismiss. Plaintiff thus files a combined brief in support of his Motion for Summary Judgment and in opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 16).

## SUMMARY

With the clarifications of *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* 597 U.S. ___ (2022), the statute challenged by Plaintiff, 18 U.S.C. § 922(o) ("the machinegun ban") does not pass constitutional muster. Since machineguns are a type of arm in common use and protected under the plain text of the Second Amendment, "as informed by history[,]" the "Constitution presumptively protects" the possession of machineguns, and "the government must demonstrate that" the machinegun ban "is consistent with this Nation's historical tradition of firearm regulation." *Id.*, slip op. at 8. The Defendants have failed to satisfy the burden imposed on them by *Bruen.* Accordingly, Plaintiff requests that the Court grant summary judgment in his favor.

DATED this 7th day of April, 2023.                Respectfully Submitted,


Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

# United States District Court

for the

District of Wyoming

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT, AND BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.    Under Supreme Court Precedent, Machineguns Are Protected by the Second
        Amendment......................................................................................................2

        A.  Defendants Misread the Common Use Test ......................................................2

        B.  The Common Use Test Protects Arms Commonly Used in the Military at the
            Time of Litigation, Which Includes Machineguns ............................................4

        C.  The Common Use Test Also Protects Arms Outside of Military Service .........5

        D.  The Product of an Unconstitutional Law Cannot be Used to Justify Its
            Existence ...........................................................................................................8

        E.  *Bruen* Clarified That Dangerous and Unusual Refers to the Manner of Bearing
            Arms, Not Possession of a Class of Arms ......................................................10

        F.  Arms That Are in Common Use Are Protected, Even If They Are Dangerous
            and Unusual ....................................................................................................10

        G.  Machineguns Are Not Unusual.......................................................................11

    II.   Arms Not in Common Use May Also be Protected Under the Plain Text of the
        Second Amendment.................................................................................................12

    III.  *Heller* Did Not Determine That Machineguns May be Banned ...................................15

    IV.  Courts of Appeals Upholding § 922(o) Since *Heller* Did Not Meet the Standards of
        *Bruen*...........................................................................................................................17

    V.   District Courts Upholding § 922(o) Since *Bruen* Have Not Complied With *Bruen* ...20

    VI.  Section 922(o) Does Not Comport With *Bruen*...........................................................22

WYD 118

A. Defendants Improperly Conflate the Two Prongs of *Bruen* ............................22

B. The Plain Text of the Second Amendment, as Informed by History, Protects
   the Possession of a Machinegun ......................................................................23

C. Section 922(o) is Not Consistent With This Nation's Historical Traditions of
   Regulating Arms ............................................................................................26

CONCLUSION...............................................................................................................29

WYD 119

## TABLE OF AUTHORITIES

### CASES

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ........................................................16

*Caetano* v. *Massachusetts,* 577 U.S. 411 (2016) .................................................... passim

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................. passim

*Firearms Policy Coalition, Inc. et al., v. McCraw*, No. 4:21-cv-1245-P (N.D. Tex., Aug 25, 2022) ....................................................................................................................................24

*Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) ...................................8

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) ..........................................19, 20

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ........................................................ passim

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .................................................................23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................................24

*New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* 597 U.S. ___ (2022) ............................ passim

*State v. Kessler*, 289 Or. 359, 368, 614 P. 2d 94 (1980) ..................................................3

*United States v. Adamiak*, No. 2:22-cr-47 (E.D. Va. Sept. 22, 2022) ...........................21

*United States v. Dixon*, No. 22-cr-140 (N. D. Ill. Mar 28, 2023) ..................................21

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) .............................................18, 19

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ....................................................18

*United States v. Hoover*, No. 3:21-cr-22(S3)-MMH-MCR (M.D. Fla. Oct. 18, 2022) .................21

*United States v. Miller,* 307 U.S. 174 (1939)........................................................................... passim

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown*

*Caliber Serial No. LW001804*, 822 F.3d 136 (3d Cir. 2016)............................................18, 19, 20

*United States v. Price*, No. 2:22-cr-00097 (S.D. W. VA. Oct 12, 2022).................................24, 25

*United States v. Quiroz*, No. PE:22-cr-00104-DC (W.D. Tex. Sep 19, 2022) ..............................25

*United States v. Simien*, No. SA-22-cr-00379-JKP (W.D. Tex. Feb. 10, 2023)............................21

*United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) .....................................................28

*United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012).......................................................19, 20

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II.....................................................................................................1, 13

## STATUTES

10 U.S.C. § 246....................................................................................................................1

18 U.S.C. § 922(g)(1) ..........................................................................................................21

18 U.S.C. § 922(k)...........................................................................................................24, 25

18 U.S.C. § 922(n) ...............................................................................................................25

18 U.S.C. § 922(o) .......................................................................................................... passim

18 U.S.C. § 924(c)(4)...........................................................................................................27

Alaska Stat. § 11.61.200 .........................................................................................................9

Ariz. Rev. Stat § 13-3101 .......................................................................................................9

Ariz. Rev. Stat § 13-3102 ...........................................................................................9

Colo. Rev. Stat. § 18-12-102 .....................................................................................9

Firearm Owners Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 ...............................1

Fla. Stat. § 790.221 .....................................................................................................9

Ga. Code Ann. § 16-11-122 .......................................................................................9

Ga. Code Ann. § 16-11-124 .......................................................................................9

Ind. Code § 35-47-5-8 ................................................................................................9

Ind. Code § 35-47-5-10(7) .........................................................................................9

Kan. Stat. § 21-6301 ...................................................................................................9

Me. Rev. Stat. Ann. tit. 17-A, § 1051 ........................................................................9

Mich. Comp. Laws § 750.224 ....................................................................................9

Mo. Ann. Stat. § 571.020 ...........................................................................................9

N.C. Gen. Stat. § 14-409 ............................................................................................9

N.D. Cent. Code § 62.1-05-01 ...................................................................................9

Neb. Rev. Stat. § 28-1203 ..........................................................................................9

Nev. Rev. Stat. § 28-1203 ..........................................................................................9

Ohio Rev. Code Ann. § 2923.11 ................................................................................9

Ohio Rev. Code Ann. § 2923.17 ................................................................................9

Or. Rev. Stat. § 166.272 ........................................................................................................ 9

S.C. Code Ann. § 16-23-230 .................................................................................................. 9

S.C. Code Ann. § 16-23-250 .................................................................................................. 9

S.D. Codified Laws § 22-14-6 ............................................................................................... 9

Tenn. Code Ann. § 39-17-1302 ............................................................................................. 9

Tex. Penal Code Ann. § 46.05 ............................................................................................... 9

W. Va. Code § 61-7-9 ............................................................................................................ 9

**OTHER AUTHORITIES**

Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48 (2008),

    https://uknowledge.uky.edu/law_facpub/265/ ..................................................................... 5

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *ATF National Firearms Act*

    *Handbook* – ATF E-Publication 5320.8 – Revised: April 2009 .......................................... 6

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Commerce in the*

    *United States – Annual Statistical Update 2021* (2021) ...................................................... 6

Daniel Page, *Dangerous and Unusual Misdirection* (4 May 2011), https://ssrn.com/abstract=

    1859395 ............................................................................................................. 10, 18, 27

*FOPA Hughes Amendment VOTE APRIL 10 1986* (25 Jan. 2011),

    https://www.youtube.com/watch?v=a6Mx2UcSEvQ ......................................................... 28

George Neumann, *Swords and Blades of the American Revolution* (1 Jan. 1973)..........................3

Madison, James, Federalist 46, THE FEDERALIST PAPERS .............................................................13

National Firearms Act Trade & Collectors Association, *The Partisan*, Volume 4, Issue 3, Third

Quarter, 2012 ..........................................................................................................................6

National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million*

*MSRs in Circulation* (20 Jul. 2022), https://www.nssf.org/articles/commonly-owned-nssf-

announces-over-24-million-msrs-in-circulation/ .................................................................8

RESOLUTIONS OF FAIRFAX COUNTY COMMITTEE, 17 Jan. 1775.....................................................14

Tasha Tsiaperas, *Constitution a 'dead, dead, dead' document, Scalia tells SMU audience*,

Dallas Morning News (February 20, 2013), http://web.archive.org/web/20130530011243/

http://www.dallasnews.com/news/community-news/park-cities/headlines/20130128-

constitution-a-dead-dead-dead-document-scalia-tells-smu-audience.ece ........................15

Tom Morganthau, et al., *Machine Gun U.S.A.,* Newsweek (Oct. 14, 1985) ...................................7

Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*, VFW Magazine (Sep. 2010)

.................................................................................................................................................4

WYD 124

**INTRODUCTION**

Plaintiffs' complaint challenges the constitutionality of 18 U.S.C. § 922(o) ("the machinegun ban"), passed as an amendment to the Firearm Owners Protection Act. Plaintiff is a law-abiding citizen, United States Marine Corps veteran, and member of the militia as defined at 10 U.S.C. § 246. Having been trained and qualified in the employment of machineguns while on active duty, primarily the M-16 platform, Plaintiff is acutely aware of the fundamental necessity for machinegun tactics and operations in military and militia service, as well as the importance of arms and discipline being standardized and well regulated. Accordingly, Plaintiff desires to make and own an M-16, but is prohibited from doing so as a result of section 922(o).

Enacted in 1986, the machinegun ban constitutes the first time in this Nation's history that the possession by citizens of the standard small-arms weapon used by the U.S. armed services has been prohibited. Since then, the understanding of the scope of Second Amendment protections has been greatly expanded and clarified. *District of Columbia v. Heller*, 554 U.S. 570 (2008) defined the standard of review for challenges to regulations of conduct protected under the Second Amendment, and *New York State Rifle & Pistol Assn., Inc.* v. *Bruen,* 597 U.S. ___ (2022) clarified the holdings in *Heller* after lower courts repeatedly misapplied those holdings.

History is repeating itself as district courts are now misapplying *Bruen*, and Defendants' arguments perpetuate that misinterpretation. The Second Amendment commands: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Plaintiff objects that "if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Heller*, 554 U.S. at 627. "Logic demands that there be a link between the stated purpose and the command." *Id*. at 577.

WYD 125

Both *Heller* and *Bruen* determined that *total bans* on Second Amendment conduct are not constitutional. When the standards of *Heller* and the clarifications of *Bruen* are applied to the machinegun ban, it too must be found unconstitutional. The Court should thus deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment.

## ARGUMENT

I.   **Under Supreme Court Precedent, Machineguns Are Protected by the Second Amendment**

A.   **Defendants Misread the Common Use Test**

*Bruen* prescribes the framework for a Second Amendment challenge. *Bruen* identified two evaluations that must be carried out. First, it must be determined whether or not the challenged conduct is protected by using a "test rooted in the Second Amendment's text, as informed by history." *Bruen*, slip op. at 10.[1] Second, if the conduct is protected, then the government holds the burden of providing historical analogues showing that the challenged regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id*. at 8. In *Bruen,* the Court found that the first prong of the test was met by determining that, in addition to the right to bearing arms being protected, the type of arms in the challenged conduct, handguns, were "in common use." *Id*. at 23 (citing *Heller*, 554 U.S. at 627). Since *Heller* had already determined that handguns were in common use, and reaffirmed that arms in common use were protected, *Bruen* had "little difficulty"

---

[1] There are three independent and alternative grounds upon which this Court should find, at *Bruen*'s first prong, that machineguns are arms protected by the Second Amendment:

  1.   Machineguns are protected by the plain text of the Second Amendment, as informed by history. *See infra*. at Part II.
  2.   Machineguns are in common use in the military, which grants them protection under the Second Amendment. *See infra*. at pp. 3-5.
  3.   Machineguns are in common use in the citizenry, which grants them protection under the Second Amendment. *See infra*. at pp. 5-10. This ground can be decided on the existing record and can be supported further, should the Court require, with additional discovery. *See infra*. at pp. 7-8.

2

concluding that the challenged conduct was protected under the Second Amendment. *Id*. Important to the instant case is the "common use" test used by *Heller*.

*Heller* found the "common use" test in *United States v. Miller,* 307 U.S. 174 (1939)*.* The Court analyzed *Miller* in-depth, and determined that the central question in *Miller* was whether or not the "type of weapon at issue" enjoyed the protection of the Second Amendment. *Heller*, 554 U.S. at 622. The *Miller* Court sought to perform this evaluation by determining if the arm was "part of the ordinary military equipment." *Miller,* 307 U.S. at 178*. Heller* requires that the "part of ordinary military equipment" language be used "in tandem with what comes after": "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Heller, * 554 U.S. at 624 (citing *Miller*, 307 U.S. at 179) (referring to *Miller*'s description of arms brought by militiamen). *Heller* went on to say that, among those commonly used arms, there was no difference between those used by militiamen and citizens in their homes; "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were *one and the same*." *Id.* at 624-625 (citing *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254 (1973))) (emphasis added).

Thus, the "common use" test, used in *Heller*, is derived from *Miller*. The test in *Miller* was used to determine if an arm was commonly used for service in the militia, which would grant it protection under the Second Amendment. In looking to historical analogues, *Miller* determined that arms in "common use" by militiamen were protected, because those arms had a "reasonable relationship to the preservation or efficiency of a well regulated militia." *Miller,* 307 U.S. at 178. Applying the same logical comparisons, *Miller* set out to determine if the "type of weapon at

3

issue," a short-barreled shotgun, contained any such "reasonable relationship." *Id.* "The defendants made no appearance in the case, neither filing a brief nor appearing at oral argument," so there was an absence of factual record and no "judicial notice that this weapon is any part of the ordinary *military equipment* or that its use could contribute to the common defense." *Heller*, 554 U.S. at 622-623 (emphasis added) (referring to the *Miller* proceedings).

The Defendants misread this aspect of the "common use" test, saying that "use by the military is the wrong metric" and that "*Heller* squarely rejected the argument that 'weapons useful in warfare are protected[.]'" Def. Mem. at p. 20 (citing *Heller*, 554 U.S. at 624). This is certainly the boldest reading that Defendants make in their memorandum. The Founders would have undoubtedly been dumbfounded by the notion that weapons useful in warfare were not protected by the Second Amendment, given that the majority of them were veterans of the American Revolution[2] and used such arms to *secure our independence*. A single preceding word that Defendants did not include in their quote from *Heller*, however, completely turns over their argument: *only*. *Heller* rejected the argument that "*only* weapons useful in warfare are protected[.]" *Heller*, 554 U.S. at 624 (emphasis added). This of course enabled *Heller*'s holding, that the "common use" test may *also* protect arms used by civilians in the present day, as opposed to *only* those "useful in warfare." *Id.* Defendants' reading of *Heller* abrogates *Miller* altogether. But *Heller* did not abrogate *Miller*, and the holdings in *Miller* remain binding authority; contrarily, *Heller* derived the "common use" test from *Miller*, and *expanded* it.

## B. The Common Use Test Protects Arms Commonly Used in the Military at the Time of Litigation, Which Includes Machineguns

---

[2] Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*, VFW Magazine (September 2010); *See* Ex. A

Although *Heller expanded* the "common use" test to permit the measure of civilian-owned arms, which are *also* protected, *Miller* did not so much as suggest that there was any requirement to apply the "common use" test to arms owned by civilians in 1939; *Miller* did not even *consider* whether or not short-barreled shotguns were commonly used by civilians. The Court considered whether or not the arm in question was commonly used *in the military at the time of litigation*, because the militia, in their historical analogue, was expected to perform the same functions as a "disfavored standing arm[y.]" *Miller,* 307 U.S. at 179. Accordingly, it would not have made sense for *Miller* to apply the "common use" test to arms owned by civilians. Further, *Miller* did not determine that short-barreled shotguns *were not* useful in military service; rather, there was no judicial notice that short-barreled shotguns *were* useful in military service. This lack of judicial notice was surely due to the fact that neither Mr. Miller nor his counsel appeared in his defense. *See* Brian L. Frye, *The Peculiar Story of* United States v. Miller (2008) (*See* Ex. G).

At this point, the historical context and methodology that *Miller* identified and applied in the "common use" test can be used to evaluate whether or not machineguns are arms protected by the Second Amendment. The militiamen of the colonial and revolutionary war era commonly used the *same* small-arms weapons that a citizen of the same era would use in defense of person and home; to contribute to the common defense; to suppress insurrections; and to repel invasions. Those arms had a "reasonable relationship to the preservation or efficiency of a well regulated militia[.]" *Miller,* 307 U.S. at 178*.* Correspondingly, the standard small-arms weapon in common use by the U.S. armed services today, the M-16, has a "reasonable relationship to the preservation or efficiency of a well regulated militia"; is accordingly suitable for the militia and citizens of today to use for the *same* purposes; and is therefore protected by the Second Amendment. *Id.*

### C.  The Common Use Test Also Protects Arms Outside of Military Service

5

Notwithstanding the historical context of the "common use" test, there have been many additional cases since *Heller* that have applied the test to arms in common use outside of military service in the present day pursuant to *Heller*'s expansion. One particularly relevant case, *Caetano v. Massachusetts,* 577 U.S. 411 (2016) *(per curiam),* determined that stun guns were arms protected under the Second Amendment, and vacated and remanded the judgment of the Supreme Judicial Court of Massachusetts. In Justice Alito's concurrence, he wrote that stun guns were used and useful in the U.S. armed services, and acknowledged that the approximately 200,000 stun guns owned by civilians classified them as "widely owned" and in "common use," and therefore protected arms under the Second Amendment. *Id.* at 419-420 (Alito, J., concurring).

*Requiring* the "common use" test to be used in the context of the possession of arms by citizens in the present day would fail the requirement of the first step of the test underscored by *Bruen,* which is to evaluate a restriction in view of the plain text of the Second Amendment, as "informed by history." *Bruen,* slip op. at 10 (emphasis added). However, if this "present-day" requirement was imposed, machineguns would still pass the test.

As of May 2021, there were more than 700,000 machineguns lawfully registered in the National Firearms Registration and Transfer Record (NFRTR).[3] The possession of a large percentage of those machineguns are restricted to certain manufacturers, importers, local law enforcement, and other non-private entities.[4] However, the BATFE defines a machinegun on the NFRTR as being "not in the possession or under the control of the U.S. Government."[5] 700,000 machineguns obviously exceed the 200,000 stun guns declared to be in "common use" by *Caetano*.

---

[3] BATFE, *Firearms Commerce in the United States – Annual Statistical Update 2021*. *See* Ex. B
[4] BATFE, *ATF National Firearms Act Handbook – ATF E-Publication 5320.8 See* Ex. C
[5] *Id.*

Using the most restrictive measure of transferrable machineguns, however, yields a conclusion in keeping with this theme. A "pre-86" machinegun is one that was registered on the NFRTR on the date the ban went into effect in 1986, and is freely transferrable amongst private citizens. Since transferrable machineguns can no longer be registered, and when such arms are naturally disposed of due to loss, theft, destruction, rendering inoperable, or other legitimate reasons, the total finite number of transferrable machineguns can only decrease. In 2012, there were approximately 183,500 transferrable machineguns on the NFRTR,[6] and four years later, in 2016, that number had decreased to 175,977.[7] Therefore, it can be presumed that the decrease of approximately 1,800 transferrable machineguns per year from the NFRTR is a result of the ban in section 922(o) prohibiting the total number of transferrable machineguns from increasing. The same math can be performed in reverse to calculate and presume that in 1986, the year when the ban was enacted, there would have been at least 230,000[8] "pre-86" machineguns on the NFRTR, which would exceed the 200,000 stun guns that were declared to be "widely owned" and in "common use" by *Caetano.* Plaintiff can validate this presumption with discovery.

The amount of "pre-86" machineguns currently in existence also does not consider the amount that *would* exist but for the ban. While this can be a challenging number to determine, it can at a minimum be measured by a simple count of all applications the Defendants have received to make a "post-86" machinegun since the enactment of the ban, such as the "Form 1" application submitted by the Plaintiff and disapproved by the Defendants. This measure could be used to

---

[6] NFATCA, *The Partisan*, Volume 4, Issue 3, Third Quarter, 2012 (taking the median of the range of transferable machine guns reported as 182,000-185,000) *See* Ex. D
[7] BATFE letter, dated February 24, 2016. *See* Ex. E
[8] In 2012, the ban had existed for 26 years. Multiplying a decrease of approximately 1,800 machineguns per year times 26 years equals 46,800 transferrable machineguns removed from the NFRTR since the enactment of the ban. Adding those removed machineguns to the 2012 transferrable count of 183,500 equals 230,300 transferrable machineguns presumably registered on the NFRTR in 1986.

bolster the number of machineguns that would be in common use today, but for the machinegun ban, and can be determined by the Plaintiff with discovery.

Additionally, information supplied by the ATF in 1985, less than a year prior to the enactment of the machinegun ban, could help theorize how many machineguns would exist today, but for the machinegun ban. The ATF's then chief weapons expert, Frank W. (Bill) Nickell, concurred with an estimate that there were 500,000 "assault weapons" in "American homes," more than 300,000 of which were AR-15s.[9] ATF records at the time consisted of an additional 116,000 "licensed automatic weapons."[10] Thus, a *minimum* of 18% of "assault weapons," which the ATF agreed included AR-15s, were registered as automatic in 1985.[11] Applying that figure to the amount of AR-15s[12] estimated to be owned today,[13] it could be presumed that there would currently be more than 4,300,000 registered automatic AR-15s *alone* in private ownership, but for the machinegun ban.[14] This would far exceed the 200,000 "common use" standard used in *Caetano*.

### D. The Product of an Unconstitutional Law Cannot be Used to Justify Its Existence

"[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning… it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) (referring to the circular reasoning of solely relying on a banned arms' commonality at

---

[9] Tom Morganthau, et al., *Machine Gun U.S.A.*, Newsweek, Oct. 14, 1985 at 49. *See* Ex. F
[10] *Id.*
[11] 116,000 "licensed automatic weapons" divided by the sum of 500,000 "assault weapons" plus the additional 116,000 "licensed automatic weapons" (616,000) equals just over 18% of "assault weapons" being registered as automatic.
[12] The amount of AR-15s estimated to be in circulation in the U.S. today are tracked under the category of "Modern Sporting Rifles" (MSRs) by the National Shooting Sports Foundation as "AR-15 and AK-style rifles," which are functionally similar. *See Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (2022).
[13] *Id.* (updating the industry estimate of MSRs in circulation to 24,446,000 since 1990).
[14] A conservative estimate of 24 million MSRs in circulation multiplied by the 18% of such rifles that were registered as "licensed automatic weapons" in 1985 equals 4,320,000.

the time of litigation to determine if it is constitutionally protected). The circular reasoning rebuked

by the Seventh Circuit in *Friedman* is precisely the reasoning the Defendants use to say that

because "35 states and the District of Columbia generally ban machineguns," they are "not in

common use," and their rarity "shows that machineguns are not protected by the Second

Amendment." Def. Mem. at pp. 18-19. In addition to this logical fallacy, 22 of the 35 states

identified by the Defendants as generally banning machineguns have exceptions for machineguns

possessed lawfully pursuant to federal, state, or local laws.[15] Therefore, 37 states, the majority,

permit the lawful possession of machineguns. If this statistic supported any conclusion, it could

only be that machineguns are in common use and protected by the Second Amendment.

In any event, *Heller* did not *limit* the "common use" test to the present time, it *expanded* it.

Justice Breyer attempted to illustrate his understanding of the "common use" test as it was applied

in *Heller* to arms owned by civilians in the present time, as opposed to historically:

> On the majority's reasoning, if tomorrow someone invents a particularly useful, highly
> dangerous self-defense weapon, Congress and the States had better ban it immediately, for
> once it becomes popular Congress will no longer possess the constitutional authority to do
> so. In essence, the majority determines what regulations are permissible by looking to see
> what existing regulations permit. There is no basis for believing that the Framers intended
> such circular reasoning.

*Heller*, 554 U.S. at 721 (Breyer, J., dissenting). If Justice Breyer's interpretation of how the

"common use" test was *limited* by *Heller* is accurate, then his sentiment regarding the Framers'

---

[15] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. §§ 13-3101, 13-3102; Colo. Rev. Stat. § 18-12-102; Fla. Stat. §
790.221; Ga. Code Ann. § 16-11-122; Ind. Code § 35-47-5-8; Kan. Stat. § 21-6301; Me. Rev. Stat. Ann. tit. 17-A, §
1051; Mich. Comp. Laws § 750.224; Mo. Ann. Stat. § 571.020; N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-
05-01; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350; Ohio Rev. Code Ann. §§ 2923.11, 2923.17; Or. Rev.
Stat. § 166.272; 18 Pa. Stat. and Cons. Stat. § 908; S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§22-1-2, 22-
14-6; Tenn. Code Ann. § 39-17-1302;Tex. Penal Code Ann. § 46.05; W. Va. Code § 61-7-9. These 22 statutes identify
the machinegun bans for states having exceptions for possession of machineguns pursuant to federal, state, or local
laws; the exceptions are identified in each statute, except for Georgia, Indiana, and South Carolina, where the
exceptions are identified in separate statutes. *See* Ga. Code Ann. § 16-11-124; Ind. Code § 35-47-5-10(7); S.C. Code
Ann. § 16-23-250.

intent should resonate emphatically. However, if his interpretation is erroneous, which is likely given that his opinion was in the dissent, then the only alternative is that the "common use" test may consider the context of historical traditions, such as the approach used by *Miller*. This latter approach also complies with *Bruen's* requirement to evaluate the Second Amendment, as "informed by history." *Bruen*, slip op. at 10. Either conclusion of Justice Breyer's analysis should support the application of the "common use" test in the instant case.

### E. *Bruen* Clarified That Dangerous and Unusual Refers to the Manner of Bearing Arms, Not Possession of a Class of Arms

Defendants place significant emphasis on *Heller's* dicta regarding "dangerous and unusual weapons," using and citing the phrase 42 times in their memorandum and identifying it as a test that may preclude arms from having protection under the Second Amendment. *See generally* Def. Mem. *Bruen's* clarification of *Heller*, however, completely forecloses Defendants' reading. *Bruen* studied the statutes regulating dangerous and unusual weapons and determined that their purpose was "[f]ar from banning… any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38. These "common-law offenses of 'affray' or going armed 'to the terror of the people'" referred to the *manner* in which arms were *carried*; they did not refer to a "class of firearms." *Id*; *see also* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H)*.* Thus, machineguns may not be classified as "dangerous and unusual," because *Bruen* has clarified *Heller's* dicta to refer to an offense of *affray*, not a "class of firearms." *Bruen*, slip op. at 38.

### F. Arms That Are in Common Use Are Protected, Even If They Are Dangerous and Unusual

10

If this Court chose to proceed with the pre-*Bruen* "dangerous and unusual" standards applying to arms rather than the manner of carry, *Bruen* specifically declared that arms in "common use" cannot be banned, even if they were found to be "dangerous and unusual":

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Id.* at 39 (internal citations omitted).

*Bruen* wrote this immediately after addressing and discounting the interpretation used by the government that "dangerous and unusual" referred to a class of arms, rather than the manner in which arms were carried. Plaintiff agrees with Defendants that this language "suggest[s] that the status of handguns may have changed since the 17ᵗʰ century," Def. Mem. at p. 20, but does not read the Courts' dicta to be *limited* to such a casual observation. The language is clear; it could be argued that *every* protected arm in the history of this Nation was at one point dangerous and unusual under Defendants' reading. Regardless, once the arm comes into "common use," it is protected. *Bruen*, slip op. at 39. *Bruen* determined that even if handguns *were* once classified as dangerous and unusual, their eventual common use granted them Second Amendment protection. Accordingly, since machineguns are in common use today, they could not be banned if they were found to be "dangerous and unusual."

### G. Machineguns Are Not Unusual

If this Court chose to move forward with the pre-*Bruen* understanding of the dangerous and unusual language, it should find support in *Caetano*'s pre-*Bruen* dicta of "unusual" criteria. The *per curiam* Court rejected a conclusion finding stun guns "'unusual' because they are a

11

thoroughly modern invention." *Caetano*, 577 U.S. 411. In Justice Alito's concurrence, he wrote that stun guns were used and useful in the U.S. armed services; acknowledged that the approximately 200,000 stun guns owned by civilians classified them as "widely owned" and in "common use"; and therefore, that stun guns are not unusual. *Id.* at 419-420 (Alito, J., concurring). Further, he reiterated that the "dangerous and unusual" test "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at 417 (Alito, J., concurring) Accordingly, since machineguns are used and useful in the U.S. armed services, and commonly owned and used by civilians, they are not unusual; therefore, they do not meet the criteria to be classified as "dangerous and unusual" weapons.

Of the six courts of appeals decisions that the Defendants point to in Part II of their memorandum, they place most of their reliance on *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016). *See* Def. Mem. at pp. 11-13. Specifically, Defendants identify *Hollis*' conclusion that "machineguns were 'unusual,' noting the low number of machineguns in circulation (with just '175,977 pre-1986 civilian-owned machineguns in existence')[.]" Def. Mem. at p. 13 (citing *Hollis*, 827 F.3d at 449). *Hollis* did not follow the majority opinion of *Caetano*. Instead, *Hollis* rewrote the majority opinion by relying on a misreading of Justice Alito's concurring opinion. Namely, *Hollis* inferred that Justice Alito required both a specific quantity of arms along with laws authorizing possession of such arms. *Caetano*'s holding includes no such requirement and, as a result, *Hollis* misapplied Caetano.

## II.   Arms Not in Common Use May Also be Protected Under the Plain Text of the Second Amendment

Even if this Court determined that machineguns did not pass the "common use" test in either historical or modern context, they are still protected arms under the Second Amendment.

12

Amendment protection is whether it is commonly used by private individuals," but this claim is unfounded and conflicts with *Heller* and *Bruen*. Def. Mem. at p. 20. The *Heller* opinion derived the "common use" test from *Miller,* and determined that arms in common use were undeniably protected under the Second Amendment. However, the Court did not purport to *require* arms to be in common use by civilians to receive Second Amendment protection, as Defendants argue, *id.*; the test is just one of the methods that may be used to identify protected arms. *Bruen* also did not say that arms must be in common use by civilians. *Bruen* imposed *just one* requirement when attempting to determine if the conduct is covered by the plain text of the Second Amendment: it *must* be "informed by history." *Bruen*, slip op. at 10. Defendants' reading of the "common use" test fails this requirement. As such, the *strictly textual* question to ask to determine if machineguns are protected arms is as follows: is possession of the standard small-arms service rifle for the U.S. armed services, the M-16, protected by the plain text of the Second Amendment, as informed by history? The answer is yes, and it is found in both the prefatory clause and the operative clause of the Second Amendment.

In the prefatory clause, the purpose is announced, which is to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. This is because the militia was expected to be capable of performing the same duties as a "disfavored standing arm[y]," *Miller,* 307 U.S. at 179, and is "necessary to the security of a free State[.]" U.S. Const. amend. II. These conclusions find further support in The Federalist Papers, where James Madison, the primary author of the Second Amendment, wrote to alleviate the concerns of the people regarding the creation of a standing army. He compared the proposed army's "twenty-five or thirty thousand men" to the "militia amounting to near half a million of citizens with arms in their hands… fighting for their common

13

liberties, and united and conducted by governments possessing their affections and confidence."[16] Madison continued by defending the belief that the militia would be a superior force that easily rivaled that of a standing army, saying that "[i]t may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops."[17] Madison emphasized this reassurance to the people, because it was commonly understood that the militia, consisting of citizens who were soldiers on occasion, was expected to be capable of opposing any standing army.

In the operative clause, that expectation is enabled by conferring an "individual right" to possess "all instruments that constitute bearable arms[.]" *Heller*, 554 U.S. at 582. This holding finds support in the manner in which George Washington expected citizens to arm themselves for militia service. Washington wrote "that a well regulated militia, composed of… freemen, is the natural strength and only staple security of a free government, and that such militia will… render it unnecessary to keep standing armies among us, ever dangerous to liberty."[18] In concurring with these principles, then Chairman Washington *recommended* that in order to ensure the capability of the militia to be organized and well regulated, these freemen should "provide *themselves* with good firelocks, and use their utmost endeavours to make *themselves* masters of the military exercise[.]"[19] General Washington did not recommend that *Fairfax County* procure arms for the militia; he recommended the *freemen* to procure arms *themselves,* and he made that recommendation with the complete understanding and knowledge that such arms were the typical and standard armament used by the standing British army that they needed to oppose.[20]

---

[16] The Federalist No. 46 (James Madison)
[17] *Id.*
[18] Resolutions of Fairfax County Committee, 17 January 1775
[19] *Id.* (emphasis added)
[20] *Id.* (emphasis added)

WYD 138

The Founders knew that bearable military arms were required for militia service, and no serious dispute could be made to the contrary; thus, they wrote the Second Amendment. Therefore, the plain text of the Second Amendment, as informed by history, protects the possession of the standard-issue bearable military arm of today, the M-16.

## III.   *Heller* Did Not Determine That Machineguns May be Banned

The Defendants point to two remarks in *Heller* (veritably, the *only* two occasions where the opinion even mentions machineguns), to conclude a holding that was not even argued or pled in *Heller*. *See generally* Def. Mem. The first remark, in *Heller*'s analysis of *Miller*, is a suggestion by Justice Scalia saying that it would be "startling" if the "National Firearms Act's *restrictions* on machineguns… *might* be unconstitutional." *Heller*, 554 U.S. at 624 (emphasis added). Such a supposition may indeed be startling, given that both *Heller* and *Bruen* held that the Second Amendment right is not unlimited. But the *restrictions* in the National Firearms Act do not constitute a *total ban*, and a *total ban* on machineguns was not at issue in *Miller* or *Heller.* Further, Justice Scalia did not say that judges could not find "startling" conclusions; to the contrary, Justice Scalia said that "the judge who always likes the results he reaches is a bad judge," which supported his viewpoint that "decisions should reflect the letter of the law."[21] The opinion in *Heller* acknowledged that they were "not undertak[ing] an exhaustive historical analysis… of the full scope of the Second Amendment," *Heller*, 554 U.S. at 626, and the Court reinforced this point by emphasizing that the issue of the *types of arms* that are protected was undecided, writing that "we will have to consider eventually[] *what* types of weapons *Miller* permits." *Id*. at 624.

---

[21] Tasha Tsiaperas, *Constitution a 'dead, dead, dead' document, Scalia tells SMU audience,* Dallas Morning News (January 28, 2013)

The second remark the Defendants place much reliance on is the only sentence in *Heller* that mentions an M-16 rifle. The sentence proposes a hypothetical objection, which contains distinct similarities to the instant case, and is followed by a defense to that hypothetical objection. When reading the sentence in full, it is obvious that it does not implicitly declare that machineguns may be banned:

> It *may be objected* that *if* weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause.

*Id.* at 627 (emphasis added).

The Defendants extract pieces of this excerpt to say that the Court "listed machineguns, and specifically the M-16 rifle, as paradigmatic examples of the type of unprotected dangerous and unusual weapons, finding it implicit that 'M-16 rifles and the like[] may be banned.'" Def. Mem. at p. 10 (citing *id.*). This reading, however, directly conflicts with the *actual* list of "longstanding prohibitions" *Heller* explicitly identified as "presumptively lawful" in the same part of the Court's opinion; notably absent from that list, which would have been the perfect vehicle for its endorsement, was the machinegun ban. *See Heller*, 554 U.S. at 626-627 (specifically listing "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."). Defendants then point to the Tenth Circuit noting that Supreme Court dicta binds "almost as firmly as by the Courts' outright holdings[.]" Def. Mem. at p. 10 (citing *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015)). However, *Heller* rejected such conclusive readings of Supreme Court dicta, especially for the circumstance presented here, saying that "[it is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a… dictum in a case where the point

16

was not at issue and was not argued." *Heller*, 554 U.S. at 625, n.25. Thus, reading *Heller* to say that machineguns are implicitly unprotected directly contradicts the text of the opinion. Further, even if *Heller had* included the machinegun ban in its list of longstanding prohibitions, the ban would still be subject to the constitutional scrutiny required by *Bruen*.

Indeed, Plaintiff's challenge objects "that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause," *Heller*, 554 U.S. at 627, and *Heller*, anticipating arguments against such an objection comparing the effectiveness of the militia to modern armament and armies, defended Plaintiffs' objection by asserting "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627-628.

IV.   **Courts of Appeals Upholding § 922(o) Since *Heller* Did Not Meet the Standards of *Bruen***

In looking for support for the machinegun ban, the Defendants point to opinions in "[s]ix courts of appeals [that] have rejected Second Amendment challenges to § 922(o) since *Heller*." Def. Mem. at p. 11. *All* of these opinions, however, did not conduct the analysis under *Bruen*, and do not comply with the requirements of *Bruen*. Defendants argue that these decisions concluded machineguns were not protected "based on the Second Amendment's text and history, including *Heller's* analysis of text and history." *Id.* at p. 12. Defendants' argument is incorrect. Those decisions were based *only* on *Heller*'s analysis. *None* of the courts of appeals performed an independent analysis of the "Second Amendment's text, as informed by history," as *Bruen* requires. *Bruen*, slip op. at 10. Indeed, each of the six courts of appeals used the same approach that the Defendants use now in the instant case: they supposed that machineguns are not in common use, are dangerous and unusual, or a combination of both, and conclude that *Heller* implicitly

prohibits their possession. Plaintiff addresses each of these separately and demonstrates that their holdings do not comply with *Bruen*.

