No. 23-8054

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

Jake Stanley DeWilde

*Plaintiff - Appellant,*

v.

Attorney General of the United States; Director of the
Bureau of Alcohol, Tobacco, Firearms, and Explosives,

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the District of Wyoming
The Honorable Chief Judge Scott W. Skavdahl
No. 1:23-cv-00003-SWS

---

## APPELLANT'S REPLY BRIEF

---

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................2

    I.    DeWilde has Suffered an Injury ................................................2

    II.    Section 922(o) does Not Comport with the Second Amendment..............5

        A. *The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun* .......................................5

        B. *The Machinegun Ban is Not Consistent with This Nation's Historical Traditions of Regulating Arms* ......................................17

CONCLUSION.......................................................................................29

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE ...............................................................31

i

## TABLE OF AUTHORITIES

## CASES

*Baker v. USD 229 Blue Valley*, 979 F.3d 866 (10th Cir. 2020) ...........................2, 3

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................... 1, 4-16, 22, 27-28

*Frank v. Lee*, No. 21-8058 (10th Cir. Oct. 23, 2023) ...............................................4

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).........................15

*Jama v. Immigration and Customs Enforcement*, 543 U.S. 335 (2005)...................6

*National Rifle Ass'n of Am. V. Magaw*, 132 F.3d 272 (6th Cir. 1997)..................3, 4

*New York State Rifle & Pistol Assn., Inc. v. Bruen*,

    597 U.S. ___ (2022)................................................................. 1, 4-5, 8-25, 27

*Rocky Mountain Gun Owners v. Polis*, No. 23-1251 (10th Cir. 2023)......................4

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .............................................2, 3

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).......................................11

*Teter v. Lopez*, No. 20-15948 (9th Cir. Aug. 7, 2023)........................................25, 26

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ......................................8

*United States v. Miller,* 307 U.S. 174 (1939) .............................................14, 16, 27

*United States v. Nixon*, 919 F.3d 1265 (10th Cir. 2019) ..........................................7

## STATUTES

18 U.S.C. § 922(o) ................................................................... 1

26 U.S.C. § 5845(f) ................................................................ 13

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436 .................... 20

2 Edw. 3, c. 3 (1328) .............................................................. 19

## RULES

Fed. R. App. P. 32(a)(7)(B)(ii) ............................................... 30

Fed. R. App. P. 32(f) .............................................................. 30

Fed. R. App. P. 32(a)(5) ......................................................... 30

Fed. R. App. P. 32(a)(6) ......................................................... 30

## OTHER AUTHORITIES

Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General
Assembly of Virginia, of a Public and Permanent Nature, as are now in
Force* (1794) ......................................................................... 20

Madison, James, Federalist 46, THE FEDERALIST PAPERS ....................... 27

National Firearms Act: Hearings Before the House Committee on Ways and

Means, 73rd Cong., 2d Sess., 8 (1934)..........................................................28

## INTRODUCTION

18 U.S.C. § 922(o) is unconstitutional. The statute violates the Second Amendment right to possess the U.S. military's standard-issue service rifle, the M-16. In its response brief, the government argues in support of the ban primarily by classifying machineguns as "dangerous and unusual," not in "common use," and prohibited by *Heller*'s dicta. This obsolete, pre-*Bruen* practice of disjoining Second Amendment conduct as unprotected by pointing to *Heller*'s enfeebled dicta and abrogated post-*Heller* methodology does not comport with the updated, binding Supreme Court precedent that this Court must adhere to.

*Bruen* clarified the text, history, and tradition test that *Heller* established. Courts *must* determine [1] whether the plain text of the Second Amendment covers an individual's conduct, and [2] whether the government evinces a historical tradition of regulating the presumptively unconstitutional regulation. Despite the first prong being a straightforward, strictly textual analysis, the government improperly conducts much of its analysis, particularly of historical traditions, at the first prong. But historical traditions must be demonstrated at the second prong, not at the textual analysis. This high bar represents the crux of *Bruen*'s clarifications and, in this challenge, an insurmountable mountain that the government's argument attempts to circumnavigate. Indeed, the government bears the *sole* burden at the second prong of the *Bruen* analysis, at which there is *no* historical analogue that

1

justifies its presumptively unconstitutional prohibition. Because there is no historical tradition of *totally banning* the possession of our Nation's commonly-used standard-issue service rifle, the challenged statute is unconstitutional.[1]