*Hollis*, 827 F.3d 436, *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008), *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), and *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, (3d Cir. 2016) determined that because machineguns were "dangerous and unusual" weapons as described in *Heller*, they did not receive Second Amendment protection. *See Hollis*, 827 F.3d at 451 ("Machineguns are dangerous and unusual and… [t]hey do not receive Second Amendment protection[.]"); *Fincher*, 538 F.3d at 874 ("Machine guns… fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *Henry*, 688 F.3d at 638 ("machine guns are 'dangerous and unusual weapons' that are unprotected by the Second Amendment."); *Palmetto State Armory*, 822 F.3d at 143 ("'Machine guns… fall    within    the category of dangerous and unusual weapons that the government can prohibit for individual use.'") (citing *Fincher*, 538 F.3d at 874). In the most recent of these cases, the Fifth Circuit acknowledged a source submitted by Mr. Hollis, *see* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H), that "advance[d] his view that dangerous and unusual refers *only* to the manner in which weapons are used," not a *class* of firearms. *Hollis*, 827 F.3d at 448 (emphasis added). Recognizing the compelling analysis by the source, the Fifth Circuit explained that accepting its conclusions would contradict Supreme Court dicta, saying "that very paper acknowledged this 'inaccurate definition of "dangerous and unusual weapons" [was] embraced in *Heller*….' We leave changes in Supreme Court caselaw to the Supreme Court." *Id.* Indeed, in *Bruen*, the Supreme Court clarified *Heller*'s dicta that the Fifth Circuit could not overrule, and affirmed that Mr. Hollis' source is correct, saying that "[f]ar from banning… any class of firearms," statutes prohibiting

18

dangerous and unusual weapons "merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38. Thus, these cases relying on *Heller*'s dangerous and unusual criteria would not comply with the dicta that was clarified by *Bruen*. Additionally, these decisions would incorrectly conflate the two prongs required by *Bruen*. *See infra*, Section VI.A.

*Hollis*, 827 F.3d 436, and *Fincher*, 538 F.3d 868 determined that because machineguns were not in common use as the test was applied in *Heller*, they were not protected under the Second Amendment. *See Hollis*, 827 F.3d at 451 ("Machineguns are… therefore not in common use. They do not receive Second Amendment protection[.]") (analyzing various *modern* measures to try to determine which standard delineates the common use threshold. *See id*. at 449-450); *Fincher*, 538 F.3d at 874 ("Machine guns are not in common use… and therefore fall within the category of… weapons that the government can prohibit[.]"). These narrow approaches to the "common use" test, however, improperly constrains the measure of arms to "civilian-owned arms" as described *supra*, pp. 5-10. In these opinions, the courts did not evaluate the plain-text of the Second Amendment, "as informed by history," *Bruen*, slip op. at 10, and their strict method of employing the "common use" test to arms owned by civilians in the present day would therefore not survive the requirements of *Bruen*.

*Palmetto State Armory*, 822 F.3d 136, *Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009), and *United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012) read *Heller* to say that the ban on machineguns was implicitly constitutional. *See Palmetto State Armory*, 822 F.3d at 141 ("*Heller*… make[s] clear that the… ban on machine guns… does not impose a burden on conduct falling within the scope of the Second Amendment."); *Hamblen*, 591 F.3d at 474 ("[W]hatever the individual right to keep and bear arms might entail, it does not authorize an… individual to

possess… machine guns[.]") (drawing on *Heller*'s "startling" supposition); *Zaleski*, 489 F. App'x at 475 ("[T]he Second Amendment does not protect Zaleski's personal possession of machine guns.") (drawing on *Heller*, 554 U.S. at 624-625). But as explained *supra*, pp. 15-17, *Heller* did not determine that machineguns may be banned, saying that "[it is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a… dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 625, n.25. Importantly, neither *Palmetto State Armory, Hamblen*, nor *Zaleski* performed an independent analysis of the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. Thus, none of these cases comply with the first prong required by *Bruen*.

The analysis here of the six courts of appeals decisions upholding section 922(o) shows a common theme of pointing to *Heller* and "sister circuit courts" to subvert constitutional analysis. But *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, slip op. at 17. Accordingly, since these six decisions did not perform that analysis, they would not have been "resolved… at step one," Def. Mem. at p. 12, and are not "consistent with [the] reasoning[,]" Def. Mem. at p. 13, of *Bruen*.

## V.   District Courts Upholding § 922(o) Since *Bruen* Have Not Complied With *Bruen*

Looking for post-*Bruen* guidance, Defendants point to three district courts upholding § 922(o) and one district court upholding the NFA. Def. Mem. at p. 13. These decisions, despite their acknowledgement of the clarified *Bruen* standards, *still* did not comply with *Bruen*. The district courts simply relied on the pre-*Bruen* decisions explained *supra*, pp. 17-20, and did not consider the plain text of the Second Amendment, as informed by history, that *Bruen* requires.

In *United States v. Simien*, No. SA-22-cr-00379-JKP (W.D. Tex. Feb. 10, 2023), the court pointed to *Heller*'s "dangerous and unusual" dicta, *id.* at 17, disregarding *Bruen*'s clarification identified *supra*, p. 10, and then looked for support in *Hollis*, which would not comply with *Bruen* as explained *supra*, pp. 17-20. In Order, *United States v. Adamiak*, No. 2:22cr47, ECF No. 46 (E.D. Va. Sept. 22, 2022), the court determined that machineguns were not "in common use" and "thus fall outside of the Second Amendment's protection." *Id.* at 9-10. As explained *supra*, pp. 5-10, this conclusion fails to consider the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. In Order, *United States v. Hoover*, No. 3:21-cr-22(S3)-MMH-MCR, ECF No. 141 (M.D. Fla. Oct. 18, 2022) the court wrote that "*Bruen* did not overturn [*Heller*]," which acknowledged the tradition of prohibiting "'dangerous and unusual weapons.'" *Id.* at 33 (citing *Heller*, 554 U.S. at 627). This is similar to the Defendants' argument that "*Bruen*… was '[i]n keeping with *Heller*[,]'" when the Court "found it 'fairly supported by the historical tradition of prohibiting… "dangerous and unusual weapons[.]"'" Def. Mem. at p. 9 (citing *Bruen*, slip op. at 8; *Heller*, 554 U.S. at 627). As explained *supra*, p. 10, the "dangerous and unusual" dicta in *Heller* was *clarified* by *Bruen* to mean that "[f]ar from banning… any class of firearms," statutes prohibiting dangerous and unusual weapons "merely codified the existing common-law offense of bearing arms to terrorize the people," *Bruen*, slip op. at 38, which forecloses the reading used by the district court in *Hoover*. The district court holding in *United States v. Dixon*, No. 22-cr-140 (N. D. Ill. Mar. 28, 2023) was particularly capricious; after determining that § 922(o) was constitutional for the same erroneous reasons the district courts used *supra*, and failing to perform the historical analysis of the plain text of the Second Amendment as required by *Bruen*, the court proceeded to immediately evaluate the constitutionality of 18 U.S.C. § 922(g)(1) by analyzing the plain text of the Second Amendment. *See id.* at Part II.

*Bruen* did not clarify the holdings in *Heller* because they were being correctly applied; the Court clarified its holdings because lower courts for fourteen years incorrectly evaluated Second Amendment challenges. District court decisions that continue to simply point back to pre-*Bruen* decisions, despite the clarified holdings, only to find the same results in an effort to avoid "break[ing] new ground to uphold § 922(o)[,]" Def. Mem. at p. 15, cannot be considered instructive as to how to evaluate a Second Amendment challenge in compliance with *Bruen*. The test in *Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, slip op. at 17.

VI.    **Section 922(o) Does Not Comport With *Bruen***

    A. **Defendants Improperly Conflate the Two Prongs of *Bruen***

*Bruen* identified two distinct prongs to be used when evaluating a Second Amendment challenge. At the first, it must be determined if the "plain text" of the Second Amendment "covers an individual's conduct," *Bruen*, slip op. at 8, which should be "informed by history." *Id.* at 10. Then, second and separately, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 8. In the instant case, the Defendants improperly conflate *Bruen*'s two prongs into one, when in addressing the second prong they say that "[t]he key question" in identifying "'relevantly similar'" "historical prohibitions on the carriage of dangerous and unusual weapons" "is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are 'dangerous and unusual weapons.'" Def. Mem. at p. 22 (citing *Bruen*, slip op. at 20). Put simply, Defendants argue at *Bruen*'s first prong that the plain text of the Second Amendment does not protect machineguns based on historical laws supposedly prohibiting dangerous and unusual weapons, and *then* attempt to satisfy *Bruen*'s second prong by providing *the same* historical laws supposedly

22

prohibiting dangerous and unusual weapons. *See* Def. Mem at pp. 16-22. This approach completely misapplies the two individual prongs of *Bruen* by conflating them into one.

*Bruen*'s first prong asks a strictly textual question. The "'textual analysis'" must "focus[] on the "'normal and ordinary'" meaning of the Second Amendment's language," *Bruen*, slip op. at 10-11 (citing *Heller*, 554 U.S. at 576-577, 578), as it was understood "*when the people adopted [it].*" *Id.* at 25 (citing *Heller*, 554 U.S. at 634-635 (emphasis added)). The first prong is *not* the step where *Bruen* requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation[s]" by providing historical analogues; that analysis is explicitly reserved for the second prong. *Id.* at 15. As such, Defendants improperly attempt to classify machineguns as dangerous and unusual at the first prong; the historical analysis to be conducted at the first prong must be in the context of the plain text of the Second Amendment.

### B.  The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun

When evaluating Second Amendment challenges, the first prong prescribed in *Bruen* "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* Courts must "ascertain the original scope of the right based on its historical meaning." *Id.* at 9. Even "if the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,'" courts then proceed to the second step. *Id.* (citing *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (internal quotation marks omitted)). As explained *supra*, pp. 2-15, there are three independent confirmations that machineguns are protected arms under the Second Amendment: machineguns are in common use in the military, which grants them protection; machineguns are in common use amongst citizens,

which grants them protection; most importantly, machineguns are protected by the plain text of the Second Amendment, as informed by history.

While none of the post-*Bruen* holdings referenced by Defendants, when conducting analyses of challenges to Second Amendment conduct, have complied with *Bruen*'s requirement to consider the plain text of the Second Amendment, "as informed by history," *Bruen*, slip op. at 10, there have been several courts that *have* done so. Although the following three cases did not implicate section 922(o), they did implicate Second Amendment conduct, and are particularly instructive as to how courts should read and employ the first prong required by *Bruen*; indeed, there are conspicuous parallels to the instant case.

In *Firearms Policy Coalition, Inc. et al., v. McCraw*, No. 4:21-cv-1245-P (N.D. Tex., Aug 25, 2022), the district court found that a statute banning "18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age... violates the Second Amendment[.]" *Id.* at 22. The court concluded that 18-to-20-year-olds were "a part of the militia" mentioned in the prefatory clause (*id.* at 10) and "a part of 'the people' mentioned in the [operative clause of the] Second Amendment[.]" *Id.* at 6. The court gleaned these conclusions from performing historical analysis of the actual plain text of the Second Amendment as well as Supreme Court dicta that analyzed that text in *Heller* and *Miller*. *Id.* at 5-13.

In *United States v. Price*, No. 2:22-cr-00097 (S.D. W. VA., Oct 12, 2022), particularly relevant to the instant case, the district court found that 18 U.S.C. § 922(k), prohibiting possession of firearms with altered, obliterated, or removed serial numbers, is unconstitutional under the Second Amendment. The government argued that section 922(k) was a constitutional commercial regulation, relying on language in *Heller, McDonald v. City of Chicago*, 561 U.S. 742 (2010)*, and Bruen. See id.* at 5. But the court determined that because the statute was "a blatant prohibition on

possession" of a type of arms, "[t]he conduct prohibited by Section 922(k) f[ell] squarely within the Second Amendment's plain text." *Id.* at 7.

In *United States v. Quiroz*, No. PE:22-CR-00104-DC (W.D. Tex., Sep 19, 2022), the district court found that 18 U.S.C. § 922(n), prohibiting persons under felony indictment from obtaining a firearm, is facially unconstitutional. The government quoted *Heller*, arguing "for a rigid, sterile reading of 'keep and bear arms,'" to mean it would only be permissible for such persons to "have weapons" or to "carry," and that "receiving a firearm falls outside the Second Amendment right[.]" *Id.* at 6. The court rejected the government's *sole* reliance on *Heller*, and after performing its own analysis of the plain text of the Second Amendment, as required by *Bruen*, concluded that "the Second Amendment's plain text cover[s] the conduct… [w]ithout a doubt," emphasizing that "*Bruen*'s first step asks a strictly textual question[.]" *Id.* at 7.

In the instant case, the Defendants' approach to *Bruen*'s first prong is comparable to the government's approach in *Quiroz*. "[F]rom the jump, the Government seems to misread *Bruen*[,]" *id.* at 5, when they say that "[t]he key question is the same question underlying whether machineguns are covered by the Second Amendment's text: whether machineguns are 'dangerous and unusual weapons.'" Def. Mem. at p. 22. By adding the "dangerous and unusual" criteria to the *conduct* in the first prong, the *possession of arms*, "the Government conflates *Bruen*'s first step with its second." *Quiroz*, No. PE:22-CR-00104-DC at 6. But "*Bruen*'s first step asks a strictly textual question: does the Second Amendment's plain text cover the conduct? Without a doubt the answer here is yes." *Id.* at 7. § 922(o)'s constitutionality *then* turns on whether prohibiting the possession of machineguns "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

These district court holdings contain similar themes that have appeared in post-*Bruen* litigation. First, the government argues that a statute is constitutional based on "implicit dicta" in *Heller*, and disregards *Bruen*'s requirement to consider the plain text of the Second Amendment, "as informed by history." *Bruen*, slip op. at 10. Next, the courts apply the requirements of *Bruen*, analyzing the regulated conduct in view of the plain text of the Second Amendment, "as informed by history." *Id.* Resultingly, the courts determine that the conduct in question is protected under the plain text of the Second Amendment, and proceed to the second prong. Indeed, the Defendants in the instant case employ the same approach of relying on *Heller* to the extent that it avoids *Bruen*'s requirement to determine whether or not machineguns are protected by the plain text of the Second Amendment, "as informed by history." *Id.*

Plaintiff has identified three independent conclusions demonstrating that machineguns are protected; one conclusion complies with the "common use" test as *Heller* expanded it to permit the measure of modern civilian-owned arms; and two conclusions comply with *Bruen*'s requirement to consider the plain text of the Second Amendment, as informed by history. *See supra*, pp. 2-15.

## C. Section 922(o) is Not Consistent with This Nation's Historical Traditions of Regulating Arms

In *Bruen*, the Supreme Court reaffirmed that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them." Bruen*, slip op. at 25 (citing *Heller*, 554 U.S at 634-635). Detailing the framework for Second Amendment challenges to use, the court categorized "historical sources from the late 1200s to the early 1900s" into five time periods, "because, when it comes to interpreting the Constitution, not all history is created equal." *Id.* The court then elaborated on the weight and considerations that sources from each time period

26

should possess and provide. *Bruen* explained how courts must use analogical reasoning in the context of the Second Amendment to identify historical regulations that are acceptable as analogues to modern regulations. The "'central' considerations when engaging in an analogical inquiry" should be "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 20. When considering these metrics, the Defendants' examples do not sufficiently justify section 922(o).

In their only attempt to identify regulations historically analogous with the machinegun ban, the Defendants point to the authorities referenced by *Heller* to support "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Def. Mem. at p. 21 (citing *Heller*, 554 U.S. at 627). These authorities, however, did not impose restrictions on the *types* of arms that may be owned by citizens, much less a *total ban*. As explained above, *see supra*, p. 10, *Bruen* determined that these references referred to the offense of "affray," and were "[f]ar from banning… any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38; *see also* Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H). The most fitting modern regulations analogous to Defendants' authorities referencing affray may be present-day offenses criminalizing the act of "brandishing." *See* 18 U.S.C. § 924(c)(4) ("'[B]randish' means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person[.]"). Such modern regulations do not prohibit a class of firearms; they criminalize specific manners in which *protected* arms may be used.

In performing the historical analysis required by *Bruen*, one of the two metrics that must be used in comparing modern regulations to historical regulations is to identify *how* the "regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, slip op. at 20. The

27

*Heller* authorities referenced by Defendants easily fails this metric. The historical regulations burdened the *manner* in which persons could *bear* arms, but the modern regulation, the machinegun ban, burdens the *type* of arms that may be *kept* or *possessed*.

The other metric that must be considered is *why* the "regulations burden a law-abiding citizen's right to armed self-defense." *Id*. The *Heller* authorities referenced by Defendants fail this metric as well. The historical regulations burdened Second Amendment conduct to keep from "terroriz[ing] the people," but the intent of the machinegun ban is not evidenced by the Defendants, as their burden requires. *Id*. at 38. This lack of evidence is surely because the "legislative history surrounding § 922(o) is virtually nonexistent. The provision was a last minute floor amendment, no hearings were conducted, and no committee report refers to it." *United States v. Wilks*, 58 F.3d 1518, 1519 (10th Cir. 1995). There also was no recorded vote; the provision passed by a voice vote.[22] *Bruen* provides guidance for considering these circumstances:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen*, slip op. at 17-18.

Thus, the societal problem must be addressed by a "distinctly similar historical regulation addressing that problem." *Id*. If the challenge "implicat[es] unprecedented societal concerns or dramatic technological changes… a more nuanced approach" may be required. *Id*. at 18. However, Defendants have provided no evidence that the challenged regulation in the instant case was

---

[22] *See FOPA Hughes Amendment VOTE APRIL 10 1986* (25 Jan, 2011),
(https://www.youtube.com/watch?v=a6Mx2UcSEvQ) (video footage of the United States House of Representatives floor vote of the machinegun ban ("the Hughes Amendment")).

enacted by Congress to address any societal problem *whatsoever*. Therefore, the regulation falls far short of the bar established by *Bruen*.

*Bruen* established the standard and set the example to satisfy the requirement of identifying historical American traditions to justify a regulation affecting conduct protected under the Second Amendment. The court studiously evaluated various English regulations and laws from the 1200s through the 1700s; three colonial era restrictions; three late-18th-century and early-19th-century laws; various post-ratification common-law offenses; ten post-ratification statutory prohibitions along with eight court cases upholding those prohibitions; ten post-ratification surety statutes; three laws and two court cases from the reconstruction era; and six laws from the late-19th-century. *See Bruen*, slip op. at 30-62. In analyzing these historical restrictions that contained *actual* similarities to the protected conduct in question in that case, *Bruen* determined that they were not historical analogues, and did not justify a *total ban* on that conduct. In consideration of the analytical standard that *Bruen* established, the *Heller* authorities criminalizing the offense of affray, which have not been proven to be analogous to the machinegun ban, cannot be accepted as historical American traditions to justify such a ban.

## **CONCLUSION**

The Supreme Court has held that "the Second Amendment right is not unlimited." *Heller*, 554 U.S. at 571. To be sure, there are numerous federal, state, and local regulations and restrictions on machineguns, including purchase, transfer, registration, importation, manufacture, possession, and transportation regulations under the NFA; time and place restrictions; background check requirements; carry restrictions; and prohibited possession by felons, people convicted of domestic violence, fugitives, and unlawful users of controlled substances. Plaintiff does not challenge any

of these restrictions, and they would remain unaffected if the machinegun ban was found to be unconstitutional.

Nonetheless, a *total ban* on conduct protected under the Second Amendment does not pass constitutional muster. While acknowledging that the Second Amendment right is not unlimited, *Heller* and *Bruen* determined that the opposite extreme also is not permissible, and accordingly overturned *total bans* on protected arms and conduct. Since machineguns are a type of arm in common use and protected under the plain text of the Second Amendment, as informed by history, the "Constitution presumptively protects" the possession of machineguns, and "the government must demonstrate that" the machinegun ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, slip op at 8. The government has failed to make that demonstration, and section 922(o) therefore fails the requirements mandated by *Bruen*. As such, the machinegun ban must be found unconstitutional.

Plaintiff requests that the Court grant Plaintiffs' Motion for Summary Judgment; deny Defendants' Motion to Dismiss; and award Plaintiff any other relief he is entitled to.

DATED this 7th day of April, 2023.                    Respectfully Submitted,


Jake S. DeWilde
PO Box 267
Wapiti, WY 82450
(307) 587-4524

30

**Exhibit A**

Veterans of Foreign Wars, *Veteran-Signers of the U.S. Constitution*

VFW Magazine, September 2010

Pages 28-29

# Veteran-Signers of the U.S. Constitution

**On Sept. 17, 1787,** 22 Revolutionary War veterans—men who had served in both Continental and state forces—signed the U.S. Constitution at a monumental convention in Philadelphia. Fully 56% of the 39 signers were veterans.

George Washington presided over and William Jackson was secretary of the Constitutional Convention.

These Founding Fathers ratified a "singular work of genius." But they did much more. "Veterans of the Revolutionary War," wrote the authors of *Soldier-Statesmen of the Constitution*, "formed a human bridge between the promise of independence and the realization of representative government."

Some 400 vets served in prominent executive, legislative and judicial positions and as governors before 1815.



George Washington

| VETERAN | STATE | SERVICE YEARS | UNITS | CAPACITY |
|---|---|---|---|---|
| Baldwin, Abraham | Connecticut | 1775-1783 | Continental Army Contingent, Connecticut | Chaplain |
| Bassett, Richard | Delaware | 1776-1777 | Dover Inf. and Horse (M), Haslet's Regt. (C) | Officer |
| Blount, William | North Carolina | 1777-1780 | 3rd North Carolina Regt. (C) | Paymaster |
| Brearly, David | New Jersey | 1776-1779 | 1st New Jersey Regt. (C), Van Cortlandt's Regt. (M) | Officer |
| Butler, Pierce | South Carolina | 1779-1782 | South Carolina Militia | State Adjt. Gen. |
| Dayton, Jonathan | New Jersey | 1776-1783 | 2nd and 3rd New Jersey Regts. (C) | Officer |
| Dickinson, John | Delaware | 1775-1778 | Associators (M) | Enlisted Man/Officer |
| Few, William | Georgia | 1778-1780 | Richmond County Regt. (M) | Officer |
| Fitzsimons, Thomas | Pennsylvania | 1776-1777 | Cadwalader's 3rd Battalion (M) | Officer |
| Gilman, Nicholas | New Hampshire | 1776-1783 | 3rd New Hampshire Regt. (C) | Officer |
| Hamilton, Alexander | New York | 1775-1781 | Continental Army, N.Y. Provincial Co. of Artillery (M) | Officer |
| Jackson, William* | South Carolina | 1776-1780 | 1st South Carolina Regt. (C) | Officer |
| King, Rufus | Massachusetts | 1778-1779 | Glover's Regt. (M) | Officer |
| Langdon, John | New Hampshire | 1777-1778 | Whipple's Eastern Brigade (M) | Officer |
| Livingston, William | New Jersey | 1775-1776 | New Jersey Militia | Head Officer |
| McHenry, James | Maryland | 1775-1781 | 5th Pennsylvania Battalion (C) | Surgeon |
| Mifflin, Thomas | Pennsylvania | 1775-1779 | Associators 3rd Battalion (M), Continental Army | Quartermaster General |
| Morris, Gouverneur | Pennsylvania | 1776-1777 | Pennsylvania Militia | Volunteer |
| Pinckney, Charles | South Carolina | 1779-1781 | Charleston Regiment (M) | Officer |
| Pinckney, Charles C. | South Carolina | 1776-1783 | 1st South Carolina Regt. (C) | Officer |
| Spaight, Richard | North Carolina | 1780-1781 | North Carolina Militia | Officer |
| Washington, George | Virginia | 1775-1783 | Continental Army | Commander-in-Chief |
| Williamson, Hugh | North Carolina | 1780-1781 | North Carolina Militia | Surgeon General |

*Source:* Soldier-Statesmen of the Constitution by Robert Wright and Morris MacGregor (Center of Military History, 1987).

28 • VFW September 2010



Jonathan Dayton   Nicholas Gilman   William Jackson

Alexander Hamilton   David Brearly   James McHenry   Charles C. Pinckney

| BATTLES | CIVILIAN OCCUPATION |
|---|---|
| Unknown | Senator, Georgia Representative |
| Unknown | Senator and Governor |
| Brandywine Creek, Camden | Tenn. Territorial Governor, State Legislator |
| Germantown, Monmouth, New York City, Brandywine Creek | Jurist |
| Savannah, Charleston | Senator, State Legislator, Businessman |
| Germantown, Monmouth, Yorktown, N.Y. Frontier, Brandywine Creek | Congressman, State Legislator, Businessman |
| New York City | Congressman |
| Sunbury, Savannah, Guerrilla Warfare on Frontier | Congressman, State Legislator, Jurist |
| Princeton | Congressman, State Legislator, Businessman |
| Valley Forge, Monmouth, Yorktown, Fort Ticonderoga, Saratoga | Senator, Representative, State Legislator |
| Princeton, Monmouth, Yorktown, New York City, Trenton | Secretary of the Treasury, Attorney |
| Savannah, Charleston, Florida, Stono Ferry | Attorney, Civil Servant |
| Newport (R.I.) | Senator (N.Y.), State Legislator, Diplomat |
| Saratoga, Newport | Senator, Governor, State Legislator |
| None | Governor |
| Monmouth, Springfield, Yorktown, New York City, Valley Forge | Secretary of War, State Legislator |
| Boston, New York City, Princeton | Governor, State Legislator |
| New York City, Hudson Highlands | Congressman, Businessman, Diplomat |
| Savannah, Charleston | Congressman, Governor, State Legislator |
| Germantown, Florida, Savannah, Charleston, Brandywine Creek | Diplomat, State Legislator |
| Camden | Congressman, Governor, State Legislator |
| Boston to Yorktown | First U.S. President |
| Camden, Guerrilla Warfare on Frontier | Congressman, State Legislator |

* William Jackson authenticated the results of the sessions.   C=Continental Army   M=Militia

September 2010 • WWW.VFW.ORG • 73

**Exhibit B**

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Commerce in the*

*United States – Annual Statistical Update 2021*

Page 16

Exhibit 8: National Firearms Act Registered Weapons by State
(May 2021) — continued

| State | Any Other Weapon [1] | Destructive Device [2] | Machinegun [3] | Silencer [4] | Short Barreled Rifle [5] | Short Barreled Shotgun [6] | Total |
|---|---|---|---|---|---|---|---|
| North Carolina | 1,158 | 107,333 | 15,875 | 76,759 | 17,478 | 3,563 | 222,166 |
| North Dakota | 215 | 3,726 | 1,670 | 23,042 | 2,003 | 319 | 30,975 |
| Nebraska | 816 | 9,780 | 2,403 | 25,879 | 3,472 | 911 | 43,261 |
| New Hampshire | 534 | 5,834 | 20,817 | 36,954 | 7,613 | 681 | 72,433 |
| New Jersey | 534 | 47,080 | 44,422 | 3,889 | 3,775 | 2,528 | 102,228 |
| New Mexico | 404 | 93,029 | 4,233 | 19,873 | 3,775 | 2,528 | 102,228 |
| Nevada | 1,264 | 50,124 | 14,577 | 19,873 | 4,590 | 839 | 122,968 |
| New York | 1,848 | 54,148 | 13,554 | 37,880 | 12,662 | 2,500 | 119,007 |
| Ohio | 2,312 | 92,909 | 22,979 | 7,406 | 7,622 | 7,613 | 92,191 |
| Oklahoma | 1,253 | 19,174 | 9,776 | 68,736 | 15,158 | 6,567 | 208,661 |
| Oregon | 1,683 | 28,654 | 6,740 | 62,404 | 8,738 | 2,023 | 103,368 |
| Pennsylvania | 2,482 | 205,854 | 21,169 | 49,197 | 9,483 | 1,717 | 97,474 |
| Rhode Island | 46 | 3,663 | 630 | 83,563 | 21,215 | 13,884 | 348,167 |
| South Carolina | 733 | 44,017 | 10,997 | 96 | 338 | 114 | 4,887 |
| South Dakota | 388 | 4,559 | 2,176 | 50,422 | 9,088 | 3,948 | 119,205 |
| Tennessee | 1,803 | 54,554 | 14,683 | 55,666 | 1,612 | 265 | 64,666 |
| Texas | 7,517 | 332,208 | 46,318 | 60,573 | 13,350 | 6,573 | 151,536 |
| Utah | 578 | 19,648 | 7,745 | 529,150 | 81,000 | 10,362 | 1,006,555 |
| Virginia | 3,094 | 250,986 | 43,877 | 79,557 | 9,212 | 1,668 | 118,408 |
| Vermont | 238 | 3,106 | 1,465 | 90,454 | 26,361 | 8,935 | 423,707 |
| Washington | 1,981 | 62,633 | 4,673 | 3,528 | 904 | 210 | 9,451 |
| Wisconsin | 853 | 36,053 | 8,391 | 78,279 | 16,919 | 1,049 | 165,534 |
| West Virginia | 465 | 25,315 | 7,359 | 40,596 | 8,070 | 1,467 | 95,430 |
| Wyoming | 337 | 120,688 | 2,019 | 13,696 | 2,913 | 1,215 | 50,963 |
| Other US Territories | 6 | 323 | 408 | 16,681 | 2,089 | 433 | 142,247 |
| | | | | 20 | 12 | 103 | 872 |
| **Total** | 67,744 | 3,343,519 | 741,146 | 2,664,774 | 532,725 | 162,267 | 7,512,175 |

Alcohol, Tobacco, Firearms and Explosives
Firearms Commerce in the United States – Annual Statistical Update 2021
| 16 |

WYD 159

**Exhibit C**

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *ATF National Firearms Act Handbook* –

ATF E-Publication 5320.8 – Revised: April 2009

Pages 23-25

# CHAPTER 3.   REGISTRATION OF NFA FIREARMS

## Section 3.1  The National Firearm Registration and Transfer Record (NFRTR)

The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).[30]

## Section 3.2  Who may register NFA firearms

**3.2.1  Amnesty registration.**  When the NFA was amended in 1968, a 30-day amnesty period immediately following the law's effective date was established during which persons possessing unregistered firearms could register them in the NFRTR.[31]

The 1968 amendments also provided for the establishment of additional amnesty periods not exceeding 90 days per period.[32] To date, no additional amnesty periods have been declared. Requests for further amnesty periods have been denied, principally because additional periods could jeopardize pending ATF investigations and prosecutions of NFA violations.

**3.2.2  Registration by State and local agencies**.  To be lawfully possessed by States and political subdivisions of the States (for example, local police departments), NFA firearms must be registered in the NFRTR. The regulations permit State and local police organizations acquiring unregistered NFA firearms for official use, by seizure, forfeiture, or abandonment, to register them in the NFRTR by filing ATF Forms 10. Appendix C contains a copy of the form. Firearms registered on Forms 10 are for official use only and subsequent transfers will be approved only to other government agencies for official use.[33]   For example, they may not be traded to an FFL/SOT in exchange for other firearms or police equipment.

**3.2.3  Registration by makers.**  Persons other than FFLs and SOTs desiring to make an NFA firearm are required to first register the firearm by filing Form 1 with ATF and obtaining approval of the form and registration of the firearm. Appendix C contains a copy of the form. ATF will approve a making application on Form 1 if the maker pays the $200 making tax required by the NFA, identifies the firearm as the form requires, includes his/her fingerprints and photographs if the maker is an individual, and if the making and the maker's possession of the firearm would not place the maker in violation of any Federal, State or local law.[34] A law enforcement certification is also required if the maker is an individual. Note also that ATF will not approve the making of a machinegun it determines would violate 18 U.S.C. 922(o). Section 922(o) generally prohibits the possession of machineguns manufactured on or after May 19, 1986.

---

[30] 26 U.S.C. 5841(a)
[31] Section 207(b) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968
[32] Section 207(d), ibid
[33] 27 CFR 479.104
[34] 26 U.S.C 5822; 27 CFR 479.62, 479.63, 479.64

WYD 161

**3.2.4  Registration by importers.**  FFLs/SOTs qualified as importers must register imported firearms by filing ATF Forms 2, Notice of Firearms Manufactured or Imported, no later than 15 days from the date the imported firearms were released by Customs.  Upon timely receipt by ATF of a Form 2 and a copy of Form 6A showing Customs' release of an imported firearm, ATF will register the firearm to the importer.[35]  Appendix C contains copies of Forms 2 and 6A. Note that the NFA prohibits importation of NFA firearms unless they are being imported for the use of the United States or a State agency, for scientific or research purposes, or for testing or use as a model by a registered importer or solely for use as a sales sample by a registered importer or registered dealer.[36]  In the case of an imported machinegun, Section 922(o) of the GCA would also apply.

**3.2.5  Registration by manufacturers.**  FFLs/SOTs qualified as manufacturers must register manufactured firearms by filing ATF Form 2, Notice of Firearms Manufactured or Imported. All firearms manufactured during a single day must be listed on one Form 2. The form must be filed no later than the close of the next business day. Receipt of the form by ATF will serve to register the listed firearms to the manufacturer.[37]  Appendix C contains a copy of Form 2.

**3.2.6  Registration to transferees.**  Registered firearms may be transferred by their registered owners/possessors to transferees. Other than Form 10 registration, there is no mechanism in the NFA to lawfully transfer unregistered NFA firearms.

**3.2.6.1  Transfers by persons other than FFLs/SOTs to other such persons.** Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax.[38]  Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[39]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[40]  A law enforcement certification is also required on ATF Form 4.

**3.2.6.2  Transfers by FFLs/SOTs to persons other than FFLs/SOTs.**  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax. Appendix C contains a copy of the form. The form must be approved by ATF before the transfer may be made.[41]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[42]

**3.2.6.3  Transfers by non-FFLs/SOTs to FFLs/SOTs.**  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to

---

[35] 27 CFR 479.112
[36] 26 U.S.C. 5844
[37] 27 CFR 479.103
[38] 26 U.S.C. 5812(a); 27 CFR 479.84
[39] 26 U.S.C. 5812(b); 27 CFR 479.86
[40] 26 U.S.C. 5812(a); 27 CFR 479.85
[41] 26 U.S.C. 5812(b); 27 CFR 479.86
[42] 26 U.S.C. 5812(a); 27 CFR 479.85

the transferee and pay the applicable transfer tax.[43]   Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[44]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.4  Transfers by FFLs/SOTs to other FFLs/SOTs.**  Transferors must file ATF Forms 3, Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, to register the firearm to the transferee.[45]  Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The form must be approved by ATF before the transfer may be made.[46]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.5  Transfers to State and local government agencies**.  Transferors must file ATF Forms 5, Application for Tax Exempt Transfer and Registration of a Firearm, to register the firearm to such agency.[47]  Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The Form must be approved by ATF before the transfer may be made.[48]

**Section 3.3  Status of unregistered firearms**

Firearms not lawfully registered as required by the NFA may not be registered and legitimized by their possessors.  They are contraband and unlawful to possess.[49]  However, see Section 2.4 for information on removing NFA firearms from the scope of the NFA because of their status as collectors' items, modification, or elimination of certain component parts.

**Section 3.4  ATF disclosure of NFA registration information**

**3.4.1  Restrictive use of information.**  The NFA provides that no information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person (individual) in order to comply with the NFA or the NFA regulations shall be used directly or indirectly as evidence against the person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration.[50]  Filing false information is an exception to this prohibition.[51]

**3.4.2  Prohibition on ATF's disclosure of tax returns or tax return information.**  NFA forms are treated as tax returns and registration information in the NFRTR is considered to be tax return

---

[43] 26 U.S.C. 5812(a); 27 CFR 479.84
[44] 26 U.S.C. 5812(b); 27 CFR 479.86
[45] 26 U.S.C. 5812(a); 27 CFR 479.88
[46] 26 U.S.C. 5812(b); 27 CFR 479.88(b)
[47] 26 U.S.C. 5812(a); 27 CFR 479.90
[48] 26 U.S.C. 5812(b); 27 CFR 479.90(b)
[49] U.S. v. Freed, 401 U.S. 601 (1971)
[50] 26 U.S.C. 5848(a)
[51] 26 U.S.C. 5848(b)

**Exhibit D**

National Firearms Act Trade & Collectors Association, *The Partisan*, Volume 4, Issue 3, Third

Quarter, 2012

Page 2



THE PARTISAN

PAGE 2

## Performance Anxiety (continued)

### Associate Memberships

The NFATCA now has $50 Associate Memberships available to provide an opportunity for even more folks to help keep NFA weapons available to all. Join now!

www.nfatca.org



Can't get enough of your own NFA action? Be sure to check out NFATCA member Jeff Zimba on YouTube!

www.youtube.com/ user/Bigshooterist

NATIONAL FIREARMS ACT TRADE & COLLECTORS ASSOCIATION

POWER THROUGH EXPERIENCE

NFATCA
20603 Big Wells Drive
Katy, Texas 77449
281.492.8288
info@nfatca.org

Publisher: John K. Brown, III
Senior Editor: Jeff Folloder
Photography: Oleg Volk
NFATCA is a 501(c)(6) corp.
© Copyright 2012, NFATCA

includes minor, yet significant variation that ultimately affects the outcome and disposition of each and every Form. It would be a stretch, at the least, to assume that the new Research Assistants would be able to go from a starting point of zero knowledge to full-speed, meeting all the expectations of ATF and the NFA community. They haven't.

Some of you may have noticed unusual notices and "new" questions coming back on "old issues" that were never a problem before. Please be patient. Each and every Research Assistant is being trained, under live fire, as you read this article. Each of the NFA Examiners and Mr. Clutter, in his role as Area Supervisor, are working hand in hand with the contractors to bring them up to speed as fast as possible, while at the same time not negatively impacting the current production rates. A Herculean task, indeed.

Clutter is both confident and extremely optimistic about the prospects for this new arrangement in Martinsburg, West Virginia. As the training program progresses, he believes that we will start seeing real impact before the end of the summer. (The

timing of being able to handle all of your Knob Creek purchases has not gone unnoticed). In the mean time, please be aware that there will be a few bumps in the road and taking some extra time to make sure that your NFA Forms are correct and that proper payment is included (where appropriate) with each one will certainly be appreciated.

For your reference, the following states have been assigned to the following Examiners:

**Sandra Snook** - WA, OR, ID, AK, HI
**Ann Feltner** - CA, NV,AZ, NM
**Jason Frushour** - MT, WY, UT, CO ND, SD, MN, WI
**Jason Bowers** - NE, IA, KS, MO, OK, AR, LA
**Sara Jones** - TX

**Chris Farris** - MI, NY, VT, NH, MA, ME, NJ, CT, RI
**Nicole Dudash** - IL, IN, OH, PA
**Dana Pickles** - KY, TN,VA, WV, NC, MD, DE
**Shannon Siviero** - MS, AL, GA, SC
**Albert Lamberger** - FL



Suppressors and SBR's represent the fastest growing segments in terms of total NFA Forms.