## ARGUMENT

### I.    DeWilde has Suffered an Injury.

The district court *sua sponte* concluded that DeWilde has not demonstrated an injury-in-fact. The government defends that conclusion by erroneously arguing that the title he held when he submitted his Form 1 application separates him individually from restrictions imposed on his trust.[2] But despite these arguments,[3] DeWilde was not required to submit any application *whatsoever* to have Article III standing. DeWilde's "desire[] to own an M16 machinegun" *alone* demonstrates an injury. ROA, Vol. 1, at 79. The government refutes this assertion by pointing to *Baker v. USD 229 Blue Valley*, 979 F.3d 966, 874 (10th Cir. 2020) (plaintiff's desire to "exercise certain 'options' for [her son's] home schooling or care" did not confer an injury); *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (expressing a desire

_____

[1] This reply brief is intended solely to respond to the government's contentions requiring further discussion for proper determination of issues raised on appeal. This brief does not respond to issues that DeWilde believes were adequately discussed in his opening brief, and DeWilde intends no waiver of those issues by not expressly reiterating them here.

[2] Aple. Br. at 11-13.

[3] DeWilde addressed these arguments in his opening brief. *See* Aplt. Br. at 5-9.

to visit a national forest does not confer an injury); and *National Rifle Ass'n of Am. V. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) (a desire to engage in "possibly" prohibited activities did not confer standing). None of these three cases support the government's argument.

Neither the proposed conduct nor the challenged regulations in both *Baker* and *Summers* finds any similar comparisons to the instant case. And although, like DeWilde, the plaintiffs in *National Rifle Ass'n* desired to possess prohibited weapons, their lack of standing was also in part due to just a "mere 'possibility of criminal sanctions applying'" to them. *National Rifle Ass'n*, 132 F.3d at 293. Here, there is no dispute that the challenged statute is absolutely enforced. Furthermore, to any extent that *National Rifle Ass'n* is comparable to the instant case, this Court is not bound by Sixth Circuit precedence.

More importantly, these three cases do not predominate the eight cases DeWilde provided in his opening brief, where the circumstances surrounding the

standing of the individuals were *actually* comparable to DeWilde's.[4] *See* Aplt. Br. at 9-11. And unlike *National Rifle Ass'n*, which was decided more than a decade prior to *Heller*, *all* of DeWilde's supporting cases are post-*Heller* (to be sure, most are post-*Bruen*), and thus more relevant in the context of Second Amendment jurisprudence. Indeed, the Supreme Court did not question Mr. Heller's "wish[]" to possess a prohibited arm, a handgun; his Article III standing was undisputed. *Heller*, 554 U.S. at 575. There should be no doubt as to whether a *desire* to engage in conduct proscribed by a statute, but constitutionally-protected, confers an injury. But if doubt remains, this Court need not look further than *Bruen* to confirm that an injury exists.

Reaffirming the holding in *Heller* that a wish, desire, or want to engage in prohibited, constitutionally-protected conduct confers an injury, *Bruen* found that the two individual petitioners had demonstrated an injury-in-fact. Their demonstration was virtually identical to what DeWilde has demonstrated. Mr. Nash

---

[4] The government, analyzing *Rocky Mountain Gun Owners v. Polis*, No. 23-1251 (10th Cir. 2023), differentiates that unlike DeWilde, the "plaintiffs in that case appear to have submitted declarations purporting to substantiate an intent to violate the law." Aple. Br. at 10 n.2. But this observation is irrelevant, because "[DeWilde] need not violate the law to challenge it." *Frank v. Lee*, No. 21-8058 (10th Cir. Oct. 23, 2023). Both DeWilde and the *Rocky Mountain Gun Owners* plaintiffs have the same ultimate intention: "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," e.g., to possess prohibited arms. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

"simply *wanted* to carry a handgun for self-defense." *Bruen*, slip op. at 6 (emphasis added). Mr. Koch similarly just "*wanted* a handgun for general self-defense." *Id*. at 7 (emphasis added). The Article III standing of petitioners in *Bruen* was *undisputed*. Accordingly, even if DeWilde had merely submitted his complaint *without* having submitted a Form 1 application, his "desire[] to own an M16 machinegun for all lawful purposes" *independently* demonstrates an injury-in-fact, and sequentially Article III standing. ROA, Vol. 1, at 79.

## II.    Section 922(o) does Not Comport with the Second Amendment.

A.    *The Plain Text of the Second Amendment, as Informed by History, Protects the Possession of a Machinegun.*

### *Heller*'s Machinegun Dicta

The government's argument significantly relies on two remarks made in *Heller*. *See* 554 U.S. at 624 (characterizing as "startling" the notion that the NFA's restrictions on machineguns might be unconstitutional); *id*. at 627 (proposing hypothetical arguments in a hypothetical case challenging a ban on M-16s). The government argues that this dicta makes "clear that the Second Amendment does not extend to machineguns like M-16s," Aple. Br. at 14, and that DeWilde "offers no basis on which to ignore that limitation." *Id*. at 16. These arguments have no merit.