## Statistics (continued)

This is an aspect of the registry that causes grief across the board. Firearms often become unserviceable for a variety of reasons. If a museum renders a machinegun inoperable and turns it into an attractive paperweight, the ATF would likely never be aware of the change and carry it on the NFRTR for decades or in perpetuity.

Other interesting numbers raise eyebrows. For instance, the report lists some 488,065 machine guns as active on the registry. That's a lot of machine guns and doesn't seem to jive with the number of

"transferable" machine guns that we are familiar with. The number is huge because it includes all of the machineguns registered, including transferable, pre-May samples, post-May samples and machine guns properly registered to law enforcement and military. ATF does not have a good way to regularly break out the sub groups of machine gun types, but does report outside of this publication that the number of fully transferable machine guns available to the general population is between 182,000 and 185,000. The number is a moving target because of unre-

ported destructions, deactivations, etc.

Surprisingly, the region with the lowest number of registered NFA items is not the District of Columbia (40,836), but rather the idyllic state of Rhode Island (3,592). And in what must be a nod to the fact that hunting all game animals with a suppressor is now legal for Texans, the Lone Star State leads in suppressor registration with 47,712. The entire report can be downloaded:

http://www.nfatca.org/ pubs/2012Firearms.pdf

**Exhibit E**


BATFE letter, dated February 24, 2016.


Document identifying the count of pre-86 machineguns to be 175,977.

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

www.atf.gov

February 24, 2016                          REFER TO:  2016-0003 / AP-2015-05939

Mr. Jeffrey E. Folloder
NFATCA
20603 Big Wells Drive
Katy, TX  77449

Dear Mr. Folloder:

This is in response to your request for information that the Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF) initially withheld, pursuant to the reasons stated in our August
25, 2015 correspondence.  By letter dated September 16, 2015, you appealed our decision to
withhold the information requested to the Office of Information Policy (OIP).  By letter dated
December 9, 2015, OIP remanded the case for further processing.  Your request has been
assigned number 2016-0003.  Please refer to this number on any future correspondence.

The following information corresponds to your request for an exact count of transferrable pre 86
machineguns, post May 86 machineguns, and sale sample machineguns, registered in the
National Firearms Registration Transfer Record System (NFRTR).

|              |          |
|--------------|----------|
| Restricted 922(o) | 297,667 |
| Sales Samples | 17,020 |
| Pre 86 | 175,977 |

Please note that ATF utilizes customized Standard Query Language (SQL) to collect information
from system databases.  In the instant case, an SQL query may not capture all methods in which
the requested information has been manually entered into system data fields.  Thus, while each
individual record is accurate, there is an inherent albeit wholly unintentional margin of error as to
the aggregate statistical information requested.

Sincerely,

Stephanie M. Boucher
Chief, Disclosure Division

**Exhibit F**

Tom Morganthau, et al., *Machine Gun U.S.A.*, Newsweek, Oct. 14, 1985

Page 49

*Owner Paul Lavista, center, and two customers at the Bullet Stop in Marietta, Ga.: Rent-a-guns and 'rock and roll'*

going after dealers and manufacturers who neglect its requirements for record keeping on sales and serial numbers. As a result, ATF is the only federal agency that collects statistics on the sale of military weapons in the United States—but its statistics, which are predicated on the increasingly tenuous distinction between machine guns and other military guns, are suggestive at best. Over the last three years, the ATF reports, its seizures of illegal machine guns have more than tripled, from 871 guns and conversion kits in 1983 to 3,263 in 1985. (The number does not include weapons seized by other agencies, such as the FBI, the Drug Enforcement Administration or state and local police.) Over the last five years the number of persons licensed to sell machine guns also has tripled, and the number of machine guns being sold legally—ATF provides no actual numbers for this—has risen by about [ ] percent. American dealers are importing an average of 55,000 foreign-made machine guns each year; to judge by the number of inquiries from foreign governments for ATF's investigative assistance, the number of machine guns sold by Americans to overseas buyers is also rising sharply. "We're kind of the 'Guns-R-Us' for a large part of the world," an ATF agent jokes.

Calculating the number of assault weapons in American homes is a complicated matter. The estimate of 500,000 comes from a gun-control lobbyist, Michael Hancock, who is general counsel for the National

Coalition to Ban Handguns. Hancock guesses that perhaps 125,000 of those guns have been converted to full automatic. Sales figures collected by ATF indicate that more than 300,000 AR-15s have been sold as semiautomatics since the gun was approved for the civilian market. In addition, some 36,000 MAC-10s were sold between 1979 and 1982, when ATF at last restricted its sale. Add to those statistics about 5,000



*Shooter and target: 'Like a roller coaster'*

KG-9s and a genuinely incalculable number of UZI's, H&K's and other guns, and Hancock's cautiously ventured estimate is that about half a million such weapons are now in private hands. ATF's chief weapons expert, Frank W. (Bill) Nickell, concurs: "I would accept that," Nickell says. (The 500,000 total does not include the number of *licensed* machine guns in private hands, which also is rising: currently, ATF records show 116,000 licensed automatic weapons of all types nationwide.)

The numbers underscore the fact that military guns have acquired a powerful allure for millions of Americans—and it is by no means true that all those who covet UZI's or AR-15s or H&K MP-5s have some secret wish to use them on other human beings. The Bullet Stop's owner, Paul Lavista, says his clientele includes a "big cadre" of solid citizens—lawyers, salesmen, airline pilots—who are simply intrigued by the novelty and glamour of automatic weapons; and he says that none of his customers are "closet crazies." Other aficionados, such as Robert K. Brown, publisher of Soldier of Fortune magazine, stoutly defend their right to own and use such guns for sport or self-defense despite the disapproval of the gun-control lobby. The liberals have inflamed the public's fears about guns, the argument goes, and the media often ignores the fact that the vast majority of American gun owners are law-abiding, responsible citizens. And it is probably true, as Tulane

**Exhibit G**

Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48 (2008)



**NYU JOURNAL OF LAW & LIBERTY**

# THE PECULIAR STORY OF UNITED STATES V. MILLER

## Brian L. Frye[*]

INTRODUCTION ........................................................................ 48
I.   THE HISTORIOGRAPHY OF UNITED STATES V.
     MILLER ......................................................................... 50
II.  THE HISTORY OF UNITED STATES V. MILLER ...................... 52
     A.   Jackson Miller and the O'Malley Gang..................... 52
     B.   Miller in the District Court.................................... 58
     C.   National Firearms Act .......................................... 60
     D.   Judge Ragon ....................................................... 63
     E.   Miller in the Supreme Court .................................. 65
     F.   Postscript............................................................ 68
III. INTERPRETING UNITED STATES V. MILLER........................ 69
CONCLUSION........................................................................... 82

### INTRODUCTION

On April 18, 1938, the Arkansas and Oklahoma state police stopped Jack Miller and Frank Layton, two washed-up Oklahoma bank robbers. Miller and Layton had an unregistered sawed-off

[*] Associate, Sullivan & Cromwell LLP. J.D., New York University School of Law, 2005; M.F.A., San Francisco Art Institute, 1997; B.A., University of California, Berkeley, 1995. Research funded in part by the Institute for Humane Studies.

48

2008]          *The Peculiar Story of U.S. v. Miller*          49

shotgun, so the police arrested them for violating the National Fire-
arms Act ("NFA"). Surprisingly, the district court dismissed the
charges, holding the NFA violates the Second Amendment.[1] The
Supreme Court reversed in *United States v. Miller*,[2] holding the Sec-
ond Amendment does not guarantee the right to keep and bear a
sawed-off shotgun as a matter of law.

   Seventy years later, *Miller* remains the only Supreme Court
opinion construing the Second Amendment.[3] But courts struggle to
decipher its holding. Some find *Miller* adopted an individual right
theory of the Second Amendment, some find it adopted a collective
right theory, and some find it adopted a hybrid theory, protecting
the right to possess a firearm in connection with militia service.[4]
Most recently, in *Parker v. District of Columbia*, the D.C. Circuit con-
cluded *Miller* assumed the Second Amendment protects an individ-
ual right to possess and use weapons "'of the kind in common use
at the time,'" including handguns.[5]

   Oddly, Second Amendment scholars have largely ignored
*Miller*. While individual and collective right theorists alike claim
*Miller* supports their position, most provide only a perfunctory ac-
count of the case. The few exceptions focus on the text of the opin-
ion, rather than the history of the case, and the context in which it
was decided.[6] All conclude *Miller* is an impenetrable mess.

_____

[1] United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1939), *rev'd*, 307 U.S. 174 (1939).
[2] United States v. Miller, 307 U.S. 174 (1939).
[3] Of course, other cases mention or allude to the Second Amendment. *See, e.g.*, David
B. Kopel, *The Supreme Court's Thirty-Five Other Gun Cases: What the Supreme Court Has
Said About the Second Amendment*, 18 ST. LOUIS U. PUB. L. REV. 99 (1999).
[4] For the individual right theory, *see* Parker v. District of Columbia, 478 F.3d 370
(D.C. Cir. 2007); United States v. Emerson, 270 F.3d 203, 260 (5th Cir. 2001). For the
collective right theory, *see* Silveira v. Lockyer, 312 F.3d 1052, 1086-87 (9th Cir. 2003);
Hickman v. Block, 81 F.3d 98, 102 (9th Cir. 1996); United States v. Warin, 530 F.2d
103, 106 (6th Cir. 1976). For the hybrid theory, *see* Gillespie v. City of Indianapolis,
185 F.3d 693, 710-11 (7th Cir. 1999); United States v. Wright, 117 F.3d 1265, 1274 &
n.18 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996); Love v.
Pepersack, 47 F.3d 120, 124 (4th Cir. 1995); United States v. Hale, 978 F.2d 1016, 1019-
20 (8th Cir. 1992); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977); Cases v.
United States, 131 F.2d 916, 922 (1st Cir. 1942).
[5] Parker v. District of Columbia, 478 F.3d 370, 394 (D.C. Cir. 2007) (quoting *Miller*, 307
U.S. at 179) (emphasis omitted), *cert. granted*, 128 S. Ct. 645 (2007).
[6] *See, e.g.*, Brannon P. Denning & Glenn H. Reynolds, *Telling Miller's Tale: A Reply to
David Yassky*, 65 LAW & CONTEMP. PROBS. 113 (2002).

50                    *N.Y.U. Journal of Law & Liberty*                    [Vol. 3:48

This essay suggests the conventional wisdom is only half-right, because *Miller* did less than generally supposed. Part I presents a brief historiography of *Miller*. It argues scholars have not provided an entirely convincing account of the Supreme Court's holding in Miller, largely because they focus on the original meaning of the Second Amendment. Part II recounts the history of the case. It shows Jack Miller was a career criminal and government informant. It finds *Miller* was a Second Amendment test case arranged by the government and designed to support the constitutionality of federal gun control. And Part III analyzes *Miller* in light of this history.

This essay concludes that *Miller* is coherent, but largely irrelevant to the contemporary debate over the meaning of the Second Amendment. *Miller* was a Second Amendment test case, teed up with a nominal defendant by a district judge sympathetic to New Deal gun control measures. But the Supreme Court issued a surprisingly narrow decision. Essentially, it held that the Second Amendment permits Congress to tax firearms used by criminals. While dicta suggest the Second Amendment guarantees an individual right to possess and use a weapon suitable for militia service, dicta are not precedent.[7] In other words, *Miller* did not adopt a theory of the Second Amendment guarantee, because it did not need one.

### I. The Historiography of United States v. Miller

Originally, courts and commentators alike found Miller inscrutable,[8] or maybe just unremarkable. In any case, they basically ignored it. In 1939, legal scholars were uninterested in anachronisms like the right to keep and bear arms. But as gun control became increasingly controversial, scholars began to debate the meaning of the Second Amendment and the nature of the right to keep and bear arms. Eventually, they produced remarkably sophisticated

---

[7] *See, e.g.*, Carey v. Musladin, 127 S. Ct. 649, 653 (2006).
[8] *See, e.g.*, *Cases*, 131 F.2d at 922 ("However, we do not feel that the Supreme Court in this case was attempting to formulate a general rule applicable to all cases. The rule which it laid down was adequate to dispose of the case before it and that we think was as far as the Supreme Court intended to go.").

and comprehensive competing accounts of its origins and ratification.

Second Amendment scholarship reflects the bitterly partisan politics of gun control. Opponents of gun control generally endorse an individual right theory, claiming the Second Amendment protects an individual right to possess and use firearms. Advocates generally endorse a collective right theory, claiming it protects a collective right to form a militia. Both theories find substantial support in the text and history of the Second Amendment.

Unusually, for Second Amendment scholars, text and history are everything. Individual and collective right theorists alike focus on the original meaning of the Second Amendment, carefully parsing its origins, drafting, ratification, and implementation in the early republic. Indeed, originalism uniquely dominates Second Amendment scholarship.[9]

Why? Maybe the focus on originalism is tactical. Maybe it is strategic. Collective right theorists, in particular, may find originalist arguments less "embarrassing" than the alternatives.[10] Second Amendment scholarship does highlight the Talmudic niceties of constitutional law: Why is this right different from every other right? And maybe it is just circumstantial. After all, without clear precedents, what is left but original meaning? Regardless, courts are obliged to follow *Miller*, as far as it goes, whatever the Second Amendment originally meant.

Of course, both individual and collective right theorists still claim *Miller* supports their position. Individual right theorists generally emphasize that the Court addressed the merits of Miller's Second Amendment claim, rather than dismissing it for lack of standing.[11] Some go further, and argue *Miller* simply failed to show

---

[9] "For some reason, virtually everyone on both sides of the pro- and anti-gun Second Amendment debate tends to focus on text and history." Glenn Harlan Reynolds, *The Second Amendment as a Window on the Framers' Worldview*, 48 J. LEGAL EDUC. 597, 599 (1998).

[10] *See generally* Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637 (1989) (noting Hobson's choice Second Amendment presents gun control supporters committed to the Bill of Rights).

[11] *See, e.g.*, Denning & Reynolds, *supra* note 6, at 2.

52               *N.Y.U. Journal of Law & Liberty*               [Vol. 3:48

short-barreled shotguns have military uses.[12] Collective right theo-
rists highlight the Court's conclusion the Second Amendment
"must be interpreted and applied" with the end of preserving the
militia in view and argue the Second Amendment simply protects
the right to serve in the militia.[13] Many note the absurd conse-
quences of holding the Second Amendment protects only military
firearms, rather than those actually used by civilians.[14] In the end,
it's a stalemate. On its face, *Miller* does not clearly adopt either the-
ory of the Second Amendment.

## II. THE HISTORY OF UNITED STATES V. MILLER

### A. JACKSON MILLER AND THE O'MALLEY GANG

Jackson "Jack" Miller[15] was a gambler, roadhouse owner,
and small-time hood from Claremore, Oklahoma.[16] Born in about
1900, he grew into a hulking, 240-pound thug.[17] By 1921, he was in
trouble with the law.[18] His troubles worsened on August 14, 1924,
when he accidentally killed H.A. Secrest, a young court reporter
from Tulsa, while working as a bouncer at the Oak Cliff Resort near
Claremore.[19] Secrest was plastered and roughing up his date, so
Miller decked him, breaking his jaw.[20] Unfortunately, Secrest died

---

[12] *See, e.g.,* Nelson Lund, *The Second Amendment, Political Liberty, and the Right to Self-Preservation,* 39 ALA. L. REV. 103, 109 (1987).

[13] *See, e.g.,* H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate,* 76 CHI.-KENT L. REV. 403, 420 (2000); and David Yassky, *The Second Amendment: Structure, History, and Constitutional Change,* 99 MICH. L. REV. 588 (2000).

[14] *See, e.g.,* Michael C. Dorf, *What Does the Second Amendment Mean Today?, in* THE SECOND AMENDMENT IN LAW AND HISTORY 247, 250 (Carl T. Bogus ed., 2000).

[15] Also known as "J. J. Miller." Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942).

[16] *O'Malley Gang Trial Witness Slain,* MUSKOGEE DAILY PHOENIX, April 6, 1939, at 1.

[17] Miller was one-eighth Cherokee, and Oklahoma police called him a "big, yellow punk." *Officers Continue Without Clues In O'Malley Gang Witness Slaying,* MUSKOGEE DAILY PHOENIX, Apr. 7, 1939, at 1. *See also Claremore Man is Found Slain in Gang Killing,* TULSA DAILY WORLD, Apr. 6, 1939, at 1; *Robber Suspect to Get Immunity,* TULSA DAILY WORLD, Nov. 26, 1935, at 20.

[18] *See* State v. Miller, CR-21-03077B (D. Okla. Nov. 23, 1921).

[19] *Blow on Jaw Caused Death of Tulsa Man,* OKLAHOMAN, Aug. 29, 1924, at 18.

[20] *Id.*

of septicemia a couple of weeks later.[21] Miller turned himself in on September 11, 1924, and immediately posted $5,000 bail.[22]

But Miller did not hit the major leagues until he joined the O'Malley Gang in 1934. The Depression was the golden age of Midwestern bank robbery, and the O'Malleys executed some of the era's most daring and successful heists. From 1932 to 1935 they claimed "most of the major bank robberies in the Southwest," hitting banks in Missouri, Arkansas, Kansas, and Illinois.[23] Originally known as the Ozark Mountain Boys, the gang consisted of a score of hoods, most of whom met in the Missouri State Penitentiary. A reporter christened them the O'Malley Gang after the dashing Leo "Irish" O'Malley, notorious for his sensational but remarkably inept kidnapping of August Luer. In fact, O'Malley was only a bit player.[24] The gang's real leaders were Dewey Gilmore, Daniel "Dapper Dan" Heady, and George Leonard "Shock" Short.[25]

In the summer of 1934, Short moved to a rented farmhouse outside of Claremore.[26] The rest of the gang soon followed. Heady recruited Miller as a "follow-up man" (lookout) and "wheelman" (getaway driver).[27] Then the O'Malleys got to work. On September 14, 1934, they hit the McElroy Bank and Trust in downtown Fayetteville, the oldest bank in Arkansas. While Miller and Art Austin circled the block, Gilmore, Heady, Virgil "Red" Melton, and Fred Reese broke into the bank before it opened, shanghaied the employees as they arrived, and made off with about $5,700.[28]

Then, on December 22, 1934, the O'Malleys robbed two Okemah, Oklahoma banks at the same time, one of the few success-

---

[21] *Id.*

[22] *Alleged Oak Cliff Guard Surrenders,* OKLAHOMAN, Sept. 12, 1924, at 1.

[23] Robert E. Bates, *Irish O'Malley and the Okemah Caper,* 12 OKLAHOMBRES 1, 3–6 (2001).

[24] What's more, "Leo O'Malley" was the alias of Walter Holland, who was born Walter Riley and adopted his foster parents' surname. *See* R.D. Morgan, Irish O'Malley and the Ozark Mountain Boys (unpublished manuscript, on file with the NYU Journal of Law and Liberty).

[25] Short was the wayward son of a prominent Galena, Missouri family and the brother of Missouri Congressman Dewey Short.

[26] *See* Morgan, *supra* note 24.

[27] *Robber Suspect to Get Immunity,* *supra* note 17.

[28] *See* Morgan, *supra* note 24. $5,700 in 1934 dollars is the equivalent of about $88,686 in 2007 dollars. *See* U.S. Department of Labor, The Inflation Calculator, http://data.bls.gov/cgi-bin/cpicalc.pl (last visited Sept. 6, 2007).

ful double heists in American history.[29] They drove a Plymouth and a Ford into Okemah at dawn, wore bandages concealing their faces, and struck shortly before the banks opened.[30] Gilmore, O'Malley, Short, and Russell Land Cooper hit the Okemah National Bank, while Heady, Melton, and Reese hit the First National Bank of Okemah.[31] Miller "was stationed at the Okemah city limits to guard against possible breakdowns and to pick up members of the gang if their autos failed."[32] Armed with pistols and machineguns, the O'Malleys bound and gagged the unsuspecting bank employees as they arrived, then forced a bank officer to open the safe. The Okemah National Bank yielded $13,186 and the First National Bank of Okemah yielded $5,491.25.[33] The police pursued, to no avail.

Miller returned to Claremore with his $2,100 share of the Okemah job, half of which he kicked back to Gilmore on the sly.[34] But he soon grew restless. On the night of January 11, 1935, he and some friends decided to rob Joe Lewis's gas station and café in Salina, Oklahoma. Nineteen-year-old Percy Bolinger was alone behind the counter when Miller, Earnest Tennyson, Ray Anderson, Norman Hoch, Howard Bridwell, Cap Ellis, Bill Meyers, and Blue Culver sauntered in at about 2 a.m. They ordered coffee and started playing the slot machines. When they got unruly and started tilting the machines, Bolinger asked them to leave. The hoods returned a few hours later, accompanied by Jeff Armstrong, who promptly pistol-whipped Bolinger. They stole $23.71 from the till and $120 from four slot machines, which they dumped in Lake Cherokee.[35] A week later, the police arrested the whole crew in Claremore.[36] It was the beginning of the end for the O'Malleys.

---

[29] *Five Bank Bandits to Trial Monday*, TULSA DAILY WORLD, Nov. 24, 1935, at 6; *Five to Face Trial in Raid*, OKLAHOMAN, Nov. 24, 1935, at 22. Today, Okemah is best known as Woody Guthrie's hometown.

[30] *See* Morgan, *supra* note 24.

[31] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir 1942).

[32] *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[33] *Gilmore*, 124 F.2d at 538.

[34] *Robber Suspect to Get Immunity*, *supra* note 17; *O'Malley Gang Trial Witness Slain*, *supra* note 16, at 4.

[35] Armstrong v. State, 68 P.2d 114, 114-17 (Okla. Crim. App. 1937).

[36] Id. at 115.

2008]          *The Peculiar Story of U.S. v. Miller*          55

On May 3, 1935, the O'Malleys hit the City National Bank of Fort Smith, Arkansas, stealing about $22,000.[37] It was their last big job. The police arrested Cooper as a likely suspect and struck gold. Cooper ratted out Gilmore, who was already on the lam. The police caught up with Gilmore on May 22, outside of Lancaster, Texas.[38] Gilmore sang too, fingering the rest of the gang. The police pinched O'Malley and Heady in Kansas City, where they'd rented a swanky pad from James Maroon.[39] O'Malley immediately confessed to the Luer kidnapping and was extradited to Illinois.[40] But the FBI took Heady to Muskogee, Oklahoma, to face federal charges on the Okemah job.[41] A couple of weeks later, the police nabbed Short in Galena, Missouri.[42] And on August 8, they caught up with Melton and Reese at a fishing camp in Taney County, Missouri.[43] The FBI took all three to Muskogee for trial.[44]

In the meantime, federal prosecutors indicted the O'Malleys in the Eastern District of Oklahoma.[45] The Oklahoma trial came first. Federal prosecutors charged Gilmore, Cooper, O'Malley, and Short with robbing the Okemah National Bank and Heady, Melton, and Reese with robbing the National Bank of Okemah.[46] All seven pleaded not guilty and the trial was set for October 16. But on October 2, the United States re-indicted the lot of them, added Jack Miller to both counts, and postponed the trial to November 25.[47] Miller soon flipped, confessing to his role in the Okemah job and turning state's evidence.

----

[37] *Five Bank Bandits to Trial Monday*, supra note 29, at 6; *Five to Face Trial in Raid*, supra note 29, at 22; *Robber Suspect to Get Immunity*, supra note 17; *Luer Kidnapping Leader is Seized in Kansas City*, CHI. DAILY TRIB., June 1, 1935, at 3; *Federal Officers Will Attend Trial*, TULSA DAILY WORLD, November 24, 1935, at 6; *Irish O'Malley and the Okemah Caper*, supra note 23; *see also* Morgan, supra note 24.
[38] *Five Bank Bandits to Trial Monday*, supra note 29, at 6; Morgan, supra note 24.
[39] *Luer Kidnapping Leader is Seized in Kansas City*, supra note 37; Morgan, supra note 24.
[40] *See* Morgan, supra note 24.
[41] *See id.*
[42] *Federal Officers Will Attend Trial*, supra note 37, at 6.
[43] Morgan, supra note 24.
[44] *Federal Officers Will Attend Trial*, supra note 37, at 6.
[45] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); Gilmore v. United States, 129 F.2d 199, 201 (10th Cir. 1942).
[46] *Gilmore*, 124 F.2d at 538; *Gilmore*, 129 F.2d at 201.
[47] *Gilmore*, 129 F.2d at 201; *Okemah Bank Holdup Trial Begins Today*, OKLAHOMAN, Nov. 25, 1935, at 9.

Miller was the government's ace in the hole. To preserve the surprise, federal prosecutors sequestered him in the county jail until trial.[48] As soon as the trial began, Miller's lawyer H. Tom Kight announced, "Jack Miller, my client, will testify only on condition that he be granted complete immunity."[49] Judge Robert L. Williams agreed, on the condition Miller "gives a complete and truthful account of the crime."[50]

He did, and then some. "Miller, placed on the witness stand, identified the defendants as coconspirators and testified Dan Heady, charged with participation in the robbery of the First National bank approached him 'regarding robbery of some banks.' He testified the plan of robbing the Okemah banks was agreed upon and he was employed as a 'follow-up man.' He said he received $2,100 as his share of the loot taken from the banks."[51] Miller's erstwhile companions branded him a "squealer," Cooper even requesting to leave the courtroom while Miller testified.[52]

The trial was over almost as soon as it started. On November 27, the jury convicted the seven defendants on all counts.[53] Williams acquitted Miller as promised, but added an admonishment. "You had a narrow escape this time . . . and you won't be so lucky again. Get into something honest and quit this gambling business."[54] Miller immediately returned to Claremore.[55]

Williams set a sentencing date of December 9, 1935. But on December 3, Heady's wife "Pretty Betty" slipped him a pistol during a visit. Heady used the pistol to break out of prison, escaping

---

[48] *Five Bank Bandits to Trial Monday*, supra note 29, at 6; *O'Malley Gang Trial Witness Slain*, supra note 16, at 4.

[49] *Robber Suspect to Get Immunity*, supra note 17. Kight was a sometime state legislator from Claremore, elected as a Democrat to represent Rogers County in 1919, 1927, 1929, 1931, 1933, 1937, 1939, 1943. *See* Simpson v. Hill, 263 P. 635 (Okla. 1927).

[50] *Robber Suspect to Get Immunity*, supra note 17; *Okemah Bank Hearing Ends*, OKLAHOMAN, Nov. 27, 1935, at 2.

[51] *Robber Suspect to Get Immunity*, supra note 17.

[52] *O'Malley Gang Trial Witness Slain*, supra note 16, at 4.

[53] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); *O'Malley Gang Trial Witness Slain*, supra note 16, at 4.

[54] *Okemah Bank Convictions Heard*, OKLAHOMAN, Nov. 28, 1935, at 23; *O'Malley Gang Trial Witness Slain*, supra note 16, at 4.

[55] *Three Convicted of Bank Robbery*, TULSA DAILY WORLD, Nov. 28, 1935, at 8; *O'Malley Gang Trial Witness Slain*, supra note 16, at 4.

2008]          *The Peculiar Story of U.S. v. Miller*          57

with Gilmore, Short, and Cooper, among others. During the jail-break, Heady shot Muskogee Chief of Detectives Ben Bolton, who died a couple of days later.[56] A huge posse of Oklahoma police and federal agents, aided by bloodhounds and observers in airplanes, tracked the fugitives to Pushmataha County into the Kiamachi Mountains near Clayton, Oklahoma.

On December 5, the posse caught Cooper while he was walking down a country road twelve miles north of Clayton.[57] And the next day, they found Heady and Gilmore in a farmhouse near Weathers, Oklahoma. When Heady and Gilmore refused to surrender, the police opened fire, killing Heady. Gilmore quickly gave up and led the police to Short, about a mile and a half away. Short was already dying, having been critically burned in an accidental fire the night before, and he drowned when a boat used to evacuate him accidentally capsized.[58] On December 9, Williams sentenced Gilmore, Cooper, O'Malley, Melton, and Reese to 25 years.[59]

Miller was terrified of the fugitive O'Malleys, so the FBI held him in a county jail during the manhunt.[60] They needed their snitch alive for the Arkansas trial. On January 10, 1936, federal prosecutors charged Dewey Gilmore, Russell Cooper, Otto Jackson, and Floyd Y. Henderson with robbing the McElroy Bank and Trust Company of Fayetteville and the City National Bank of Fort Smith, Arkansas.[61] At first, all four pleaded not guilty, but Gilmore flipped when Miller implicated him in the Fayetteville job, and the others quickly folded.[62] On January 14, Judge Hiram Heartsill Ragon sentenced Gilmore, Cooper, and Jackson to 25 years, and Smith to

------

[56] *Four Are Slain in Day's Toll of Prison Escapes*, CHICAGO DAILY TRIBUNE, Dec. 4, 1935, at 1; *Tenn. Fugitive Captured After Mountain Chase*, CHICAGO DAILY TRIBUNE, Dec. 6, 1935, at 11.
[57] *Tenn. Fugitive Captured After Mountain Chase,*, *supra* note 56; *Kill Fugitive, Shoot Another; Find One Dying*, CHICAGO DAILY TRIBUNE, Dec. 7, 1935, at 12.
[58] *Kill Fugitive, Shoot Another; Find One Dying*, CHICAGO DAILY TRIBUNE, *supra* note 57. Short was very popular in Galena - over 1,000 people attended his funeral - and his death was controversial. The police denied shooting him, but a Galena undertaker insisted he found several buckshot wounds in the corpse. *See* Morgan, *supra* note 24.
[59] Gilmore v. United States, 124 F.2d 537, 538 (10th Cir. 1942); Gilmore v. United States, 129 F.2d 199, 201 (10th Cir. 1942).
[60] *Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1.
[61] Gilmore v. United States, 131 F.2d 873, 873-74 (8th Cir. 1942).
[62] *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, *supra* note 17, at 4.

58          *N.Y.U. Journal of Law & Liberty*          [Vol. 3:48

twelve.[63] And on February 14, Gilmore and Cooper got another 99 years for murdering Bolton.[64]

   That was the end of the O'Malleys. Melton, Cooper, Gilmore, and Reese started in Leavenworth and ended up in Alcatraz.[65] O'Malley did his time in Illinois, but soon went mad and died in 1944. And Miller returned to his penny-ante ways. In 1937, the United States Fidelity and Guarantee Company sued him for the proceeds of the Okemah job, to little effect.[66] Eventually, he fell in with Frank Layton, another small-time Claremore hood.[67]

   On April 18, 1938, the Arkansas and Oklahoma state police stopped Miller and Layton outside of Siloam Springs, Arkansas, en route from Claremore.[68] They had an unregistered, short-barreled shotgun in the car and apparently were "making preparation for armed robbery."[69] So the police arrested them.[70]

B.   MILLER IN THE DISTRICT COURT

   Miller and Layton ended up in Fort Smith, Arkansas, where United States Attorney for the Western District of Arkansas Clinton R. Barry charged them with violating the National Firearms Act. Barry knew all about Miller, as he had attended the O'Malley trials

---

[63] *Crime*, CHIC. DAILY TRIB., Jan. 19, 1936, at A8; *O'Malley Gang is Sentenced*, OKLAHOMAN, Jan. 15, 1936, at 16.

[64] *Two of O'Malley Gang Get 99 Year Sentences*, CHIC. DAILY TRIB., Feb. 16, 1936, at 18.

[65] Several members of the O'Malley Gang ultimately served time in Alcatraz: Dewey E. Gilmore # 301, Russell Land Cooper # 304, Donnie Garrett # 314, Fred Reese # 321, Virgil Melton # 381. Letter from R.D. Morgan to author (May 10, 2005) (on file with author).

[66] *Return of $11,647 In Loot is Sought*, OKLAHOMAN, Feb. 12, 1937, at 21.

[67] Layton was affiliated with Robert Trollinger of the Cookson Hills Gang and did time in the 1920s for helping the Henry Starr Gang rob a bank in Maize, Oklahoma. *See* Morgan, *supra* note 24.

[68] *Firearms Test Case Probable at Ft. Smith*, ARK. DEMOCRAT, Jan. 4, 1939, at 2; Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration),

[69] Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration),

[70] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. June 2, 1938); Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Sept. 21, 1938).

2008]               *The Peculiar Story of U.S. v. Miller*               59

and seen Miller testify.[71] Barry was eager to ensure the government could prove an NFA violation. It is "[e]xtremely important this case be investigated by competent federal officers quickly before these parties released on bond to prove possession this weapon in Oklahoma immediately before arrest in Arkansas to show transportation."[72]   The United States Attorney's office forwarded Barry's request to the F.B.I. for investigation.[73]

Miller was scheduled to appear before the district court in Fort Smith during its next term, which began June 6, 1938.[74] While in prison, Miller returned to form, ratting out Joel Carson for murdering a hospital security guard in Little Rock, Arkansas.[75] On May 3, 1938, District Judge for the Western District of Arkansas Hiram Heartsill Ragon set Miller's bail at $2,000,[76] which D.A. Blackburn of Clarksville, Arkansas posted on May 16, 1938.[77]

On June 2, 1938, Miller and Layton were both indicted on one count of violating 26 U.S.C. § 1132(c) by transporting an untaxed short-barreled shotgun in interstate commerce.[78] Both Miller and Layton pleaded guilty, but Ragon refused to accept their plea and appointed Paul E. Gutensohn as counsel.[79] On June 11, 1938,

---

[71] *Robber Suspect to Get Immunity, supra* note 17.

[72] Telegram from Clinton R. Barry, United States Attorney for the Western District of Arkansas, to the Attorney General of the United States (Apr. 23, 1938) (National Archives and Records Administration).

[73] Memorandum for the Director, Federal Bureau of Investigation, Brian McMahon, Assistant Attorney General (Apr. 23, 1938) (National Archives and Records Administration).

[74] Recognizance, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. 1938).

[75] *Officers Continue Without Clues In O'Malley Gang Witness Slaying, supra* note 17, at 4; *Gangland Death Mystery Deepens*, TULSA DAILY WORLD, Apr. 7, 1939, at 1.

[76] Minutes, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).

[77] Recognizance, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. 1938).

[78] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. June 2, 1938).

[79] *See Firearms Test Case Probable at Ft. Smith, supra* note 68; Murrey v. United States, 138 F.2d 94, 99 (8th Cir. 1943) (noting "it was the practice of Judge Ragon to decline to accept a plea on a felony charge from a defendant until the Judge had ascertained whether or not the defendant desired counsel, and . . . it was the Judge's custom to appoint counsel for defendants in criminal cases who were not represented by counsel and who desired counsel"). A member of the Fort Smith firm of Warner & Warner, Gutensohn graduated from the University of Oklahoma Law School in 1929 and joined the Arkansas Bar in February 1934. *See, e.g., Law Class of '29 Plans Reunion*, OKLAHOMAN, Sept. 17, 1939, at 25; Richard W. Stevens & Aaron Zelman, *The U.S. v.*

60          *N.Y.U. Journal of Law & Liberty*          [Vol. 3:48

Miller and Layton demurred to the indictment, claiming that it presented insufficient evidence of a transfer requiring payment of a tax and challenging the constitutionality of the NFA under the Second and Tenth Amendments.[80] Surprisingly, Ragon immediately issued a memorandum opinion sustaining the demurrer and quashing the indictment. He held that the NFA violates the Second Amendment by prohibiting the transportation of unregistered covered firearms in interstate commerce.[81]

*United States v. Miller* immediately became the first Second Amendment test case.[82] On September 21, 1938, Miller and Layton were both re-indicted on one count of violating 26 U.S.C. § 1132(j) for transporting an unregistered short-barreled shotgun in interstate commerce.[83] On January 3, 1939, Miller and Layton demurred again, claiming the NFA registration and taxation provisions violate the Second Amendment.[84] Ragon immediately re-issued the same memorandum opinion.[85] Miller and Layton were free men and promptly disappeared. The next day, Governor Bailey appointed Gutensohn to finish the term of State Senator Fred Armstrong, who had died on December 10, 1938.[86] The appointment sparked a political firestorm.[87]

C.   NATIONAL FIREARMS ACT

Enacted in 1934, the National Firearms Act taxed the manufacture, sale, and transfer of short-barreled rifles and shotguns, machine guns, and silencers; required registration of covered firearms;

*Miller Revisited,* FIREARMS SENTINEL, Fall/Winter 1995, available at http://www.jpfo.org/miller.htm (last visited Sept. 6, 2007).
[80] Demurrer to Indictment, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).
[81] Memorandum Opinion, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1938).
[82] *Firearms Test Case Probable at Ft. Smith, supra* note 68; *National Firearms Act May Be Attacked as Invalid,* ARK. GAZETTE, January 5, 1939, at 2.
[83] Indictment, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Sept. 21, 1938).
[84] Demurrer to Indictment, United States v. Miller, 26 F. Supp. 1002 (W.D. Ark. 1939).
[85] United States v. Miller, 26 F. Supp. 1002 (W.D. Ark.), *rev'd,* 307 U.S. 174 (1939).
[86] Matthews v. Bailey, 131 S.W.2d 425, 430 (Ark. 1939); *see also* Charles Aikin, *State Constitutional Law in 1939-1940,* 34 AM. POL. SCI. REV. 700, 701-02 (1940).
[87] *No Governor Should Name a Legislator,* ARK. GAZETTE, Jan. 6, 1939 at 4 (arguing Arkansas Constitution prohibits appointment of legislators, requiring special elections instead).