Prior to authoring *Heller*'s dicta that the government relies on, Justice Scalia opined that "[d]ict[a] settles nothing, even in the court that utters it." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 352 n.12 (2005). He then reemphasized this principle in *Heller*, writing that "[i]t is inconceivable that [the Supreme Court] would rest [it's] interpretation of the basic meaning of any guarantee of the Bill of Rights upon… dict[a] in a case where the point was not at issue and was not argued." 554 U.S. at 625, n.25. Such an interpretation is exactly what the government tries to make here. The government relies on dicta in *Heller* that bore no relation to the holding in *Heller*; indeed, if *Heller*'s dicta explicitly stated the opposite of what the government argues (e.g., that machineguns are protected arms), such dicta could only have *supported Heller*'s holding that the possession of handguns may not be prohibited. The Supreme Court did not even mention, *much less consider*, the statute challenged in the instant case. In addition to the Supreme Court rejecting such a dispositive interpretation of dicta, the machinegun dicta in *Heller* is not recent, and it has never been repeated nor endorsed by the Supreme Court.

*Heller* did not determine that M-16 rifles "may be banned." 554 U.S. at 627. The Court merely analogized a hypothetical challenge and argument (which is distinctly similar to the instant case), as it often does, to support the conclusion that "the fact that modern developments have limited the degree of fit between the

prefatory clause and the protected right cannot change our interpretation of the right." *Id*. at 627-628. Thus, when the government argues, Aple. Br. at 37 (quoting *id*.), that machineguns may be banned because "no amount of small arms could be useful against modern-day bombers and tanks,"[5] its argument is invalid, because such an ahistorical conjecture "cannot change our interpretation of the right." 554 U.S. at 628. The Court surely included this passage to maintain that arguments about the relevance of the prefatory clause *given* modern technological advancements have no historical basis in nullifying the text. Such invalid arguments are precisely what the government makes here.

"[T]he Supreme Court's dicta is almost as influential… as its holdings," *United States v. Nixon*, 919 F.3d 1265, 1273 (10th Cir. 2019). But "almost as influential" necessarily ascertains that *some dicta* fall short of holdings. To be sure, prior to *Bruen*, the government's reliance on *Heller*'s dicta was concerning to courts, because that "dict[a] inhibit[ed] lower courts from exploring the contours of *Heller*

---

[5] *Heller* qualified this argument, saying that "it *may* be true." 554 U.S. at 627 (emphasis added). Indeed, like *Heller*'s other enfeebled dicta the government relies on, the Court gave no consideration to whether or not "small arms could be useful against modern-day bombers and tanks." *Id*. Surely if such an inquiry was earnestly before this Court, *and* it was relevant or permissible, examples could be provided of occasions, between the time *Heller* was decided and the present, where America's enemies found that small arms *were*, in fact, useful against forces that employed modern bombers and tanks. But no such inquiry must be supported here; the Supreme Court has rejected the government's argument, and this Court should do the same.

and its application to firearm restrictions." *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, T., concurring). But *Heller*'s dicta is now enfeebled by *Bruen*'s clarification, which is that identification of protected conduct at the first prong of a Second Amendment challenge consists of a strictly "textual analysis." *Bruen*, slip op. at 10. As such, this Court may no longer "simply reference the applicable *Heller* dictum and move on." *McCane*, 573 F.3d at 1050 (Tymkovich, T., concurring). It must "apply" the "Second Amendment [test]" clarified by *Bruen*. *Id*.

The government argues that this Court should hold *Heller*'s machinegun dicta in the same regard as *Heller*'s list of "longstanding prohibitions." *See* Aple. Br. at 16 (identifying two cases where this Court upheld the federal felon-in-possession statute on the basis of *Heller*'s longstanding prohibitions, and arguing that "[t]he same approach is warranted with respect to the federal machinegun ban here.") But the government's argument contradicts itself. DeWilde provided several post-*Bruen* authorities that supports the argument that *Bruen* enfeebled *Heller*'s "longstanding prohibitions" dicta, which *Heller* identified only as "presumptively lawful." *See* Aplt. Br. at 20-21. Because DeWilde provided this support, the government on the next page argues that the "'presumptively lawful" language [referring to the longstanding prohibitions] does not qualify *Heller*'s discussion of the machinegun ban and has no bearing on DeWilde's facial challenge." Aple. Br. at 17 n.4.

8

Thus, the government argues that *Heller*'s machinegun dicta should be regarded as one of the identified longstanding prohibitions, but that it should not receive the status of "presumptively lawful" that those prohibitions received. The government cannot have it both ways, but this Court need not decide which of the government's arguments to accept; it should reject them both. Because the first prong of *Bruen* has been clarified to be a strictly textual analysis, it can no longer be simply posited that enfeebled *dicta* may classify an arm as not protected by the Second Amendment. The textual analysis *requires* that it be determined whether or not a weapon is an "arm."