2008]          *The Peculiar Story of U.S. v. Miller*          61

and prohibited interstate transportation of unregistered covered firearms.[88] Nominally, it was a revenue act, levying a $200 transfer tax on all covered firearms, as well as an annual license tax of $200 on dealers, $300 on pawnbrokers, and $500 on manufacturers. In practice, it produced little revenue because it imposed prohibitive rates, often many times the value of the covered firearms.[89]

Of course, the NFA was really a ban disguised as a tax, intended to discourage the possession and use of covered firearms. "The gangster as a law violator must be deprived of his most dangerous weapon, the machine gun."[90] Modeled on the Harrison Narcotics Act, the NFA made covered firearms risky and expensive.[91] "We certainly don't expect gangsters to come forward to register their weapons and be fingerprinted, and a $200 tax is frankly prohibitive to private citizens."[92] The Act was quite successful. While many people registered NFA firearms,[93] few legitimate dealers could afford to pay the license tax and even fewer legitimate buyers were willing to pay the transfer tax.[94] For example, Oklahoma po-

---

[88] Act of June 26, 1934, Ch. 757, 48 Stat. 1236, currently codified as amended at 26 U.S.C. §§ 5801-72. The House Ways and Means Committee held hearings on the NFA in the spring of 1934. *See National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means*, 73rd Cong. 1-2 (1934).

[89] Apparently, the $200 transfer tax was based on the average price of a machine gun. *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means*, *supra* note 88, at 12. A typical shotgun cost about $30 new or $10 used. Adjusted for inflation, the $200 transfer tax would amount to roughly $3000 today. *See* U.S. Department of Labor, The Inflation Calculator, *supra* note 28.

[90] H.R. REP. NO. 73-1780, at 1 (1934).

[91] John Brabner-Smith, *Firearms Regulation*, 1 LAW. & CONTEMP. PROBS. 400, 406-07 (1934); Note, *Federal Legislation: National Firearms Act*, 98 U. PA. L. REV. 917, 918 (1950).

[92] *Registry of One Weapon Purchase in Year Shows Gangsters Flouting Firearms Tax*, N.Y. TIMES, Nov. 6, 1936, at 52.

[93] By 1937, about 16,000 short-barreled rifles and shotguns, 18,000 machine guns, and 700 silencers were registered under the NFA. *Urges Firearms Act to Include All Kinds*, N.Y. TIMES, May 5, 1937, at 13.

[94] In 1935, 25 manufacturers and dealers paid the license tax, but only one person paid the transfer tax. *Registry of One Weapon Purchase in Year Shows Gangsters Flouting Firearms Tax*, *supra* note 92, at 52.

lice saw dealers search for ways to get rid of NFA firearms.[95] The Tommy Gun Era was soon over.[96]

The NFA was a product of a long-standing push toward federal regulation of firearms. In 1927, Congress prohibited mailing most handguns, with limited success.[97] Several bills introduced in 1930 would have prohibited the transportation of certain firearms in interstate commerce.[98] But Attorney General Homer Cummings supported the NFA because it relied primarily on the tax power, ensuring its constitutionality.[99]

As originally proposed, the NFA also applied to pistols and levied a $1000 tax on manufacturers and importers. However, after the NRA and other firearms associations opposed the inclusion of pistols at the public hearings, the restrictions on pistols were eliminated.[100] The Ways and Means Committee approved the bill without reservation, and the Finance Committee recommended amending the tax on manufacturers and importers to $500, which the House accepted.[101] Congress explicitly disclaimed any intention to include "pistols and revolvers and sporting arms" because "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction."[102]

Some gun control opponents suggested that the NFA was "sponsored by people who wish to compel all sportsmen to register their firearms and store them in armories when they are not being used for hunting or target purposes."[103] But even they generally conceded the Second Amendment permits federal regulation of ma-

---

[95] *Rigid Act on Firearms Put in Force Here*, OKLAHOMAN, Sept. 7, 1934, at 5; *New Federal Act Discloses Arms Bristle in State*, OKLAHOMAN, Sept. 17, 1934, at 9.
[96] Note, *supra* note 91, at 918.
[97] 18 U.S.C. § 1715 (2000).
[98] See Stephen P. Halbrook, Congress Interprets Second Amendment, 62 TENN. L. REV. 597, 604-05 (1995); *see also Firearms: Hearing on H.R. 2569, H.R. 6606, H.R. 6607, and H.R. 11325 Before a Subcomm. of the H. Comm. on Interstate and Foreign Commerce*, 71st Cong. 1-3, 7 (1930).
[99] *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. of Ways and Means, supra* note 88, at 6-8.
[100] Brabner-Smith, *supra* note 91, at 406; Note, *supra* note 91, at 917.
[101] S. REP. NO. 73-1444, at 1 (1934).
[102] H.R. REP. NO. 73-1780, at 1 (1934).
[103] G.A. Nelson, Letter to the Editor, *Objections Made to Firearms Act: Proposed Bill Viewed As Likely to Aid Our Criminals*, N.Y. TIMES, June 3, 1934, at E5.

2008]          *The Peculiar Story of U.S. v. Miller*          63

chine guns and other 'gangster weapons.'[104] "No person outside our
national defense units and police has any legal use for such weap-
ons because they have no sporting or hunting value, being made for
the sole purpose of taking human life."[105]

But Cummings was not content with the NFA. The New
York Times reported that he considered federal regulation of pistols
"the national government's next step in the war against crime," so in
1936 he circulated a proposed bill imposing a $1 transfer tax on pis-
tols and requiring registration.[106] The gradual expansion of federal
gun control met with growing opposition. Thousands of gun own-
ers wrote to the Ways and Means Committee objecting to the Fed-
eral Firearms Act, some invoking the Second Amendment.[107] Never-
theless, on June 30, 1938, Congress passed the Federal Firearms Act,
regulating interstate commerce in firearms.[108]

## D.   JUDGE RAGON

The newspapers assumed Miller was a "test case of the Na-
tional Firearms Act."[109] They were probably right. The government
needed a Supreme Court precedent holding that federal gun control
does not violate the Second Amendment. Ragon teed up the case.

Ragon did not really think the NFA violated the Second
Amendment, and probably colluded with the government to create
the ideal test case. His opinion is peculiar on its face, begging for an
appeal. A memorandum disposition is appropriate when deciding a
routine case, but not when holding a law facially unconstitutional.

---

[104] *See* Michael A. Bellesiles, *Firearms Regulation: A Historical Overview*, 28 CRIME &
JUST. 137, 168-70 (2001); Nelson, *supra* note 103.
[105] Nelson, *supra* note 103.
[106] *Pistol Control Sought*, N.Y. TIMES, Jan. 12, 1936, at E11; *Urges Firearms Act to Include
All Kinds*, *supra* note 93, at 13.
[107] John W. Rankin, Letter to the Editor, WASH. POST, Apr. 9, 1938, at X6 (suggesting
more than 20,000 people wrote the Ways & Means Committee in opposition). *See also*
Raymond R. Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 10, 1938, at 25
(indicating that "rod and gun clubs are circulating petitions and drawing up resolu-
tions to oppose" the act); Raymond R. Camp, Op-Ed., *Wood, Field and Stream*, N.Y.
TIMES, Mar. 17, 1938, at 27.
[108] Federal Firearms Act, ch. 850, 52 Stat. 1250 (1938) (codified as amended at 15
U.S.C. §§ 901-909 (2007)) (repealed in 1968); Alfred M. Ascione, *Federal Firearms Act*,
13 ST. JOHN'S L. REV. 437, 438 (1939).
[109] *State Men Force Test of Arms Law*, OKLAHOMAN, Jan. 5, 1939, at 4.

And Ragon was the first judge to hold that a federal law violates the Second Amendment, even disagreeing with a Florida district court that had dismissed a Second Amendment challenge to the NFA.[110]

Before he became a judge, Ragon represented the Fifth District of Arkansas in Congress from 1923 to 1933.[111] As a congressman, he was a vocal advocate of federal gun control. In 1924, Ragon introduced an unsuccessful bill prohibiting the importation of guns in violation of state law,[112] and vigorously supported another bill prohibiting the mailing of most pistols, which eventually passed in 1927.[113]

Basically, Ragon wanted to prohibit firearms used by criminals, including pistols.[114] "I want to say that I am unequivocally opposed to pistols in any connection whatever. If you want something in the home for defense, there is the shotgun and the rifle, but a pistol is primarily for the purpose of killing somebody."[115] And he specifically dismissed Second Amendment objections to federal gun control. "I cannot see that violence to the Constitution which my friend from Texas sees in this bill."[116] If Arkansas could prohibit pistols, so could the United States.[117]

A prominent Democrat, Ragon endorsed Roosevelt in 1932 and helped push the New Deal through the Ways and Means

---

[110] *See* United States v. Adams, 11 F. Supp. 216, 218-19 (S.D. Fla. 1935) ("The Constitution does not grant the privilege to racketeers and desperadoes to carry weapons of the character dealt with in the act. It refers to the militia, a protective force of government; to the collective body and not individual rights." (holding Second Amendment "has no application" to NFA)).

[111] *Shadow of Ku Klux Klan Grows Larger in Congress and Nation*, N.Y. TIMES, Dec. 10, 1922, at 116 (Ragon was endorsed by the Ku Klux Klan and succeeded H.M. Jacoway). Apparently, he was a bit hotheaded, starting a fistfight with a man who called him a liar. *Telegraphic Dispatches*, WASH. POST, July 16, 1932, at 3.

[112] H.R. 6868, 68th Cong., 66 CONG. REC. 2282 (1924) ("a bill for the prevention of the shipment and transportation of certain firearms into a State, Territory, or District of the United States in violation of any law thereof").

[113] 18 U.S.C. § 1715 (2000).

[114] 66 CONG. REC. 725, 734 (Dec. 17, 1924).

[115] *Id.* at 729.

[116] *Id.* at 734.

[117] *Id.* at 728-29 ("In the State of Arkansas, it is a violation of the law for a man to sell a pistol within that State. . . . This law has been, by the Supreme Court of the State of Arkansas, held constitutional, and you can not lawfully sell a pistol in the State of Arkansas.").

WYD 187

2008]                *The Peculiar Story of U.S. v. Miller*                65

Committee.[118] In return, Roosevelt made him a district judge.[119] The NFA was part of Roosevelt's New Deal program, enacted with broad support shortly after Ragon took the bench.[120] But the Federal Firearms Act of 1938 was stirring up popular opposition, much of it based on the Second Amendment.[121] The government needed to silence the complaints, and Miller was the perfect vehicle. Ragon had presided in an O'Malley prosecution, so he knew Miller was a crooked, pliable snitch, who wouldn't cause any trouble. And Gutensohn was a comer who knew the game and got his due. Ragon's memorandum opinion presented no facts and no argument. With no defense muddying the waters, it was the government's ideal test case.

E.   MILLER IN THE SUPREME COURT

The test came quickly. On January 30, 1939, Barry appealed *Miller* directly to the Supreme Court.[122] Embroiled in the controversy concerning his contested appointment to the Arkansas State Senate,[123] Gutensohn did not object.[124] The Supreme Court accepted the government's appeal.[125]

––––––––––––––––––

[118] *Ragon is Appointed to District Bench*, N.Y. TIMES, May 13, 1933, at 5; *Heartsill Ragon, Judge, Dies at 55*, N.Y. TIMES, Sept. 16, 1940, at 24.

[119] *See* John Kyle Day, *Bargain and Corruption, Arkansas Style: The Theft of the 1933 Special Congressional Election*, 2 CENT. ARK. HIST. REV. 1 (1999).

[120] *See*, N. Y. TIMES, March 21, 1932, at 4; *New Deal Victor in Court Tests*, N.Y. TIMES, May 30, 1937, at 39 (including Sonzinsky in list of victories). *See also* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 664 (2000).

[121] Raymond R. Camp, Editorial, *Wood, Field and Stream*, N.Y. TIMES, Mar. 20, 1938, at 74. *See also* Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 17, 1938, at 27; Camp, Op-Ed., *Wood, Field and Stream*, N.Y. TIMES, Mar. 10, 1938, at 25; Rankin, *supra* note 107, at X6.

[122] Assignments of Error, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939); Petition for Appeal, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939). At that time, the United States could appeal criminal cases implicating a constitutional question directly to the Supreme Court under the Criminal Appeals Act, 18 U.S.C. § 682 (1907) and 28 U.S.C. § 345 (1940).

[123] Matthews v. Bailey, 131 S.W.2d 425, 430 (Ark. 1939); *see also* Aikin, *supra* note 18, at 701-02.

[124] Notice of Service, United States v. Miller, 26 F. Supp. 1002, No. 3926 (W.D. Ark. Jan. 30, 1939).

[125] United States v. Miller, 307 U.S. 174 (1939).

66                    *N.Y.U. Journal of Law & Liberty*                    [Vol. 3:48

As usual, the Solicitor General's office drafted the government's brief.[126] In the absence of precedent, the government could not anticipate what theory the Court would adopt. Accordingly, it offered several reasonable but inconsistent arguments supporting the constitutionality of the NFA.

The government began by claiming the Second Amendment does not grant a new right, but prohibits Congress from infringing a common law right.[127] So what common law right does the Second Amendment protect? The government argued the Second Amendment "refers to the militia, a protective force of government; to the collective body and not individual rights."[128] In any case, it only guarantees the right to keep and bear arms "for lawful purposes," and certainly does not protect weapons used by criminals.[129] The NFA affects "weapons which form the arsenal of the gangster and desperado," and the Second Amendment "does not, we submit, guarantee to the criminal the right to maintain and utilize arms which are particularly adaptable to his purposes."[130]

Supreme Court Clerk Charles Cropley wrote to Gutensohn on March 15, informing him the Supreme Court had accepted the appeal and expected to hear oral argument on March 31.[131] Gutensohn wrote back on March 22, asking why he had not received the record or the government's brief and emphasizing that he represented Miller and Layton pro bono.[132] Cropley replied on March 25, informing Gutensohn that the government had submitted a typewritten brief and he could do the same. In the alternative, Cropley suggested the court could postpone oral argument until April 17.

---

[126] *See* Warner W. Gardner, *Pebbles From The Path Behind, reprinted in* 9 GREEN BAG 2d 271, 273 (2006) (noting the Solicitor General's office generally had to draft briefs from scratch in appeals from the criminal division).

[127] Brief for the United States at 8-9, United States v. Miller, 307 U.S. 174 (1939) (No. 696) ("The Second Amendment does not confer upon the people the right to keep and bear arms; it is one of the provisions of the Constitution which, recognizing the prior existence of a certain right, declares that it shall not be infringed by Congress. Thus the right to keep and bear arms is not a right granted by the Constitution and therefore is not dependant [sic] upon that instrument for its source.").

[128] Id. at 21.

[129] Id. at 20.

[130] Id. at 7, 8.

[131] Letter from Charles Elmore Cropley to Paul E. Gutensohn (March 15, 1939).

[132] Letter from Paul E. Gutensohn to Charles Elmore Cropley (March 22, 1939).

But on March 28, Gutensohn replied by telegram: "Suggest case be submitted on Appellants brief. Unable to obtain any money from clients to be present and argue case = Paul E Gutensohn."[133] He was probably relieved to be rid of Miller and Layton.

On March 30, 1939, seven justices of the Supreme Court heard oral argument in *United States v. Miller*. Chief Justice Hughes was ill,[134] and the newly appointed Justice Douglas was not confirmed until April 4. Gordon Dean represented the United States and no one represented Miller or Layton.[135] Two days later, Gutensohn finally received four copies of the government's brief.[136]

The decision came quickly. On May 15, 1939, Justice James Clark McReynolds "drawled from the bench: 'We construe the amendment as having relation to military service and we are unable to say that a sawed-off shotgun has any relation to the militia.'"[137] The unanimous vote was 8-0, as Justice Douglas was recused.

The papers were bemusedly pleased. The New York Times noted, "The record in the case of Miller and Dayton [sic] does not show for what purpose they were taking the sawed-off shotgun across State lines. Government officials felt, today, however, that the McReynolds decision had given them a new instrument with which to fight bank robbers, gangsters and other criminals, whose favorite arm is the sawed-off shotgun."[138] And Jackson soon asked Congress to enact legislation requiring the registration of all firearms, in order to foil subversives:[139] "'It is to be particularly noted that the legislation, the enactment of which I recommend, would in nowise improperly limit the freedom of action of peaceful, law abiding persons. The contemplated legislation would not hamper or hinder any person from purchasing or possessing a firearm. It

---

[133] Telegram from Paul E. Gutensohn to Charles Elmore Cropley (March 28, 1939).

[134] Paul A. Freund, *Charles Evan Hughes as Chief Justice*, 81 HARV. L. REV. 4, 39 (1967).

[135] *United States Supreme Court*, N.Y. TIMES, Mar. 31, 1939, at 42; United States v. Miller, 307 U.S. 174, 175 (1939).

[136] Notice of Service, United States v. Miller, 307 U.S. 174, No. 696 (Apr. 3, 1939).

[137] *Supreme Court Bars Sawed-Off Shotgun*, N.Y. TIMES, May 16, 1939, at 15.

[138] *Id.*

[139] *Proposes a Law to Register All Firearms in U.S.*, CHI. DAILY TRIB., May 30, 1940, at 5.

68                    *N.Y.U. Journal of Law & Liberty*                 [Vol. 3:48

would merely require him to register the firearm and to record any transfer of the weapon.'"[140]

F.   POSTSCRIPT

    In the meantime, Miller resurfaced. On April 3, 1939, Miller, Robert Drake "Major" Taylor, and an unidentified accomplice robbed the Route 66 Club, a Miami, Oklahoma dive.[141] Armed with shotguns, they stole about $80, superficially wounding two by-standers in the process.[142] Apparently, it was an inside job. Earl "Woodenfoot" Clanton, the uncle of notorious bank robbers Herman and Ed "Newt" Clanton, owned the bar.[143] Taylor was a former associate of Newt Clanton's,[144] and a peripheral member of the O'Malley Gang.[145]

    At about 9 a.m. on April 3, two or three men in a car picked up Miller at his home in Ketchum, Oklahoma.[146] The next day, around noon, a farmhand named Fisher discovered Miller's bullet-ridden corpse on the bank of the "nearly dry" Little Spencer Creek, nine miles southwest of Chelsea, Oklahoma.[147] Miller was shot four times with a .38, twice in the chest, once under the left arm, and once through the left arm. The .45 automatic next to him had been fired three times.[148] On April 6, someone found Miller's torched 1934 sedan off a dirt road in the Verdigris River bottoms, about four

---

[140] *Id.*

[141] Morgan, *supra* note 24. *See also Claremore Slayer Suspect Captured*, OKLAHOMAN, Oct. 9, 1939, at 13; *Prisoner is Halted in Flight Attempt*, OKLAHOMAN, Sept. 20, 1932, at 9 (recounting Taylor's unsuccessful attempt to escape from custody in Missouri).

[142] *Former O'Malley Gangster to Start 10-Year Sentence*, OKLAHOMAN, Oct. 20, 1939, at 26.

[143] *See* Morgan, *supra* note 24.

[144] Taylor was sentenced to a 75-year term in McAlester Prison for first degree robbery. Taylor escaped on November 26, 1938. *Aide of O'Malleys Arrested in Texas*, MUSKOGEE DAILY PHOENIX, Oct. 9, 1939, at 1.

[145] *Id.*

[146] *Auto of Slain Gang Member Found Burned*, OKLAHOMAN, Apr. 7, 1939, at 4; *Officers Continue Without Clues In O'Malley Gang Witness Slaying*, *supra* note 17.

[147] *Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1; *O'Malley Gang Trial Witness Slain*, *supra* note 16.

[148] *Claremore Man is Found Slain in Gang Killing*, *supra* note 17, at 1.

2008]              *The Peculiar Story of U.S. v. Miller*                69

miles southeast of Nowata.[149] It was stripped and still smoldering.
A farmer said he saw it burning shortly before noon on April 3.[150]

    Taylor was a suspect in the investigation.[151] On October 8,
1939, Sheriff Ellis Summers arrested him in Kermit, Texas, after he
got in a "fight with an oil field worker over a dice game."[152] Ulti-
mately, what happened on April 4 is unclear. Maybe Miller and
Taylor disputed the proceeds of the robbery.[153] Maybe Taylor shot
Miller for snitching on the O'Malleys.[154] In any case, Oklahoma
charged Taylor with murder, but eventually dropped the charges
for lack of evidence. Still, he pleaded guilty to armed robbery and
got ten years in McAlester.[155]

    On January 8, 1940, Layton pleaded guilty to the reinstated
NFA charge and Ragon sentenced him to five years probation.[156]
Ragon expected an appointment to the Eighth Circuit, but died
suddenly of a heart attack on September 15, 1940.[157] Layton's proba-
tion ended on January 29, 1944.[158] He died in 1967. Both Miller and
Layton were buried at Woodlawn Cemetery in Claremore, Okla-
homa.[159]

### III. INTERPRETING UNITED STATES V. MILLER

    Both individual and collective rights theorists claim Miller
adopted their position. But few Second Amendment scholars spend
much time analyzing Miller, because few take it seriously. Most

---

[149] *Officers Continue Without Clues In O'Malley Gang Witness Slaying, supra* note 17.
[150] *Auto of Slain Gang Member Found Burned, supra* note 146.
[151] *See  Missouri Convict Sought in Slaying*, OKLAHOMAN, Apr. 20, 1939, at 15.
[152] *Claremore Slayer Suspect Captured, supra* note 141; *see also Aide of O'Malleys Arrested in Texas, supra* note 144.
[153] *See generally Missouri Convict Sought in Slaying, supra* note 151; *Claremore Slayer Suspect Captured, supra* note 141.
[154] *See Claremore Man is Found Slain in Gang Killing, supra* note 17, at 1; *Aide of O'Malleys Arrested in Texas, supra* note 144.
[155] *Former O'Malley Gangster to Start 10-Year Sentence, supra* note 142. Taylor later won a wild-cow milking award in the McAlester rodeo. *See Crowd of 24,000 Sees Rodeo in McAlester Prison*, OKLAHOMAN, Oct. 14, 1940, at 4.
[156] Probation Document, United States v. Layton, C-3917 (W.D. Ark. 1944).
[157] *Heartsill Ragon, Federal Judge in Arkansas, Dies*, OKLAHOMAN, Sept. 16, 1940, at 1; *Judge Heartsill Ragon*, ARK. DEMOCRAT, Sept. 16, 1940, at 8; *Ragon Rites Wednesday at Fort Smith*, ARK. DEMOCRAT, Sept. 16, 1940 at 1.
[158] Probation Document, *supra* note 156.
[159] *See Morgan, supra* note 24.

assume Justice McReynolds was either uninterested in, or incapable of drafting a competent opinion, and dismiss Miller as hopelessly opaque.[160] However, this consensus reflects the identity of the author as much as the quality of his opinion.[161] Many justices were poor draftsmen, but none are as universally despised as McReynolds.[162] The last of the "Four Horsemen," he is remembered only as a cranky bigot, notorious for shunning Justice Brandeis[163] and referring to blacks as "darkies."[164] Even his own, lone biographer characterized him as "an easy man to dislike . . . on occasion intolerant, cantankerous, and rude."[165]

And yet, McReynolds's peers were far more charitable.[166] Holmes considered him "acute."[167] Taft described him as "a man of real ability, and great sharpness of intellect." [168] Frankfurter despised him, but respected his abilities.[169] Even Brandeis conceded that McReynolds "is capable of effective writing."[170] The problem was "his studied avoidance of obiter, even when there may have been an alluring temptation to catch the public eye by some spectacular utterance."[171] Or rather, his "curious notion that opinions

---

[160] David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 665 (2000) (claiming "the opinion itself says very little").

[161]    *See* Robert W. Langran, *Why Are Some Supreme Court Justices Rated As "Failures"?*, 1985 SUP. CT. HIST. SOC'Y Y.B. 8, 10 (arguing many judges are ranked failures for ideological reasons).

[162] *See* Timothy S. Huebner, Book Review, 45 AM. J. LEGAL HIST. 346 (2001) (reviewing JOHN KNOX, THE FORGOTTEN MEMOIR OF JOHN KNOX (Dennis J. Hutchinson & David J. Garrow eds., 2002)) (noting that McReynolds "routinely ranks among the least effective or 'worst' justices in the Court's history").

[163] 9 ALEXANDER M. BICKEL, A HISTORY OF THE UNITED STATES SUPREME COURT: THE JUDICIARY AND RESPONSIBLE GOVERNMENT, 1910-21 354 (1984).

[164] *See* JOHN KNOX, THE FORGOTTEN MEMOIR OF JOHN KNOX 51 (Hutchinson & Garrow eds., 2002).

[165] JAMES E. BOND, I DISSENT: THE LEGACY OF CHIEF JUSTICE JAMES CLARK MCREYNOLDS 135 (1992).

[166] R.V. Fletcher, *Mr. Justice McReynolds – An Appreciation*, 2 VAND. L. REV. 35, 45 (1948).

[167] BICKEL, *supra* note 163, at 355 (quoting Holmes-Laski Letters, I, 413).

[168] *Id.* (quoting letter from W.H. Taft to R.A. Taft, Feb. 1, 1925, Taft Papers).

[169] *Id.* at 356 (quoting Phillips ed, Felix Frankfurter Reminisces 101).

[170] Melvin I. Urofsky, *The Brandeis-Frankfurter Conversations*, 1985 SUP. CT. REV. 299, 309.

[171] R.V. Fletcher, *supra* note 166, at 45.

2008]            *The Peculiar Story of U.S. v. Miller*            71

were essentially superfluities anyway, and that the less said, the better."[172]

True to form, Miller is quite terse. The nine-page opinion consists primarily of lengthy quotations and string cites, anchored by a few paragraphs of crabbed analysis. Still, it was not an afterthought. Chief Justice Hughes usually assigned opinions at the Saturday conference after argument.[173] But Hughes fell ill in mid-March 1939 and did not return to the bench for several weeks, after Miller was argued and assigned.[174] As the most senior associate, McReynolds assigned cases in Hughes's absence. Apparently, he assigned Miller to himself, presumably because he considered it important.

The NFA found an unlikely champion in McReynolds, erstwhile foe of federal regulation. While McReynolds was a Democrat, he was no New Dealer. On the contrary, he was a Gold Democrat[175] who detested Roosevelt and the New Deal alike.[176] And he hated Attorney General Cummings, too. As the architect of Roosevelt's court-packing plan, Cummings added insult to injury by citing a superficially similar proposal McReynolds himself advanced in 1913.[177]

McReynolds knew gun control was part of the New Deal program. He knew Miller and Layton were gangsters. And he knew Miller was a Second Amendment test case. But he barely addressed the Second Amendment. Instead, he discussed the nature of the militia and the history of its governance. And he concluded the Second

––––––––––––––––––––––––––––

[172] Bickel, *supra* note 163, at 355.
[173] Edwin McElwain, *The Business of the Supreme Court as Conducted by Chief Justice Hughes*, 63 HARV. L. REV. 5, 17-18 (1949).
[174] Freund, *supra* note 134.
[175] OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 630 (Kermit Hall ed., 1992). Gold Democrats supported the gold standard in opposition to William Jennings Bryan's Free Silver movement.
[176] McReynolds considered Roosevelt "utterly incompetent," pointed to farm relief as "evidence of his mental infirmity and lack of stability," and attributed the New Deal to "the forces which control" Roosevelt, who "probably lacks brains to understand what he is doing." Freund, *supra* note 134, at 12 (quoting letters from Justice McReynolds to Robert P. McReynolds (Mar. 20, 1933 & Jan. 10, 1936) (on file with the University of Virginia Library)); Roosevelt reciprocated by snubbing McReynolds when he retired. R.V. Fletcher, *supra* note 166, at 45-46 (citing JAMES FARLEY, JIM FARLEY'S STORY: THE ROOSEVELT YEARS 83 (1948)).
[177] Knox, *supra* note 164, at 108 n.8.

72                          *N.Y.U. Journal of Law & Liberty*                          [Vol. 3:48

Amendment does not protect short-barreled shotguns because they aren't militia weapons.

Oddly, McReynolds began by holding that the NFA does not violate the Tenth Amendment by infringing state police power. "Considering *Sonzinsky v. United States*, and what was ruled in sundry causes arising under the Harrison Narcotic Act[,] the objection that the Act usurps police power reserved to the States is plainly untenable."[178] But Ragon did not reach Miller's Tenth Amendment claim and the government did not brief it, so it was not properly before the court. Of course, Sonzinsky did indeed foreclose most Tenth Amendment objections to the NFA.[179] But McReynolds was notoriously punctilious about jurisdiction.[180] It is surprising he addressed the issue at all.

In fact, McReynolds alone thought the NFA does violate the Tenth Amendment. Today, Congress can regulate virtually anything under the Commerce Clause. But when Congress drafted the NFA in 1934, the Court prohibited federal regulation of intrastate commerce under the Commerce Clause.[181] Because Congress could not regulate directly under the Commerce Clause, it regulated indirectly under the Tax Clause. For example, the Harrison Narcotics Act effectively regulated narcotics by taxing them and enforcing the tax. The Supreme Court held such regulatory taxation did not infringe state police power, so long as it produced some revenue.[182]

The Four Horsemen and their predecessors disagreed.[183] They conceded Congress can both tax narcotics and punish tax evasion, but argued the Harrison Act is "beyond the constitutional power of Congress to enact because to such extent the statute was a mere attempt by Congress to exert a power not delegated, that is,

---

[178] United States v. Miller, 307 U.S. 174, 177-78 (1939) (citations and footnote omitted).
[179] Some contemporary commentators noted that the NFA transfer tax and registration requirements were arguably more regulatory than the sales tax at issue in *Sonzinsky. See Recent Decisions*, 38 MICH. L. REV. 391, 403-04 (1939).
[180] According to Brandeis, "McR[eynolds] care[d] more about jurisdictional restraints than any of them…" Melvin I. Urofsky, *supra* note 170, at 317.
[181] *See* Hammer v. Dagenhart, 247 U.S. 251, 272-74 (1918).
[182] United States v. Doremus, 249 U.S. 86, 94 (1919).
[183] Barry Cushman, *The Secret Lives of the Four Horsemen*, 83 VA. L. REV. 559, 574 (1997).

2008]        *The Peculiar Story of U.S. v. Miller*        73

the reserved police power of the States."[184] In other words, they thought regulatory taxes violate the Tenth Amendment.

For years, McReynolds continued to object to regulatory taxes on Tenth Amendment and due process grounds, gradually getting lonelier and lonelier.[185] Eventually, even he threw in the towel. In 1937, Max Sonzinsky, "a notorious East St. Louis fence," challenged the NFA under the Tenth Amendment.[186] McReynolds joined the unanimous opinion upholding the law.[187] And in *Miller*, he relied on *United States v. Jin Fuey Moy*,[188] *United States v. Doremus*,[189] *Linder v. United States*,[190] *Alston v. United States*,[191] and *Nigro v. United States*,[192] the very cases in which he resisted the Harrison Act.

In any case, McReynolds began Miller by emphasizing the NFA satisfies the Tenth Amendment only because it is at least nominally a tax, rather than a regulation.[193] As the government pointed out, "even as to this class of firearms there is not a word in the National Firearms Act which expressly prohibits the obtaining, ownership, possession or transportation thereof by anyone if compliance is had with the provisions relating to registration, the payment of taxes, and the possession of stamp-affixed orders."[194] So,

---

[184] Doremus, 249 U.S. at 95 (White, C.J., dissenting).

[185] *See, e.g.*, Casey v. United States, 276 U.S. 413, 420 (McReynolds, J., dissenting) (" The provision under which we are told that one may be presumed unlawfully to have purchased an unstamped package of morphine within the district where he is found in possession of it conflicts with those constitutional guaranties heretofore supposed to protect all against arbitrary conviction and punishment. The suggested rational connection between the fact proved and the ultimate fact presumed is imaginary.").

[186] Carl R. Baldwin, *The Impact of Judge Fred L. Wham*, SAINT LOUIS POST-DISPATCH, Feb. 16, 1967, at 3H.

[187] Sonzinsky v. United States, 300 U.S. 506 (1937). A couple of months later, McReynolds relied on the 10th Amendment again in his last-ditch dissent to *Steward Machine Co. v. Davis*. 301 U.S. 548, 598-99 (1937) (McReynolds, J., dissenting).

[188] 241 U.S. 394 (1916).

[189] 249 U.S. at 86.

[190] 268 U.S. 5 (1925).

[191] 274 U.S. 289 (1927).

[192] 276 U.S. 332 (1928).

[193] United States v. Miller, 307 U.S. 174, 176-78 (1939).

[194] Brief for the United States at 6-7, United States v. Miller, 307 U.S. 174 (1939) (No. 696).

74 *N.Y.U. Journal of Law & Liberty* [Vol. 3:48

whatever it holds, *Miller* does not hold that Congress can regulate firearms directly.

The rejection of Miller's Tenth Amendment claim highlights the implausibility of his Second Amendment claim. Miller could not just argue that the Second Amendment guarantees the right to possess and use NFA firearms. He had to claim it prohibits taxation of NFA firearms. Unsurprisingly, McReynolds found this claim unconvincing. Whether or not the Second Amendment guarantees an individual right to keep and bear arms, it hardly prohibits Congress from taxing particular weapons.

McReynolds assumed the Second Amendment guarantees the right to keep and bear arms in order to ensure an effective militia exists. "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view."[195] In other words, the Militia Clause empowers Congress to regulate the militia,[196] and the Second Amendment ensures it is armed.

Accordingly, McReynolds devoted most of Miller to analyzing the composition of the militia and the duties of militia service. After consulting "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators," he concluded the militia consists of "all males physically capable of acting in concert for the common defense."[197] Essentially, everyone subject to conscription.[198] "And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[199] Like the Cooley treatise on which he relied, McReynolds assumed the militia "cannot exist unless the people are

---

[195] *Miller*, 307 U.S. at 178.
[196] U.S. CONST. art I, § 8.
[197] *Miller*, 307 U.S. at 179.
[198] Today, the "organized militia" consists of the National Guard and Naval Militia and the "unorganized militia" consists of all current or prospective male citizens between 17 and 45. *See* 10 U.S.C. § 311 (2000).
[199] *Miller*, 307 U.S. at 179.

trained to bearing arms."[200] A militiaman may own a firearm because he must know how to use one.

In other words, McReynolds assumed the Second Amendment guarantee ensures those subject to conscription may possess weapons suitable for militia service. And he held it does not protect NFA firearms as a matter of law, because they aren't suitable for militia service. "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense."[201] A short-barreled shotgun is a weapon, but it is not a militia weapon, and the Second Amendment only protects militia weapons.

Essentially, McReynolds adopted the government's fallback argument: the Second Amendment does not protect weapons used by criminals.[202] McReynolds often worked directly from the briefs, incorporating elements from them into his opinions.[203] In support of his holding in *Miller*, he cited only *Aymette v. State*, a Tennessee case holding the right "to keep and bear arms" doesn't guarantee the right to carry a concealed bowie knife.[204] The government cited *Aymette* for the proposition that "the term 'arms' as used in constitutional provisions refers only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals." [205] McReynolds agreed, concluding the Second Amendment only protects weapons reasonably related to militia service, not including

---

[200] THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 429 (5th ed. 1883), *cited in* United States v. Miller, 307 U.S. 174, 182 n.3 (1939).

[201] *Miller*, 307 U.S. at 178.

[202] Brief for the United States, United States v. Miller, 307 U.S. 174 (1939) (No. 696).

[203] Knox, *supra* note 164, at 142.

[204] Aymette v. State, 21 Tenn. (1 Hum.) 154 (1840).

[205] Brief for the United States at 18, United States v. Miller, 307 U.S. 174 (1939) (No. 696).

short-barreled shotguns. But he did not specify which weapons the Second Amendment does protect or how it protects them.

McReynolds also adopted the government's argument that the Second Amendment did not create a right, but guaranteed a pre-constitutional common law right. "The Second Amendment does not *confer* upon the people the right to keep and bear arms; it is one of the provisions of the Constitution which, recognizing the prior existence of a certain right, declares that it shall not be infringed by Congress."[206] Notably, McReynolds's analysis of the militia relied exclusively on pre-ratification sources.[207] And he closed by linking the Second Amendment guarantee to state constitutional guarantees. "Most if not all of the States have adopted provisions touching the right to keep and bear arms. Differences in the language employed in these have naturally led to somewhat variant conclusions concerning the scope of the right guaranteed. But none of them seem to afford any material support for the challenged ruling of the court below."[208] Apparently, McReynolds assumed the scope of the Second Amendment guarantee depends upon the relevant state constitution. Or at the very least, the guarantees incorporated into the state constitutions illuminate the scope of the right guaranteed by the Second Amendment.

Of course, McReynolds generally assumed the Constitution simply protects common law rights. As he memorably put it in *Meyer v. Nebraska*, the Constitution guarantees "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law

---

[206] *Id.* at 9-10 (emphasis in original).
[207] *See* United States v. Miller, 307 U.S. 174, 179-82 (1939) (citing WILLIAM BLACSTONE, 1 COMMENTARIES *410; ADAM SMITH, 2 WEALTH OF NATIONS 186-202 (Edwin Cannan ed., Methuen 1904) (1776); 1 HERBERT L. OSGOOD, THE AMERICAN COLONIES IN THE 17TH CENTURY, 498-526 (The MacMillan Company 1904); The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142); Act to Regulate the Militia, ch. 25, 1786 N.Y. Laws 220; Militia Act of 1785, ch. 1, 1785 Va. Acts 1.
[208] *Miller*, 307 U.S. at 182.

WYD 199

2008]                *The Peculiar Story of U.S. v. Miller*                77

as essential to the orderly pursuit of happiness by free men."[209] And
it protects those common law rights against federal and state gov-
ernments alike. "As often heretofore pointed out, rights guaranteed
by the Constitution may not be abridged by legislation which has
no reasonable relation to some purpose within the competency of
the State."[210] And "liberty may not be interfered with, under the
guise of protecting the public interest, by legislative action which is
arbitrary or without reasonable relation to some purpose within the
competency of the State to effect."[211]

Basically, McReynolds believed in a reasonable Constitu-
tion. And a reasonable Constitution permits reasonable regulation.
So the Second Amendment protects a weapon only if its possession
and use "has some reasonable relationship to the preservation or
efficiency of a well regulated militia."[212] In other words, *Miller* held
the common law right to keep and bear arms only protects weapons
related to militia service, not including NFA firearms.[213] Congress
can tax NFA firearms because the Second Amendment doesn't pro-
tect them. But *Miller* did not explain what makes a weapon related
to militia service. Nor did it explicitly adopt an individual or collec-
tive right theory of the Second Amendment. It did not have to. The
NFA was reasonable on either theory, as it affected only unpro-
tected weapons.