This conclusion finds support in *Heller*. The Court did not profess its opinion as being the end of the matter. Contrarily, the Court acknowledged that it did "not provid[e] extensive historical justification for those regulations of the right that [the Court] described as permissible," e.g., the Court's list of longstanding prohibitions. That is because *Heller* "represents [the] Court's first in-depth examination of the Second Amendment." 554 U.S. at 635. The Court emphasized that "there will be time enough to expound upon the historical justifications for the exceptions [it has] mentioned." *Id*. This case represents just one of those occasions.

**Dangerous and Unusual**

The government posits that machineguns may be banned because they are dangerous and unusual weapons as mentioned in *Heller*'s dicta. This argument fails for similar reasons as the government's erroneous reliance on *Heller*'s machinegun dicta. The Court merely mentioned, once, a reference to the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627. Far from being necessary to the Court's holding, this dictum, taken in context, simply attempted to place a limit on its holding. The Court articulated that it did "not undertake an exhaustive historical analysis [in *Heller*] of the full scope of the Second Amendment," *id*. at 626, and *Bruen* repeated this approach. *See Bruen*, slip op. at 12 (quoting *Heller*, 554 U.S. at 627).

Further, to the extent that the government tries to draw a line between *Heller*'s dangerous and unusual dictum and machinegun dicta, such an interpretation would be enfeebled by *Bruen*. The government essentially posits that a "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" would support the modern ban on *possession* of machineguns. 554 U.S. at 627 (emphasis added); *see* Aple. Br. at 16-17 (explaining that the dangerous and unusual dicta "left no doubt" that M-16 rifles may be banned); *see also id*. at 30 ("There is no reason why *restrictions* on the manner of *carrying* firearms… cannot fairly support *prohibitions* on the *possession* of firearms." (emphasis added)). But *Bruen* clarified that a

10

historical tradition only supports a modern law if they both impose the same "*comparable* burden." *Bruen*, slip op. at 20 (emphasis added). A burden on the *carrying* of arms is not *comparable* to a burden on the *possession* of arms. *See infra* at 21 n.10 (explaining why burdens on *carrying* and *possessing* arms are not comparable).

Moreover, the government is incorrect to argue that *Heller*'s dangerous and unusual authorities, if they *were* acceptable historical analogues, would come in to play when performing the strictly textual analysis of the Second Amendment. *Heller itself* identified the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons. *See id*. at 627. *Heller* did not reference the dangerous and unusual authorities when conducting the textual analysis of the Second Amendment. The Court reiterated this approach in *Bruen*, and then *actually performed* analysis of the authorities at the *second prong*. *See Bruen*, slip op. at 37-38. *Bruen*, again, did not consider the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons at the textual analysis. The government's argument is especially capricious in the instant case when it applies the *tradition* of prohibiting the carrying of dangerous and unusual weapons at both prongs.

**Limiting Principle**

The government argues that *Heller*'s recognition that the Second Amendment protects "all instruments that constitute bearable arms" is not a "reasonable" limiting principle. *Heller*, 554 U.S. at 582; *see also* Aple. Br. at 38 (suggesting that "rocket-propelled grenade launchers, anti-tank weapons, guided missiles, or suitcase bombs" may be protected). But neither the government nor this Court is permitted to decide if Second Amendment rights are reasonable, because *Heller* squarely rejected any type of "freestanding 'interest-balancing' approach" in the context of the Second Amendment, 554 U.S. at 634:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Id*. at 634-635.

*Bruen*, affirming *Heller*, made clear that the Second Amendment "'is the very *product* of an interest balancing by the people,' and it 'surely elevates above all other

interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, slip op. at 17 (quoting 554 U.S. at 635).

Furthermore, while the government correctly identifies *bearable* arms that may be protected at *Bruen*'s first prong, it provides no justification for such a limitation being unreasonable. The argument also is not attuned with reality, because there is no prohibition of the possession of any of the *bearable* arms it identifies, and the government provides no evidence of *a single crime* having been committed with the arms, much less of the arms presenting any general societal problem. To be sure, possession of those bearable arms is substantially controlled; all of them are classified and regulated as destructive devices under the NFA. *See* 26 U.S.C. § 5845(f). But the legal status of the destructive devices that the government suggests are protected under *Heller*'s limiting principle—specifically, the fact that there exists a lawful method to possess them—simply highlights the egregiousness of the machinegun ban.