Some individual right theorists argue *Miller* held the Sec-
ond Amendment guarantees an individual right to keep and bear
any weapon with a military use. They claim the Court upheld the
NFA only because Miller failed to present any evidence of the many
military uses of short-barreled shotguns, including trench and jun-
gle warfare.[214] But machine guns obviously had military uses.
Surely *Miller* did not invalidate the NFA tax on machine guns sub

---

[209] Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (internal citations omitted).
[210] Pierce v. Society of Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 535
(1925).
[211] *Meyer*, 262 U.S. at 399–400 (1923).
[212] *Miller*, 307 U.S. at 178.
[213] *Id.*
[214] *See, e.g.*, Nelson Lund, *The Second Amendment, Political Liberty, and the Right to Self-
Preservation*, 39 ALA. L. REV. 103, 109 (1987).

78                    *N.Y.U. Journal of Law & Liberty*                    [Vol. 3:48

silentio.[215] As the First Circuit recognized three years later in *Cases v. United States*, "the rule of the Miller case . . . would seem to be already outdated . . . because of the well known fact that in the so-called 'Commando Units' some sort of military use seems to have been found for almost any modern lethal weapon," including short-barreled shotguns.[216]

Indeed, the government implicitly conceded NFA firearms have military uses. "It may be assumed that Congress, in inserting these provisions in the National Firearms Act, intended, through the exercise of its taxing power and its power to regulate interstate and foreign commerce, to discourage, except for military and law enforcement purposes, the traffic in and utilization of the weapons to which the Act refers." [217] It nevertheless argued the Second Amendment does not protect NFA firearms because they "form the arsenal of the gangster and desperado."[218]

The *Miller* Court agreed, concluding "it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense."[219] While short-barreled shotguns, machine guns, and silencers may have military uses, they aren't appropriate for militia service. Nor will civilian use help preserve the peace. Relying on *Aynette*, the *Miller* Court assumed the Second Amendment only protects the right to possess weapons "usually employed in civilized warfare," not "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[220]

Of course, short-barreled shotguns do have legitimate civilian uses, primarily protection and hunting small game. Pre-NFA, firearms manufacturers had long produced short-barreled shot-

---

[215] *See* David Yassky, *The Second Amendment:Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 666 (2000).
[216] Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942), *cert. denied*, 319 U.S. 770 (1943).
[217] Brief for the United States at 7, United States v. Miller, 307 U.S. 174 (No. 696).
[218] *Id.*
[219] United States v. Miller, 307 U.S. 174, 178 (1939) (emphasis added).
[220] Aynette v. State, 21 Tenn. (1 Hum.) 154, 158 (1840).

guns, or their functional equivalent.[221] However, Miller's gun was homemade, as Stevens never produced a shotgun with a barrel shorter than 18 inches. And in any case, *Miller* assumed taxation, regulation, or even prohibition of NFA firearms is reasonable whether or not they have legitimate civilian uses. As is taxation, regulation, and prohibition of many other varieties of firearm. Miller assumed the Second Amendment only guarantees the right to possess and use a firearm suitable for militia service, not any particular firearm.

Some collective right theorists argue *Miller* held the Second Amendment only protects a collective right to form a militia, or even a state's right to maintain a militia.[222] Many courts have agreed.[223] But this reading is plainly untenable, because the Miller Court assumed Miller and Layton had standing to assert an individual right of some kind.

Arguably, an individual could assert a collective right to participate in militia service.[224] But Miller did not challenge the NFA as a limitation on his right to participate in militia service. He challenged his indictment for transporting an untaxed NFA firearm in interstate commerce. And the Court evaluated Miller's right to possess and use a particular firearm, not his right to join the militia. Everyone knew Miller and Layton were criminals, and unlikely militiamen. They certainly were not pinched during a muster. But the Court did not ask whether Miller and Layton intended to partici-

---

[221] Commercial short-barreled shotguns were often marketed as "handy guns." One company sold the "Game Getter" – a single-shot short-barrel shotgun with a wire stock – to bicyclists.

[222] *See generally* H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT (Duke University Press 2002).

[223] For the collective right theory: *see* Silveira v. Lockyer, 312 F.3d 1052, 1086-87 (9th Cir. 2003); Hickman v. Block, 81 F.3d 98, 102 (9th Cir. 1996); United States v. Warin, 530 F.2d 103, 106 (6th Cir. 1976). For the hybrid theory, protecting the right to own firearms in connection with militia membership: Gillespie v. City of Indianapolis, 185 F.3d 693, 710-11 (7th Cir. 1999); United States v. Wright, 117 F.3d 1265, 1274 & n.18 (11th Cir. 1997); United States v. Rybar, 103 F.3d 273, 286 (3d Cir. 1996); Love v. Pepersack, 47 F.3d 120, 124 (4th Cir. 1995); United States v. Hale, 978 F.2d 1016, 1019-20 (8th Cir. 1992); United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977); Cases v. United States, 131 F.2d 916, 922 (1st Cir. 1942).

[224] *See generally* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588 (2000).

pate in militia service. It only asked whether the Second Amendment protects NFA firearms.

Furthermore, McReynolds adopted a colloquial reading of the Second Amendment guarantee. Second Amendment scholars dispute the original meaning of the terms "keep" and "bear." Individual right theorists claim "keep" meant private ownership.[225] Collective right theorists claim both terms meant military use.[226] But McReynolds assumed "keep" means "possess" and "bear" means "use."[227] And "to possess and use" a weapon implies private ownership. Basically, McReynolds adopted a traditional, commonsense interpretation of the Second Amendment, assuming it guarantees an individual right to possess and use firearms, subject to reasonable regulation of time, place, and manner.[228]

Alternatively, a cynic could dismiss *Miller* as simply holding the Constitution doesn't protect criminals. When the Supreme Court upheld the NFA in Sonzinsky, "Government attorneys hailed the decision as a material aid in the war against gangsters and gunmen."[229] And as a former Attorney General, McReynolds surely appreciated the convenience of laws like the NFA. After all, everyone knew Miller and Layton were gangsters, and "a right exercised in morality" cannot "sustain a right to be exercised in immorality.[230]

But McReynolds would not have gone along. Sure, he was a bigot. But he was a principled bigot. And his principles demanded neutrality. "That the State may do much, go very far, indeed, in or-

---

[225] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 140 (2007).

[226] *See generally* Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 657-668 (2002); UVILLER & MERKEL, *supra* note 222; David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms*," 22 LAW & HIST. REV. 119 (2004):.

[227] "In the absence of any evidence tending to show that *possession* or *use* of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to *keep* and *bear* such an instrument." United States v. Miller, 307 U.S. 174, 178 (1939) (emphasis added).

[228] *See, id.* at 178-83

[229] *Court Takes Suits on Security Taxes; Test Cases on Alabama and Federal Acts Before High Tribunal Next Week*, N. Y. TIMES, Mar. 30, 1937, at 17.

[230] Hoke v. United States, 227 U.S. 308, 321 (1913).

2008]          *The Peculiar Story of U.S. v. Miller*          81

der to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected."[231] For instance, he objected to the Harrison Act not only because he thought it infringed state police power, but also because he thought it violated due process by shifting the burden of proof to the accused.[232] While the government generally prosecuted only junkies and dealers, the Harrison Act permitted it to prosecute anyone it liked. And lots of people owned narcotics they purchased before Congress passed the Harrison Act.[233]

Ultimately, the *Miller* Court's reading of the Second Amendment simply reflected popular sentiment and conventional wisdom. In 1939, the federal government promoted widespread firearms ownership, providing surplus military rifles to the public in order to ensure civilians knew how to use firearms.[234] And most scholars assumed the Second Amendment guarantees an individual right to possess and use firearms, subject to reasonable regulation.[235]

_____

[231] Meyer v. Nebraska, 262 U.S. 390, 401 (1923).

[232] *See* Linder v. United States, 268 U.S. 5 (1925); Casey v. United States, 276 U.S. 413, 420-21 (1928) (McReynolds, J., dissenting).

[233] Casey, 276 U.S. at 421 (McReynolds, J., dissenting) ("Probably most of those accelerated to prison under the present Act will be unfortunate addicts and their abettors; but even they live under the Constitution. And where will the next step take us? When the Harrison Anti-Narcotic Law became effective, probably some drug containing opium could have been found in a million or more households within the Union. Paregoric, laudanum, Dover's Powders, were common remedies. Did every man and woman who possessed one of these instantly become a presumptive criminal and liable to imprisonment unless he could explain to the satisfaction of a jury when and where he got the stuff? Certainly, I cannot assent to any such notion, and it seems worthwhile to say so.").

[234] *See* Bellesiles, *supra* note 104, at 168-170. The United States Army administered this program from 1916 to 1996. It is currently administered by the Civilian Marksmanship Program, a non-profit corporation created by Congress.

[235] *But see* Robert J. Spitzer, *Lost and Found: Researching the Second Amendment, in* THE SECOND AMENDMENT IN LAW AND HISTORY 16, 24 (Carl T. Bogus ed., 2000). While Spitzer claims legal scholars uniformly accepted the collective right theory until 1960, most of the articles he cites simply conclude the right to possess firearms is subject to reasonable regulation.

## CONCLUSION

So what did *Miller* hold? At a minimum, it held the Second Amendment permits Congress to tax firearms used by criminals. At the maximum, dicta suggest the Second Amendment protects an individual right to possess and use a weapon suitable for militia service. And in general, it implies the Second Amendment permits reasonable regulation of firearms. In any event, the Court left legislators a lot of wiggle room.

But what does Miller tell us about the meaning of the Second Amendment? Maybe nothing. Some believe precedent cannot bind the Constitution of a sovereign people.[236] Others believe the original meaning of a constitutional provision always trumps precedent.[237] Still others believe in an instrumental Constitution, to which precedent supplies only the contingent value of stability.[238] Nevertheless, faint-hearted originalists [239] and incrementalists [240] alike might find Miller useful, or even appealing. After all, it anticipates the status quo: federal, state, and local governments may reasonably regulate firearms, but may not prohibit them altogether. In other words, maybe McReynolds got it right, at least this once.

---

[236] *See* LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 247 (2004).

[237] *See* RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY 112 (2004).

[238] *See generally* RICHARD A. POSNER, LAW, PRAGMATISM, AND DEMOCRACY 62 (Harvard University Press 2003).

[239] *See generally* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. CINN. L. REV. 849 (1989).

[240] *See generally* STEPHEN BREYER, ACTIVE LIBERTY: INTERPRETING OUR DEMOCRATIC CONSTITUTION (2005).

WYD 205

**Exhibit H**

Daniel Page, *Dangerous and Unusual Misdirection* (4 May 2011)

## Dangerous and Unusual Misdirection

**A look at the common law tradition of prohibiting going armed with dangerous and unusual weapons to the terror of the people as cited in District of Columbia v. Heller**

by
Daniel Page*

Abstract

In dicta, the Supreme Court in Heller cited the historical ban on "Dangerous and Unusual Weapons" to support a common use test on statutes that ban certain types of weapons considered to be "dangerous and unusual".  This paper examines the historical use and definition of the phrase "Dangerous and Unusual Weapons" and concludes that it refers not to a class of weapons, but to a class of behavior.

D. Page, pg 1

Electronic copy available at: http://ssrn.com/abstract=1859395

*Not a blacksmith could be found in the whole land of Israel, because the Philistines had said, "Otherwise the Hebrews will make swords or spears!"[1]*

In District of Columbia v. Heller, Justice Scalia wrote,

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New-York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also State v. Langford, 10 N.C. 381, 383-384 (1824); O'Neill v. State, 16 Ala. 65, 67 (1849); English v. State, 35 Tex. 473, 476 (1871); State v. Lanier, 71 N.C. 288, 289 (1874).[2]

This paper seeks to review the tradition to which Justice Scalia refers. This paper will examine each of the sources the Court cites in the portion quoted above, and will then examine other sources to attempt to determine the nature and extent of the historical tradition to which the court refers. Finally, this paper will examine what, if any, impact that tradition will have on future firearms litigation.

As will be shown later in this paper, most of the Court's cited case law is in the context of a common law crime known as the affray.

I.      **Affrays and the English Common Law**

Timothy Cunningham's 1789 law dictionary defines an affray as follows.

Affray, Is derived from the French word *effrayer*, to *affright*, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror

---

* Daniel Page can be reached at 208.870.3820 or at drpage@email.wm.edu or at 25145 CheRanda Ln Middleton, Id 83644

[1] 1 Samuel 13:19, New International Version.

[2] Dist. of Columbia v. Heller, 554 U.S. 570, 627, 128 S. Ct. 2783, 2817, 171 L. Ed. 2d 637 (2008).

D. Page, pg 2

Electronic copy available at: http://ssrn.com/abstract=1859395

of others; and so is the word used in the statute of Northampton, 2 Ed. 3 c 3. It is now commonly taken for a skirmish, or fighting between two or more. … Yet, as it is there said, they differ in this, that where an assault is but a wrong to the party, an affray is wrong to the commonwealth, and therefore both inquirable and punishable in a leet. … Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in flat 2 Ed 3 c 3. But altho' no bare words, in the judgement of law, carry in them so much terror as to amount to an affray, yet it seems certain, than in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the Common law and is strictly prohibited by Statute. [3]

It is clear from the sources above that an affray is a crime against the public peace.[4]  One possible way to commit this crime against the public peace is by "riding armed with dangerous and unusual weapons, to the terror of the public." However, sometimes riding armed with dangerous and unusual weapons to the terror of the public is listed as an offense in of itself, separate from an affray.  Whether the two are separate offenses or whether riding armed is a crime unto itself is unclear.  What is clear is that both terms cite back to 2 Edw. 3 Stat. Northampt. c. 3 (1328).  At least three of the sources cited by the Court in Heller to support a common use test, Blackstone, Wharton, and Stephen, referenced the same statute, enacted in 1328 by King Edward III which reads as follows:

ITEM, it is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also upon a Cry made for Arms to keep the Peace, and the same in such places where Acts happen, (footnote omitted) be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part

---

[3] Timothy Cunningham A new and complete law-dictionary, or, General abridgment of the law: on a more extensive plan than any law-dictionary hitherto published: containing not only the explanation of the terms, but also the law itself, both with regard to theory and practice. Very useSul to barristers, justices of the peace, attornies, solicitors, &c. Affray, 1789.
[4] See 2 Blackstone 145 (1803).

D. Page, pg 3

Electronic copy available at: http://ssrn.com/abstract=1859395

elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[5]

This appears to be the origin of the law against affrays, to which the Supreme Court's sources cite.

Cunningham defines Riding Armed, with dangerous and unusual weapons as

an offense at Common law. [citation omitted] By the stat. 2 Ed. 3. Cap. 3. None shall ride armed by day or night to the terror of the people; or come with force and arms before the King's justices...but men may wear common arms according to their quality and fashion, and have attendants with them armed agreeable to their characters; all persons may ride or go armed take felons, suppress riots, execute the King's process…[6]

Unfortunately, this definition merely states the name of the law, followed by the origins. The name of the law is filled with contestable definitions. Which weapons are dangerous and unusual? What does the word, "terror" mean?

**A.  Dangerous and Unusual Weapons**

The term dangerous weapons, in the English common law, is a legal term of art[7] that usually included weapons designed to kill human beings.[8]

The term, "unusual weapons" does not mean, contrary to the Heller court's opinion, "weapons not in common use". As it was used in the time of the founding fathers, the term, "unusual weapons" appears to mean "surprising or uncommon force". In an English case called Baron Snigge v. Shirton, a long term tenant was in a dispute with his landlord, and "kept the possession [of the house he rented] with drum, guns, and halberts".[9] This was considered

---

[5] 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[6] Cunningham, supra, Riding.
[7] See The King v. Hutchinson and Others 168 E.R. 273 (1784).
[8] "[S]howing  weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life...is...the use of dangerous weapons" United States v. Hare, 26 F. Cas. 148, 163-64 (C.C.D. Md. 1818).  See also The King v. Oneby 92 E.R. 465 (Court of the King's Bench 1727) "any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt".
[9] See Generally Baron Snigge v. Shirton 79 E.R. 173 (1607).

D. Page, pg 4

keeping "his house with unusual weapons against a purchaser".[10]  In another English case, a sailor was firing warning shots with a "musqet and ball" across the bow of another ship as a signal, and killed a man.[11]  This firing was not done with unusual weapons.[12]  In both cases, the weapons were in common use at the time.  However, in one case, the weapon was unusual, while in the other case, it was not.  The main difference between the cases is whether the use of force was a reasonable one.

Other, stricter laws outlawed specific types of weapons for certain individuals. "The keeping or carrying any gun-powder, shot, club, or other weapon, whatsoever, offensive or defensive, by any negroe or mulatto whatsoever (except in certain special cases) is an offence, for which the gun or other weapon may be seized, and the offender whipped, by order of a justice of the peace."[13] if these weapons were dangerous and unusual, within the meaning of the term, why did the legislators exhibit such verbosity? Why not simply save paper and ink and time and say, "The keeping of dangerous or unusual weapons by any negroe or mulatto is an offence"?  It seems unlikely that the legislature would find this proposed language outlawed certain types of weapons that they wanted black people to be able to keep.  After all, the legislature outlawed possession of "any weapon whatsoever" by black people.  Similarly, King George III issued a statute outlawing the possession of "pistol, hanger, cutlass, bludgeon, or other offensive weapon with intent feloniously"[14] and declared, "such a person shall be deemed a rogue and a vagabond". [15]  Why didn't the lawmakers use the term dangerous and unusual weapons in this case?  There are three options.  The first is that the terms mean the same, but the lawmakers simply preferred

---

[10] Id.
[11] See generally Rex v. Rowland Phillips 98 E.R. 1385
[12] Id.
[13] 4 Blackstone 175 (1803).
[14] 5 Blackstone 169 (1803).
[15] Id.

D. Page, pg 5

other language.  The second option is that the term, "dangerous and unusual weapons" did not

describe enough weapons to suit the lawmakers' desires.  The third option is that the term,

"dangerous and unusual weapons" does not describe a class of weapons, but rather describes a

class of behavior.

This last option appears to make the most sense when one examines the way the word

"unusual" is used in other legal contexts.

When discussing forcible entry or detainer, Blackstone states, "so that the entry now

allowed by law is a peaceable one; that forbidden is such as is carried on and maintained, with

force, with violence, and unusual weapons."[16] It would make little sense to think that the

distinction was being drawn between peaceable entry and entry with weapons that are difficult to

purchase or hard to find.  Instead, the term "unusual weapons" means weapons that are being

used in a threatening or shocking manner, or weapons that are being used to facilitate an

unlawful endeavor.

This definition of unusual is supported by Blackstone's discussion of forfeited

recognizance.  "A recognizance for the good behavior may be forfeited ... by going armed with

unusual attendance, to the terror of the people."[17] In other words, terrifying people with gangs

constitutes unusual attendance.  Presumably, just as people may own weapons, large people may

gather together, so long as their purpose is lawful.  It is when those groups of people become

threatening (or  terrifying), that those groups are labeled as unusual attendance to the terror of the

public.  Similarly, when the manner in which one carries a weapon becomes threatening, it is

labeled an unusual weapon to the terror of the public.

---

[16] 5 Blackstone 148 (1803).
[17] 5 Blackstone 256 (1803).

D. Page, pg 6

When used to describe weapons, the word, "unusual" is not being used in a different way than when it is being used to describe attendance. Blackstone states, "Any justice of the peace may… bind all those… who make any affray; or threaten to kill or beat another ; or contend together with hot and angry words ; or go about with unusual weapons or attendance, to the terror of the people"[18]. Just as the common law is not outlawing the assembly of misfits or strange people, the common law is not referring to the type of weapon involved when it mentions unusual weapons. Therefore, when the historical phrase, "dangerous and unusual weapons" is used to justify a ban on a class of weapons, it is a misuse, and an abuse of the historical definition.

Does Timothy Cunningham's definition contradict this analysis? "Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in stat 2 Ed 3 c 3." One might argue that this definition supports the Supreme Court's contention that the weapons protected by the second amendment are those in common use at the time. However, this does not seem to make rational sense. Would Timothy Cunningham have argued that a rare pistol was more frightening than a common pistol? Perhaps a less common weapon, such as an intricate morning star would be more` frightening than a normal club, but the crime described as an affray is essentially a breach of the peace. People used to wear ornamental and defensive weapons as part of their everyday dress[19] or as a necessary accessory to their vehicle[20], and this, more likely, is to what Timothy

---

[18] 5 Blackstone 254 (1803).
[19] George Neumann, The History of Weapons of the American Revolution 150 Harper & Row 1967. "It was considered normal for civilians to carry pocket pistols for protection while traveling."
[20] John George, English Pistols and Revolvers 47 Wheaton and Co. 1938. "Travelers…went heavily armed, and had to be prepared to use their weapons at any moment. … [N]o gentleman would dream of starting upon a journey without a pair of pistols in the pockets of his carriage.

D. Page, pg 7

Cunningham referred when he wrote, "weapons not usually worn".  With this in mind, a lance-wielding knight in shining armor would be in great contrast to (and much more frightening than) a man in shirt and pantaloons with a rapier.

The mention of armor in Edward III's law[21], and in Blackstone's commentary on it[22] suggests the prohibition is primarily upon the types of armament that the military would use, not upon the small, concealable weapons that were in more common use by the people.[23]  Clearly, the English and the Americans know how to outlaw weapons, whether they wish to outlaw all types, or only weapons of a certain class.  The term, "dangerous and unusual weapons" did not describe a class of weapons.  Rather it described a class of behavior with weapons.

### B.  Terror of the People

A 1675 dictionary defines terror as, "dread, great fear or fright"[24]

An affray may not be committed in private,[25] presumably because then, the public would not be terrified.

Another plain English dictionary from 1768 describes the word, "Bo" (which, I assume, is an older equivalent to the modern day "Boo!") as "A word of terror".[26]

Unfortunately, for our purposes, the oldest legal dictionaries that I could find with a definition of the word, "terror" come from the turn of the twentieth century.  The cyclopedia Law Dictionary from 1922 defines terror as

---

[21] 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[22] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the Government of the United States and of the of Virginia 145 1803.
[23] The Complete Encyclopedia of Arms & Weapons, Leonid Tarrassuk and Clause Blair, 369 Simon and Schuster 1982.  "Among civilians the pistol became the weapon most commonly used for personal attack and defense." See also George Neumann supra.
[24] An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675).
[25] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).
[26] Samuel Johnson, A Dictionary of the English Language (1768).

D. Page, pg 8

That state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe; affright from apparent danger. One of the constituents of the offense of riot is that the acts of the persons engaged in it should be to the terror of the people, as a show of arms, threatening speeches, or turbulent gestures; but it is not requisite, in order to constitute this crime, that personal violence should be committed. [27]

The Collegiate Law Dictionary from 1925 defines terror as "1. The state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe. 2. Affright from apparent danger."[28]

It seems as though the gravamen of the word, "terror" is an apprehension of harm to come. In describing a mugging, James Wilson writes, "If one assault another with such circumstances of terror as to put him in fear, and he, in consequence of his fear, deliver his money; this is a sufficient degree of violence".[29] Later, Wilson describes arson as "a crime of deep malignity … The confusion and terror which attend arson, and the continued apprehension which follows it, are mischiefs frequently more distressing than even the loss of the property."[30] In describing an ideal judge, Wilson writes, "He ought, indeed, to be a terror to evil doers".[31] Wilson writes, in describing interrogation methods, "terror is frequently added to fraud. The practice… is said… to have been derived its origin from the customs of the inquisition."[32] Giles Jacob's law dictionary states, when describing a legal device known as a Surety of the Peace (which appears to be a promise not to harm), "the demand of the Surety of the Peace ought to be soon after the cause of fear; for the suffering much time to pass before it is demanded, shews that

---

[27] The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901).
[28] The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) (1925). See also Bouvier's law Dictionary (Francis Rawle, ed., Vernon Law Book Company and West Publishing Company 1914) (1839).
[29] 3 Wilson 59 (1804).
[30] Id. At 63.
[31] 2 Wilson 300 (1804).
[32] 3 Wilson 155 (1804).

D. Page, pg 9

the party has been under no great terror."[33]  Jacob further describes the difference between mere fear and terror while defining the word, "robbery".  Jacob writes, "[a]nd when it is laid to be done by putting in fear, this does not imply any great degree of terror, or affright in the party robbed.  It is enough that so much force, or threatening by word or gesture, be used, as might create an apprehension of danger, or induce a man to part with his property without or against his consent."[34] From these sources, terror, is more than mere apprehension of danger; it might more aptly be described as the apprehension of an extreme danger, or a catastrophe.

Some American case law comports with the above view.  A 1795 case describes "a defence based upon the ground of duress and terror".[35] Another 1795 case states, "raising a body of men to …oppose and prevent by force and terror, the execution of a law, is an act of levying war."[36]

However, other old American case-law treats the word, "terror" as if it were synonymous with the word, "threat".  One case mentions people "armed with all the terrors of forfeiture"[37].  Another case mentions  "the terror of public censure"[38].  A third case mentions "the terrors of a law-suit"[39].

Clearly, it will be difficult to determine what the word terror means in the context of the common law tradition that the court in Heller describes, as "terror" has varying levels of severity, ranging from the feeling one gets when someone says, "bo" to the anticipation of a great catastrophe.

---

[33] Giles Jacob, The law-dictionary : explaining the rise, progress, and present state of the English law; defining and interpreting the terms or words of art; and comprising copious information on the subjects of law, trade, and government. 149(P. Bryne 1811 first American from the second London edition) (1811).
[34] Id at 546.
[35] U.S. v. Vigol 2 U.S. 346 (1795).
[36] U.S. v. Mitchel 2 U.S. 348 (Pennsylvania circuit court 1795).
[37] Warder v. Arell 2 Va. 282 (1796).
[38] State v. Norris 2 N.C. 429 (1796).
[39] Neilson & Sarrazin v. Dickenson 1 Des. 133 (1785).

D. Page, pg 10

## II.      Heller's secondary sources

### A.  Blackstone

Justice Scalia first cites Blackstone who, in his commentaries, lists the following

offense:

> The offence of *riding* or *going armed* with dangerous or unusual weapons, is a crime
> against the public peace, by terrifying the good people of the land; and is particularly
> prohibited by the statute of Northampton, 2 Edw. III, c. 3 upon pain of forfeiture of the
> arms, and imprisonment during the king's pleasure: in like manner, as by the laws of
> Solon, every Athenian was finable who walked about the city in armour.[40]

Notice that this is a crime against the public peace.  Presumably, if the public peace was

not harmed, or if the peace was disturbed through a means that did not terrify the good people of

the land[41], this crime would not be charged. Furthermore, this crime appears to be a crime one

cannot commit while alone in the privacy of one's own home.  However, as we will see, modern

courts use this common law history to uphold laws banning private, solitary possession of certain

classes of weapons, such as fully automatic rifles.   Blackstone does not mention any way of

classifying different types of weapons, unless the fallacious definition of dangerous and unusual

weapons is applied.  In no way does this source fairly support a prohibition based on which

weapons are presently in common use.

### B.  James Wilson

Justice Scalia then cites the James Wilson's explanation of an affray.  James Wilson

wrote,

> Affrays are crimes against the personal safety of the citizens; for in their personal safety,
> their personal security and peace are undoubtedly comprehended.  An affray is a fighting

---

[40] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the
Government of the United States and of the of Virginia 145 1803
[41] For example, if one were to disturb the peace by playing a minstrel tune with a very loud trumpet, while carrying
a concealed knife, that behavior would probably not terrify anyone and would presumably not constitute a
violation of the common law rule against riding with dangerous and unusual weapons to the terror of the public.

D. Page, pg 11

of persons in a publick place, to the terror of the citizens. They are considered as common nuisances. They may, and ought to be suppressed by every person present; and the law, as it gives authority, so it gives protection, to those who obey its authority in suppressing them, and in apprehending such as are engaged in them ; if by every person present ; then still more strongly by the officers of peace and justice (footnote omitted). In some cases, there may be an affray, where there is no actual violence ; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terror among the people.[42]

Again, we see that an affray is a crime committed only in the presence of others. The exception listed at the end of the quoted section is not an exception to the public requirement, but is rather an exception to the actual violence requirement. Heller cites this as part of the common law tradition that supports a test of whether a class of weapon was in common use.[43] However, the only possible class of weapons in this quote comes a fallacious definition of the term "dangerous and unusual". To say that this source fairly supports a restriction based on which weapons were in common usage at the time is dubious.

### C. John A. Dunlap

Justice Scalia next points us to John A. Dunlap's The New-York Justice, which discusses the crime of affray,

> An affray is the fighting of two or more persons in some public place to the terror of the people; for if the fighting be in private it is not an affray, but an assault ; neither will threatening words amount to an affray, although it seems that the constable may, at the request of the party threatened, carry the person using the threats before a justice of the peace, in order that he may find sureties. ... As where two persons coolly and deliberately engage in a duel; this being attended with an apparent intention and danger of murder, and being a high contempt of justice, is a strong aggravation of the affray, though no mischief has actually ensued. It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people. [44]

---

[42] 3 James Wilson, Works of the Honourable James Wilson 79 (1804).
[43] D.C. v. Heller, 554 U.S. at 627.
[44] John Dunlap, The New-York Justice; or, a Digest of the Law Relative to Justices of the Peace in the State of New-York 8 Isaac Riley 1815.

D. Page, pg 12

Dunlap's description of an affray also includes the public place requirement, as well as the terror of the people requirement. Here, Dunlap compares carrying dangerous and unusual weapons with dueling people, with the intention and danger of murder.[45] This is once again an exception to the Affray's element of actual violence. Dunlap's exception to actual violence includes a manner element. The manner in which these arms are carried is what is being compared to dueling. The manner that is outlawed is the manner that would naturally cause terror to the people. Dunlap does not support a restriction on the type of weapons being used, but rather on the manner in which they are used.

### D.  C. Humphrey

The court then refers to C. Humphrey's  A Compendium of the Common Law in Force in Kentucky,[46] which says,

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment. But here it should be remembered, that in this country the constitution guaranties to all person the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily. We have a statute on the subject, relating to concealed weapons.[47]

The crime mentioned by Humphry is a public one that involves terrifying the people. Notice that it is the manner that the right is exercised, not the type of weapon that is carried that constitutes the crime. Humphrey makes it explicit that one may carry weapons so long as it is not in a manner that excites people to unnecessary terror. The unnecessary terror of the people appears to be an essential element. At no point does Humphrey refer to a test of whether the

---

[45] Dueling often resulted in no harm to either party. "If a duel should lead to the death of one of the principals, an event which was by no means so common as the reader of modern historical novels might be led to suppose". John George, English Pistols and Revolvers 74 Wheaton and Co. 1938. See also "A duel could be declared ended with honor without a wound's being inflicted... a number of duelists pointedly chose to miss their targets." Jack Williams, Dueling in the Old South: Vignettes of Social History 58 Texas A&M University Press 1980.

[46] D.C. v. Heller 554 U.S. at 627.

[47] H. Stephen, Summary of the Criminal Law 48 (1840).

D. Page, pg 13

arms mentioned were in common use at the time, unless one uses the fallacious definition of "dangerous or unusual".

### E.  W. Russell

The court then refers to <u>A Treatise on Crimes and Indictable Misdemeanors</u> by W. Russell,[48] which states in relevant part,

> [Y]et it seems certain that in some cases there may be an affray where there is no actual violence; as where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the common law, and is strictly prohibited by several statutes. (citation omitted.)[49]

Russell is providing an exception to the violence requirement of the affray.  Notice again that there is a manner requirement.  Presumably, if one were to arm himself with dangerous and unusual weapons in a manner that did not naturally cause a terror to the people, one would not be guilty.  One might do this in several ways.  First, one could do it out of sight, in private.  One might conceal the weapon from public view.  One might carry the weapon in a peaceable manner that did not excite anyone to terror.  From the plain meaning of the text, those manners of carrying dangerous and unusual weapons were not outlawed.  It is worth noting that it is the manner that is the essential element, not the type of weapon involved, unless one applies the fallacious definition of dangerous and unusual weapons.

### F.  H. Stephen

The court then refers to H. Stephen's  Summary of the Criminal Law, which states, "Riding or going armed with dangerous or unusual weapons. By statute of Northampton, 2 Edw.

---

[48] D.C. v. Heller 554 U.S. at 627.
[49] Sir William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831).

III c. 3, this is a misdemeanor, punishable by forfeiture of the arms and imprisonment during the King's pleasure."[50]

This source was rather bare. However, it uses the same language and cites the same statute as Blackstone. It should be noted that in the statute that Stephens cites, the crime of riding armed was conditioned on being in a public place or before a public official.[51] Because Stephen uses the same language and cites the same sources as the other authors listed by the Heller court, one should not take the bareness of the language to mean that, according to Stephen, the exceptions and restrictions on the common law are not present. All Stephen does is name the offense, cite to Statutes of the Realm, and then state the punishment. It does not investigate the intricacies of what constitutes a violation of the law, nor does it define the law. Rather than read into the bareness of the language, one should assume Stephen simply declines to investigate the details of the common law.

**G. F. Wharton**

The Supreme Court then refers to F. Wharton's A Treatise on the Criminal Law of the United States.

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted) There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). … yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute. For by statute 2 Edw. 3., s. 3, in force in several of the United States, it is enacted…[52]

---

[50] Henry John Stephen, Summary of the Criminal Law, 1840.
[51] See 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[52] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

D. Page, pg 15

Wharton describes the affray as a crime committed in public, to the terror of the citizens. Wharton includes a restriction on the affray that other sources do not. Namely, Wharton distinguishes between a sudden attack and a sudden affray. Supposedly, people committing an affray do not wish to do any great bodily harm. Notice that Wharton seems to contradict Dunlap, where Dunlap discusses dueling with the intent to commit murder as an aggravation of an affray.

In addition, Wharton includes in his definition of the affray a requirement that the affray be committed in public. If the fight takes place in private, rather than in public, the fighters may be charged with assault, but not an affray.

Wharton also includes a manner requirement to the rule against dangerous and unusual weapons. The text appears to suggest that if a man armed himself with a dangerous and unusual weapon in such a manner that did not naturally cause a terror to the people, he would not be guilty of an affray.

Once again, a manner restriction as to where and how someone can carry weapons will later be used, by modern courts, to justify a complete prohibition on certain classes of weapons.

After discussing the King's statute, Wharton continues,

In Tennessee, however, it was ruled, that the act of 1837-8 c. 137 s. 2, which prohibits any person from wearing any bowie-knife, or Arkansas tooth-pick[53], or any knife or weapon in form, shape or size resembling a bowie-knife or Arkansas tooth-pick, under his clothes, concealed about his person, conflicts with the 26th section of the first article of the bill of rights, securing to the free white citizens the right to keep and bear arms for their common defence. (Aymette v. State, 2 Hum. 154). The contrary rule, it would seem, has been laid down in Indiana, where it was held that a similar statute was in conformity with the federal and state constitutions (State v. Mitchell, 3 Blackf. 229). An act of the same character is in force in Virginia. (footnote omitted). If a person, not being a traveler, carry a pistol concealed on his person, he is guilty of an indictable offence, under the revised statutes of Indiana, of 1843, and his motive for carrying the pistol is immaterial (rev. stat. page 982; Walls v. State, 7 Blackf. 572). It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law. (State v. Huntly, 3 Iredell, 418; but see State

---

[53] An Arkansas toothpick is a type of Bowie knife with a blade that can be as large as one foot long. See Robert E. Hunt, Randell Military Models: Fighters, Bowies, and Full Tang Knives, 208, Turner Publishing Company 2003).

D. Page, pg 16

v. Simpson, 5 Yerger 356). On the same general reasoning, it has been held indictable to
drive a carriage through a crowded street, in such a way as to endanger the lives of the
passers-by ; (footnote omitted) to disturb a congregation when at religious worship;
(footnote omitted) to beset a house, with intent to wound, tar and feather ; (footnote
omitted) to raise a liberty-pole, in the year 1794, as a notorious and riotous expression of
ill-will to the government ; (footnote omitted) to tear down forcibly and contemptuously
an advertisement set up by the commissioners of a sale of land for county taxes ;
(footnote omitted) to break into a house in the day-time, and disturb its inhabitants ;
(footnote omitted) and to violently disturb a town-meeting, though the parties engaged
were not sufficient in number to amount to a riot.'[54]

While Wharton does describe restrictions on certain classes of weapons, all of those

restrictions occurred after the constitution was ratified.  If this is the common law to which the

Heller court refers, it is common law that would have been subject to the bounds of the

constitution.  Normally, when common law is persuasive, it is the common law that came before

the constitution was ratified.  That common law speaks to what was considered normal at the

time. Common law that arises after the constitutional amendment was adopted and conflicts with

the constitution should not be cited as support for a particular interpretation of the constitution.

In a first amendment setting, this would be comparable with citing the Alien and Sedition Acts as

speaking to the founders' views on the freedom of speech.  The constitution has been violated on

numerous occasions, many of them shortly after the document was ratified.  Simply pointing to a

tradition of violating the constitution does not make a statute that is in line with that tradition

constitutional.  It is therefore puzzling to see references to cases from the 1870s in an originalist

opinion.

Wharton goes on to describe the reasoning behind the rule against "open exhibition of

dangerous weapons by an armed man, to the terror of good citizens".  The first thing to which

---

[54] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).  It should be noted that Aymette v.
State, 2 Hum. 154 actually upheld the ban, rather than striking it down.  In Bliss v. Commonwealth 12 Ky. 90, 13
Am. Dec. 251 (Ky. Ct. App. 1822), a Kentucky court held that a similar statute conflicted with the portion of its state
constitution that is analogous to the second amendment.  (Special thanks to Robert Dowlut, who alerted me to this
error).