**Common Use**

The government argues that *Heller* found that the "arms" identified in the Second Amendment's text *only* refers to arms "in common use." Aple. Br. at 18-19 (citing 554 U.S. at 624-25). But pointing to a *historical tradition* is not how a "textual analysis" works, and the Supreme Court made no such determination. While

*Heller* reaffirmed that arms in common use are protected, the common use test is just one method of protection; it is not a minimum threshold question. Accordingly, *Heller* held that handguns were protected arms because they were in common use, not that handguns *were "arms"* because they were in common use.

The government attempts to circumscribe this holding to say that the common use test *only* applies to arms possessed by the citizenry. *See* Aple. Br. at 36 ("There is no suggestion in *Heller*, *Bruen*, or any other opinion that the issuance of a firearm to members of the military in active service counts for this inquiry, which concerns the constitutional rights of private people as individuals"). But the government's argument ignores *Miller*'s historical conclusion derived "from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators." *Miller*, 307 U.S. at 179 (1939). The Court found that "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in *common use* at the time." *Id*. Thus, the *Miller* Court focused on whether the arm at issue, for purposes of bringing arms to *militia service*, was commonly used by the U.S. military. *Miller*, employing the common use test, did not even *consider* whether or not the weapon at issue was commonly used amongst the citizenry.

Importantly, the government's interpretation of the common use test lacks any limiting principle with respect to *what* future arms a legislature may ban. Under such

circular logic, Congress could simply ban the possession of *any new arms* because they are not commonly possessed by the citizenry. But *Heller* rejected such a notion when the Court affirmed that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding*." 554 U.S. at 582 (emphasis added). The Supreme Court thus recognized that technological advancements occur, and that new weapons resulting from those advancements are protected. *See also Bruen*, slip op. at 39 (even if an arm *were* dangerous and unusual, its common usage protects its possession).

Indeed, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning... it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). But in an incredible endorsement of this circular logic, the government emphatically argues that machineguns may be banned because they are not "in common use," Aple. Br. at 18, because "[w]ith the ban on new machineguns, th[e] number [of machineguns in common use] can only decrease over time," so they "are not typically possessed for lawful use [and in common use]" and can thus be banned. Aple. Br. at 33. The government's interpretation of the common use test is untenable, and this Court should reject it.

Finally, far from the textual analysis at the first prong, *Heller* found the common use test in *Miller* while considering the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons. *See* 554 U.S. at 627. The common use test in *Miller* was derived from the "*traditional* militia" bringing "arms 'in common use.'" *Id*. at 624 (emphasis added). Thus, the government is incorrect to argue that, at the first prong of *Bruen*, a showing must be made demonstrating the *historical tradition* of bringing arms in common use to militia service.

**Protected Arms**

This Court should have no difficulty concluding that machineguns are "arms" according to the plain text of the Second Amendment, and the right to keep machineguns is thus presumptively constitutional under the first prong of *Bruen*. This strictly textual analysis, informed by history, is "straightforward," and the *historical traditions* provided by the government may only be considered at the second prong of *Bruen*'s analysis. *Bruen*, slip op. at 17. "But if the historical evidence at this step is "inconclusive or suggests that the regulated activity is *not* categorically unprotected," the Supreme Court has directed this Court to "proceed to step two." *Id*. at 9 (citations omitted).

B.  *The Machinegun Ban is Not Consistent with This Nation's Historical Traditions of Regulating Arms.*

Searching for analogues to evince a historical tradition of totally banning this Nation's standard-issue service rifle at *Bruen*'s second prong, the government provides 194 authorities. *See generally* Aple. Br. at 20-32. But the government provides only eight authorities from the controlling time-period in this challenge, the Founding.[6] Importantly, none of those eight authorities demonstrates a historical tradition that the government avers exists. Crucially, neither the *how* nor *why* of the machinegun ban is "comparable" to those of the government's proffered authorities; "at least" both metrics must be "relevantly similar". *Bruen*, slip op. at 20.

**The *How***

The *how* of the machinegun ban is affected by imposing a *total ban* on the possession of an arm by *all* of the citizenry. Of the Founding time-period authorities the government provides, *zero* of them impose such a sweeping prohibition. The acts provided from the correct time-period *criminalized* the carrying of arms by a narrowly-tailored subset of the population; those who had committed the offense of an affray. They certainly did not disarm law-abiding citizens.

---

[6] *See infra* at 19-22.