D. Page, pg 17

Wharton compares carrying dangerous weapons is to reckless driving and reckless endangerment. This makes sense as a manner restriction based upon the terror of the people element. Presumably, just as one may drive a carriage through a crowded street with due care, one could carry a dangerous weapon in a nonthreatening and careful manner without violating a law. Wharton then compares carrying dangerous weapons with disturbing a congregation when at religious worship. This comparison is a little more puzzling. Perhaps if one were to disturb a religious congregation (by, say, entering a church during the middle of Easter mass and screaming that there is no god), it would excite them to violence or to such a state of uproar that the interruption should be illegal. The next comparison makes more sense. To beset a house is to "surround and harass" it or to assail the house on all sides.[55] Tar and feathering was not a pleasant practice, and any reasonable person would raise a general hullaballoo if such a performance would save him from this practice.[56] Therefore, to "beset a house with intent to wound, tar, and feather", is to have an angry mob surround a house with the desire to wound and assault and humiliate the occupants. Wharton is saying that the same reasoning used to outlaw besetting a house with intent to wound, tar, and feather is being used to outlaw riding armed with dangerous weapons to the terror of the people.

The next two examples have to do with insurrection. Raising a liberty pole[57] as a riotous expression of ill-will toward the government and contemptuously tearing down advertisements

---

[55] The New Oxford American Dictionary 156 Erin McKean, 2nd ed (2005).
[56] "When heated, tar would blister the skin, but there is little evidence to suggest it regularly was... Yet even when tar was applied cool, it made for a painful experience. Once dry, tar clung tenaciously to the skin and could be removed only with a tremendous amount of scrubbing, possibly with the aid of turpentine or other chemical solvents that would further irritate the skin. Presumably, most victims lost a good deal of body hair; others may have developed tar acne, a skin condition..." Benjamin Ervin, Tar, Feathers, and the Enemies of American Liberties, pg. 204 New England Quarterly, Vol.76 No.2 Jun. 2003.
[57] "Liberty poles originated as large wooden columns--often fashioned out of ship masts--erected in public squares as part of the "rites of resistance" to British authority during the American Revolution. Simon P. Newman, Parades and the Politics of the Street: Festive Culture in the Early American Republic 25-29 (1997). After the revolution, they were used as symbols of resistance during the Whiskey Rebellion. Id. at 172-73; see In re Fries, 9 F. Cas. 826,

D. Page, pg 18

meant to alert people to an auction meant to finance the government were both activities

outlawed primarily to curb active resistance against the government.  Wharton says that same

reasoning being used to outlaw those two activities is used to outlaw carrying dangerous

weapons to the terror of the people.  This suggests that there is an element of curbing

insurrection present in the prohibition against carrying dangerous weapons to the terror of the

people.  It seems doubtful that the government was outlawing people carrying weapons for self

defense.  Instead, the government had an interest in outlawing the type of show of force that

could help encourage insurrection the same way a liberty pole could encourage insurrection.  The

government also had an interest in outlawing the type of armed presence that would undermine

the rule of law in a similar way that hindering tax auctions would undermine the rule of law.

Next, Wharton compares the reasoning behind outlawing the carrying of dangerous

weapons to the terror of the people with the reasoning behind outlawing breaking and entering in

the middle of the day to disturb the home's inhabitants.  When one imagines the kind of uproar

that would happen when one engages in breaking and entering a home to disturb its inhabitants,

it speaks to the kind of uproar that might happen if one were to parade down the middle of the

street, firing guns into the air, waiving weapons at the population.  It also speaks to the level of

danger that is discussed.  If someone suddenly bursts into a man's home, there is at least some

likelihood that the occupant will fear for his life or his family members' lives and will attack the

---

862, 864, 870 (C.C.D. Pa. 1799) (No. 5,126) (describing the erection of a liberty pole during the Whiskey Rebellion);
Respublica v. Montgomery, 1 Yeates 419, 421 (Pa. 1795) (referring to liberty poles as one of the "avowed
standards of rebellion"). They were also adopted by Jeffersonian Republicans as "prominent and easily
recognizable symbols of liberty, equality, and republicanism," and as symbols of opposition to the Federalist
government and to the Sedition Act. Newman, supra at 80, 97, 170-76. By the middle of the nineteenth century,
the erection of liberty poles "on highways and public squares" by "each political party of the country to express its
greater devotion to the rights of the people" had come to be viewed as "a custom sanctioned by a hundred years
and interwoven with the traditions, memories and conceded rights of a free people." City of Allegheny v.
Zimmerman, 95 Pa. 287, 294 (1880). The custom apparently disappeared at the end of the nineteenth century."
Seth F. Kreimer, Technologies of Protest: Insurgent Social Movements and the First Amendment in the Era of the
Internet, 150 U. Pa. L. Rev. 119, 171 (2001)

D. Page, pg 19

intruder.  Even if the intruder meant no violence, but only meant to disturb the inhabitants of the

home, there was a risk of violence.  Perhaps, in the same way, the common law outlaws such

provocative and public use of weapons in the hopes of avoiding violence when none was

intended.

      Finally, Wharton compares the reasoning behind outlawing riding with dangerous

weapons to the terror of the public with the reasoning behind outlawing the violent disruption of

a town-hall meaning, even if it does not amount to a riot.

    In order to be charged with rioting, a certain number of people had to be involved.

Blackstone defines a riot as follows,

> Riots, routs, and unlawful assemblies, must have three persons at least to constitute them
> (footnote omitted). … A riot is where three or more actually do an unlawful act of violence,
> either with or without a common cause or quarrel (footnote omitted): as if they beat a man; or
> hunt and kill game in another's park, chase, warren, or liberty; or do any other unlawful act
> with force and violence; or even do a lawful act, as removing a nuisance, in a violent and
> tumultuous manner. [58]

    Here, it is clear that the link between the reasoning behind the two common law rules is clear.

In a riot, the situation can spiral out of control.  The rule against riots is meant to help preserve

the public peace and to avoid unruly mobs. Similarly, to preserve the peace, the common law has

outlawed reckless displays of firearms in public.


   **III.**     **Heller's cited caselaw**

     **A. State v. Langford**

    In Heller, the Supreme Court also directs the reader to three cases concerning what the

court calls "the historical tradition of prohibiting the carrying of 'dangerous and unusual

---

[58]  5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of
the Federal Government of the United States; and of the Commonwealth of Virginia 146 1803.

D. Page, pg 20

weapons'".[59] The first of these, <u>State v. Langford</u>, is a case discussing the sufficiency and clarity of an indictment.  Here, the defendant and several other men armed with guns fired at an elderly woman's house and killed her dog, "thus exciting her alarm for the safety of her person and her property".[60]

During the opinion, the court discusses whether the actions that led to the indictment were a private trespass or a forcible breach of the public peace.  The court wrote,

> For the counsel for the prosecution, in arguing, say, 'one man may commit a breach of the peace, though not a riot; he might be armed with pistols for aught that appears, and this might be, possibly, proved.' To this the Court answers, "coming with a pistol, though possible, is not to be supposed;' thereby implying, that if the fact of coming with a pistol had been laid in the indictment, it would have been a circumstance in itself naturally implying such a degree of force as was indictable.

One who wishes to interpret this in a manner unfavorable to the civil right to the means to self-defense could suppose that this is an example of presuming anyone armed with a pistol to be an aggressor. The anti-civil rights argument would be that the common law made negative assumptions about people armed with pistols.  If this is the case, it is unclear whether the court would make a distinction between loaded and unloaded pistols, holstered or unholstered pistols. It seems as though one who is armed "for aught that appears" is ready to shoot anything that moves.  However, it seems less than likely that "being armed with pistols for aught that appears" could describe an unloaded or holstered weapon.

Furthermore, a passage later on in the case would contradict the argument that there was a negative presumption against people armed with pistols, "[l]aying the offence to have been committed vi et armis[61] does not itself show … as applied to forcible entry … that a breach of

---

[59] D.C. v. Heller 554 U.S. at 627.
[60] State v. Langford 3 Hawks 281, 10 N.C. 381 (N.C.), 1824 WL 380 (N.C. 1824),
[61] Latin for with force of arms, See Walter Shumaker and George Longsdorf, The Cyclopedic Law Dictionary, 1058 Chicago Callaghan and Company (1922).

D. Page, pg 21

the peace had been committed in the cases"[62].   That is to say that just because someone behaved while armed does not show that a breach of the peace has been committed.  Here, it is the manner in which the person with the arms behaved that is the gravamen of the crime.  If, instead of shooting at an old woman's house and killing her dog, the defendant had politely knocked on the old woman's door, with his rifle slung over his shoulder, there would have been much less cause for the old woman to fear for her life, her property, and her dog.

Here, the gravamen of the crime seems to be the breach of the peace.  The court said, "All the law requires in an indictment of this kind is, that the facts shall be so charged, as to show that a breach of the peace had been committed, and not merely a civil trespass."[63]  Here, it seems like the offense was not based on how unusual the weapons were (the court simply said they were armed with guns[64]).  It might be argued that the dangerousness of the weapons was the gravamen of the crime.  However, the death of the dog (the result of the dangerous weapons) was a matter of aggravation, not the "corpus delicti" or body of the crime. Instead, it was the frightening and threatening behavior of the defendant that constituted the crime.  The defendant terrified the victim, and it is the actions that made her feel threatened and fear for her safety and the safety of her property that seem to be the focus of the court, not the type of weapons used.

In any case, it is unclear how the Supreme Court in Heller did or would place significance on this opinion.

**B.  O'Neill v. State**

Justice Scalia then references O'Neill v. State, where a man insulted a second man, who then beat the first man with a cane.  The first man did not resist, and the question before the court

---

[62] Id

[63] Id.

[64] Id. "These men were armed with guns, which they fired at the house of an unprotected female, thus exciting her alarm for the safety of her person and her property."

D. Page, pg 22

was whether the first man was also guilty of the affray. The Court states, "[i]t is probable, however, that if persons arm themselves with deadly or unusual weapons *for the purpose of an affray*, and in such a manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."[65]   With this language, the judge seems to suggest that if the persons had armed themselves for a reason other than an affray, and did not actually come to blows, they might not be guilty of the offense. If we were to apply this rule to modern day statutes, laws that prohibit people arming themselves with intent to engage a public fight would probably fall under the limitation on the second amendment to which Justice Scalia referred. [66]

### C. English v. State

The next case Justice Scalia mentions is <u>English v. State</u>. In this 1872 Texas case, Judge Walker, says the following concerning the second amendment, "Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks[67], daggers, slungshots,[68] swordcanes,[69] spears, brass-knuckles and bowie knives." [70] Judge Walker continues,

> If we look to this question in the light of judicial reason, without the aid of specific authority, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such are

---

[65] 16 Ala. 65, 1849 WL 407 (Ala.) Emphasis added.

[66] See D.C. v. Heller 554 U.S. at 627.

[67] "Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)'" People v. Bain, 5 Cal. 3d 839, 851, 489 P.2d 564, 570 (1971).

[68] California case law provides a clear definition of "slungshot." In People v. Williams (1929) 100 Cal.App. 149, 279 P. 1040 (Williams ), the  court adopted the following dictionary definition: "a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon." People v. Fannin, 91 Cal. App. 4th 1399, 1401-02, 111 Cal. Rptr. 2d 496, 498 (Cal. Ct. App. 2001)

[69] "A sword cane looks like an ordinary cane but is in fact a sword with a sheath made to look like the lower part of a cane." State v. McCoy, 618 N.W.2d 324, 326 (Iowa 2000), quoting Commonwealth v. Walton, 252 Pa.Super. 54, 380 A.2d 1278, 1279 n. 1 (1977).

[70] English v. State 35 Tex 473 (Supreme Court of Texas, 1872).

D. Page, pg 23

properly known by the name of 'arms'. … To refer the deadly devices and instruments called in the statute "(sic)"deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous.  No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.  The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.  The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of artillery, the field piece, siege gun, and mortar, with side arms.  The Terms dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives, belong to no military vocabulary.  Where a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline. … We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.[71]

It seems as though Judge Walker believes that the Second Amendment only protects military arms. Confusingly, he glosses over the fact that pistols are, by his own admission, used by the military and regulated by the challenged statute.  In retrospect, his reasoning is also suspect, as several of the other weapons mentioned have been used by the military at one point or another.  American soldiers used brass-knuckle knives for trench warfare in WWI.[72] Bowie knives, dirks, and daggers are not so different from the K-Bar knives carried by the Navy Seals[73] or the Kukri carried by some of the most feared soldiers in the world, the Gurkhas,[74] or the trench knives that have been standard issue in various armed forces around the world.[75] Spears were standard for the Spartan military[76].  Perhaps Judge Walker meant that the Second

---

[71] Id.

[72] See Evan Nappen, Knuckle Down With Knuckle Knives, Knives 2008 at 42 (2007). See also Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).

[73] See Fred Pushies, Weapons of the Navy Seals, 93-95 MBI publishing company (2004).

[74] See Mike Chappell, The Gurkhas 31 Osprey Publishing, 1994.

[75] Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).

[76] Nick Sekunda, The Spartan Army 52 Osprey Publishing 1998.

D. Page, pg 24

Amendment only protected what the U.S. military currently used. It seems doubtful that the founders would allow the state to ban muskets on the basis that the military now uses M-16s.

The Supreme Court did not adopt Judge Walker's reasoning, nor did the Supreme Court adopt Judge Walker's interpretation of the Second Amendment. Justice Scalia merely cited to Judge Walker's opinion when referring to "historical prohibitions on the carrying of 'dangerous or unusual weapons'"[77].

Perhaps this is part of the history to which the Supreme Court refers. After all, this 1872 case misuses the term, "dangerous and unusual weapons" in much the same way that Supreme Court misuses it in Heller. However, English v. State does not rely upon the phrase "dangerous and unusual weapons". Instead, they rely upon an interpretation of the prefatory clause that is contrary to the interpretation that the Supreme Court in Heller used[78], combined with a definition of arms that is contrary to the interpretation that the Supreme Court in Heller used.[79]

### D. State v. Lanier

It is perplexing that the court cites State v. Lanier. The court in Heller was pointing to the tradition of riding armed with dangerous and unusual weapons as support for the constitutionality of legislation against particular types of uncommon weapons as seen in Miller. In State v. Lanier, a man rode unarmed through an empty courthouse. The Lanier court does say "The elementary writers say that the offence of going armed and dangerous or unusual weapons

---

[77] See D.C. v. Heller 554 U.S. at 627.

[78] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "To refer the deadly devices and instruments called in the statute 'deadly weapons', to the proper or necessary arms of a 'well-regulated militia,' is simply ridiculous" with D.C. v. Heller 544 U.S. 570, 578(2008), "apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."

[79] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense" with D.C. v. Heller 544 U.S. 570, 581 (2008), "The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."

D. Page, pg 25

is a crime against the public peace by terrifying the good people of the land, and this Court has

declared the same to be the common law in State v. Huntley 3 Ired. 418"[80]

However, the court also states, "In this case we attach no importance to the fact that the

defendant had no arms, for we think it may be conceded that driving or riding without arms

through a court house or a crowded street at such a rate or in such a manner as to endanger the

safety of the inhabitants amounts to a breach of the peace and is an indictable offence at the

common law."[81]   Clearly this is not a case about outlawing certain types of weapons.  If

dangerous and unusual weapons really did describe classes of weapons rather than classes of

dangerous behavior, why mention dangerous and unusual weapons in this case where the

defendant was unarmed? State v. Lanier is a case punishing a certain types of behavior, whether

the person was armed or not.  It mentions dangerous and unusual weapons because that is

common law outlawing a certain type of dangerous behavior; it is not common law outlawing

certain classes of rare weapons.


IV.     **Post-Heller interpretations of dangerous and unusual weapons**

In the third district of California, Judge Sims upheld California's ban on so-called "assault

weapons" based primarily on Heller's reasoning that prohibitions based upon classes of weapons

were fairly supported by the traditional prohibition on the carrying of dangerous and unusual

weapons.[82] California law outlaws possession of so-called "assault weapons", a term that is

defined in a way that baffles the mind.  The law outlaws a semi-automatic centerfire rifle that can

accept a clip and has a thumbhole stock.[83] A thumbhole stock is a stock that one can put his

---

[80] State v. Lanier 71 N.C. 288, 1874 WL 2582 (N.C.) (1874).
[81] Id at 2
[82] See Generally People v. James 174 Cal. App. 4th 662, 94 Cal. Rptr. 3d 576 (2009).
[83] Id at 669.

D. Page, pg 26

thumb through as he grips the rifle.  The same rifle without a thumbhole stock is legal.[84]  That

legal rifle would then be illegal if the owner installed a forward pistol grip.[85]  A forward pistol

grip is a piece of material (usually plastic or metal) that attaches to the underside of the barrel.

It allows the shooter to hold the rifle with his knuckles facing horizontally rather than vertically.

With and without the modifications, the rifle has the same capabilities.  With the modifications,

the rifle is deemed to be an "assault weapon", and is therefore illegal.  Without it, the rifle is not

classified as an "assault weapon" and is therefore lawful. Other authors have noticed the

misleading definition of the scare term "assault weapons".[86]  "For example, the term 'assault

weapon' has become so elastic that it has been applied to a revolving firearm and even a single

shot firearm."[87]

 The part of this statute that was challenged was the prohibition on so-called "assault weapons"

and a prohibition on a gun that shoots a particular type of bullet, a 50 caliber bmg.[88]  The court

upheld this law based on a faulty definition of dangerous and unusual.  The court found that "the

Legislature enacted the [law]in order to address the proliferation and use of unusually dangerous

weapons."[89]  "[The Second Amendment] is the right to possess and carry weapons typically

possessed by law-abiding citizens for lawful purposes such as self-defense. …as the court's

discussion makes clear, the Second Amendment right does not protect possession of a military

M-16 rifle."[90] This represents a fundamental misunderstanding of the term "dangerous and

unusual weapons" as well as a fundamental misunderstanding of the Second Amendment.

---

[84] Id.

[85] Id.

[86] For a more in-depth look at the absurdity for California's "assault weapons" ban, see Eric C. Morgan's note, Assault Rifle Legislation: Unwise and Unconstitutional, 17 Am. J. Crim. L. 143 (1990).  Available online at http://www.saf.org/LawReviews/EMorgan1.html.

[87] Robert Dowlut 5 St. Thomas L. Rev. 203, 208 (1992).

[88] Id at 666.

[89] Id at 674.

[90] Id at 676.

D. Page, pg 27

To review, the Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[91]  Judge Sims interpreted that amendment to not protect the possession of the United States Army's standard issue rifle.  This rifle is used by all branches of the military, including the National Guard.  He arrived at this conclusion through the reasoning in Heller that was supposedly supported by the tradition of prohibiting the carrying of dangerous and unusual weapons.

Judge Sims goes on to say, "These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war."[92]  Reading this alongside a case Heller cited, English v. State (the case that upheld a law banning non-military weapons), the government could ban all firearms.  Obviously, one of these cases must be wrong.   Judge Sims continues,

> [O]ur conclusion that Heller does not extend Second Amendment protection to assault weapons and .50 caliber BMG rifles is supported by post-Heller federal precedent.  In U.S. v. Fincher (8th Cir. 2008) 548 F.3d 868 (Fincher), the Eighth Circuit Court of Appeals held that Fincher's possession of a machine gun was "not protected by the Second Amendment" because "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."[93]

Judge Sims also states that .50 caliber BMG rifles are also dangerous and unusual.[94]  This case upheld an asinine law through historically inaccurate reasoning.

The defendant in the case over which Judge Sims presided, Michael Eugene James, was on a state registry for firearms.  He was then subject to a restraining order that directed him to "turn in

---

[91] U.S. Const. amend. 2.
[92] People v. James 174 Cal. App. 4th at 676.
[93] Id.
[94] Id.

D. Page, pg 28

or sell all firearms in his possession by a certain date."[95] The information on the state database was enough to obtain a search warrant for his house.  The police then found the banned weapons in Mr. James' house. Michael Eugene James went to prison because of a law that was upheld through the misinterpretation of a historical phrase.  A similar law was upheld in Cook county, Illinois in Wilson v. Cook County.[96]

In Heller v. District of Columbia[97], Heller challenges, among other things, the ban on so called "assault weapons" in the District of Columbia.[98] The district court says the following, "As the Heller Court made clear, the Second Amendment does not confer the right to use *any* type of firearm in self-defense. [citation omitted] Rather, the Second Amendment protects only those weapons 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes' [citation omitted], as opposed to weapons considered 'dangerous and unusual'".[99]

## V.   Common Use as Used Today

Under the current interpretation of the Second Amendment, the common use test is valid and is being used by several lower courts.[100] Under this test, courts are upholding prohibitions on certain classes of firearms.  The courts ask whether a type of firearm is commonly used by law-abiding citizens.  This is an insidious question, as some of these bans have been in place for some time.  When the government prohibits the possession of a type of firearm, the possessors of those firearms cease to be law-abiding citizens. Therefore, under a common use test, no court would strike down a firearms ban that had been in place for an

---

[95] Id at 665.
[96] See generally, Wilson v. Cook County 943 N.E. 2d 768, 348 ill. Dec. 160 (appellate Court of Illinois, First District, Third Division, 2011).
[97] This is not to be confused with D.C. v. Heller.  Heller v. D.C. is a case involving the same parties and was brought in D.C. District Court.
[98] See Generally, Heller v. District of Columbia 698 F. Supp. 2d 179 (D.C. District Court, 2010).
[99] Id at 193.
[100] See generally, Wilson v. Cook County 943 N.E. 2d 768, People v. James 174 Cal. App. 4th 662, and Heller v. District of Columbia 698 F. Supp. 2d 179.

D. Page, pg 29

extended period of time.  Applying the common use test without falling into this circular trap is a difficult task.  It is also difficult to determine how much weight the Supreme Court is willing to place on a common use test.  After all, in Heller, the Supreme Court struck down a ban on pistols that had in effect since 1976.[101]

Apparently, the Supreme Court did not think these weapons were dangerous and unusual enough to outweigh the plaintiffs' rights to self defense. But if no law-abiding private citizen our nation's capital had a handgun for thirty-two years, what could be more unusual?  Or did the court look to see if the weapon were unusual in places where it was not banned?  Many questions about the nature of this test remain unresolved.  This murky test is bound to bring about differing results to similar fact patterns.

Another puzzle arises when one considers the idea of a new weapon.  Suppose the starship Enterprise landed in Oklahoma tomorrow, and set up a factory producing phasers. A court would have no problem upholding a ban on these 'dangerous and unusual' weapons. Nobody owns them, and they can be set to stun or disintegrate a victim.  This type of reasoning could ban any type of new weapon, yet this is obviously not what the Supreme Court envisioned.  It said,

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, e.g., Reno v. American Civil Liberties Union, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, e.g., Kyllo v. United States, 533 U.S. 27, 35-36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.[102]

---

[101] See http://voices.washingtonpost.com/rawfisher/2008/06/dc_gun_ban_the_decision.html.
[102] D.C. v. Heller 554 U.S. at 582

D. Page, pg 30

So if the court wants modern firearms to be protected under the Second Amendment, how should the common use test be applied to newly invented weapons?

The most frustrating part of the common use test is that it doesn't measure how dangerous a society would be if a given ban remained in effect or if it was lifted.[103] What place does popularity have in determining whether a gun ban should be constitutional? Under Heller, the answer is "it has at least some weight".

The common use test is not supported under an originalist style of interpretation, and it was not included in the original meaning or understanding of the Second Amendment. It is circular, allows for arbitrary and cosmetic distinctions between firearms, and will result in differing outcomes for similar fact patterns. However, it is currently the law of the land. Why is this included in <u>D.C. v. Heller</u>?

There are several possible reasons. First, it could be a mistake. The authors could have wanted a one hundred percent historically accurate originalist interpretation. Maybe the court missed it.

Another possibility is that the court did not care about the history as much as they did the outcome of the case and the precedent it sets. But if this is the case, why write an originalist opinion? Was Justice Scalia simply trying to inundate the reporters with his style of interpretation? And if this is the case, why not explain why the policy outweighs the history in this particular matter?

---

[103] Both sides of the gun control debate can probably agree with this statement. On one side, people who want more gun control want the court to be able to determine how dangerous a weapon is to society when deciding whether to keep a ban. On the other side, people who want less gun control want a court to consider how undesirable society will become when that option for self defense (against private or governmental aggressors) is taken away, along with their liberty to possess a type of weapon.

D. Page, pg 31

A third possibility is strategic fallacy.  If Justice Scalia wanted to write an opinion that protected firearms, save for three exceptions,[104] and if one of the other judges that was needed for a majority wanted a fourth exception,[105] what does a strategic judge do?  A strategic judge would provide the strongest possible support for every part of the majority opinion, save for the part with which he or she disagreed.  Perhaps, in the hopes that someday when the makeup or the disposition of the court is different the court will revisit the issue, Justice Scalia posited the shakiest argument that he thought would escape unnoticed by his colleagues.  This would set the stage for a future court to examine the case, upholding three of the exceptions, striking down the fourth, and declaring, "The Supreme Court never had a good reason for this."

**Conclusion**

The future of firearms litigation is far from clear.  So long as courts continue to use the historically inaccurate definition of "dangerous and unusual weapons" embraced in Heller, common use tests are bound to be a part of second amendment jurisprudence.  A re-examination of the definition of "dangerous and unusual weapons" may result in a more historically accurate Second Amendment jurisprudence, as well as a more rational approach to firearms regulation.

---

[104] For example, restrictions on place, manner of use, and manner of manufacture.
[105] For example, an exception to certain classes of weapons.

D. Page, pg 32

NICHOLAS VASSALLO
United States Attorney
JEREMY A. GROSS (WY Bar #7-5110)
Assistant United States Attorney
P.O. Box 668
Cheyenne, WY  82003-0668
Telephone: 307-772-2124
jeremy.gross@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN (*PRO HAC VICE*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
jeremy.s.newman@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | | |
|---|---|---|
| Jake Stanley De Wilde, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; | ) | |
| Director of the Bureau of Alcohol, | ) | |
| Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT AND OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................. 1

I.      The Court Should Grant Defendants' Motion to Dismiss ................................................. 1

      A.      Plaintiff Misreads Applicable Supreme Court Precedent .................................... 1

      B.      Plaintiff Fails to Counter the Uniform Case Law Upholding Section 922(o) ................................................................................................. 6

      C.      Section 922(o) Satisfies *Bruen*'s Second Amendment Test .............................. 10

II.     Plaintiff Is Not Entitled to Summary Judgment .......................................................... 17

CONCLUSION ........................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Cases**

*Becker v. Bateman,*
    709 F.3d 1019 (10th Cir. 2013) ............................................................. 17

*Bonidy v. United States Postal Service,*
    790 F.3d 1121 (10th Cir. 2015) ............................................................... 7

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ............................................................................... 13

*Diné Citizens Against Ruining Our Env't v. Haaland,*
    59 F.4th 1016 (10th Cir. 2023) .............................................................. 18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... *passim*

*Dobbs v. Anthem Blue Cross & Blue Shield,*
    600 F.3d 1275 (10th Cir. 2010) ............................................................... 7

*Firearms Policy Coal., Inc. v. McCraw,*
    No. 4:21-CV-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ..................... 9

*Gee v. Pacheco,*
    627 F.3d 1178 (10th Cir. 2010) ............................................................. 12

*Guzzo v. Mead,*
    No. 14–CV–200, 2014 WL 5317797 (D. Wyo. Oct. 17, 2014) ................................. 7

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) ......................................................... 4, 7, 13

*Johnson v. Weld Cnty., Colo.,*
    594 F.3d 1202 (10th Cir. 2010) ............................................................. 19

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 136 (2010) ............................................................................... 18

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................. *passim*

*Reese v. Bureau of Alcohol Tobacco Firearms & Explosives,*
    No. 6:20-CV-01438, 2022 WL 17859138 (W.D. La. Dec. 21, 2022), *appeal filed*, No. 23-
    30033 (5th Cir. Jan. 13, 2023) ............................................................... 9

*United States v. Henry,*
    688 F.3d 637 (9th Cir. 2012) ............................................................. 8, 16

*United States v. Holton*,
    No. 3:21-CR-0482-B, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022).....................................9

*United States v. McCane*,
    573 F.3d 1037 (10th Cir. 2009)..............................................................................7

*United States v. Miller*,
    307 U.S. 174 (1939)...............................................................................1, 2, 15

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame,*
*Unknown Caliber Serial No. LW001804*,
    822 F.3d 136 (3d Cir. 2016) ..................................................................................8

*United States v. Price*,
    No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022).....................................9

*United States v. Quiroz*,
    No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022), *appeal filed*,
    22-50834 (5th Cir. Sep. 21, 2022).............................................................................9

*United States v. Simien*,
    No. SA-22-CR-00379-JKP, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023)......................9, 12

*United States v. Teerlink*,
    No. 2:22-cr-0024-TS, 2022 WL 17093425 (D. Utah Nov. 21, 2022)......................................7

*United States v. Thompson/Ctr. Arms Co.*,
    504 U.S. 505 (1992)..............................................................................................16

*United States v. Wilks*,
    58 F.3d 1518 (10th Cir. 1995)................................................................................16

*Weidenbach v. Casper-Natrona Cnty. Health Dep't*,
    563 F. Supp. 3d 1170 (D. Wyo. 2021)......................................................................17

## Constitutions

U.S. Const. amend. II............................................................................................15

## Statutes

18 U.S.C. § 922..........................................................................................*passim*

## Legislative Materials

H.R. Rep. No. 73-1780 (1934) .......................................................................12, 16

H.R. Rep. No. 495, 99th Cong., 2d Sess. 4 (1986)................................................................16

**Rules**

Fed. R. Evid. 801(c)................................................................................................................19

Fed. R. Evid. 802....................................................................................................................19

Fed. R. Civ. P. 56(a)..............................................................................................................17

U.S.D.C.L.R. 7.1(b)(2)(D)......................................................................................................19

**Other Authorities**

NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*
(July 20, 2022),
    https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-
    msrs-in-circulation/................................................................................................................19

WYD 243

## INTRODUCTION

Pursuant to this Court's Order of April 13, 2023 (ECF No. 23), Defendants hereby submit this combined Reply Brief in Support of Defendants' Motion to Dismiss and Opposition to Plaintiff's Motion for Summary Judgment.

Plaintiffs' combined motion to dismiss opposition and summary judgment brief, ECF No. 21 ("Pl. Br.") fails to rebut the arguments in Defendants' motion to dismiss memorandum, ECF No. 17 ("Mem."), showing that 18 U.S.C. § 922(o) is constitutional.   Plaintiff misinterprets Supreme Court precedent that forecloses his claim and fails to explain away the uniform lower court authority rejecting Second Amendment challenges to § 922(o).   Under the test set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), machinegun possession is not protected by the Second Amendment's text because machineguns are not in common use for lawful purposes such as self-defense, and § 922(o) is consistent with the historical tradition of prohibiting carrying dangerous and unusual weapons.

Because § 922(o) is constitutional, Plaintiff is not entitled to summary judgment on his claim that § 922(o) violates the Second Amendment.   Besides this core legal deficiency, Plaintiff's summary judgment motion is improper because he fails to set forth or apply the legal standard for summary judgment, does not include a numbered statement of facts, makes no attempt to show entitlement to injunctive relief, and makes speculative and unsupported factual assertions based on inadmissible hearsay.

## ARGUMENT

I.   **The Court Should Grant Defendants' Motion to Dismiss**

A.   **Plaintiff Misreads Applicable Supreme Court Precedent**

In a series of cases, the Supreme Court has explained which types of weapons fall within and outside the scope of the Second Amendment.  *See United States v. Miller*, 307 U.S. 174 (1939);

*District of Columbia v. Heller*, 554 U.S. 570 (2008); *Bruen*, 142 S. Ct. 2111. Together, these cases establish that the Second Amendment protects weapons that are in common use for lawful purposes such as self-defense, but that dangerous and unusual weapons are not protected. *See generally* Mem. 6-10. These cases show that machineguns such as the M-16 rifle are within the class of unprotected weapons that may be restricted or even banned, consistent with the Second Amendment. *Id*. at 10-11.

In arguing that these cases support his position, Plaintiff misinterprets the holdings and reasoning of these cases. Plaintiff argues that under *Miller*, weapons that are "part of the ordinary military equipment" and "common[ly] use[d]" in the military are protected by the Second Amendment. Pl. Br. 3. But in *Heller*, the Supreme Court rejected that reading of *Miller*, reasoning: "Read in isolation, *Miller*'s phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Heller*, 554 U.S. at 624. Plaintiff suggests that the Court rejected the notion that *only* ordinary military equipment is protected, concluding instead that military *and* civilian weapons are protected. Pl. Br. 4. But the Court found the rejected reading "startling" precisely because it would invalidate restrictions on useful military weaponry such as machineguns.[1] *Heller* instead held that the Second Amendment protects "arms 'in common use at the time' *for lawful purposes like self-defense*," because those were the types of weapons that members of the militia brought to militia service in the founding era. *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179) (emphasis added).

---

[1] Plaintiff's argument that the Supreme Court did not intend to reject the reading it dismissed as "startling," *see* Pl. Br. 15 ("Justice Scalia did not say that judges could not find 'startling' conclusions"), is fanciful and finds no support in the rest of the Supreme Court's opinion.

*Heller* therefore made the relevant metric common use for civilian purposes such as self-defense, not military usage.  Plaintiff's erroneous argument that ordinary military equipment is protected by the Second Amendment also has no limiting principle and could result in highly destructive weapons such as Javelin anti-tank missiles being protected.

Plaintiff's reading of the passage of *Heller* explaining that M-16 rifles "may be banned" is equally unconvincing.  The Supreme Court reasoned:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause.  But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty.  It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large.  Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks.  But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Id.* at 627-28.  Plaintiff twists *Heller* in arguing that *Heller* "defended" the hypothetical objection to the conclusion that M-16 rifles were unprotected.  Pl. Br. 17.  In fact, *Heller* rebutted this objection by explaining that despite the lack of protection for modern military weapons such as M-16 rifles, the Second Amendment right was not completely detached from the prefatory clause concerning the militia, because members of the militia in the founding era used the weapons they possessed at home for militia duty.  It is true that the subsequent divergence between commonly used weapons and the sort of weapons necessary for effective military service "have limited the degree of fit between the prefatory clause and the protected right," but the Supreme Court emphatically stated that this divergence "cannot change our interpretation of the right."  *Heller*,

554 U.S. at 628.  Sophisticated military weaponry that is "highly unusual in society at large" is not protected, even if it is commonly used in the military.  *Id.* at 627.[2]

The Fifth Circuit accurately synthesized *Heller*'s analysis:

> *Heller*, therefore, distinguished between two classes of weapons: (1) those that are useful in the militia or military, and (2) those that are "possessed at home" and are in "common use at the time for lawful purposes like self-defense."  The individual right protected by the Second Amendment *applies only to the second category of weapons*, though that category at times may overlap with the first. The Second Amendment does not create a right to possess a weapon solely because the weapon may be used in or is useful for militia or military service.

*Hollis v. Lynch*, 827 F.3d 436, 445 (5th Cir. 2016) (internal citation omitted).  Plaintiff misreads *Heller* in arguing that it protects both categories of weapons.

Finally, Plaintiff misreads *Bruen* in asserting that *Bruen* supports his claim.  *Bruen* generally reaffirmed *Heller*, including *Heller*'s limitation of Second Amendment protection to weapons in common use for self-defense, as opposed to dangerous and unusual weapons.  Mem. 9-10.  Plaintiff argues incorrectly that "*Bruen* specifically declared that arms in 'common use' cannot be banned, even if they were found to be 'dangerous and unusual.'"  Pl. Br. 11.  But as Defendants already explained, *Bruen* did not treat "common use" and "dangerous and unusual" as separate inquiries; under *Bruen* (as under *Heller*), if a class of weapons is "dangerous and unusual," then it necessarily is not "in common use" and is not protected.  Mem. 19-20; *see Bruen*, 142 S. Ct. at 2143 ("the Second Amendment protects only the carrying of weapons that are those 'in

---

[2] Plaintiff argues that *Heller* protected machineguns by not including machinegun bans in a non-exhaustive list of "presumptively lawful" regulations.  Pl. Br. 16; *see Heller*, 554 U.S. at 626-27 & n.26.  But in the paragraph immediately following that passage, the Supreme Court "recognize[d] another important limitation on the right to keep and carry arms": that "the sorts of weapons protected were those in common use at the time," a limitation "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons."  *Heller*, 554 U.S. at 627 (quotations and citations omitted).

common use at the time,' *as opposed to those* that 'are highly unusual in society at large'") (emphasis added).

Plaintiff also argues that *Bruen* endorsed the approach of an online paper that argued that the historical tradition of restricting "dangerous and unusual weapons" extended only to the manner of carrying weapons and not to classes of weapons that were unprotected by the Second Amendment. Pl. Br. 10, 21, 27 (citing Daniel Page, *Dangerous and Unusual Misdirection* (2011), Pl. Br., Ex. H). That paper acknowledges that *Heller* "embraced" what the author contended was a "historically inaccurate definition of 'dangerous and unusual weapons,'" that is, that certain classes of weapons are not protected. Pl. Br., Ex. H, at 32. *Bruen* did not cite, let alone mention, the Page article, and Plaintiff is wrong that *Bruen* discarded *Heller*'s reasoning in favor of the Page article's reasoning.