**The *Why***

Comparing the *why* of those authorities demonstrates even *more* disparity.[7] The government does not adequately explain *why* the machinegun ban was enacted. Its argument is particularly skewed when it conflates the history and background of the NFA and congressional reports to support the machinegun ban.[8] None of this history advanced by the government supports the statute at issue in the instant case. The government provides not a *single* indication of why Congress, nearly a half-century after passing the NFA, codified the machinegun ban. There were no hearings, no floor debate, and there was no recorded vote. Looking at the text of the short statute, the government posits that because it "exempts machineguns possessed or transferred by… the United States military," the ban's text is simply Congress recognizing that machineguns are only used by the military. Aple. Br. at 38. A better reading of this text is surely that Congress preferred not to *disarm* the United States

---

[7] Notably, the government does not identify the "why" for each of its proffered historical authorities. Instead, in its only explicit explanation of the "why," the government sweeps its historical authorities together as one, saying that the weapons in *all 194 of its historical authorities* "have been determined not to be typically possessed by law-abiding citizens for lawful use." Aple. Br. at 31. But the government does not provide a single reference in support of this claim, much less 194 references, such as legislative discussions, reports, hearings, judicial opinions or actions, or even statutory text. To be sure, those references certainly exist. However, they simply are not "relevantly similar" to the "why" of the machinegun ban, and are blatantly absent from the government's brief. *Bruen*, slip op. at 20.

[8] *See generally* Aple. Br. at 31-32, 37.

military. But even if such an assumption was made about this exemption, it is not comparable to the *why* of the historical authorities provided by the government.

## Pre-Founding

The government identifies the 1328 Statute of Northampton as supporting the prohibition of "riding or going armed, with dangerous or unusual weapons." Aple. Br. at 20 (citations omitted). But *Bruen* cautioned against giving this statute much consideration, saying that "the Statute of Northampton… has little bearing on the Second Amendment adopted in 1791." *Bruen*, slip op. at 32.

## Founding

The government provides two acts criminalizing the common-law offense of affray from the controlling time-period in this challenge. While *Bruen* "doubt[ed] that [just] three colonial regulations could suffice to show a [historical] tradition," *Bruen*, slip op. at 37, the Court still evaluated them "on their own terms." *Id*. The Act of Nov. 27, 1786, ch. 21 (Virginia) and Act of Jan. 29, 1795, ch. 2 (Massachusetts) were both enacted near the time of the Second Amendment's adoption in 1791. In these statutes, the two commonwealths codified the common-law offense of affray.

Analyzing the *how* of the acts, they criminalized the *manner* in which dangerous arms were carried: *unusually* and to the terror of the people. They did not

prohibit the possession of any arm (much less any specific *type* of arm). They were also narrowly-tailored, applying only to those who committed an affray. [9] But in a far more sweeping manner, the machinegun ban *totally prohibits* the possession of arms, even by law-abiding citizens.

Furthermore, the *why* of these statutes also are not "relevantly similar." *Bruen*, slip op. at 20. As described *supra* at 18-19, the government has not identified *why* the machinegun ban was codified, but there is no basis in the assumption that it was to criminalize the *unusual* display of a firearm to *terrorize* the people. The how *and* why of the affray statutes thus are not "relevantly similar" to the machinegun ban. *Bruen*, slip op. at 20.

The government posits that these two acts are "similar" to "early American justice-of-the-peace manuals" which permitted "justices to confiscate the arms of a person who 'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.'" Aple. Br. at 21 (citations omitted).

---

[9] It should be observed that the government does not contend that the two affray acts would have resulted in the violators being disarmed or otherwise prohibited from possessing arms. This is especially troubling since disarmament is "*how*" the machinegun ban affects protected Second Amendment conduct. Indeed, the government provides *no* evidence of the acts even being enforced. The Supreme Court has rejected historical authorities as unacceptable analogues under similar circumstances. *See Bruen*, slip op. at 49-50 ("[R]espondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of… is surely too slender a reed on which to hang a historical tradition of restricti[ons].")

These authorities fail for the same reasons as the two affray acts. The *how* and the *why* of the manuals are not "relevantly similar" to the machinegun ban. *Bruen*, slip op. at 20.

The government argues that "even if some statutes only restricted the manner of *carrying* firearms, DeWilde does not explain why those statutes would not support a tradition of prohibitions on the *possession* of weapons." Aple. Br. at 30-31.[10] The government's argument is misplaced. To justify a presumptively unconstitutional statute, "*the government* must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, slip op. at 8. Thus, the government is not permitted to recast its burden onto DeWilde to show the *absence* of "a tradition of prohibitions on the possession of weapons." Aple. Br. at 30-31. The burden is on *the government* to demonstrate "a tradition of prohibitions." *Id*. If the government is unable to do so, as is the case here, that failure "is relevant

---

[10] The government argues that laws regulating the *carrying* of firearms should support a total ban on the *possession* of firearms. Such argument contradicts *Bruen*. That case challenged a total ban on the *carrying* of firearms. The affray statutes, offered as historical analogues in *Bruen*, criminalized the manner in which arms were *carried*. Upon consideration, the Supreme Court determined that the *how* of the affray statutes did not support a total ban on *carrying* firearms. *See generally Bruen*, slip op. at 36-38. Accordingly, the government's argument that the *how* of the affray statutes would support a total ban on firearm *possession*, conduct even more divergent than that at issue in *Bruen*, *carrying*, is erroneous.

evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, slip op. at 17.