Contrary to Plaintiff's argument, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment does not protect classes of weapons that are dangerous and unusual. In *Bruen*, the Court rejected the argument that historical statutes setting forth the crime of affray "bann[ed] the public carry of all firearms." 142 S. Ct. at 2143. The Supreme Court explained that these affray statutes did not "ban[] the carrying of any class of firearms," meaning that they did not provide that carrying of any firearm at all was a crime; rather, they "codified the existing common-law offense of bearing arms to terrorize the people[.]" *Id.* But *Bruen* also acknowledged that such statutes "prohibited the carrying of 'dangerous and unusual weapons[,]'" *id.*, which supports the conclusion "that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* (quoting 554 U.S. at 627); *see also id.* at 2162 (Kavanaugh, J. concurring, joined by Roberts, C.J.) (endorsing this analysis from *Heller*: "[T]he sorts of weapons protected were those in common use

at the time.  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.") (citation omitted).  *Bruen* therefore reaffirmed *Heller*'s conclusion that "dangerous and unusual weapons" are classes of weapons that are unprotected by the Second Amendment.  *Bruen* merely rejected the argument that *all* firearms fall within the category of unprotected dangerous and unusual weapons.[3]

### B.    Plaintiff Fails to Counter the Uniform Case Law Upholding Section 922(o)

Plaintiff does not dispute Defendants' showing that six Courts of Appeals have upheld § 922(o) since *Heller*, four district courts have upheld § 922(o) or the National Firearms Act's (NFA) machinegun restrictions since *Bruen*, and no court has ever held that § 922(o) violates the Second Amendment.  Mem. 11-15.  But Plaintiff argues that all of these cases either were incorrectly decided or are no longer good law.  Pl. Br. 17-22.  Plaintiff is wrong.  These decisions properly analyzed the scope of the Second Amendment based on text and history, and they are highly persuasive authority for rejecting Plaintiff's claim here.

### 1.    Court of Appeals cases upholding § 922(o) remain good law

As Defendants showed, each post-*Heller* Court of Appeals decision upholding § 922(o) concluded that machineguns were beyond the scope of the Second Amendment based on analysis of "the Second Amendment's text, as informed by history," an inquiry "broadly consistent with *Heller*" and *Bruen*'s clarification of *Heller*.  *Bruen*, 142 S. Ct. at 2127; Mem. 11-12.  Plaintiff does not dispute Defendants' showing that none of these decisions advanced to step two of the

---

[3] Plaintiff misunderstands the Court's statement in *Bruen* that historical affray statutes did not "ban[] the carrying of any class of firearms."  *Bruen*, 142 S. Ct. at 2143.  Plaintiff misreads this statement as signifying that these statutes banned the carrying of no classes of firearms, *see* Pl. Br. 10, 18, 21, but read in context, the Court merely conveyed that the statutes did not ban the carrying of all classes of firearms.  *See Bruen*, 142 S. Ct. at 2143 (noting respondents' argument, which the Court rejected, that "bearing any offensive weapons, including firearms" violated affray statutes).

6

predominant pre-*Bruen* framework to employ means-end scrutiny of the type that *Bruen* repudiated. Mem. 12.

Plaintiff's main attack on these decisions is that they were based "on *Heller*'s analysis" and purportedly did not "perform[] an independent analysis" of the Second Amendment's text and history. Pl. Br. 17. To the extent that these decisions drew upon the Supreme Court's analysis, that bolsters, rather than undermines, their validity. Lower courts can rely on reasoning from recent Supreme Court case law that is directly on point without replicating the Supreme Court's analysis. Indeed, in *Bonidy v. United States Postal Service*, 790 F.3d 1121, 1125 (10th Cir. 2015), the Tenth Circuit concluded that *Heller*'s analysis of the limitations of the Second Amendment was binding. Plaintiff urges this Court to reject *Bonidy* as unpersuasive, Pl. Br. 16, but "[w]hile the Tenth Circuit's decisions . . . may be publicly debated, one thing remains undebatable: '[A] district court is bound by decisions made by its circuit court.'" *Guzzo v. Mead*, No. 14–CV–200, 2014 WL 5317797, at *1 (D. Wyo. Oct. 17, 2014) (quoting *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279 (10th Cir. 2010)). Even after *Bruen*, district courts in this Circuit continue to treat as binding Tenth Circuit precedent that upheld firearms laws based on *Heller*'s analysis of text and history. *See* Mem. 13; *United States v. Teerlink*, No. 2:22-cr-0024-TS, 2022 WL 17093425, at *1 & n.14 (D. Utah Nov. 21, 2022) (adhering to *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)). Plaintiff does nothing to refute this.

Moreover, Plaintiff is wrong to assert that each of these appellate decisions was "based *only* on *Heller*'s analysis," and not on "independent analysis." Pl. Br. 17. After discussing *Heller*'s analysis, several of these decisions conducted independent analysis, grounded in text and history, to confirm that machineguns were not protected by the Second Amendment. *See Hollis*, 827 F.3d at 448-451 ("undertak[ing] an independent inquiry as to whether machineguns are

7

protected by the Second Amendment"); *see also United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 142-44 (3d Cir. 2016) (analyzing history of machinegun regulations and relevant precedent to conclude that machineguns were unprotected); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (analyzing the history of machineguns to conclude that § 922(o) fell within "historical tradition").

At bottom, Plaintiff's disagreement with these appellate decisions rests on his misreading of *Heller* and *Bruen*. For example, Plaintiff disagrees with the appellate decisions' conclusions that machineguns are unprotected "dangerous and unusual weapons" by arguing that under *Heller* and *Bruen*, the historical tradition of restricting dangerous and unusual weapons extends only to the manner of carry and not to classes of weapons. Pl. Br. 18-19. But as described above, that is wrong: *Bruen* reaffirmed *Heller*'s conclusion that classes of weapons that are dangerous and unusual are unprotected by the Second Amendment. *See supra*, pp. 5-6. Plaintiff also criticizes decisions concluding that machineguns are not in common use because they focus on "civilian-owned arms." Pl. Br. 19. But as explained, under *Heller* and *Bruen*, the metric for "common use" is use for civilian purposes such as self-defense, not military usage. *See supra*, pp. 2-4.

    2.    *Recent district court decisions upholding § 922(o) correctly applied* Bruen

Plaintiff's attack on the post-*Bruen* district court cases upholding § 922(o) and other machinegun restrictions fares no better than his attack on post-*Heller* appellate cases. Plaintiff admits that these cases "acknowledge[d] . . . the clarified *Bruen* standards," but nonetheless argues that they "*still* did not comply with *Bruen*." Pl. Br. 20. Plaintiff criticizes these decisions for concluding, based on *Heller* and *Bruen*, that the Second Amendment protects weapons "in common use," but not "dangerous and unusual weapons." *Id*. at 21. Again, those cases' reading of *Heller* and *Bruen* is entirely correct. It is Plaintiff who misreads *Heller* and *Bruen* in arguing that dangerous and unusual weapons can only be restricted if carried in a certain manner. *See*

8

*supra*, pp. 5-6. *Heller*'s conclusion that dangerous and unusual weapons are unprotected was based on "historical tradition," 554 U.S. at 627, making it entirely consistent with *Bruen*'s test rooted in "historical tradition," *Bruen*, 142 S. Ct. at 2126. Therefore, the district court cases cited by Defendants faithfully applied *Bruen* in concluding that machineguns were "dangerous and unusual weapons" unprotected by the Second Amendment. *See* Mem. 13-14.

Plaintiff gets no further in arguing that three district court decisions holding other firearms laws unconstitutional properly applied *Bruen*. *See* Pl. Br. 24-25 (citing *Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-CV-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022), *appeal filed*, 22-50834 (5th Cir. Sep. 21, 2022)). These decisions are inapposite because they did not analyze the issue of which classes of weapons are protected by the Second Amendment. Rather, *McCraw* held unconstitutional a state statute restricting firearms rights of 18-to-20-year-olds, 2022 WL 3656996, at *13, *Price* held unconstitutional 18 U.S.C. § 922(k), which prohibits possession of firearms with obliterated serial numbers, *Price*, 2022 WL 6968457, at *1, and *Quiroz* held unconstitutional 18 U.S.C. § 922(n), which prohibits those under felony indictment from receiving firearms, *Quiroz*, 2022 WL 4352482, at *13.[4] Defendants do not quarrel with Plaintiff's overall

---

[4] The Court need not and should not venture down the rabbit hole of evaluating the reasoning of district court cases about firearms laws not at issue here, but it is worth noting that other courts have come to different conclusions regarding the constitutionality of the laws or same type of laws at issue in *McCraw*, *Price*, and *Quiroz*. *See*, *e.g.*, *Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, No. 6:20-CV-01438, 2022 WL 17859138, at *10 (W.D. La. Dec. 21, 2022), *appeal filed*, No. 23-30033 (5th Cir. Jan. 13, 2023) (upholding federal firearms restrictions on 18-to-20-year-olds); *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *3-6 (N.D. Tex. Nov. 3, 2022) (rejecting *Price* and upholding 18 U.S.C. § 922(k)); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487, at *7-9 (W.D. Tex. Feb. 10, 2023) (rejecting *Quiroz*, upholding 18 U.S.C. § 922(n), and also upholding § 922(o)).

point that under *Heller* and *Bruen*, Second Amendment analysis must be based in text and history. But as to the issue of which weapons are protected, the Supreme Court has already done much of the work by "[d]rawing from [the] historical tradition" of "prohibit[ing] the carrying of 'dangerous and unusual weapons'" to conclude "that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

> C.    **Section 922(o) Satisfies *Bruen*'s Second Amendment Test**
>
> *1.    Defendants did not improperly conflate the two prongs of* Bruen*'s test*

Defendants showed that § 922(o) is constitutional under either prong of *Bruen*'s Second Amendment test: the Second Amendment's plain text does not protect machinegun possession, Mem. 16-21, and § 922(o) is consistent with historical tradition, Mem. 21-22.   In arguing otherwise, Plaintiff accuses Defendants of improperly conflating *Bruen*'s two prongs by considering at both prongs the distinction between protected weapons in common use and unprotected dangerous and unusual weapons.   Pl. Br. 22-23.   But Defendants' approach is consistent with *Bruen*, which considered the inquiry about the categories of protected weapons as relevant to both prongs.   Mem. 15 n.5.

As Plaintiff acknowledges, at the first prong of *Bruen*'s test, courts consider the Second Amendment's text, "which should be 'informed by history.'"   Pl. Br. 22 (quoting *Bruen*, 142 S. Ct. at 2127).   History illuminates the Second Amendment's text because its "text . . . was widely understood to codify a pre-existing right, rather than to fashion a new one," *Heller*, 554 U.S. at 603.   That history informing the scope of the pre-existing right codified in the Second Amendment's text includes both the history of members of the militia "bringing arms 'in common use at the time' for lawful purposes like self-defense" to militia service, and the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"   *Id.* at 624, 627 (citation

omitted).  This historical tradition is also directly relevant to *Bruen*'s second prong, under which even laws that burden conduct protected by the Second Amendment are constitutional if "consistent with this Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126. Ultimately, for the reasons explained below, § 922(o) is constitutional regardless of whether this Court concludes that the inquiry about weapons in common use as opposed to dangerous and unusual weapons is relevant to *Bruen*'s first prong, second prong, or both.

2.       *Machineguns are not protected by the Second Amendment's text*

Defendants showed that possession of machineguns is not protected by the text of the Second Amendment because machineguns are not in common use for lawful purposes such as self-defense; rather, they are dangerous and unusual weapons.  Mem. 16-21.  Plaintiff's contrary arguments are incorrect.

First, Plaintiff argues that machineguns are protected by the Second Amendment because they are commonly used in the military.  Pl. Br. 3-5.  But as already explained, the Second Amendment does not confer a right to possess all weapons in standard usage by the military. Instead, the test is whether a class of weapons is in common use for lawful purposes such as self-defense. *See supra*, pp. 2-4.

Second, Plaintiff cites various statistics and calculations regarding the number of machineguns in circulation, but none of them establish that machineguns are in common use. Plaintiff cites a 2021 statistical report indicating that there were 741,146 registered machineguns in a federal database of firearms registered under the NFA.  *See* Pl. Br. 6 & n.3 (citing Pl. Br., Ex. B).  But as Plaintiff acknowledges, "[t]he possession of a large percentage of those machineguns are restricted to certain manufacturers, importers, local law enforcement, and other non-private entities." *Id*. at 6; *see also* 18 U.S.C. § 922(o)(2)(A) (statutory exception for "a transfer to or by, or possession by or under the authority of" federal, state, or local government).  A figure that

11

includes such restricted machineguns is not relevant because the Second Amendment protects weapons "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, as opposed to specialized weapons used in law enforcement.[5]  Indeed, the premise behind the NFA was Congress's conclusion that "there is no reason why anyone except a law officer should have a machine gun."  H.R. Rep. No. 73-1780, at 1 (1934).

Plaintiff seeks to generate a much higher number of machineguns by arguing that had states and the federal government not enacted legal restrictions on machineguns, there would have been "more than 4,300,000" machineguns in circulation.  Pl. Br. 8.  But under *Heller* and *Bruen*, the test is whether weapons are "'in common use' today for self-defense," *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627), not whether they *would have been* in common use in a counterfactual world in which the legal regime had been different.  Further, Plaintiff's counterfactual prediction is purely speculative.  Plaintiff starts from estimates about the number of machineguns and semi-automatic assault rifles from a 1985 news article, which was not cited in the Amended Complaint and therefore not properly before the Court on a Motion to Dismiss, *see Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) ("Generally, the sufficiency of a complaint must rest on its contents alone."),[6] then assumes without evidence that the ratio of machineguns to assault rifles would have stayed constant over the course of decades.  *See* Pl. Br. 8 & n.9 (citing Ex. F).

---

[5] Even if this total number of registered machineguns was the relevant metric, that number would still be insufficient because it "is less than .2% of total firearms in the United States[,]" which "remains too insignificant for machineguns to be considered in common use." *Simien*, 2023 WL 1980487, at *9 (cited in Mem. 20-21).  Plaintiff offers no response to this analysis in *Simien*.

[6] As explained below, the news article is also inadmissible hearsay that cannot be considered on a Motion for Summary Judgment.  *See infra*, pp. 19-20.

Plaintiff also cites a document produced by ATF in 2016 in response to a FOIA request, which reports that as of 2016, there were 175,977 "Pre 86" machineguns, *id.* at 7; *id.*, Ex. E, meaning machineguns falling under the statutory exception for "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [May 19, 1986]." 18 U.S.C. § 922(o)(2)(B). But the Fifth Circuit recently considered this very document and correctly concluded that this amount is insufficient to demonstrate that machineguns are in common use. *Hollis*, 827 F.3d at 449-50.

Plaintiff incorrectly relies on Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring), which concluded that stun guns were protected by the Second Amendment and noted that there were approximately 200,000 stun guns owned by civilians. *See* Pl. Br. 6-7. That concurrence commanded the votes of just two Justices and is not the law. But it also does not support Plaintiff on its own terms. Justice Alito did not endorse a numerical threshold for common use, but rather concluded that stun guns were protected because they "are widely owned *and accepted as a legitimate means of self-defense across the country*," noting that private citizens "may lawfully possess them in 45 States." *Caetano*, 577 U.S. at 420 (emphasis added). By contrast, machineguns are not widely accepted as a legitimate means of self-defense across the country. They are banned (apart from machineguns possessed under governmental authority or grandfathered weapons) by the federal government, and most states have enacted machinegun laws that are at least as restrictive as federal law. Mem. 18-19 & n.6; *see also Hollis*, 827 F.3d at 450 ("Justice Alito did not think the absolute number [of 200,000 stun guns] by itself was sufficient. Rather, he thought the number was sufficient when paired with the

13

statistic that stun guns may be lawfully possessed in 45 states.  The same showing cannot be made for machineguns.").[7]

Plaintiff argues that widespread laws restricting machineguns cannot support the conclusion that machineguns are unprotected by the Second Amendment.  But because the Supreme Court has made "common use" a requirement for Second Amendment protection, the regulatory landscape of where a weapon is permitted or restricted is part of the backdrop underlying whether a weapon is protected.  Nor is considering such laws tantamount to using "an unconstitutional law . . . to justify its existence[,]" Pl. Br. 8-9 (capitalization omitted), as Plaintiff protests.  As Defendants showed, Congress curtailed machinegun usage through severe regulation soon after machineguns became widely available because of their prevalence in violent crime, and most states have followed suit.  Mem. 2-5, 18-19.  Such laws are a continuation of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Heller*, 554 U.S. at 627 (citation omitted).

Finally, Plaintiff's argument that machineguns "are still protected arms under the Second Amendment" even if "machineguns did not pass the 'common use' test," Pl. Br. 12-15, is directly foreclosed by *Heller* and *Bruen* and finds no support in the Second Amendment's text.  *Bruen* and *Heller* held that "the Second Amendment protects *only the carrying of weapons that are those 'in common use at the time,'* as opposed to those that "are highly unusual in society at large."  *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627) (emphasis added).  Under clear Supreme Court

---

[7] Because Plaintiff is incorrect that the Supreme Court recognized a numerical "common use" threshold of 200,000 weapons, Plaintiff's estimate that "there would have been at least 230,000 'pre-86' machineguns" as of 1986, Pl. Br. 7 (internal footnote omitted), would not support his claim even if credited.  Furthermore, that estimate is based on speculative extrapolation from a 2012 news article, *see id.* at 7 & nn.6 & 8 (citing Pl. Br., Ex. D), which is not properly before the Court because it was not cited in the Amended Complaint and is inadmissible hearsay.  *See supra*, p. 12; *infra*, pp. 19-20.

precedent, weapons not in common use are not protected.  Further, Plaintiff is incorrect that the Second Amendment's prefatory clause, which states, "[a] well regulated Militia, being necessary to the security of a free State," U.S. Const. amend. II, demonstrates that machineguns are protected. The prefatory clause "announces a purpose," but "does not limit or expand the scope of the operative clause." *Heller*, 554 U.S. at 577-78.  And limiting protection to weapons in common use is consistent with the prefatory clause's purpose of supporting the militia because at the founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179).

*3.      Section 922(o) is consistent with historical tradition*

Section 922(o) is consistent with "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); Mem. 21-22.  Plaintiff does not dispute Defendants' showing that machineguns are dangerous. Mem. 16-17.  As described above, Plaintiff's arguments that machineguns are in common use, and therefore are not unusual, are incorrect. *See supra*, pp. 11-14.

As Plaintiff acknowledges, *Bruen* describes two metrics for analogizing historical regulations to modern regulations: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2123; Pl. Br. 27.  Plaintiff's arguments that § 922(o) fails these metrics are unpersuasive.  Regarding the "how" metric, Plaintiff argues that § 922(o) restricts machinegun usage in a way that goes beyond historical regulations on dangerous and unusual weapons because those historical regulations merely "burdened the *manner* in which persons could *bear* arms." Pl. Br. 28.  But as already explained, that is wrong: *Heller* and *Bruen* correctly determined that historical regulations prohibited the carrying of types of weapons that were dangerous and unusual. *See supra*, pp. 5-6.  And *Bruen* concluded that this historical tradition

15

was sufficient to limit Second Amendment protection to "the possession and use of weapons that are 'in common use at the time.'"  142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).

Regarding the "why" metric, contrary to Plaintiff's argument, the reasons for § 922(o) are perfectly in line with the reasons for historical regulations of dangerous and unusual weapons, which Plaintiff admits are to prevent conduct that would terrorize the people. Pl. Br. 28.  Plaintiff cites *United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995), which characterizes § 922(o)'s legislative history as "virtually nonexistent" and "scant," but *Wilks* acknowledged that the legislative history included discussion of the necessity of legislation to "prohibit[] the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime."  *Id.* at 1519 (quoting H.R. Rep. No. 495, 99th Cong., 2d Sess. 4 (1986)).[8]  And § 922(o) followed in the footsteps of the NFA, which severely restricted machineguns in order to "deprive[]" "[t]he gangster as a law violator . . . of his most dangerous weapon, the machinegun[,]" to address "[t]he growing frequency of crimes of violence in which people are killed or injured by the use of dangerous weapons."  H.R. Rep. No. 73-1780, at 1.  As with historical restrictions on dangerous and unusual weapons, Congress has restricted machineguns in order to protect people from being terrorized by violent criminals.[9]

---

[8] Plaintiff cites no authority for the proposition that in engaging in analogical reasoning, courts must rely on legislative history, even when the purpose of a law is readily discernible from its text. The Supreme Court has noted that "[i]t is of course clear from the face of the [NFA] that the NFA's object was to regulate certain weapons likely to be used for criminal purposes[.]" *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion).  The same is true of § 922(o).

[9] Plaintiff is incorrect to argue that a "distinctly similar historical regulation" is required to sustain § 922(o) because it addresses "a general societal problem that has persisted since the 18th century[.]"  Pl. Br. 28 (quoting *Bruen*, 142 S. Ct. at 2131).  Machineguns did not exist at the founding.  The development of new advanced weaponry capable of "kill[ing] dozens of people within a matter of seconds," *Henry*, 688 F.3d at 640 (citation omitted), is the sort of "dramatic technological change[]" that "may require a more nuanced approach" to analogical reasoning, *Bruen*, 142 S. Ct. at 2132.

16

## II.  Plaintiff Is Not Entitled to Summary Judgment

Plaintiff's brief failed to articulate the legal standards for summary judgment, let alone explain how he met those standards.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Weidenbach v. Casper-Natrona Cnty. Health Dep't*, 563 F. Supp. 3d 1170, 1176 (D. Wyo. 2021) (quoting Fed. R. Civ. P. 56(a)).  "A dispute is genuine 'if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way,' and it is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Id.* (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).  "In considering the motion, the Court views the record and all reasonable inferences that might be drawn from it in the light most favorable to the party opposing summary judgment," *id.* (citation omitted), here, Defendants.

Plaintiff is not entitled to summary judgment for largely the same reasons, explained in this brief and Defendants' opening Motion to Dismiss brief, that Plaintiff's claim should be dismissed for failure to state a claim: Section 922(o) and its implementing regulations are constitutional as a matter of law. *See* Mem. 6-22; *supra*, pp. 1-16.  Plaintiff's sole claim, for "Violation of the Second Amendment Right to Keep and Bear Arms," Am. Compl. for Declaratory and Injunctive Relief, at 7 ("Am. Compl.") ECF No. 11-1, is based on the legal conclusion that "[t]he machine gun ban in 18 U.S.C. § 922(o) and the associated regulations violate Plaintiff's Second Amendment rights." *Id.* ¶ 22.  For the reasons already explained, machineguns are not protected by the Second Amendment, and § 922(o) is consistent with historical tradition. *See* Mem. 6-22; *supra*, pp. 1-16. Accordingly, Plaintiff is not entitled to judgment on this claim, nor is Plaintiff entitled to a declaratory judgment that § 922(o) is unconstitutional.  Am. Compl. ¶ 25A.

Plaintiff also is not entitled to injunctive relief in the form of an order directing ATF to approve the Form 1 application to make a machinegun, *id.* ¶ 25B, for several additional reasons.

17

First, the DeWilde Arms Trust (the "Trust") submitted the application. *See* Compl. App'x "A", at 2, ECF No. 1-1. After Defendants pointed out that Plaintiff lacked authority to represent the Trust *pro se*, Memo. In Supp. of Defs.' Mot. to Dismiss the Compl., at 22-23, ECF No. 10, Plaintiff chose to drop the Trust from the Amended Complaint rather than retain counsel to represent the Trust, Mot. for Leave to Amend Compl., at 2, ECF No. 11. Accordingly, Plaintiff, who now asserts claims only in his personal capacity, *see* Am. Compl. ¶ 3, could not obtain relief on behalf of the Trust, even if his claim were otherwise valid (which it is not).

Second, Plaintiff has not offered any evidence that apart from the legal impediment of § 922(o), he and the Trust met all regulatory and statutory requirements for approval to make a machinegun. For example, Plaintiff has not provided evidence that he is not prohibited from possessing a firearm by other laws whose constitutionality he has not challenged. *See*, *e.g.*, 18 U.S.C. § 922(g). Therefore, Plaintiff has not shown that the Trust would be entitled to such approval, even if the legal impediment of § 922(o) were removed.

Third, Plaintiff has not attempted to show satisfaction of the factors for permanent injunctive relief. Parties seeking injunctive relief "must demonstrate '(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049-50 (10th Cir. 2023) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 136, 156-57 (2010)). Plaintiff neither cites these factors nor explains how he satisfies them.

Moreover, Plaintiff's Motion for Summary Judgment violates local rules. Plaintiff fails to abide by the requirement to set forth "a statement of all of the material facts as to which the movant contends no genuine issue exists[,]" which "must be numbered and must refer with particularity to those portions of the record upon which the movant relies." U.S.D.C.L.R. 7.1(b)(2)(D). Because of that failure, it is difficult for Defendants to satisfy the requirement to identify each fact cited by Plaintiff as to which a genuine dispute exists. *See id.*

Nonetheless, Plaintiff makes factual assertions that are not supported by competent evidence. For example, Plaintiff asserts that there were at least 230,000 privately held machineguns in 1986, and that there would have been more than 4,300,000 privately held machineguns today had § 922(o) never been enacted. Pl. Br. 7-8. These assertions are based on speculative extrapolations from estimates about the number of different types of weapons at different times in a 1985 *Newsweek* article, a 2012 publication of a firearms industry trade association, and the website of a different firearms industry trade association. *See id.* at 7-8 & nn.6 & 8-14 (citing Pl. Br., Ex. D; Pl. Br., Ex. F; NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/ (last visited April 24, 2023)). Such sources are inadmissible hearsay, Fed. R. Evid. 801(c), 802, and Plaintiff does not show that they fall within any hearsay exception.[10] But this Court "can consider only admissible evidence" on a motion for summary judgment; "any hearsay" is "beyond the bounds of the court's consideration." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010) (Gorsuch, J.). In any event,

---

[10] Defendants do not dispute that Exhibits B, C, and E to Plaintiff's motion are communications or publications of ATF (or excerpts of such publications), or that the statistics contained in Exhibits B and E are accurate.

19

for the reasons already explained, Plaintiff's unsupported factual assertions would not support his legal claim, even if credited. *See supra*, pp. 12-14.

## CONCLUSION

For the foregoing reasons and the reasons explained in Defendants' motion to dismiss, the Court should dismiss Plaintiff's Amended Complaint for failure to state a claim and deny Plaintiff's Motion for Summary Judgment.

Dated this 25th day of April, 2023

Respectfully Submitted,

NICHOLAS VASSALLO
United States Attorney

By:   */s/ Jeremy A. Gross*
JEREMY A. GROSS
Assistant United States Attorney

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN (*Pro Hac Vice*)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

21

# United States District Court

for the

District of Wyoming

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................1

    I.    The Court Should Grant Plaintiffs' Motion for Summary Judgment ............................1

        A.  Defendants Misread Supreme Court Precedent ..................................................1

        B.  Plaintiff Has Demonstrated That Existing Case Law Upholding Section
            922(o) Does Not Comport With *Bruen*.................................................................4

        C.  Section 922(o) Does Not Comport With *Bruen*...................................................4

           1.   Defendants Improperly Conflate the Two Prongs of *Bruen* ...............4

           2.   The Plain Text of the Second Amendment, as Informed by History,
                Protects the Possession of a Machinegun ...........................................6

           3.   Section 922(o) is Not Consistent With This Nation's Historical
                Traditions of Regulating Arms ...........................................................6

    II.    Plaintiff Is Entitled to Summary Judgment..................................................................8

CONCLUSION......................................................................................................................10

i

## TABLE OF AUTHORITIES

### CASES

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................................................................. passim

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .......................................................................... passim

*New York State Rifle & Pistol Assn., Inc. v. Bruen,* 597 U.S. ___ (2022)............................. passim

*State v. Kessler*, 289 Or. 359, 368, 614 P. 2d 94 (1980)....................................................................1

*United States v. Miller,* 307 U.S. 174 (1939).....................................................................................6

*United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) .......................................................................7

### CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II...........................................................................................................................9

### STATUTES

18 U.S.C. § 922(g) ............................................................................................................................8,9

18 U.S.C. § 922(o) ........................................................................................................................ passim

Firearm Owners Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449....................................7

### RULES

Fed. R. Evid. 803(15)........................................................................................................................10

Fed. R. Evid. 803(16)........................................................................................................................10

Fed. R. Evid. 803(17)........................................................................................................................10

WYD 267

## OTHER AUTHORITIES

Daniel Page, *Dangerous and Unusual Misdirection* (4 May 2011), https://ssrn.com/abstract= 1859395...................................................................................................................3,4,5

George Neumann, *Swords and Blades of the American Revolution* (1 Jan. 1973).........................1

J. Trusler, *The Distinction Between Words Esteemed Synonymous in the English Language* (3d ed. 1794) ..................................................................................................................................2

National Firearms Act Trade & Collectors Association, *The Partisan*, Volume 4, Issue 3, Third Quarter, 2012 ......................................................................................................................10

National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (20 Jul. 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/ ...............................................................10

Tom Morganthau, et al., *Machine Gun U.S.A.,* Newsweek (Oct. 14, 1985) ................................10

WYD 268

## INTRODUCTION

Defendants' response brief, ECF No. 24 ("Def. Br."), does not adequately invalidate the arguments Plaintiff makes in his brief in support of his motion for summary judgment, ECF No. 21 ("Pl. Br."). Defendants largely repeat a few quotes from *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. ___ (2022) to conclude a narrow reading of Supreme Court precedent that disregards *Bruen*'s requirement to analyze the plain text of the Second Amendment, "as informed by history[,]" *Bruen*, slip op. at 10, and which improperly concludes that machineguns are not in common use, are dangerous and unusual, and may be banned. The arguments put forth by Defendants do not comport with the standards of *Bruen*, and § 922(o) ("the machinegun ban") therefore must be found unconstitutional. Since the machinegun ban is unconstitutional, Plaintiff is entitled to summary judgment.

## ARGUMENT

I.  **The Court Should Grant Plaintiffs' Motion for Summary Judgment**
    **A. Defendants Misread Supreme Court Precedent**

The Supreme Court has reaffirmed that the Court has never conducted "an exhaustive historical analysis… of the full scope of the Second Amendment[.]" *Bruen*, slip op. at 12 (quoting *Heller*, 554 U.S. at 627). Especially relevant to the instant case, the Court emphasized that courts "will have to consider eventually[] *what* types of weapons" are protected. *Heller*, 554 U.S. at 624. From the start, Defendants incorrectly argue that it is erroneous "that ordinary military equipment is protected by the Second Amendment" because such a reading would have "no limiting principle[.]" Def. Br. at p. 3. *Heller did* propose a theoretical limit: "[small-arms] weapons used by militiamen[.]" *Heller*, 554 U.S. at 625 (citing *State v. Kessler*, 289 Ore. 359, 368, 614 P. 2d 94, 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254

1

(1973))) This perfectly comports with *Heller*'s holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Id.* at 582, and *Heller* determined that "all firearms constitute[] 'arms.'" *Id.* at 581 (citing 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794)) A machinegun is defined as a firearm. *See* 26 U.S. Code § 5845 ("The term 'firearm' means… (6) a machinegun").

This attempt by the Defendants to identify a "limiting principle" to prohibit "ordinary military equipment" highlights their overall failure to perform analysis of the Second Amendment's text and historical purpose, and especially the prefatory clause of the Second Amendment. Def. Br. at p. 3. Indeed, nowhere in Defendants' brief do they perform a comprehensive analysis of the plain text of the Second Amendment, as *Bruen* requires, such as to identify the primary purpose of the prefatory clause, let alone tie the clause to the command.

Defendants reinforce this misreading when pointing to *Heller*'s hypothetical objection surrounding weapons that are most useful in military service, contorting the passage to implicitly endorse the machinegun ban, *see* Def. Br. at p. 3-4 (citing *Heller*, 554 U.S. at 627-28), which Plaintiff thoroughly rebuffed, *see* Pl. Br Part III. Defendants then point to analysis by the Fifth Circuit in *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016), which Plaintiff demonstrated would not comply with *Bruen. See generally* Pl. Br. Defendants specifically quote *Hollis*' unfounded conclusion that the "individual right protected by the Second Amendment *applies only to the second category of weapons*[.]" *Hollis*, 827 F.3d 445 (referring to two "classes of weapons" that the *Hollis* court improperly extrapolated from *Heller*). Defendants read *Heller*'s common use language to say that "*Heller* therefore made the relevant metric for common use for civilian purposes," Def. Br. at p. 3, but the Court made no such requirement, and Defendants misread the common use language to exclude weapons commonly used in military service.

2

Finally, the faulty reliance Defendants place on the pre-*Bruen* dicta surrounding dangerous and unusual criteria is evident in the complete absence of any actual independent analysis of the text or meaning of their dangerous and unusual authorities in their reply brief whatsoever. *See generally* Def. Br. To simply posit that *Heller* said dangerous and unusual weapons are not protected, without actually considering the meaning of those authorities, and then determine that machineguns fall into that category is not a genuine analysis, and does not comport with *Bruen*, which analyzed statutes criminalizing affray. Plaintiff will perform analysis on one of Defendants' dangerous and unusual authorities, 4 Blackstone, Commentaries, 148–149 (1769), which should carry the most weight among their authorities because it is the most likely to align with "American colonial views leading up to the founding," *Bruen*, slip op. at 11, being their only referenced authority prior to the founding and close to the time of the ratification of the Second Amendment.

Blackstone identified the following offense: "The offence of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land[.]" 4 Blackstone, Commentaries, at 148-149. This offense was analyzed in Daniel Page, *Dangerous and Unusual Misdirection* (2011) (*see* Ex. H). The offense "did not mention any way of classifying different types of weapons," it was "a crime against the public peace" when an individual would "terrify the good people of the land[.]" *Id.* at p. 11. *Bruen* addressed *the same* authority, when "respondents' *amici* argue that "'offensive'" arms in the 1600s and 1700s were what Blackstone and others referred to as "'dangerous or unusual weapons,'" Brief for Professors of History and Law as *Amici Curiae* 7 (quoting 4 Blackstone, Commentaries, at 148-149), a category that they say included firearms[.]" *Bruen*, slip op. at 38. The Court went on to find the same conclusion as the Page reference, explaining that "Respondents, their amici, and the dissent all misunderstand these statutes. Far from banning the carrying of any *class* of firearms, they

3

merely codified the existing common-law offense of bearing arms to terrorize the people[.]" *Id.*
(emphasis added). Thus, *Bruen* did not determine that statutes prohibiting carrying of dangerous
and unusual weapons prohibited "*types* of weapons," Def. Br. at p. 15, they prohibited the *manner*
that weapons may be carried.

The conclusion of this analysis is the same for each dangerous and unusual authority that
Defendants rely on. Of course, "*Bruen* did not cite" the Page reference. Def. Br. at p. 5. The Court
performed its own analysis, and it came to the same conclusion as the Page reference. This Court,
when performing that same historical analysis, should come to the same conclusion.

**B. Plaintiff Has Demonstrated That Existing Case Law Upholding Section 922(o)
Does Not Comport With *Bruen***

Plaintiff has thoroughly explained why existing case law cited by Defendants upholding
section 922(o) does not comport with *Bruen*'s requirement to consider the plain text of the Second
Amendment, "as informed by history[,]" *Bruen*, slip op. at 10; *see* Pl. Br. at Part IV, V. Defendants
argue that these decisions "concluded that machineguns were beyond the scope of the Second
Amendment based on analysis of 'the Second Amendment's text, as informed by history[.]'" Def.
Br. at p. 6 (citing *Bruen*, slip op. at 10). Defendants' argument is incorrect. Those decisions did
not perform an independent analysis of the plain text of the Second Amendment, and Defendants
have provided no support for this claim. As such, the decisions do not comport with *Bruen*.

**C. Section 922(o) Does Not Comport With *Bruen***

**1. Defendants Improperly Conflate The Two Prongs of *Bruen***

Defendants insist that they do not conflate the two prongs of *Bruen*, but continue to do so
when they attempt to consider the "history informing the scope of the pre-existing right codified

in the Second Amendment[]" and laws "prohibiting the carrying of 'dangerous and unusual weapons'" at *Bruen*'s first prong. Def. Br. at p. 10 (citing *Heller*, 554 U.S. at 627). This argument completely contradicts the approach required by *Bruen*. When evaluating the first prong in *Bruen*, the Court did not consider a *single* "historical analogue" to the challenged conduct in that case. *Bruen*, slip op. at 21. The *strictly textual* analysis considered whether or not the plaintiffs were among *the people* mentioned in the Second Amendment; the weapons involved in the conduct met the definition of *arms* mentioned in the Second Amendment; and the conduct of carrying arms was covered by the Second Amendment's textual right to *bear arms*. *See Bruen*, slip op. at Section III.A. The Court spent less than two pages of its opinion performing this "straightforward historical inquiry." *Bruen*, slip op. at 18; *see also id.* at Section III.A. This plain-text analysis should be contrasted with the Court's more than thirty pages of in-depth analysis of historical analogues at the second prong. *See id.* at 30-62. Further demonstrating the improper approach exercised by Defendants, *none* of *Bruen*'s analysis of the statutes surrounding dangerous and unusual weapons occurred at the first prong; *Bruen* expressly considered these statutes as historical analogues at the second prong.

Defendants dispute "Plaintiff's argument that machineguns 'are still protected arms under the Second Amendment' even if 'machineguns did not pass the 'common use' test,'" by saying that "the Second Amendment protects *only the carrying of weapons that are those 'in common use at the time*[.]'" Def. Br. at p. 14 (citing Pl. Br. 12-15; *Bruen*, slip op. at 44 (quoting *Heller*, 554 U.S. at 627) (emphasis added)). But Plaintiff is not challenging a *carry* restriction in the instant case, he is challenging a *total ban* on the *possession* of a class of arms, and the Supreme Court has not "made 'common use' a requirement for Second Amendment protection." Def. Br. at p. 14. The

5

sole mandate that *Bruen*'s first prong requires is that the analysis of the plain text of the Second

Amendment be "informed by history." *Bruen*, slip op. at 10.

### 2. The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun

Plaintiff identified three independent grounds that provide machineguns with Second

Amendment protection under *Bruen*'s first prong, *see* Pl. Br. at pp. 2-15, and Defendants provide

little new argument against these demonstrations, primarily falling back on their overall erroneous

conclusions that machineguns are not in common use and are dangerous and unusual, *see generally*

Def. Br. at pp. 11-15, which Plaintiff thoroughly rebuffed, *see generally* Pl. Br. As explained

*supra*, pp. 4-6, Defendants' arguments improperly conflate the two prongs of *Bruen*, save for one

exception that does not help their case. Defendants point to "the prefatory clause's purpose of

supporting the militia" to support the conclusion that "men [brought] arms 'in common use at the

time,'" Def. Br. at p. 15 (citing *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179)), but they

stop short of identifying what those commonly used arms would consist of: weapons most useful

in military service.