Because the government has provided no acceptable historical analogues originating at the Founding, no later authorities provided by the government sustain any claimed tradition, because "to the extent later history contradicts what the text says, the text controls." *Bruen*, slip op. at 27. Since courts are "entitled to decide a case based on the historical record compiled by the parties," this Court may end its analysis here and find that the machinegun ban is unconstitutional. *Bruen*, slip op. at 17 n.6. Nevertheless, because the government's brief represents the first occasion in this case where a party has attempted to demonstrate a historical tradition of totally banning the possession of this Nation's standard-issue service rifle, DeWilde, for completeness, will consider the remaining authorities provided by the government.

**Post-Founding**

Of the post-founding authorities provided by the government, only *Heller*'s dangerous and unusual authorities follow from the founding-era affray authorities it proffered. *See* Aple. Br. at 22. Of course, the founding-era affray authorities are not acceptable historical analogues, and so *Heller*'s authorities likewise are not acceptable for the same reasons.

Looking to antebellum laws, the government identifies several statutes regulating bowie knives, blunt weapons, and other non-firearms. *See generally* Aple. Br. at 23-26, 28. All of these statutes are from the wrong time period. The government does not demonstrate that the regulations followed a tradition originating at the time of the Founding. Furthermore, the government is particularly wrong to point to statutes regulating *non-firearms*, when *Bruen* and the instant case both implicate *firearms*. *Bruen* could not have been clearer about the government's burden: it is to identify a comparable tradition of *firearm* regulation. *Bruen* affirmed this three times.[11] For either reason, these statutes do not support a historical tradition supporting the *total prohibition* of machinegun possession.

The government's statutes criminalizing trap guns also come from the wrong time period. *See* Aple. Br. at 27. And even if given credit, the *how* and *why* of the trap gun statutes were not "relevantly similar" to the machinegun ban. *Bruen*, slip op. at 20. Unlike the machinegun ban, the *how* of which is to *totally ban* the possession of an arm, the trap gun statutes simply criminalized the *manner* in which

---

[11] *See Bruen*, slip op. at 8 ("the government must demonstrate that the regulation is consistent with this Nation's historical tradition of *firearm regulation*") (emphasis added); *id*. at 15 ("[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of *firearm regulation*.") (emphasis added); *id*. at 25 ("the burden falls on respondents to show that [the regulation] is consistent with this Nation's historical tradition of *firearm regulation*.") (emphasis added).

guns may be used, specifically by setting or otherwise configuring a weapon in the form of a trap. As to the *why*, the government does not identify *why* either the machinegun ban or the trap gun statutes were codified. For these reasons, the trap gun statutes are impermissible as historical analogues to the machinegun ban.

## Late-19[th] and Early-20[th] Centuries

At the least-relevant time-period in the historical analysis, the government points to state-level machinegun bans. But "20th-century evidence… does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, slip op. at 58. As such*, Bruen* rejected analysis of those authorities. This Court should do the same.

## No Historical Tradition

The government suggests that "machineguns became a 'general societal problem' after World War I." Aple. Br. at 28 (citing *Bruen*, slip op. at 17). This is a misreading of *Bruen*. The Court did not suggest that protected Second Amendment *conduct* (e.g., possession of arms) may be construed as a *problem*. Rather, the Court acknowledged that the *abuse* of a right may present a problem. Indeed, the government provides no evidence in its brief that an *object, protected arms*, presented a general societal problem. Rather, the government argues that machineguns are "'*used*… by criminals or gangsters,'" "'*used* by racketeers and

drug traffickers,'" and "'likely to be *used* for criminal purposes.'" Aple. Br. at 31-32 (citations omitted) (emphasis added). Thus, it is the *abuse* and *misuse* of protected arms that may be perceived (and should be evidenced) as a general societal problem. One could assume (although it finds no support in the "record compiled by the parties," *Bruen*, slip op. at 17 n.6, and this Court accordingly should not make such an assumption) that the machinegun ban was enacted as a method of mitigating violent crime. But such an unfounded assumption has certainly persisted as a "general societal problem" since well beyond "the 18th century." *Id*. at 17. Nevertheless, *nowhere* in the government's brief does it sufficiently identify the "general societal problem" that the machinegun ban was codified to mitigate.