### 3. Section 922(o) is Not Consistent With This Nation's Historical Traditions of Regulating Arms

In their only attempt to explain "how and why the regulations burden a law-abiding

citizen's right to armed self-defense[,]" *Bruen*, slip op. at 20, the Defendants do not sufficiently

satisfy their burden. In attempting to justify the *how* metric, Defendants say that "*Bruen* correctly

determined that historical regulations prohibited the carrying of types of weapons that were

dangerous and unusual." Def. Br. at 15. Defendants' reading is wrong. *Bruen* said that "[f]ar from

banning the carrying of any *class* of firearms, they merely codified the existing common-law

6

offense of bearing arms to terrorize the people[.]" *Bruen*, slip op. at 38 (emphasis added). Defendants use of the word *types* is synonymous with *Bruen*'s *class*. Thus, *Bruen* squarely refuted the reading used by Defendants.

Defendants then attempt to satisfy the *why* metric by making a claim that "§ 922(o) followed in the footsteps of the NFA, which severely restricted machineguns[.]" Def. Br. at p. 16. Besides the fact that this claim is unfounded, the NFA is not a *total ban*, it is a *restriction*. Defendants also point to a single excerpt from *United States v. Wilks*, 58 F.3d 1518 (10th Cir. 1995) referring to discussion of "legislation to 'prohibit[] the transfer and possession of machine guns[.]'" Def. Br. at p. 16, citing *Wilks*, 58 F.3d 1518, 1519. But this brief discussion was not on the machinegun ban as codified, and that legislation was not passed by Congress, which demonstrates that Congress did not discuss nor provide justification for a machinegun ban to codify into law, and Congress did not ban machineguns "in order to protect people from being terrorized by violent criminals." Def. Br. at p. 16.[1] Defendants have not satisfied either of the "at least two metrics" that must be met, the *how* and *why* metrics comparing a modern regulation to a historical regulation. *Bruen*, slip op. at 20.

---

[1] Defendants challenge the proposition that courts should "rely on legislative history" when "engaging in analogical reasoning," notably "when the purpose of a law is readily discernible from its text." Def. Br. at p. 16, n. 8. But the purpose of the machinegun ban is not discernible from its text. If a reasonable person read the text of the machinegun ban in the context of the Firearm Owners Protection Act that it was amended to, which was legislation enacted to *protect* Second Amendment activity, then that person would surely be confused as to why there was a lone section among those *protections* that *prohibited* Second Amendment activity, and could reasonably even conclude that it was codified by error or mistake. However, Plaintiff disagrees that courts should rely on the text of a statute when its purpose is not clearly evidenced, and advances that courts should instead consider its documented legislative background established by elected representatives who were responsible for its enactment and are accountable to the people. Indeed, courts are required to consider "why" a regulation "burden[s] a law-abiding citizen's right to armed self-defense," *Bruen*, slip op. at 20, and Defendants, who hold the burden of justifying that metric, provide no support for it besides the erroneous assumption that the machinegun ban possessed the same legislative intent as the NFA. The NFA is not at issue in the instant case; is not a *total ban*; was enacted more than a half-century prior to the machinegun ban; and was thus codified by a Congress of a completely different generation than the Congress that codified the machinegun ban. To *assume* that the intent of two separate generations were the same is not established from a sensible analysis, and such a proposition must be further supported.

## II.   Plaintiff Is Entitled to Summary Judgment

After Defendants had the opportunity and refused to challenge Plaintiffs' standing, they now present a new legal issue arguing that because Plaintiff "asserts claims only in his personal capacity," he "could not obtain relief on behalf of the Trust[.]" Def. Br. at 18. But this argument was categorically rejected in *Hollis*, where the Fifth Circuit concluded that "Trusts are 'persons' within the Gun Control Act," after Mr. Hollis attempted to argue to the contrary, just as Defendants do here. *Hollis*, 824 F.3d at 451. Indeed, as settlor and sole trustee of the DeWilde Arms Trust (the "Trust"), a copy of which Plaintiff submitted to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE") when he submitted his Form 1 application, (ECF No. 1, App'x "A"), Plaintiff has absolute control over all actions and possessions of the Trust, and the Trust cannot take any actions on its own behalf. BATFE has further clarified the definition of a "Person" to be a "trust" on Form 1 applications. *See id.* at 5. Thus, Defendants' argument directly contradicts the definition of a "person" according to Fifth Circuit precedent and *their own published* ATF Form 1 (5320.1). *See id.*

The notion that Plaintiff cannot obtain relief becomes even more outlandish when Defendants question whether Plaintiff "and the Trust met all regulatory and statutory requirements for approval to make a machinegun[,]" Def. Br. at p. 18, and offer 18 U.S.C. § 922(g) as one such example. This cannot be a serious argument. The offered statute restricts possession of firearms by certain people who have committed certain unlawful acts. Plaintiff has asserted that he is a law-abiding citizen. *See* Pl. Br. at p. 1. It is unclear to Plaintiff why he would have to provide evidence that he is a law-abiding citizen, when the burden to prove criminal violations of section 922(g) is imposed *on the government* when submitting an ATF Form 1 (5320.1). Nonetheless, Plaintiff, through sole control of his trust, legally owns and possesses a pre-86 machinegun, which is

8

currently registered on the National Firearms Registration and Transfer Record (NFRTR), and was lawfully transferred to him pursuant to approval under the authority of Defendants. *See* Ex. I. Such approval, as well as continued ownership and possession of the machinegun, requires Plaintiff not to be in violation of section 922(g). Thus, Plaintiff, through his trust, "would be entitled to such approval." Def. Br. at p. 18.

Defendants, again raising new legal issues after they had prior occasion to do so, question whether Plaintiff has satisfied the "factors for permanent injunctive relief." Def. Br. at p. 18. (1) Plaintiff has suffered an irreparable injury in the form of a *total prohibition* of his Second Amendment right to possess weapons most useful in military service; (2) There are no remedies, monetarily or otherwise, available at law, that may compensate that injury; (3) Considering the balance of hardships between the Plaintiff and Defendant, a remedy in equity is warranted because Plaintiff is unable to exercise his Second Amendment right in alignment with the prefatory clause, *see* U.S. Const. amend. II; (4) The public interest would not be disserved by a permanent injunction, because Plaintiff is a law-abiding citizen and member of the militia who has been trained and qualified in the employment of machineguns by and for the U.S. armed services, who would have his constitutional rights restored. Thus, Plaintiff has demonstrated that his challenge satisfies the factors for permanent injunctive relief.

Defendants say that Plaintiffs' Motion for Summary Judgment violates U.S.D.C.L.R. 7.1(b)(2)(D). *See* Def. Br. at p. 19. Plaintiff has complied with the local rules. Plaintiffs' "numbered" Table of Contents addresses each "genuine issue" raised by the Defendants, and each respective part of his brief contains statements that address "all of the material facts as to which the [Plaintiff] contends no genuine issue exists." U.S.D.C.L.R. 7.1(b)(2)(D). *See generally* Pl. Br.

Defendants argue that Plaintiff provided exhibits that are inadmissible as hearsay. Def. Br. at p. 19 (citing Ex. D; Ex. F; NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022) ("*Commonly Owned*")). Ex. D falls within the hearsay exceptions of Fed. R. Evid. 803(15), (17); *Commonly Owned* falls within the hearsay exception of Fed. R. Evid. 803(17); and Ex. F falls within the hearsay exception of Fed. R. Evid. 803(16). Nonetheless, machineguns are in common use today, even if these exhibits were excluded from the record.

## CONCLUSION

For the reasons stated above and in Plaintiffs' brief in support of his motion for summary judgment, the Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion to Dismiss.

DATED this 26th day of April, 2023.          Respectfully Submitted,


Jake S. DeWilde
PO Box 267
Wapiti, WY 82450
(307) 587-4524

10

WYD 278

**Exhibit I**

Approved ATF Form 4 (5320.4)

REDACTED

OMB No. 1140-0014 (08/31/2022)

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Application for Tax Paid Transfer and Registration of Firearm

| ATF Control Number | | |
|---|---|---|

**SUBMIT in DUPLICATE to:**

820101578

**Division**
Bureau of Alcohol, Tobacco, Firearms and Explosives, P.O. Box 5015, Portland, OR 97208-5015

1. Type of Transfer *(Check one)*

☐ $5    ☑ $200

Submit the appropriate tax pay
The tax may be paid by credit or
order.  Please complete ite
the application, we will affix
National Firearms Act stamp. *(S*

2a. Transferee's Full Legal Name and Address *(Include trade name, if any) (See instruction 2d)*
DEWILDE ARMS TRUST

☐ Corporation    ☐ Other Legal Entity
☐ Individual    ☑ Trust

2b. County/Parish

3a. Transferor's Full Legal Name and Address *(Include trade name, if any)* *(Executors: see instruction 2l)*

3b. E-mail address

3c. Transferor's Telephone *(Area Code and Number)*

3d. If Applicable: Decedent's Name, Address, and Date of Death

3e. Number, Street, City, State and Zip Code of Residence *(or Firearms Business Premises)* If Different from Item 3a.

The above-named and undersigned transferor hereby makes application as required by Section 5812 of the National Firearms Act to transfer and register the firearm described below to the transferee.

4. Description of Firearm *(Complete items a through h) (See instruction 2n)*

| a. Name and Address of Maker Manufacturer and/or Importer of Firearm | b. Type of Firearm *(see definitions 1c)* | c. Caliber or Gauge | d. Model S-701 |
|---|---|---|---|
| HATTON INDUSTRIES, INC INDIAN MILLS, NJ | MACHINEGUN | .45 ACP | e. Barrel Length: 6.25"   f. Overall Length: 11" |
| | | | g. Serial Number 820101578 |

h. Additional Description or Data Appearing on Firearm *(Attach additional sheet if necessary)*

| 5. Transferee's Federal Firearms License *(if any)* or Explosives License or Permit Number *(Give complete 15-digit number) (See instruction 2c)* | | | | 6. Transferee's Special (Occupational) Tax Status *(If any)* | |
|---|---|---|---|---|---|
| First 6 digits | 2 digits | 2 digits | 5 digits | a. Employer Identification Number | b. Class |
| | | | | | |
| | | | | 8. Transferee's Special (Occupational) Tax Status *(If any)* | |
| 7. Transferor's Federal Firearms License *(If any)* | | | | a. Employer Identification Number | b. Class |
| First 6 digits | 2 digits | 2 digits | 5 digits | | |

Under Penalties of Perjury, I Declare that I have examined this application, and to the best of my knowledge and belief it is true, correct and complete, and that the transfer of the described firearm to the transferee and receipt and possession of it by the transferee are not prohibited by the provisions of Title 18, United States Code; Chap 44; Title 26, United States Code; Chap 53; or any provisions of State or local law.

| 9. Signature of Transferor *(Or authorized official)* | 10. Name and Title of Authorized Official *(Print or type)*   TRUSTEE | 11. Date   2019-11-21 |
|---|---|---|

**The Space Below is for the use of the Bureau of Alcohol, Tobacco, Firearms and Explosives**

By Authority of The Director, This Application Has Been Examined, and the Transfer and Registration of the Firearm Described Herein and the Interstate Movement of that Firearm, When Applicable, to the Transferee are:

Stamp Denomination
$200-00

☑ Approved *(With the following conditions, if any)*

☐ Disapproved *(For the following reasons)*

| Signature of Authorized ATF Official | Date |
|---|---|

Previous Editions Are Obsolete

ATF Copy 2 - To Be Returned to Registrant

ATF Form 4 (5320.4)
Revised

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

U.S. DISTRICT COURT
DISTRICT OF WYOMING

2023 JUL 17  PM 3: 43

MARGARET BOTKINS, CLERK
CASPER

Jake Stanley DeWilde,

  Plaintiff,

  vs.                                              Case No. 1:23-CV-00003-SWS

Attorney General of the United States;
Director of the Bureau of Alcohol, Tobacco,
Firearms, and Explosives,

  Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT (ECF No. 16)

This matter comes before the Court on Defendants' *Motion to Dismiss the Amended Complaint*. (ECF No. 16.) Defendants, Merrick Garland, in his official capacity as the Attorney General of the United States of America, and Steven Dettelbach, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"), submitted a Memorandum in Support of their Motion on April 3, 2023. (ECF No. 17.) Defendants argue Plaintiff fails to state a plausible claim for relief, and therefore Plaintiff's Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure, Rule 12(b)(6). (ECF No. 16 at 2.) In response, the *pro se* Plaintiff, Jake Stanley DeWilde, filed a *Motion for Summary Judgment* (ECF No. 20) and Brief in Opposition to Defendants' Motion to Dismiss and in Support of his Motion for Summary Judgment (ECF No. 21).[1] Defendants then provided a Reply Brief on April 25, 2023, in Support of their Motion and in Opposition to Plaintiff's Motion for Summary Judgment. (ECF No. 24.) Finally, Plaintiff submitted a Reply Brief in Support of his summary judgment motion. (ECF No. 25.)

---

[1] The Court notes for future reference that a single motion or filing should not contain requests for dissimilar relief (e.g., a request for dismissal and a request for continuance).

Thus, there are two pending motions before the Court: Defendants' Motion to Dismiss (ECF No. 16) and Plaintiff's Motion for Summary Judgment (ECF No. 20). Having reviewed the briefs, record, governing authorities, and being otherwise fully advised in the matter, the Court finds Defendants' Motion should be granted and Plaintiff's Motion denied as moot.[2]

## BACKGROUND

Jake Stanley DeWilde ("Mr. DeWilde" or "Plaintiff"), individually filed this action for declarative and injunctive relief, claiming that 18 U.S.C. § 922(o) and the implementing regulation 27 C.F.R. § 479.105(a) unconstitutionally ban the transfer or possession of machine guns, in violation of his Second Amendment rights.[3] (ECF No. 15 at 2.) Plaintiff alleges that the M16 rifle is a standard small-arms weapon in common use by the United States military. (*Id.* at 4.) According to Plaintiff, the use of M16s by today's military is equivalent to the musket as the "quintessential rifle for use in the militia of the colonial and revolutionary war era." (*Id.*) Citing and relying on the United States Supreme Court's decision last year in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Plaintiff alleges that the U.S. military's use of machineguns like the M16, as well as other non-U.S. Government possession of such weapons, makes them in "common use" and therefore they cannot be banned on the basis of being "dangerous and unusual." (ECF No. 15 at 6.) On behalf of the DeWilde Arms Trust, Mr. DeWilde as the trustee, submitted a form to the BATFE requesting permission to make an M16 machinegun. (*Id.* at 7; ECF No. 1-1

---

[2] Plaintiff's motion for summary judgment is also deficient. Plaintiff does not include a numbered statement of facts in compliance with our Local Rules and has assertions based on inadmissible hearsay. On summary judgment the Court may consider only admissible evidence, although it need not be in admissible form. *See* U.S.D.C.L.R. 7.1(b)(2)(D); *Adams v. Am. Guarantee & Liab. Ins. Co.*, 223 F.3d 1242, 1246 (10th Cir. 2000); Fed. R. Civ. P. 56(c); Fed. R. Evid. 801(c), 802.

[3] Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun" except for transfers or possession of machineguns "under the authority of" a federal or state governmental agency, or "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect [May 19, 1986]." 18 U.S.C. § 922(o). The BATFE regulation, 27 C.F.R. § 479.105(a), provides that applications to make, transfer, or import a machinegun will not be approved where such making, transfer, or receipt of the machinegun violates the law, including § 922(o). Additionally, although Plaintiff does not explicitly state whether his challenge is to the statutes facially or as applied, the Court understands his Amended Complaint to be a facial challenge only. Plaintiff is also not raising an Article I challenge to § 922(o). (*See* ECF No. 11 at 2.)

2

at 2–3.) Not surprisingly, the BATFE rejected the application, citing 18 U.S.C. § 922(o). (ECF No. 1-1 at 9.)

In their motion to dismiss, Defendants argue that the United States Supreme Court has recognized, including in *Bruen*, that the Second Amendment does not guarantee a right to possess dangerous and unusual weapons. (ECF No. 17 at 9, 14–19.) Defendants assert that machineguns, including M16s, are "a prime example" of the dangerous and unusual weapon that are not protected by the Second Amendment, and courts—even after the *Bruen* decision—have upheld restrictions on machineguns. (*Id.* at 9, 19–23.) Defendants also maintain that § 922(o) "is consistent with this nation's historical tradition of restricting dangerous and unusual weapons." (ECF No. 17 at 9, 23, 29–30.) Therefore, Defendants reason Plaintiff's Amended Complaint must be dismissed for failure to state a claim under Rule 12(b)(6). (*See* ECF No. 16 at 2.)

In opposition, Plaintiff argues application of the standard set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008), with clarifications by the Supreme Court in *Bruen*, make the machinegun ban of § 922(o) unconstitutional, so Defendants' motion to dismiss should be denied. (ECF No. 21 at 9–10.) Plaintiff further contends Defendants misread the "common use" test from *Heller* which Mr. DeWilde states expanded upon and is derived from *United States v. Miller*, 307 U.S. 174 (1939). (ECF No. 21 at 10–12.) Because machineguns are commonly used by the United States military and by the generic citizenry of America, Plaintiff maintains that such weapons are protected under the Second Amendment. (*Id.* at 12–18.) Moreover, Plaintiff argues *Bruen* clarified that the bar on "dangerous and unusual weapons" from *Heller* concerns the manner of bearing arms and not a class of weapons themselves. (*Id.* at 18.) Plaintiff asserts machineguns are not dangerous and unusual and even if they are, they cannot be banned because they are in common use. (*Id.* at 18–20.) Finally, even if not in common use, machineguns are protected by the Second Amendment because under *Bruen*, machineguns are covered by the Second Amendment's plain

WYD 283

text and § 922(o) is inconsistent with this nation's historical tradition of regulating arms. (*Id.* at 20–37.) In response, Defendants submit that Plaintiff "misinterprets Supreme Court precedent that forecloses his claim and fails to explain away the uniform lower court authority rejecting Second Amendment challenges to § 922(o)." (ECF No. 24 at 6.)

At bottom, both sides think the other misconstrues past United States Supreme Court decisions and improperly or insufficiently apply the standard set forth in *Bruen*. For the reasons discussed herein, the Court finds Plaintiff lacks standing and furthermore, agrees with the Government that § 922(o) is constitutional and Plaintiff's Amended Complaint must therefore be dismissed.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a plaintiff's complaint fails to state a claim upon which relief can be granted. In reviewing a motion to dismiss under Rule 12(b)(6), this Court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010). In order to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, complaints "that offer[] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" or "'naked assertions' devoid of 'further factual enhancement,'" fail to state a claim upon which relief may be granted. *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). Facts, not conclusions, must be pleaded—"the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including

4

where a "legal conclusion [is] couched as a factual allegation." *Id.* (internal quotation marks omitted).

The Court liberally construes *pro se* filings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Id.* It is never "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.* Because Plaintiff is *pro se*, we liberally construe Mr. DeWilde's filings but "will not supply additional factual allegations to round out [his] complaint or construct a legal theory on [his] behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

## DISCUSSION

### Standing

Before considering the merits of Plaintiff's claim, this Court is required to satisfy itself that Mr. DeWilde has Article III standing. Although not raised by Defendants, federal courts have jurisdiction only over "cases" or "controversies." *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citing U.S. Const. art. III, § 2). To meet the case or controversy requirement of Article III, the plaintiff must have standing to sue. Standing presents a jurisdictional issue that may be raised by the court at any time. *Bd. of Cnty. Comm'rs for Garfield Cnty., Colo. v. W.H.I., Inc.*, 992 F.2d 1061, 1063 (10th Cir. 1993). To demonstrate standing and invoke the jurisdiction of this Court, a plaintiff must establish: (1) they suffered an injury in fact; (2) there is a causal connection between the injury suffered and the conduct in question; and (3) that it is likely, not speculative, that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact involves the "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citation and internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing

these elements." *Id.* at 561. The Supreme Court's "'standing inquiry has been especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines*, 521 U.S. at 819–20).

In the Amended Complaint, it is alleged "Plaintiff submitted an ATF Form 5320.1, Application to Make and Register a firearm, to the BATFE, requesting permission to make an M16 machinegun. On December 20, 2022, the BATFE disapproved Plaintiff's application, citing 18 U.S.C. § 922(o) (see Appendix A)."[4] According to the referenced Appendix A, the applicant was a trust or legal entity named "DeWilde Arms Trust," and the Form was signed and submitted to BATFE by "Jake DeWilde, *Trustee*." (ECF No. 1-1 at 2–3 (emphasis added).) The DeWilde Arms Trust and Mr. DeWilde *as Trustee* are not Plaintiffs here.[5] The Plaintiff here is Jake Stanley DeWilde as an individual, or in other words, in his personal capacity. The Amended Complaint therefore inherently contradicts itself and the allegations do not indicate the individually-named Plaintiff, Mr. DeWilde, has ever submitted or been denied any request by the BATFE. It is unknown whether Plaintiff has individually sought to make, register, or possess a machinegun.

That leaves the Court with only one other allegation: "Plaintiff desires to own an M16 machinegun for all lawful purposes, including defense of hearth and home and militia functions." (ECF No. 15 at 7.) But this is too indefinite to establish a particularized injury and insufficient to

---

[4] In considering the adequacy of a plaintiff's allegations in a complaint, a district court may also consider the "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 & Supp. 2007)). Therefore, "notwithstanding the usual rule that a court should consider no evidence beyond the pleadings . . . '[a] district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim . . . .'" *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). Here, the Court recognizes the "Appendix A" attached to Plaintiff's original Complaint (ECF No. 1-1) to be incorporated and inherently part of his Amended Complaint and therefore, is considered.
[5] Jake Stanley DeWilde as Trustee of the DeWilde Arms Trust was previously a plaintiff in this matter, however, in response to arguments concerning Mr. DeWilde's authority to represent the Trust raised in Defendants' initial motion to dismiss (ECF No. 10 at 30–31), Mr. DeWilde withdrew the claims on behalf of the Trust. (*See* ECF No. 11 at 2; ECF Nos. 13; 15).) Plaintiff's claim is only in his personal capacity.

6

constitute an injury-in-fact. "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983). The Supreme Court has instructed that a plaintiff challenging the constitutionality of a criminal statute need not "first expose himself to actual arrest or prosecution" but must establish standing by "alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and demonstrating that "there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal quotation marks omitted). "When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Id.*, at 298–99.

Here, Plaintiff merely expresses a desire to own an M16 machinegun. He does not plead any facts regarding when or how he plans to own such a gun nor allege any fear or likelihood of investigation, arrest, or prosecution. Mr. DeWilde "does not allege past or present firearm ownership. He does not allege an attempt to purchase a firearm, much less a failed transaction. He does not aver that a firearm has been confiscated by the ATF." *Kegler v. U.S. Dep't of Just.*, 436 F. Supp. 2d 1204, 1219 (D. Wyo. 2006). *See also Montana Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *10–11 (D. Mont. Aug. 31, 2010) (stating plaintiff had not articulated concrete plan to show he faced credible threat of prosecution, and finding he lacked standing), *report and recommendation adopted*, 2010 WL 3909431 (D. Mont. Sept. 29, 2010). Rather, Mr. DeWilde generically attacks the constitutionality of the criminal statute which generally prohibits possession of machineguns unless an exception applies. *See* § 922(o). The Court will not construct a claim or standing on Mr. DeWilde's behalf. *See Whitney*, 113 F.3d at 1173–74.

Plaintiff's claim is too attenuated and fails to show the immediacy necessary to constitute an injury-in-fact and confer standing. *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) ("The individual plaintiffs have failed to show the high degree of immediacy necessary for standing when fear of prosecution is the only harm alleged."). *Cf. Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) (finding plaintiff had standing to bring suit because he "was arrested for violating the statute he now challenges" and "presented sworn testimony that he wishes to continue the conduct which precipitated his arrest, but has not done so for fear of rearrest"); *Nichols v. Brown*, 945 F. Supp. 2d 1079, 1104–05 (C.D. Cal. 2013) (pro se plaintiff alleging he had carried loaded firearm in public in the past, and intended to do so on a regular basis in the future, was enough to confer standing to challenge constitutionality of California's ban on carrying loaded firearm in public place). Further, granting standing to an individual such as Mr. DeWilde here "would allow virtually anyone to challenge a federal act concerning gun control." *Magaw*, 132 F.3d at 294. The Court declines to swing open the courthouse doors to such individuals to express "generalized grievances." *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 499–500 (1975)); *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139–41 (9th Cir. 2000) (requiring some articulated concrete plan to violate the law in question rather than general intent), *cert. denied*, 531 U.S. 1143 (2001). "Just because [plaintiff] does not like the firearms regulation does not give him standing to complain about its legality." *Westfall v. Miller*, 77 F.3d 868 (5th Cir. 1996).[6]

To conclude, Mr. DeWilde has not provided sufficient factual allegations to fulfill the standing requirements of Article III. *See Kegler*, 436 F. Supp. 2d at 1218–20 (D. Wyo. 2006)

---

[6] The Court also notes Defendants' argument that Plaintiff has not alleged or offered any evidence that he is not prohibited from possessing a firearm, including a machinegun, by other laws which he is not challenging here. (*See* ECF No. 24 at 23.) Plaintiff, *only in argument and generally*, asserts he is a law-abiding citizen. (ECF No. 21 at 9; ECF No. 25 at 12.)

(similarly finding plaintiff lacked standing); *Leo Combat, LLC v. U.S. Dep't of State*, No. 15-CV-02323-NYW, 2016 WL 6436653 (D. Colo. Aug. 29, 2016) (finding lack of standing on count 1 because "any threat of prosecution is simply too attenuated to rise to the level of a credible threat of prosecution."); *Bezet v. United States*, 276 F. Supp. 3d 576 (E.D. La.) (holding where plaintiff did not allege an application to transfer a firearm was ever filed or rejected, plaintiff lacked standing), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). This Court therefore lacks subject matter jurisdiction and *sua sponte* dismisses on those grounds.

**Second Amendment Challenge**

Alternatively, even if Plaintiff has standing, his Amended Complaint must be dismissed for failure to state a claim because machineguns are not protected by the Second Amendment. Plaintiff's claim is essentially a facial challenge to § 922(o). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Supreme Court in *Bruen* set forth the standard for district courts to apply in this context: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. Effectively, the first question is whether the Second Amendment's plain text covers Plaintiff's conduct: possessing a machinegun. If yes, the second question is whether the Government has demonstrated that § 922(o) is consistent with the United States' historical tradition of firearm regulation.

In answering the second question, courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.*

9

at 2131–32. The "historical inquiry" will often require "reasoning by analogy." *Id.* at 2132. "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Further, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* at 2133 (emphasis in original).

Pursuant to *Bruen*, the Court first considers whether the Second Amendment's plain text covers Mr. DeWilde's possession of machineguns. If the answer is yes, "the Constitution presumptively protects [his] conduct." *Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment to the United States Constitution provides: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. But as determined in *United States v. Miller*, 307 U.S. 174 (1939), "the Second Amendment does not protect *those weapons not typically possessed* by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). The Supreme Court in *Heller* stated that *Miller* stands "for the proposition that the Second Amendment right, whatever its nature, extends *only to certain types of weapons.*" *Heller*, 554 U.S. at 623 (emphasis added). History and tradition favor an "important limitation" to the Second Amendment: "prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. A machinegun is far from equivalent to the modern-day musket.

Since *Heller*, Circuit Courts of Appeals have uniformly found machineguns to be dangerous and unusual and not in common use. *See e.g.*, *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied*, 555 U.S. 1174 (2009); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009) ("[W]hatever the individual right to keep

10

and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."), *cert. denied*, 559 U.S. 1115, 130 S.Ct. 2426 (2010); *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("[T]he the Supreme Court has made clear the Second Amendment does not protect [machine guns]."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("We agree with the reasoning of our sister circuits that machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment."); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) ("Regardless of [plaintiff's] membership in the unorganized militia of the State of Connecticut, the Second Amendment does not protect [his] personal possession of machine guns."), *cert. denied*, 568 U.S. 990 (2012); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 143–44 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *Hollis v. Lynch*, 827 F.3d 436, 449–51 (5th Cir. 2016) ("For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon. . . . Machineguns are dangerous and unusual and therefore not in common use."). Even before *Heller*, courts have questioned the Second Amendment's reach to machineguns. *See e.g.*, *Haynes v. United States*, 390 U.S. 85, 87 (1968) (describing machine guns as "weapons used principally by persons engaged in unlawful activities"); *United States v. Lucero*, 43 F. App'x 299, 301 (10th Cir. 2002) (Lucero, J., concurring) ("I am not persuaded that the semi-automatic and fully automatic "machineguns" which defendant sold to federal agents, and which have been outlawed by federal legislation, are the type of arms subject to Second Amendment protection."), *cert. denied*, 537 U.S. 1064 (2002); *United States v. Spires*, 755 F. Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons [machineguns], as opposed to

11

firearms in general, are extremely dangerous and serve virtually no purpose other than furtherance of illegal activity."). Circumstances have not meaningfully changed since these decisions.

This Court therefore reaches the same conclusion—there is no Second Amendment right to possess a machinegun. Despite Plaintiff's argument to the contrary, usage of machineguns by the United States military does not alter the analysis. The Court directs Plaintiff to several key points, which this Court is either mandated or inclined to follow. First, the phrase "keep and bear arms" within the Second Amendment itself: "[b]ear arms" does not in any way "connote[] participation in a structured military organization." *Heller*, 554 U.S. at 584. It is "used to refer to the carrying of weapons *outside* of an organized militia." *Id.* at 584 (emphasis added). To be clear, "keep and bear arms" guarantees "the individual right to possess and carry weapons in case of confrontation" and is unconcerned with service in the militia. *Id.* at 584–95. Second, taking Plaintiff's argument logically would demand that the entire law-abiding citizenry is permitted to possess the same weapons our armed forces utilize. Where is the limit? Tanks, bombs, nuclear weapons? This is beyond outlandish, yet it is the logical result of Plaintiff's argument that provides no limit. The Court declines to permit such an astonishing result.

Additionally, where Plaintiff argues reference must be made to the prefatory clause of the Second Amendment, "[a] well regulated militia," so as not to render it meaningless (*see* ECF No. 21 at 21–23), Justice Scalia recognized such a conundrum in *Heller* without further fanfare or otherwise taking issue with it:

> It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. *But the fact that*

12

> *modern developments have limited the degree of fit between the prefatory clause*
> *and the protected right cannot change our interpretation of the right.*

*Heller*, 554 U.S. at 627–28 (emphasis added). It was also specified by Justice Scalia that to read

into the phrase "ordinary military equipment" in *Miller*, and as Plaintiff here suggests to determine

arms "in common use" (ECF No. 21 at 11–12), is at minimum, inadvisable, and arguably,

incorrect. "That would be a *startling* reading of the [*Miller*] opinion, since it would mean that the

National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be

unconstitutional." *Heller*, 554 U.S. at 624 (emphasis added). This Court declines to adopt what

Justice Scalia and the majority of the Supreme Court described as "startling." *See Friedman v. City*

*of Highland Park, Illinois*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private

possession of machine guns to be obviously valid."), *cert. denied sub nom. Friedman v. City of*

*Highland Park, Ill.*, 577 U.S. 1039 (2015).

The Court also rejects Plaintiff's argument that "dangerous and unusual" refers to the

common law offense of "affray" or the manner in which persons bear arms. *See Hollis v. Lynch*,

121 F. Supp. 3d 617, 636–37 (N.D. Tex. 2015) (relying on *Miller* and *Heller*, rejecting the same

argument), *aff'd*, 827 F.3d 436 (5th Cir. 2016); *One (1) Palmetto State Armory PA-15 Machinegun*

*Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d at 143–44 (rejecting similar

argument). Because firearms such as an M16 or other machineguns are dangerous and unusual

weapons, they are outside the scope and protection of the Second Amendment. Section 922(o) is

not unconstitutional. This is in line with every district court to address § 922(o) since *Bruen*. *United*

*States v. Hoover*, No. 3:21-CR-22(S3)-MMH-MCR, 2022 WL 10524008, at *13 (M.D. Fla. Oct.

18, 2022); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487, at *8–9 (W.D.

Tex. Feb. 10, 2023), *reconsideration denied*, 2023 WL 3082358 (W.D. Tex. Apr. 25, 2023);

*United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *3 (N.D. Ill. Mar. 28, 2023); *United*

*States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *2–4 (N.D. Ga. May 17,

13

2023), *report and recommendation adopted*, 2023 WL 3867792 (N.D. Ga. June 7, 2023); *Cox v. United States*, No. CR 11-00022RJB, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023). *See also Oregon Firearms Fed'n v. Tina Kotek*, ---F. Supp. 3d---, 2023 WL 4541027, at *34 (D. Or. July 14, 2023) (in determining that large capacity magazines were dangerous and unusual, court found they had uniquely dangerous propensities and are not commonly possessed by law-abiding citizens for self-defense).

The parties debate whether the question of "dangerous and unusual" and the "common use" test comes into play in *Bruen*'s first or second step. Yet at the same time, this Court understands the Plaintiff to consistently argue that we must look at the text of the Second Amendment "as informed by history." (*See* ECF No. 21 at 23, 28.) Such an argument begs the question that *Bruen*'s first step demands the inquiry of whether machineguns are the type of weapon considered to be "dangerous and unusual" and unprotected by the Second Amendment. Regardless, this Court must follow the U.S. Supreme Court's guidance that the Second Amendment right is limited to include the sorts of weapons protected "in common use at the time" and "that limitation is supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (internal quotation marks omitted) (citation omitted). The Supreme Court made clear in *Bruen* that its recent holding is "in keeping with *Heller*." *Bruen*, 142 S. Ct. at 2126. Nothing in *Bruen* brings into firing range the aforementioned caselaw holding that machineguns are simply outside the protection of the Second Amendment. *See Kazmende*, 2023 WL 3872209, at *4 n.5 (addressing similar debate).

Further, Justice Alito's concurring opinion in *Bruen* also stated the Court's opinion does not "decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns."

14

*Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). Justice Kavanaugh, joined by Chief Justice Roberts, also reiterated the Second Amendment "allows a 'variety' of gun regulations" and then directly quoted the language from *Heller* explaining the Second Amendment is not unlimited, is "not a right to keep and carry any weapon whatsoever," and prohibiting the "carrying of dangerous and unusual weapons" is an "important limitation" on the right. *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27). Both *Miller* and *Heller* remain good law and binding on this Court.

Plaintiff argues much of this language in *Heller* is dicta. (*See* ECF No. 21 at 18–19, 24.) Even if so, district courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). This Court "cannot simply override a legal pronouncement endorsed by a majority of the Supreme Court." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (internal quotation marks and alterations omitted). *See also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019) ("[L]ower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law.").

Plaintiff's claim challenging the constitutionality of § 922(o) is foreclosed by *Miller*, *Heller*, and *Bruen*. *See Dixon*, 2023 WL 2664076, at *3 (holding same). The Second Amendment does not extend to "dangerous and unusual weapons" such as machineguns. *See United States v. Cox*, 906 F.3d 1170, 1185–86 (10th Cir. 2018) (holding short-barreled rifles belong in the "category of weapons not typically possessed by law-abiding citizens for lawful purposes" and thus "fall[] outside the Second Amendment's guarantee."), *cert. denied*, 204 L. Ed. 2d 1090 (June 10, 2019), *cert. denied sub nom. Kettler v. United States*, 139 S. Ct. 2691 (2019).

15

**CONCLUSION**

The Second Amendment is not a second-class right, but it also is not without limits. As set forth above, Plaintiff lacks standing to pursue these issues and alternatively, fails to allege a plausible claim for relief.

**THEREFORE, IT IS HEREBY ORDERED** Plaintiff's *Amended Complaint* (ECF No. 15) is **DISMISSED** for lack of jurisdiction. Alternatively, to the extent this Court has jurisdiction, Defendants' *Motion to Dismiss the Amended Complaint* (ECF No. 16) is **HEREBY GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's *Motion for Summary Judgment* (ECF No. 20) is **DENIED AS MOOT.**

Dated this _17th_ day of July, 2023.

BY THE COURT:

SCOTT W. SKAVDAHL
Chief United States District Judge

16



**FILED**

*4:21 pm, 7/17/23*

**Margaret Botkins
Clerk of Court**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

JAKE STANLEY DeWILDE,

                            Plaintiff

vs                                      Case Number:  22-CV-03-SWS

ATTORNEY GENERAL OF THE UNITED
STATES; DIRECTOR OF BUREAU OF
ALCOHOL, TOBACCO, FIREARMS, AND
EXPLOSIVES,

                           Defendants

---

## JUDGMENT IN A CIVIL ACTION

---

Pursuant to the Order Granting Defendants' Motion to Dismiss the Amended Complaint (Doc.

26), entered July 17, 2023, which is fully incorporated by this reference,

      IT IS HEREBY ORDERED that final judgment is entered in Defendants' favor in

accordance with that order and this action is DISMISSED.

      Dated this 17th day of July, 2023.

                                   Margaret Botkins
                                   Clerk of Court

                                   By Kim Blonigen
                                   Deputy Clerk

# United States District Court

for the

District of Wyoming

| | | |
|---|---|---|
| Jake Stanley DeWilde | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00003-SWS |
| | ) | |
| Attorney General of the United States; Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF APPEAL

Notice is given that Plaintiff hereby appeals to the United States Court of Appeals for the

Tenth Circuit this Court's Order and Judgment entered on July 17, 2023 (ECF Nos. 26 & 27).

DATED this 27th day of July, 2023.                Respectfully Submitted,

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

1



JAKE DEWILDE
PO Box 267
WAPITI, WY 82450

U.S. DISTRICT COURT CLERK'S OFFICE
111 S. WOLCOTT, ROOM 121
CASPER, WY 82601

RETURN RECEIPT REQUESTED