The government observes, Aple. Br. at 35, the Ninth Circuit's analysis in *Teter v. Lopez*, No. 20-15948 (9th Cir. Aug. 7, 2023), which considered "whether the weapons at issue in that case were 'not typically possessed by law-abiding citizens for self-defense.'" (quoting *Teter*, slip op. at 22). But this observation does not help the government's case. In *Teter*, the Ninth Circuit concluded that *the government* "has submitted no evidence that [the weapon at issue is] not typically possessed by law-abiding citizens for self-defense." *Teter*, slip op. at 22. This is because such a showing must be made by *the government*. Here, the government also has provided no evidence that machineguns are not typically possessed by law-abiding citizens for self-defense. Contrarily, DeWilde has demonstrated that 175,977 machineguns

25

*are* possessed by law-abiding citizens, one of which he possesses. *See* ROA at 167 (identifying at least 175,977 machineguns lawfully possessed by the citizenry); *see also* ROA at 280 (evidence of DeWilde's lawful possession of a machinegun). This Court should likewise find that the government "has submitted no evidence that [machineguns] are not typically possessed by law-abiding citizens for self-defense." *Teter*, slip op. at 22.

To the extent that *Teter*'s analysis may invoke the common use test, such an argument would also contravene the government's case. *Teter* did not invoke any kind of inquiry as to the number of weapons possessed by law-abiding citizens. *Teter* simply acknowledged that "[m]ost notably… [the weapons at issue] may be used for self-defense." *Id*. It is difficult to imagine the same isn't true for M-16s, since they are the standard-issue service rifle for the U.S. military. Nonetheless, "[the government] has submitted no evidence" to the contrary. *Id*.

The government argues that when a restriction conflicts with the prefatory clause, it may be valid "even though it does not yield parity between the people and the government," Aple. Br. at 37, and that "[a]s historically understood, the general militia and standing armies were not the same." *Id*. at 36. The government argues that DeWilde's explanation of the purpose of the prefatory clause and its relationship to the operative clause to support the protection of the standard-issue service weapon for the U.S. military, Aplt. Br. at 15-16, "lacks merit." Aple. Br. at 36-37. But it is

26

certainly *the government's* arguments that are without merit, because it provides no historical reference, source, or evidence to support its quarrel with the historical authority of DeWilde's argument nor *Heller*'s analysis of the same.

While the government provides no *historical* support for these *historical* understandings, *actual* history supports the opposite of the government's argument. James Madison wrote to ease the concerns of the people concerning the creation of a standing army. He hypothetically compared the proposed army's "twenty-five or thirty thousand men" to the militia "amounting to near half a million of citizens with arms in their hands." The Federalist No. 46 (James Madison). Revealing his beliefs, he asserted "[i]t may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops." *Id*. Madison *never* indicated, nor did any other founder or commentator, that the militia would possess arms not at parity with those of the standing army. The militia was *always* envisioned to be equally as capable as a standing army. Thus, to the *only* plausible extent that "the general militia and standing armies were not the same," it was that the militia was the superior force of the two. Aple. Br. at 36. With this understanding, and as a representative of the people of the Founding generation, Madison drafted the Second Amendment. *Miller*, *Heller*, and *Bruen* are entirely consistent with this history.

"The Constitution leaves the [government] a variety of tools for combating [gun violence]." *Heller*, 554 U.S. at 636. When Congress first contemplated

regulating machineguns, the Attorney General was questioned as to whether or not the government possessed such powers. Attorney General Cummings advised Congress that "if we made a statute absolutely forbidding any human being to have a machine gun, you might say that there is some constitutional question involved. But when you say '[w]e will tax the machine gun...' you are easily within the law".[12] Indeed, the NFA has stood for almost a century as a permissible regulation of protected arms, and DeWilde simply desires to comply with its stringent requirements. But in the spirit of former Attorney General Cumming's acknowledgement, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. The Supreme Court has determined that "[t]hese include the absolute prohibition of [arms]." *Id*.

---

[12] National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 8 (1934).

## <u>CONCLUSION</u>

For the reasons stated above and in DeWilde's opening brief, the Court should vacate and reverse the order and judgment of the district court.

DATED this 12th day of November, 2023.    Respectfully Submitted,

<u>/s/ Jake S. DeWilde</u>

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

**Certificate of Compliance with Type-Volume Limit**

**Typeface Requirements and Type Style Requirements**

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6497 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point typeface.

DATED this 12th day of November, 2023.    Respectfully Submitted,

*/s/ Jake S. DeWilde*

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

(307) 587-4524

**Certificate of Service**

I, Jake DeWilde, hereby certify that I filed the foregoing document via the Court's electronic-filing system; all parties in this case have consented to electronic service; and the electronic filing of the foregoing document constitutes proof of service to all parties in this case.

DATED this 12th day of November, 2023.    Respectfully Submitted,

*/s/ Jake S. DeWilde*

Jake S. DeWilde

PO Box 267

Wapiti, WY 82450

jake.dewilde@gmail.com

(307) 587-4524